**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, RAILROAD COMMISSION OF TEXAS, TEXAS DEPARTMENT OF AGRICULTURE, TEXAS GENERAL LAND OFFICE, and TEXAS DEPARTMENT OF TRANSPORTATION, | § § § § § § § § § § | |
| *Plaintiffs*, | § § | Civil Action No. 3:23-cv-17 |
| v. | § § § | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in his official capacity as ADMINISTRATOR OF U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as CHIEF OF ENGINEERS AND COMMANDING GENERAL, U.S. ARMY CORPS OF ENGINEERS; and MICHAEL L. CONNOR, in his official capacity as ASSISTANT SECRETARY OF THE ARMY (CIVIL WORKS) | § § § § § § § § § § § § § § § § | |
| *Defendants*. | | |

## COMPLAINT AND PETITION FOR REVIEW

To address the unlawful adoption of a final rule expanding federal jurisdiction over environmental regulation, land use planning, and development of agriculture and energy resources, the State of Texas along with its agencies the Texas Commission on Environmental Quality, the Railroad Commission of Texas, the Texas Department of Agriculture, the Texas

General Land Office, and the Texas Department of Transportation (collectively, "Plaintiffs"), file this Complaint against the United States Environmental Protection Agency, its Administrator Michael S. Regan, in his official capacity, the United States Army Corps of Engineers, its Chief of Engineers and Commanding General Lieutenant General Scott A. Spellmon, in his official capacity and Assistant Secretary of the Army for Civil Works, Michael L. Connor, in his official capacity (collectively, "Defendants" or "Federal Agencies"). Plaintiffs allege on knowledge as to Plaintiffs, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.    This lawsuit challenges the legality of the final administrative rule entitled "Revised Definition of 'Waters of the United States'" (the "Final Rule"), promulgated by the Defendants United States Environmental Protection Agency; and the United States Army Corps of Engineers ("Federal Agencies"). The Final Rule was signed by Defendants Administrator Regan on December 29, 2022 and Assistant Secretary Connor on December 28, 2022, and was published in the Federal Register at 88 Fed. Reg. 3004, on January 18, 2023. A true and correct copy of the Final Rule is attached hereto as Exhibit 1. Prior to adopting the Final Rule, the Federal Agencies published a Proposed Rule. *See* Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021), attached hereto as Exhibit 2.

2.    The Clean Water Act ("CWA") requires federal permits to discharge pollutants into, 33 U.S.C. § 1342, or to dredge or fill, *Id.* § 1344, "navigable waters." "Navigable waters," in turn, is defined to mean "the waters of the United States, including the territorial seas." *Id.*

§ 1362(7).  Waters that do not fit into this definition are not within federal jurisdiction and may still be regulated by states and tribes.

3.     By this challenge, the Plaintiffs assert that by amending the definition of "waters of the United States," as provided in the Final Rule, the Federal Agencies unconstitutionally and impermissibly expand their own authority beyond Congress's delegation in the CWA—intruding into state sovereignty and the liberties of the states and their citizens.  The Final Rule also lacks clarity, leaving those wishing to identify the ambit of federal power over dry land or minor water features at the mercy of an expensive, vague, and arbitrary analysis, lest they face a staggering criminal or civil penalty.

## **THE PARTIES**

**A.  Plaintiffs.**

4.     Plaintiff the State of Texas, by and through its Attorney General, brings this suit to assert the rights of the state and on behalf of its citizens. *See* Tex. Const. art. IV, § 22; Tex. Gov't Code, Ch. 402; *see also* Tex. H.B. 1, Art. IX, § 16.01, 82nd Tex. Leg., R.S. (2011).

5.     Plaintiff the Texas Commission on Environmental Quality ("TCEQ") is charged with administering the state's water quality program including issuance of permits, enforcement of water quality rules, standards, orders, permits, and water quality planning. Tex. Water Code §§ 5.013, 5.051, 26.012. TCEQ is a coregulating agency to the United States Environmental Protection Agency and has been delegated the authority to administer the National Pollutant Discharge Elimination System program in Texas for decades. Tex. Water Code § 26.0136(a). TCEQ submitted comments on the Proposed Rule, attached hereto as Exhibit 3.

6.     Plaintiff the Railroad Commission of Texas ("RRC") is responsible for the control and disposition of waste and the abatement and prevention of pollution of surface and subsurface water resulting from activities associated with the exploration, development, and production of oil or gas or geothermal resources and charged with administering the drilling or operating oil or gas wells in Texas for the prevention of waste and protection of correlative rights. Tex. Nat. Res. Code §§ 81.051, 85.045-85.046, 86.011-86.012. RRC is a coregulating agency to the United States Environmental Protection Agency. In doing so, it protects the environment from discharges associated with oil, gas, geothermal, and surface mining activities.  Tex. Water Code § 26.131, Tex. Nat. Res. Code § 91.101. RRC submitted comments on the Proposed Rule, attached hereto as Exhibit 4.

7.     Plaintiff the Texas Department of Agriculture ("TDA") is charged with the proper development and promotion of agriculture, horticulture, and other industries that grow, process, or produce products in Texas and to maintain economic development in the rural areas of Texas. Tex. Agric. Code §§ 12.002, 12.027, 12.038. TDA submitted comments on the Proposed Rule, attached hereto as Exhibit 5.

8.     Plaintiff the Texas General Land Office ("GLO") is a constitutionally created agency empowered to supervise and manage state-owned lands dedicated to the Permanent School Fund. Tex. Const. art. VII, § 1; Tex. Nat. Res. Code §§ 31.051, 51.011, or 51.012. GLO manages millions of acres of state-owned lands and mineral interests to generate revenue for the Permanent School Fund—a constitutionally created fund that collects and distributes hundreds of millions of dollars annually to Texas public schools. Tex. Const. art. VII, §§ 2, 5, Tex. Nat. Res. Code § 11.041.

9.      Plaintiff the Texas Department of Transportation ("TXDOT") is charged with developing the policies for the location, construction, and maintenance of a comprehensive system of state highways and public roads in Texas. Tex. Transp. Code § 201.103. TXDOT partners with the federal government to develop the state highway system, Tex. Transp. Code § 222.031, and submits road projects for environmental reviews.   TXDOT submitted comments on the Proposed Rule, attached hereto as Exhibit 6.

**B.  Defendants.**

10.      Defendant United States Environmental Protection Agency ("EPA") is a federal agency within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551(1).  Under the CWA, EPA administers pollution control programs over navigable waters.

11.      Defendant Michael S. Regan is the Administrator of the EPA, acting in his official capacity. Administrator Regan signed the Final Rule on December 29, 2022.

12.      Defendant United States Army Corps of Engineers ("USACE") is a federal agency within the meaning of the APA. *See* 5 U.S.C. § 551(1).  Under the CWA, USACE administers regulation of discharge of dredged or fill material in navigable waters.

13.      Defendant Lieutenant General Scott A. Spellmon is the Chief of Engineers and Commanding General for the USACE, acting in his official capacity.

14.      Defendant Michael L. Connor is the Assistant Secretary of the Army for Civil Works, acting in his official capacity. Assistant Secretary Connor signed the Final Rule on December 28, 2022.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question), 2202 (further necessary relief), and 5 U.S.C. §§ 701–706 ("APA"). There is a present and actual controversy between the parties, and Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13), and 704. The Court may issue further necessary relief pursuant to 28 U.S.C. § 2202, 5 U.S.C. §§ 706(1), 706(2)(A) and (C), as well as pursuant to its general equitable powers.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C), because: (1) Defendants are either (a) agencies or instrumentalities of the United States, or (b) officers or employees of the United States, acting in their official capacities; (2) Plaintiff State of Texas and its agencies are residents of the Southern District of Texas; and (3) no real property is involved in this action.

## BACKGROUND

**A.     The CWA recognizes the States' authority over land and water within its borders.**

17.     Congress was clear in enacting the CWA that primary authority over land and waters belongs with the states.

> It is the policy of the Congress to recognize, preserve, and protect the **primary responsibilities and rights of States** to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

> 33 U.S.C. § 1251(b) (emphasis added).

18.     The CWA gives the Federal Agencies limited authority to regulate discharges and dredging only in "navigable waters," *see, e.g.*, 33 U.S.C. § 1251(a), 1342(a), 1344(a), defined

by Congress as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The meaning of "the waters of the United States, including the territorial seas," then, establishes the scope of waters (or land) where Federal Agencies administer discharge, and dredge and fill programs, and issue state certifications thereunder.

19. These federal permits are no small matter. Obtaining a discharge permit is a time-consuming, expensive, and uncertain endeavor. *See* 33 U.S.C. §§ 1342, 1344; *see also U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 594–95 (2016) (referencing studies finding that the average applicant spends 788 days and $271,596 for specialized "individual" permits and 313 days and $28,915 for the more readily available "general" permits). But discharging into a "water of the United States" without a permit can subject any person to civil penalties of up to $32,500 per violation, per day, as well as criminal penalties. *See Hanousek v. United States*, 528 U.S. 1102, 1103 (2000); *see also* 33 U.S.C. §§ 1311, 1319, 1365; 40 C.F.R. § 19.4. Accordingly, the determination of whether a federal permit is required affects transportation, infrastructure, real estate, agriculture, and energy development, including development undertaken by Texas's agencies on state-owned or state-managed lands.

**B.    The meaning of "waters of the United States" has been examined, and reexamined, by the Supreme Court.**

20. More than 100 years before the CWA, the Supreme Court defined the phrase "navigable waters of the United States" as "navigable in fact" interstate waters. *The Daniel Ball*, 10 Wall. 557, 563 (1871).

21. In 1974, USACE issued a rule defining "navigable waters" as those waters that have been, are, or may be used for interstate or foreign commerce. 33 C.F.R. § 209.120(d)(1)(1974).

22.      In 1986, USACE issued another rulemaking, expanding its jurisdiction to include traditional navigable waters, tributaries of those waters, wetlands adjacent to those waters and tributaries, and waters used as habitat by migratory birds that either are protected by treaty or cross state lines. *See* Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41,206 (Nov. 13, 1986).

23.      In *United States v. Riverside Bayview Homes, Inc.*, the Supreme Court first addressed the proper interpretation of "the waters of the United States." 474 U.S. 121 (1985). *Riverside Bayview* concerned a wetland that "was adjacent to a body of navigable water," because "the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent's property to . . . a navigable waterway." *Id.* at 131. The Supreme Court upheld the USACE's interpretation of "the waters of the United States" to include wetlands that "actually abut[ted]" traditional navigable waters, finding that "the Corps must necessarily choose some point at which water ends and land begins." *Id.* at 132.

24.      Fifteen years later, in *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers ("SWANCC")*, the Supreme Court rejected USACE's assertion of jurisdiction over any waters "[w]hich are or would be used as habitat" by migratory birds. 531 U.S. 159, 164 (2001) (quoting 51 Fed. Reg. 41,217 (1986)). The Court held that the CWA cannot be read to confer jurisdiction over physically isolated, wholly intrastate waters or to ponds that are not adjacent to open water. *Id.* at 168. The Court reiterated its conclusion in *Riverside Bayview* that federal jurisdiction extends to wetlands that abut navigable waters, because protection of these adjacent, actually abutting wetlands was consistent with congressional intent to regulate

wetlands that are "inseparably bound up with 'waters of the United States.'" *Id.* at 172 (quoting *Riverside Bayview*, 474 U.S. at 134).

25.     In *Rapanos v. United States*, the Supreme Court again rejected USACE's assertion of expanded authority over non-navigable, intrastate waters that are not significantly connected to navigable, interstate waters. 547 U.S. 715 (2006). Writing for the plurality, Justice Scalia emphasized that the traditional concept of "navigable waters" must inform and limit the construction of the phrase "the waters of the United States." The plurality found that in going beyond this "commonsense understanding" and classifying waters like "ephemeral streams," "wet meadows," "man-made drainage ditches" and "dry arroyos in the middle of the desert" as "waters of the United States," USACE stretched the statutory text "beyond parody." *Id.* at 734. The plurality also rejected the view that wetlands adjacent to ditches, when those ditches do not meet the definition of "waters of the United States," may nevertheless be subjected to federal regulation on the theory that they are "adjacent to" the remote "navigable waters" into which the ditches ultimately drain. *Id.* at 739–40.

26.     Justice Kennedy concurred in the *Rapanos* judgment but noted that both the plurality and the dissent would expand CWA jurisdiction beyond permissible limits. He wrote that the plurality's coverage of "remote" wetlands with a surface connection to small streams would "permit application of the statute as far from traditional federal authority as are the waters it deems beyond the statute's reach" (i.e., wetlands near to, but lacking a continuous surface connection with, navigable-in-fact waters). *Id.* at 776–77 (Kennedy, J., concurring in the judgment). This, he said, was "inconsistent with the Act's text, structure, and purpose." *Id.* at 776 (Kennedy, J., concurring in the judgment). Justice Kennedy instead employed a

"significant nexus" analysis to deeming waters that may be deemed a "navigable water." Justice Kennedy concluded that wetlands possess the requisite nexus, if they, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780 (Kennedy, J., concurring in the judgment). But if the wetlands' "effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.* at 780 (Kennedy, J., concurring in the judgment). *Id.*

27.     In 2022, on the first day of its current term, the Supreme Court heard oral argument in *Sackett v. Envtl. Prot. Agency*, which asks the Court to directly address the proper test for determining "waters of the United States." No. 21-454 (argued Oct. 3, 2022).[1] Inexplicably, the Federal Agencies have chosen to hammer through the Final Rule rather than await instruction pending from the Supreme Court.

## C.     The modern attempts (and failures) of the Agencies to define "waters of the United States."

28.     From 1986 to 2015, the regulatory definition of "the waters of the United States" remained unchanged. *See* 33 C.F.R. 328 (1986). Markedly, during that time, the only

---

[1] The Sackett's case underscores the hazards created by a definition of "waters of the United States" that gives the Federal Agencies discretion to determine their own jurisdiction. The Sacketts purchased a residential lot separated by a road from Idaho's Priest Lake where they planned to build their home. After they began placing sand and gravel fill on the lot, they received an administrative compliance order stating that the property contained protected wetlands subject to the CWA and ordering the Sacketts to remove the fill and restore the property to its natural state. *Sackett v. U.S. Envtl. Prot. Agency*, 8 F.4th 1075, 1079 (9th Cir. 2021), *cert. granted in part sub nom. Sackett v. Envtl. Prot. Agency*, 211 L. Ed. 2d 604, 142 S. Ct. 896 (2022).

development of the definition was in the judicial branch,[2] consistently narrowing scope of the term from the Federal Agencies' overly broad applications.

29.     In 2015, the Federal Agencies proposed a new definition of "waters of the United States" ("2015 Rule") 80 Fed. Reg. 37,054 (June 29, 2015).  The 2015 Rule proposed distance-based criteria and categorically included interstate waters as jurisdictional, regardless of navigability and "tributaries" of traditional or interstate waters even if its connection is broken. This Court preliminarily enjoined and, on summary judgment, remanded the 2015 Rule to the Federal Agencies.  *See Texas v. United States Envtl. Prot. Agency*, No. 3:15-CV-00162, 2018 WL 4518230, at \*1 (S.D. Tex. Sept. 12, 2018) (preliminary injunction); *Texas v. United States Envtl. Prot. Agency*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (summary judgment). The 2015 Rule was vacated because it extended the Federal Agencies' jurisdiction beyond the scope of the CWA and because it read the term navigability out of the CWA. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1358 (S.D. Ga. 2019).  The Federal Agencies ultimately withdrew the 2015 Rule.

30.     In 2020, the Federal Agencies adopted the Navigable Waters Protection Rule ("2020 Rule") 85 Fed. Reg. 22,250 (Apr. 21, 2020).  The 2020 Rule narrowed the scope of federal jurisdiction and expressly excluded features like "ephemeral streams" and "ditches" and provided regulatory certainty.  Although the 2020 Rule was preliminarily enjoined, the injunction was reversed in *Colorado v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 890 (10th Cir. 2021).  The 2020 Rule was vacated and remanded. *Pascua Yaqui Tribe v. United States Envtl. Prot.*

---

[2] During this time, the Federal Agencies issued several guidance documents not codified in rule.

*Agency*, 557 F. Supp. 3d 949, 956 (D. Ariz. 2021), *appeal dismissed sub nom. Pasqua Yaqui Tribe v.*

*U.S. Envtl. Prot. Agency*, No. 21-16791, 2022 WL 1259088 (9th Cir. Feb. 3, 2022).

**D.    The Final Rule exceeds the scope of jurisdiction contemplated in the CWA.**

31.    The Final Rule, 88 Fed. Reg. 3143-44 defines "waters of the United States" to

include five categories, each of which contain sub-categories and additional defined terms:

A.    Traditional navigable waters, territorial seas, and interstate waters, including interstate wetlands; ("Traditional Waters");

B.    Impoundments of any other "waters of the United States," whether or not the impoundment demonstrates connection to a jurisdictional water feature by either the Relatively Permanent Standard, or Significant Nexus Standard ("Jurisdictional Impoundments");

C.    Tributaries to Traditional Waters or Jurisdictional Impoundments that demonstrate connection to the Traditional Water or Jurisdictional Impoundment by either the Relatively Permanent Standard, or Significant Nexus Standard ("Jurisdictional Tributaries");

D.    Wetlands adjacent to Traditional Waters (whether or not connected by either the Relatively Permanent Standard, or Significant Nexus Standard); or wetlands adjacent to Jurisdictional Tributaries or Jurisdictional Impoundments that demonstrate connection to the Jurisdictional Tributaries or Jurisdictional Impoundment by either the Relatively Permanent Standard, or Significant Nexus Standard; ("Jurisdictional Adjacent Wetlands"); and

E.    Intrastate lakes and ponds, streams, or wetlands not already identified in the other four categories but satisfy the relatively permanent standard with Traditional Waters and Jurisdictional Tributaries, or satisfy the Significant Nexus Standard with Traditional Waters ("Other Jurisdictional Intrastate Waters").

### i.  *Traditional Waters.*

32.    Traditional Waters, sometimes referred to as "(a)(1) waters" include waters that

are "currently used, or were used in the past, or may be susceptible to use in interstate or

foreign commerce, including all waters which are subject to the ebb and flow of the tide," "the territorial seas," and "interstate waters, including interstate wetlands." 88 Fed. Reg. at 3143.

33.     The Federal Agencies identify "interstate waters" as "all rivers, lakes, and other waters that flow across, or form a part of, State boundaries," which remarkably includes all types of waters "regardless of their navigability," and does not consider whether the interstate water supports commerce.  88 Fed. Reg. at 3027.  According to the Federal Agencies, "[i]f a waterbody is determined to be a [Traditional Water], then it is jurisdictional with no need for further evaluation." 88 Fed. Reg. at 3067. Therefore, the Federal Agencies do not have to perform any jurisdictional evaluation on "interstate waters" prior to exerting federal authority, including those that are not navigable. The Federal Agencies include "interstate wetlands" in this category—regardless of whether the wetland is adjacent to any other jurisdictional water— simply for the fact that the wetland crosses state lines.  88 Fed. Reg. at 3072.

34.     By classifying all "interstate waters"—regardless of navigability—as "waters of the United States," the Federal Agencies read out the cornerstone of the CWA's jurisdiction: "**navigable** waters." 33 U.S.C. § 1251(a), 1342(a), 1344(a).  Moreover, the Final Rule allows for cascading expansion of federal authority from these non-navigable "interstate waters" by lumping even a minor water feature[3] (like a ditch, ephemeral stream, pond, or isolated wetland) that crosses state lines in with Traditional Waters, expanding the Federal Agencies' authority to all wetlands, tributaries, impoundments, or other waters connected to these minor water features.

---

[3] Additionally, the Final Rule's exclusions for ditches do not apply to these non-navigable "interstate waters" "even if the water would otherwise meet the criteria for an exclusion." 88 Fed. Reg. at 3067.

### ii. *Jurisdictional Impoundments.*

35.     Although the Final Rule purports to include "impoundments,"[4] it does not actually define the term. Jurisdictional Impoundments, referred to as "(a)(2) impoundments," include all impoundments of Traditional Waters (including interstate water), Jurisdictional Tributaries, or Jurisdictional Wetlands.

36.     In an example of the Final Rule allowing the Federal Agencies to "have it both ways," an impoundment is jurisdictional "regardless of the water's jurisdictional status at the time the impoundment was created." 88 Fed. Reg. at 3078. If the water body impounded was not a "water of the United States" at the time it was impounded but has since become a "water of the United States" (as a result of its impoundment) the impoundment is now jurisdictional, even many years later. 88 Fed. Reg. at 3078.  And in the case of an impoundment for which the water body impounded was jurisdictional at the time of impoundment but that water body is no longer jurisdictional, the impoundment remains jurisdictional, even if the contributing water body is not.  88 Fed. Reg. at 3078.  This catch-all approach requires landowners to both monitor hydrological developments related to tanks and ponds after their creation and also know the historical classifications of water features located on their properties.  Rather than add clarity, the Final Rule creates complication and confusion.

37.     And the Federal Agencies qualify impoundments as jurisdictional whether or not the impoundment is hydrologically connected to the Traditional Water, Jurisdictional

---

[4] The Federal Agencies provide that "impoundments are distinguishable from natural lakes and ponds because they are created by discrete structures (often human-built) like dams or levees that typically have the effect of raising the water surface elevation, creating or expanding the area of open water, or both." 88 Fed. Reg. at 3075.

Tributary, or Jurisdictional Wetland it impounded.  The Final Rule would include off-channel impoundments ("an impoundment with no outlet or hydrologic connection to the tributary network"), 88 Fed. Reg. at 3077-3078, and waters wholly separated by dams because "dams generally do not prevent all water flow, but rather allow seepage under the foundation of the dam and through the dam itself," 88 Fed. Reg. at 3076.  By including impoundments that under normal operation may, at most, allow seepage, the Federal Agencies show no regard for whether the impoundment bears a significant nexus or relatively permanent connection to jurisdictional water.

### iii.  Jurisdictional Tributaries.

38.     A Jurisdictional Tributary, or "(a)(3) waters,"  includes "rivers, streams, lakes, ponds, and impoundments, regardless of their flow regime, that flow directly or indirectly through another water or waters to" Traditional Waters. 88 Fed. Reg. at 3080. When the Federal Agencies note that a tributary can flow "indirectly" to a Traditional Water, they acknowledge that "indirect" flow could be through "a number" of downstream waters including non-jurisdictional tributaries, ephemeral streams, impoundments, ditches, or waste treatment systems, "so long as part of a tributary system that **eventually** flows to" a Traditional Water.[5]  88 Fed. Reg. at 3080. (emphasis added).

---

[5] To guess at whether a stream is part of a tributary system, the Federal Agencies suggested the public engage in direct observation or try their hand at "various remote sensing resources" like stream gauge data, elevation maps, flood zone maps, and satellite imagery. 88 Fed. Reg. at 3084, fn. 99. This insistence of the use of computer software encourages the Federal Agencies to assign their own jurisdiction without ever viewing the supposed "water" in real world, present-day conditions.

39.     Manmade features like ditches[6] or canals may be tributaries—notwithstanding that those features are supposedly excluded from jurisdiction—"so long as they contribute flow to" a Traditional Water. 88 Fed. Reg. at 3080. Those tributaries are Jurisdictional Tributaries when they meet either the Relatively Permanent or Significant Nexus standard.  As is endemic in the Final Rule, this creates another cascading effect—causing impoundments of these ditches and canals, and wetlands adjacent to these ditches and canals—to become jurisdictional.

### iv.  Jurisdictional Wetlands.

40.     Jurisdictional Wetlands, or "(a)(4) waters," include any wetland "adjacent" to Traditional Waters (whether or not it meets the relatively permanent or significant nexus standard) and any wetland "adjacent" to a Jurisdictional Impoundment or Jurisdictional Tributary if it meets either the permanent or significant nexus standard. 88 Fed. Reg. at 3143.

41.     "Adjacent" for purposes of determining "adjacent wetlands" means "bordering, contiguous, or neighboring" and includes as adjacent per se "wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like." 88 Fed. Reg. at 3144.  The Final Rule does not define "neighboring" as a concept distinct from "contiguous" or "bordering." And the Federal Agencies take the position that the definition "does not require flow from the wetland to the

---

[6] The Federal Agencies purported to make a concession to the many commenters opposed to federal jurisdiction over ditches by excluding ditches, but the exclusion extends only to ditches "excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water." 88 Fed. Reg. at 3144.

jurisdictional water or from the jurisdictional water to the wetland," articulating no regard for whether the wetland has a significant nexus or relatively permanent connection to jurisdictional water. 88 Fed. Reg. at 3093.

42.     Confusingly, the Federal Agencies—ignoring the plain language definition—propose to consider a wetland "adjacent" if:

A.     There is an "unbroken surface or shallow subsurface connection to a jurisdictional water," "where the wetland directly abuts the jurisdictional water or by a non-jurisdictional physical feature that provides the direct connection between the wetland and a jurisdictional water such as a pipe, culvert, non-jurisdictional ditch, or flood gate, that has at least periodic flow." 88 Fed. Reg. at 3089. "Water does not need to be continuously present in the surface or shallow subsurface connection." 88 Fed. Reg. at 3093.

B.     It is "physically separated from a jurisdictional water by human-made dikes or barriers, or natural landforms (e.g., river berms, beach dunes)." 88 Fed. Reg. at 3089. In this circumstance, "no additional identification of a hydrologic connection between the wetland and the jurisdictional water is required. . ." 88 Fed. Reg. at 3094.

C.     The "proximity to a jurisdictional water is reasonably close such that 'adjacent wetlands have significant effects on water quality and the aquatic ecosystem.'" 88 Fed. Reg. at 3089. "[C]lose proximity between an adjacent wetland and a jurisdictional water means the wetland can modulate water quantity or water quality in the jurisdictional water, and the jurisdictional water can modulate water quantity or quality in the wetland." 88 Fed. Reg. at 3089. Of course, rather than define those terms, the Federal Agencies offer that "modulating" of water quantity or quality "depends on regional variations in climate, landscape, and geomorphology." 88 Fed. Reg. at 3089.

43.     Contrary to the plain meaning of the terms "neighboring," "contiguous," or "bordering," the "surface or shallow subsurface connection" test allows for a non-jurisdictional physical feature between a jurisdictional water and a wetland as the conduit to extend the Final Rule's jurisdiction. 88 Fed. Reg. at 3093. Moreover, this non-jurisdictional

physical feature does not need to be flowing with water between the wetland and jurisdictional water. 88 Fed. Reg. at 3093.

44.     Similarly, the "physically separated" test identifies specific features that act as *barriers* between a wetland and a jurisdictional water, and yet the wetland is still be considered "adjacent" without any hydrologic connection. 88 Fed. Reg. at 3094. Even more confusing, according to the Federal Agencies a wetland that is itself divided by artificial structures is considered to be "one wetland."  88 Fed. Reg. at 3094. The Federal Agencies reserve their option to make arbitrary jurisdictional determinations without seeing, documenting, or measuring the assumed relationship between a divided wetland physically separated from any jurisdictional water to which it is "adjacent."

45.     In a sweeping generalization, the Federal Agencies deem wetlands "adjacent" if they are "reasonably close" enough to "modulate" the quantity or quality of jurisdictional waters. 88 Fed. Reg. at 3094. Pairing the Federal Agencies' "adjacency" analysis with the overly broad and vague language in the Relatively Permanent Standard or Significant Nexus Standard gives the Federal Agencies almost unfettered discretion in determining the if "adjacent wetlands" are "waters of the United States." 88 Fed. Reg. at 3095-97.

### *v.  Other Jurisdictional Intrastate Waters.*

46.     The Final Rule also asserts jurisdiction over the troublingly broad catch-all unnamed category that can be described as "Other Jurisdictional Intrastate Waters" or "(a)(5) waters." This category includes "intrastate lakes and ponds, streams, or wetlands" not already identified in the other four categories, but that satisfy either the Relatively Permanent Standard or Significant Nexus Standard. 88 Fed. Reg. at 3143. By definition, these Other Jurisdictional

Intrastate Waters are not traditional navigable waters, interstate waters, and the territorial seas, nor are they impoundments, adjacent wetlands, or even tributaries to traditional navigable waters, interstate waters, and the territorial seas, impoundments, or wetlands.

47.     Instead, the Other Jurisdictional Intrastate Waters are any lakes, ponds, steams, or wetlands that do not fall into another broad category that meets either the Relatively Permanent Standard (to Traditional Waters or Jurisdictional Tributaries) or Significant Nexus Standard (to Traditional Waters).  88 Fed. Reg. at 3097-98, 3101-03.  Due to the overly broad definitions and application of the other four categories to determine jurisdictional waters and standards, this category for Other Jurisdictional Intrastate Waters swallows up any potential remaining waters not already under the Federal Agencies' authority.

### vi.   The Relatively Permanent and Significant Nexus Standards.

48.     The Final Rule gives the Federal Agencies their pick of the "Relatively Permanent Standard" or the "Significant Nexus Standard" for purposes of asserting jurisdiction over tributaries, wetlands, and other intrastate waters.

49.     The "Relatively Permanent Standard" refers to the test to identify relatively permanent, standing or continuously flowing waters connected to Traditional Waters, and waters with a continuous surface connection to such relatively permanent waters. 88 Fed. Reg. 3006. The "Relatively Permanent Standard" includes flows that occur seasonally, but also encompasses "tributaries in which extended periods of standing or continuously flowing water are not linked to naturally recurring annual or seasonal cycles," as well as flows driven by water management practices and effluent-dependent streams. 88 Fed. Reg. 3085. Further complicating application of this standard, the Final Rule notes that a continuous surface

connection "does not require surface water to be continuously present between the wetland and the tributary." 88 Fed. Reg. at 3096. Thus, "relatively permanent" tributaries could include stream beds that remain dry for substantial portions of the year.

50.     The Significant Nexus Standard includes waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas. 88 Fed. Reg. at 3006.

51.     The Final Rule does not define "similarly situated" or "in the region." The Federal Agencies interpret tributaries and adjacent wetlands to be similarly situated and suggest that they "will identify the 'region' as the catchment that drains to and includes the tributary of interest." 88 Fed. Reg. at 3088.

52.     "Significantly affect" is defined as a material influence on the chemical, physical, or biological integrity of Traditional Waters. To determine if there is a material influence, there are five functions[7] that need to be assessed and five factors[8] that are considered.  88 Fed. Reg. 3144.

---

[7] (1) Contribution of flow; (2) Trapping, transformation, filtering, and transport of materials (including nutrients, sediment, and other pollutants); (3) Retention and attenuation of floodwaters and runoff; (4) Modulation of temperature in Traditional Waters; and (5) Provision of habitat and food resources for aquatic species located in Traditional Waters. 88 Fed. Reg. 3144.

[8] (1) Distance from a Traditional Water; (2) Hydrologic factors, such as frequency, duration, magnitude, timing, and rate of hydrologic connections, including shallow subsurface flow; (3) Size, density, or number of waters that have been determined to be similarly situated; (4) Landscape position and geomorphology; and (5) Climatological variables such as temperature, rainfall, and snowpack. 88 Fed. Reg. 3144.

53.     Although the terms "relatively permanent" and "significant nexus"[9] are both discussed in the *Rapanos* case, by giving themselves the choice of either standard, the Federal Agencies manage to run afoul of both the Scalia-plurality[10] and the Kennedy-concurrence.[11]

**F.     The Final Rule harms Texas and its agencies.**

54.     The Final Rule harms Plaintiffs by: (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding the states' authorities over their own waters; (3) increasing the states' burdens and diminishing the states' abilities to administer their own programs; and (4) undermining the states' sovereignty to regulate their internal affairs as guaranteed by the Constitution.

55.     The Final Rule intrudes upon Texas's sovereignty.  The Tenth Amendment provides States with traditional authority over their own lands and waters. *See, e.g.*, *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) (holding that "regulation of land use [is] a function traditionally performed by local governments"). The Final Rule would shift primary responsibility over traditional state lands and waters from the States to the federal government.

---

[9] Again giving themselves all options for asserting jurisdiction, the Federal Agencies misstate Justice Kennedy's definition of significant nexus which applied only to waters significantly affecting the "chemical, physical, **and** biological integrity of other covered waters more readily understood as 'navigable." *Rapanos*, 547 U.S. at 780, (Kennedy, J. concurring in the judgment) (emphasis added).  The Federal Agencies have changed the "and" to an "or," with no explanation.

[10] "…on its only plausible interpretation, the phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] ... oceans, rivers, [and] lakes."' *Rapanos*, 547 U.S. at 739 (citing Webster's Dictionary, Second Ed. 2882).

[11] "Absent a significant nexus, jurisdiction under the Act is lacking." *Rapanos,* 547 U.S. at 767 (Kennedy, J. concurring in the judgment).

56.     The Final Rule usurps the role of coregulating agencies, which the CWA recognizes as having primary responsibility over environmental management.   33 U.S.C. § 1251(b).   What's more, because the Final Rule is vaguely constructed, coregulating agencies—and regulated entities—are unable to determine where the federal government's intrusion onto state regulation ends for Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters.

57.     The Final Rule subjects the State, and agencies like the GLO and TXDOT to permitting obligations to obtain CWA section 402 and 404 permits to develop state land for the interests of the Permanent School Fund or to construct highways in Texas.   And to determine whether they must obtain section 402 and 404 permits, due to the uncertainty, inconsistency, and uncertainty of the Final Rule, the GLO and TXDOT must devote staff time and expert resources to deducing where the Federal Agencies may choose to allege jurisdiction over Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters.   With four USACE districts in Texas, state agencies and citizens will be forced seek USACE guidance regarding jurisdiction on a case-by-case basis.

58.     Development of the State's agricultural interests, the lifeblood of the rural Texas economy is regulated and statutorily guarded by TDA.   Likewise, RRC is tasked with supporting the development of the state's energy resources to prevent the waste of oil and gas resources.  These critical interests are harmed by the Final Rule.  The Final Rule increases both the costs of agricultural and energy projects by requiring federal permits where they were previously unnecessary, and uncertainty in agricultural and energy planning because it is

difficult, costly, and ultimately uncertain to determine what the Federal Agencies may choose to interpret as Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters.

## CLAIMS FOR RELIEF

59.     The Rule violates the Constitution, the CWA, and the APA for the following reasons, among others:

**A.     Claim One: The Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of the APA.**

60.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

61.     Under the APA, a final agency action may be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

62.     Even though the CWA only authorizes the Federal Agencies to regulate "navigable waters," defined as "waters of the United States." 33 U.S.C. §§ 1344, 1362(7), the Final Rule gives jurisdiction to the Federal Agencies over lands and waters that fall outside of the law established by the CWA, as interpreted by *Riverside Bayview*, *SWANCC*, and *Rapanos*. In particular, the Final Rule's assertion of jurisdiction over Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters as described in the Final Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* 5 U.S.C. § 706(2).

63.     Because the controlling law only authorizes the Federal Agencies to regulate "navigable waters" and the Final Rule effectively removes any requirement of "navigability,"

the Federal Agencies have acted arbitrarily and not in accordance with the law in promulgating the Final Rule.

**B.     Claim Two: The Final Rule is in excess of the Federal Agencies' statutory authority, in violation of the APA.**

64.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

65.     Under the APA, a final agency action may be held unlawful and set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

66.     In promulgating the Final Rule, the Federal Agencies purport to give themselves jurisdiction over Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters in excess of the grant of jurisdiction made to the Federal Agencies by the plain language of the CWA and interpretative precedent.   Accordingly, in adopting the Final Rule, the Federal Agencies exceeded their statutory jurisdiction, authority, and limitations under the CWA.  5 U.S.C. § 706(2)(C).

67.     Additionally, under the major questions doctrine, the Federal Agencies are not authorized to determine their own jurisdiction.  As the Supreme Court has explained, an agency's claim of authority through the rulemaking process must be clearly supported by statute before providing an agency "'unheralded' regulatory power over a 'significant portion of the American economy.'" *West Virginia v. Evntl. Prot. Agency*, 142 S. Ct. 2587, 2608 (2022). Therefore, an agency's claim of authority must be rejected when: (1) the rule concerns an issue of economic and political significance; and (2) Congress has not clearly empowered the agency with the statutory authority. The Court should "hesitate before concluding that Congress

meant to confer such authority" that the Federal Agencies grant themselves in the Final Rule. *See West Virginia v. Evntl. Prot. Agency*, 142 S. Ct. at 2608 (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)). The Federal Agencies are casting a broad, amorphous shadow over the economy through the Final Rule. As described previously, the Final Rule seeks to subject the State of Texas, its agencies, and its citizens to a costly and confusing regulatory framework affecting large, crucial portions of the economy—agricultural development, construction and maintenance of infrastructure, energy development, and management of State-owned lands to name a few—with the risk of potentially incurring daily civil and/or criminal penalties of non-compliance. Moreover, the Federal Agencies seek to expand their own authority without clear statutory support when the CWA itself specifically recognizes, preserves, and protects the primary responsibilities of the states to plan the development and use of their land and water resources. Thus, because Congress has not clearly empowered the Federal Agencies to interpret their own jurisdiction and exert unheralded power over the American economy, the Federal Agencies exceeded their statutory jurisdiction, authority, and limitations under the CWA. 5 U.S.C. § 706(2)(C).

## C.    Claim Three: The Final Rule intrudes on Plaintiffs' sovereignty, in violation of the APA, the Tenth Amendment, and the Commerce Clause to the U.S. Constitution.

68.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

69.    Under the APA, a final agency action may be held unlawful and set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

70.     Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people." U.S. Const., amend. X. The federal government lacks a general police power and may only exercise powers expressly granted to it by the Constitution. *See* U.S. Const., amend. X.; *United States v. Lopez*, 514 U.S. 549, 566 (1995). Land-use planning, regulation, and zoning are not enumerated powers granted to the federal government. *See SWANCC*, 531 U.S. at 174 (recognizing the "States' traditional and primary power over land and water use"); *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("Among the rights and powers reserved to the States under the Tenth Amendment is the authority to its land and water resources."); *FERC v. Mississippi*, 456 U.S. 742, 768, n.30 (1982) ("regulation of land use is perhaps the quintessential state activity"). The courts traditionally expect "a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority." *Rapanos*, 547 U.S. at 738 (citing *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994)). The phrase "the waters of the United States" does not constitute such a clear and manifest statement. *Id.*

71.     The CWA was enacted pursuant to Congress's authority to regulate interstate commerce under Article I, Section 8 of the Constitution. As a result, the Federal Agencies violate the Constitution when their enforcement of the CWA extends beyond the regulation of interstate commerce. *See SWANCC*, 531 U.S. at 173.  In enacting the CWA, instead of authorizing the intrusion onto state sovereignty, the CWA instructs the Federal Agencies to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources . . . ." 33 U.S.C. § 1251(b).

72.     The Final Rule regulates intrastate and interstate waters without regard to whether those waters may have a substantial relation to interstate commerce.  *Cf. Lopez*, 514 U.S. at 558–59. In particular, the Final Rule's assertion of jurisdiction over Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters greatly exceed those waters that may impact interstate commerce.  Accordingly, the Final Rule is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).  The Final Rule also intrudes on the environmental regulatory powers vested to the states. U.S. Const., amend. X.  The Final Rule exceeds Congress's authority to regulate interstate commerce.  U.S. Const., art. I, § 8 8.  And the Final Rule is contrary to the CWA's protection of state sovereignty, and therefore, violates the CWA. 33 U.S.C. § 1251(b)

**D.     Claim Four: The Final Rule intrudes on Plaintiffs' due process rights, in violation of the APA and the Fifth Amendment.**

73.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

74.     Under the APA, a final agency action may be held unlawful and set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

75.     The CWA contains criminal and civil penalties for failure to obtain permits before discharging or dredging in "waters of the United States." The Due Process Clause of the Fifth Amendment requires adequate notice of what conduct is forbidden before criminal or civil penalties may attach and may not be so incomplete, vague, indefinite, or uncertain that persons of common intelligence must necessarily guess at its meaning and as to its application.

*See e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964).

76.     The Final Rule fails to give adequate notice of what is, and what is not, "waters of the United States."  By employing vague, undefined terms, and unweighted arbitrary factors that may or may not be employed by the Federal Agencies, the Final Rule does not give adequate notice of what the terms "interstate waters," "impoundments," "tributaries," "adjacent wetlands," "relatively permanent," "seasonally," "significant nexus," "similarly situated," and "significantly affect" are defined and interpreted as meaning.  Accordingly, the Final Rule fails to give fair notice of what conduct is forbidden under the CWA and grants impermissible ad hoc discretion to the Federal Agencies, guaranteeing arbitrary enforcement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

(1) adjudge and declare that the rulemaking titled "Revised Definition of 'Waters of the United States'" promulgated in 33 CFR Part 328 and 40 CFR Part 120 is unlawful because it is inconsistent with, and in excess of, the EPA's and USACE's authority under the CWA;

(2) adjudge and declare that the Final Rule is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and otherwise contrary to constitutional rights and powers;

(3) adjudge and declare that the Final Rule violates the Constitution of the United States;

(4) vacate the Final Rule;

(5) award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

(6) grant Plaintiffs such additional and further relief as the Court may deem just, proper, and necessary.

Dated:   January 18, 2023

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

AARON F. REITZ
Deputy Attorney General for Legal
Strategy

SHAWN COWLES
Deputy Attorney General for Civil
Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection
Division

*/s/ J. Amber Ahmed*

J. AMBER AHMED
*Attorney-in-Charge*
Assistant Attorney General
State Bar No. 24080756
Southern District No. 3135176
amber.ahmed@oag.texas.gov

MARK A. STEINBACH
Assistant Attorney General
State Bar No. 24056653
Southern District No. 2705161
mark.steinbach@oag.texas.gov

LOGAN HARRELL
Assistant Attorney General
State Bar No. 24106054
*PRO HAC VICE pending*
logan.harrell@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
Environmental Protection Division
P. O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel:     (512) 463-2012
Fax:     (512) 320-0911

**COUNSEL   FOR   STATE   OF   TEXAS
PLAINTIFFS**