**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL. | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. 3:23-cv-00017 |
| | § | |
| U.S. ENVIRONMENTAL | § | |
| PROTECTION AGENCY, ET AL. | § | |
| | § | |
| *Defendants*. | § | |

## TEXAS'S MOTION FOR A PRELIMINARY INJUNCTION ENJOINING THE EFFECTIVENESS, IMPLEMENTATION, AND ENFORCEMENT OF THE 2023 WOTUS RULE

Plaintiffs the State of Texas and five of its agencies (together, "Texas") move for a Preliminary Injunction enjoining the effectiveness, implementation, and enforcement of the final rule titled Revised Definition of "Waters of the United States" ("Rule"), promulgated by the U.S. Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps" or "USACE") (collectively, "Federal Agencies"). Fed. R. Civ. P. 65, S.D. Tex.LR-7. The Federal Agencies use the definition of "waters of the United States" to expand their jurisdiction beyond statutory authorization, not just over traditional federal waters but also over distant wetlands (even if not connected), impoundments (even off-channel), and tributaries (even certain ditches or ephemeral streams). The Rule abandons any limitation to waters that impact interstate commerce, relying on an arbitrary "significant nexus" test that strays far from any legal authority. Texas asks the Court for an injunction to support the public interest and prevent irreparable harm to Texas's sovereignty, its agencies' core objectives, and incurrence of unrecoverable costs to comply with a rule unlikely to survive review.

# TABLE OF AUTHORITIES

## Cases

*Am. Farm Bureau Fed'n, et al. v. U.S. Env't Prot. Agency, et al.,* Civil Action No. 3:23-cv-00020 (S.D. Tex. Jan. 18, 2023) ................................................6

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ................................................9

*Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567 (5th Cir. 1974) ................................................7

*Daniels Health Scis., L.L.C. v. Vascular Health Scis.*, L.L.C., 710 F.3d 579 (5th Cir. 2013) ................................................21

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ................................................8

*Georgia v. Pruitt*, 326 F. Supp. 3d 1356 (S.D. Ga. 2018) ................................................22

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................................9, 10

*Gulf Restoration Network v. McCarthy*, 783 F.3d 227 (5th Cir. 2015) ................................................4

*Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278 (D. Wyo. 2004) ................................................22

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1977) ................................................27

*Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) ................................................22

*Louisiana v. Biden*, 55 F. 4th 1017 (5th Cir. 2022) ................................................21, 23

*Rapanos v. United States*, 547 U.S. 715 (2006) ................................................10, 11, 12, 16, 17, 18, 28

*Sackett v. EPA*, 8 F. 4th 1075 (9th Cir. 2021) ................................................25

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ................................................8, 10, 11, 21

*Texas v. United States Env't. Prot. Agency*, No. 3:15-CV-00162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018) ................................................28

*Texas v. United States Env't Prot. Agency*, 829 F.3d 405 (5th Cir. 2016) ................................................21, 24

*United States v. Lopez,* 514 U.S. 549 (1995) ................................................9

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985) ................................................8

*W. Virginia v. Evn't. Prot. Agency*, 142 S. Ct. 2587 (2022) ................................................8

## Constitutional Provisions & Statutes

33 U.S.C. § 1251(a) ....................................................................................................................4

33 U.S.C. § 1251(b) ...............................................................................................................4, 21

33 U.S.C. § 1342(a) ....................................................................................................................4

33 U.S.C. § 1344(a) ....................................................................................................................4

33 U.S.C. § 1362(7) .....................................................................................................................4

5 U.S.C. § 706(2)(A) ...................................................................................................................7

5 U.S.C. § 706(2)(B) ...................................................................................................................9

5 U.S.C. § 706(2)(C) ...................................................................................................................8

Tex. Nat. Res. Code § 91.101(a) ...............................................................................................27

Tex. Water Code § 26.011 .........................................................................................................26

Tex. Water Code § 26.012 .........................................................................................................26

Tex. Water Code § 26.017(5) .....................................................................................................26

Tex. Water Code § 26.027(a) .....................................................................................................26

Tex. Water Code § 26.121(d) .....................................................................................................26

Tex. Water Code § 26.127(a) .....................................................................................................26

Tex. Water Code § 26.131(a)(1) .................................................................................................27

Texas Water Code § 26.001(5) ...................................................................................................26

## Regulations

16 Tex. Admin. Code § 3.8(b) ....................................................................................................27

40 C.F.R. §§ 123.1-123.64 .........................................................................................................27

# BACKGROUND

## A.    The state-federal regulatory scheme under the Clean Water Act.

In enacting the Clean Water Act, Congress was clear that primary authority over land and waters belongs with the states.

> It is the policy of the Congress to recognize, preserve, and protect the **primary responsibilities and rights of States** to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b) (emphasis added). The Clean Water Act gives the Federal Agencies limited authority to regulate discharges and dredging in "navigable waters," s*ee, e.g.,* 33 U.S.C. § 1251(a), 1342(a), 1344(a). Congress defined "navigable waters" in turn as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Construction of the term "the waters of the United States," thus establishes the scope of "navigable waters" (or land) where Federal Agencies may administer programs.

"In regulating discharge, the [Clean Water Act] 'anticipates a partnership between the States and the Federal Government,' with both sovereigns sharing regulatory responsibilities for water protection." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 230 (5th Cir. 2015). The Federal Agencies "recognize that waters that are not jurisdictional under the Clean Water Act do not necessarily lack environmental protections under potential Tribal, State, or local laws." 88 Fed. Reg. at 3050. In Texas, the Texas Commission on Environmental Quality and Railroad Commission of Texas comprehensively regulate all discharges into any "water in the

state" through robust, predictable, and consistent permitting, and enforcement programs approved and certified as equivalent and at least as stringent as the federal discharge program.

**B.    The scope of "waters of the United States" asserted in the Rule.**

The Rule, 88 Fed. Reg. 3143-44, defines "waters of the United States" to include five categories, each of which contain sub-categories and additional defined terms. The Rule and its preamble span a whopping 141 pages of the federal register, often requiring any individual wishing to understand what waters are jurisdictional to parse a codified definition and then refer to the preamble to determine which the Federal Agencies actually meant to include. The five categories of jurisdictional waters in the Rule include the following:

A.    Traditional navigable waters, territorial seas, and interstate waters, including interstate wetlands; ("Traditional Waters");

B.    Impoundments of any other "waters of the United States," whether or not the impoundment demonstrates connection to a jurisdictional water feature by either the Relatively Permanent Standard, or Significant Nexus Standard ("Jurisdictional Impoundments");

C.    Tributaries to Traditional Waters or Jurisdictional Impoundments that demonstrate connection to the Traditional Water or Jurisdictional Impoundment by either the Relatively Permanent Standard, or Significant Nexus Standard ("Jurisdictional Tributaries");

D.    Wetlands adjacent to Traditional Waters (whether or not connected by either the Relatively Permanent Standard, or Significant Nexus Standard); or wetlands adjacent to Jurisdictional Tributaries or Jurisdictional Impoundments that demonstrate connection to the Jurisdictional Tributaries or Jurisdictional Impoundment by either the Relatively Permanent Standard, or Significant Nexus Standard; ("Jurisdictional Adjacent Wetlands"); and

E.    Intrastate lakes and ponds, streams, or wetlands not already identified in the other four categories but satisfy the Relatively Permanent Standard with Traditional Waters and Jurisdictional Tributaries, or satisfy the Significant Nexus Standard with Traditional Waters ("Other Jurisdictional Intrastate Waters").

The currently effective definition of "waters of the United States" asserts jurisdiction over non-navigable, intrastate waters "based solely on whether the use, degradation, or destruction of the water could affect interstate or foreign commerce." The new Rule "replaces the interstate commerce test with the relatively permanent standard and the significant nexus standard." 88 Fed. Reg. at 3029. The "Relatively Permanent Standard" means "relatively permanent, standing or continuously flowing waters connected to [Traditional Waters], and waters with a continuous surface connection to such relatively permanent waters or to [Traditional Waters]." 88 Fed. Reg. 3066. The "Significant Nexus Standard" means waters that, "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, the territorial seas, or interstate waters." *Id.* Waters that meet the Relatively Permanent Standard "will virtually always" meet the Significant Nexus Standard. 88 Fed. Reg. at 3038.

## NATURE AND STAGE OF THE PROCEEDINGS

On January 18, 2023, the Federal Agencies published the Rule purporting to "clarify," the definition of "waters of the United States" within the meaning of the Clean Water Act. The Rule unlawfully expands federal jurisdiction and arbitrarily casts federal authority over a remarkable array of water features (or dry land). On the same day the Rule was published, Texas filed a complaint in this Court, alleging that the Rule violated the Administrative Procedure Act; exceeded the Federal Agencies' authority, and offended the Tenth Amendment and Fifth Amendment. *See generally* Dkt. 1. A coalition of trade groups representing American industry also sued for relief in this Court. *See Am. Farm Bureau Fed'n, et al. v. U.S. Env't Prot. Agency, et al.,* Civil Action No. 3:23-cv-00020 (S.D. Tex. Jan. 18, 2023).

## ARGUMENT

The issue before the Court is whether Texas must incur the burden and expense of complying with a federal "clarification" while Texas challenges that Rule as federal overreach. Based on statutory context and Supreme Court guidance, the Court should enjoin the implementation and enforcement of the Rule while the case proceeds.

Preliminary injunctions, stays, and their modification are within the discretion of the district court. That discretion must be exercised by conducting the traditional four-pronged injunctive analysis of: (1) substantial likelihood that plaintiff will succeed on the merits; (2) substantial threat the plaintiff will suffer irreparable injury without injunctive relief; (3) the harm to plaintiff is outweighed by the harm to defendant if the injunction does issue; and (4) the injunction will not disserve the public interest. *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).

**A.      Texas is likely to succeed on its challenge to the Rule because it does not comply with the plain language of the Clean Water Act nor the Supreme Court precedent thereunder.**

The Federal Agencies have exceeded their limited grant of authority under the Clean Water Act. By doing so, they have failed to comply with the Administrative Procedure Act and violated the Fifth and Tenth Amendments.

The Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), because it gives the Federal Agencies jurisdiction over lands and waters that fall outside of the grant of jurisdiction found in the Clean Water Act. The Clean Water Act grants the Federal Agencies control over "navigable waters," in turn defined as "waters of the United States." But the Rule does an end run around

Congress's limitation by broadly defining "waters of the United States" to include "interstate waters," "impoundments," "tributaries," "adjacent wetlands," and other types of water features without any consideration of those waters' navigability (or obvious lack thereof).

For the same reason, the Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Additionally, under the major questions doctrine, the Federal Agencies are not authorized to determine their own jurisdiction. As the Supreme Court has explained, an agency's claim of authority through the rulemaking process must be clearly supported by statute before providing an agency "'unheralded' regulatory power over a 'significant portion of the American economy.'" *W. Virginia v. Evn't. Prot. Agency*, 142 S. Ct. 2587, 2608 (2022). Therefore, an agency's claim of authority must be rejected when: (1) the rule concerns an issue of economic and political significance; and (2) Congress has not clearly empowered the agency with the statutory authority. The Court should "hesitate before concluding that Congress meant to confer such authority" as the Federal Agencies grant themselves in the Rule. *See W. Virginia v. Evn't. Prot. Agency*, 142 S. Ct. at 2608 (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)).

Lacking authority in the Clean Water Act, the Federal Agencies infringe on Texas's traditional power over land and water resources within its borders and violate the Tenth Amendment and the Commerce Clause. The Clean Water Act was enacted pursuant to Congress's authority to regulate interstate commerce under Article I, Section 8 of the Constitution. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985). However, in *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 174 (2001)

(*SWANCC*), the Supreme Court found the Clean Water Act was not intended to extend to the constitutional limits of Congress' powers over interstate commerce. For this Rule, the Federal Agencies rely specifically on federal authority over the channels of interstate commerce as set out in *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). 88 Fed. Reg. at 3045. But the regulation under the Rule of innumerable intrastate lakes, ponds, and streams, as well as adjacent wetlands (broadly defined), is a far cry from the Federal Agencies' asserted interest in keeping the channels of interstate commerce free from injurious uses. 88 Fed. Reg. at 3045. The Rule asserts an interpretation of the Clean Water Act that "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *SWANCC* at 173. Accordingly, the Rule is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

Finally, the Rule infringes on due process. Because the Clean Water Act contains criminal and civil penalties for failure to obtain permits before discharging or dredging in "waters of the United States," the Due Process Clause of the Fifth Amendment demands adequate notice of what is or is not a "water of the United States" before criminal or civil penalties may attach. By employing vague and dynamic terms, the Rule gives Federal Agencies unbridled discretion to select the water features over which they may choose to exercise jurisdiction and renders helpless those wishing to understand the scope of federal jurisdiction. A regulation may not be so incomplete, vague, indefinite, or uncertain that persons of common intelligence must necessarily guess at its meaning and as to its application. *See e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964). The Rule is "incomprehensible," even to those with decades of experience in managing thousands of

projects subject to Clean Water Act review. *See* Exhibit 1, Declaration of Doug Booher, Director of the Texas Department of Transportation's Environmental Affairs Division ("TxDOT Declaration").

The Federal Agencies claim that a landowner uncertain of the status of water on their property may obtain a jurisdictional determination from the USACE, 88 Fed. Reg. at 3048, but the need for such determinations only highlights the impermissible vagueness of the Rule. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 109. Further, USACE districts (of which there are four in Texas) are prone to offer jurisdictional inconsistent determinations. *See* Exhibit 1, TxDOT Declaration.  And the cost to prepare a jurisdictional determination request is $35,000 to $150,000. *Id.* The Federal Agencies cannot rescue their impermissibly vague definition that implicates criminal liability by revealing its real extent on a case-by-case basis.

> i.    *The Supreme Court's interpretation of "waters of the United States" requires some connection to navigability.*

The Supreme Court already ruled that the traditional concept of "navigable waters" must inform and limit the construction of the phrase "the waters of the United States." *Rapanos v. United States*, 547 U.S. 715 (2006). The use of the phrase "waters of the United States" does not permit reading the term "navigable waters" out of the statute. *SWANCC,* 531 U.S. at 172. "Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority. This concern is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a

traditional state power." *Id.* at 172–73. To otherwise interpret the Clean Water Act would upend the federal-state balance and raise "serious constitutional problems." *Id.*

In *Rapanos*, the plurality found that USACE stretched the statutory text "beyond parody" by going beyond "commonsense understanding" and classifying waters like "ephemeral streams," "wet meadows," "man-made drainage ditches" and "dry arroyos in the middle of the desert" as "waters of the United States." *Rapanos*, 547 U.S. at 734. The plurality also rejected the view that wetlands adjacent to ditches, when those ditches do not meet the definition of "waters of the United States," may nevertheless be subjected to federal regulation on the theory that they are "adjacent to" the remote "navigable waters" into which the ditches ultimately drain. *Id.* at 739–40. In doing so, the plurality chastised USACE for their "immense expansion of federal regulation of land use that has occurred under the Clean Water Act— without any change in the governing statute—during the past five Presidential administrations," *id.* at 722, and "increasingly broad interpretations of its own regulations under the Act," *id.* at 725. The plurality espoused what is described as the "relatively permanent" standard, giving federal control only over continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows.

The Federal Agencies freely admit that they do not adhere to the four-member plurality opinion in *Rapanos*, choosing to rely on a concurring opinion written by Justice Kennedy, joined by no other justice, acknowledging that the concurrence "took a different approach" than the plurality. 88 Fed. Reg. 3013. Justice Kennedy contended a wetland could be jurisdictional if it "possess a 'significant nexus' to waters that are or were navigable in fact or

that could reasonably be so made." *Rapanos*, 547 U.S. at 759. That is, wetlands that "alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable."" *Id.* at 780. Justice Kennedy cautioned that when a wetland's "effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the term 'navigable waters.'" *Id.* Justice Kennedy limited his opinion to wetlands containing a significant nexus to traditional waters—and his opinion did not address tributaries, impoundments, or other types of waters, possessing a significant nexus to other tributaries, impoundments, or other types of water.

   *ii. The Rule exceeds the scope of the Clean Water Act and is unconstitutionally vague.*

  The Rule unlawfully defines "waters of the United States" without any meaningful connection to navigable waters. Neither the plurality nor Justice Kennedy would sanction the Kaftaesque assertion of federal jurisdiction over every wetland adjacent to a tributary to an impoundment of a tributary of a waterbody more commonly understood as navigable. As defined by the Federal Agencies, each category of water asserts jurisdiction far beyond that supported by the Clean Water Act.

   1. <u>Traditional Waters, referred to as "(a)(1) waters," improperly includes all "interstate waters."</u>

  This category includes waters that are "currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide," "the territorial seas," and "interstate waters, including interstate wetlands." 88 Fed. Reg. at 3143. The Federal Agencies identify "interstate waters" as "all rivers, lakes, and other waters that flow across, or form a part of, State boundaries,"

which remarkably includes all types of waters "regardless of their navigability," and does not consider whether the interstate water supports commerce. 88 Fed. Reg. at 3027. The Federal Agencies include "interstate wetlands" in this category—regardless of whether the wetland is adjacent to any other jurisdictional water—simply for the fact that the wetland crosses state or tribal[1] lines. 88 Fed. Reg. at 3072. According to the Federal Agencies, "[i]f a waterbody is determined to be a [Traditional Water], then it is jurisdictional with no need for further evaluation." 88 Fed. Reg. at 3067. Therefore, the Federal Agencies may conclude without any evaluation that all "interstate waters" are subject to their federal authority, including those that are not navigable or lack any connection to navigability. Despite the Supreme Court's rebuke in *Rapanos*, the Federal Agencies read navigability out of the definition in their Rule once again, violating both the Clean Water Act and the Due Process Clause.

2. Jurisdictional Impoundments, referred to as "(a)(2) impoundments," improperly include off-channel and fully dammed impoundments and disregard the navigability of the water impounded.

This category includes all impoundments of Traditional Waters (including interstate water), Jurisdictional Tributaries, or Jurisdictional Wetlands. An impoundment is jurisdictional "regardless of the water's jurisdictional status at the time the impoundment was created." 88 Fed. Reg. at 3078. If the water body impounded was not a "water of the United States" at the time it was impounded but has since become a "water of the United States" (as a result of its impoundment) the impoundment is jurisdictional, even many years later. 88 Fed. Reg. at 3078.

---

[1] Recognizing the sometimes-absurd results of classifying waters this way, the Federal Agencies have arbitrarily chosen to hold off on classifying waters that cross tribal lines as jurisdictional, deciding instead "to conduct additional analysis and outreach to inform a future action related to considering designating waters that cross a State/Tribal boundary as interstate waters under the definition of "waters of the United States." 88 Fed. Reg. at 3075.

And in the case of an impoundment for which the water body impounded was jurisdictional at the time of impoundment, but is no longer jurisdictional, the impoundment remains jurisdictional, even if the contributing water body is not. 88 Fed. Reg. at 3078. This necessarily includes impoundments that, in present day, do not bear on interstate commerce. Additionally, by requiring landowners to both monitor hydrological developments related to tanks and ponds after their creation, and also to know the historical classifications of water features located on their properties, the Rule violates the Due Process Clause. "[T]he fact that the status of impoundments would be ever-changing would require an enormous amount of extra staff labor hours spent tracking conditions on all impoundments, updating the status of such impoundments, and re-evaluating each potentially impacted impoundment for jurisdictional status prior to each project." *See* Exhibit 1, TxDOT Declaration.

The Federal Agencies assert jurisdiction over off-channel impoundments ("an impoundment with no outlet or hydrologic connection to the tributary network"), 88 Fed. Reg. at 3077-3078, and waters wholly separated by dams because "dams generally do not prevent all water flow, but rather allow seepage under the foundation of the dam and through the dam itself," 88 Fed. Reg. at 3076. The Federal Agencies include these off-channel impoundments and dams without any connection to navigability.

3. Jurisdictional Tributaries, or "(a)(3) waters," improperly include distant water features, ditches, and ephemeral streams, regardless of navigability.

This category includes "rivers, streams, lakes, ponds, and impoundments, regardless of their flow regime, that flow directly or indirectly through another water or waters to" Traditional Waters. 88 Fed. Reg. at 3080. When the Federal Agencies note that a tributary can flow "indirectly" to a Traditional Water, they acknowledge that "indirect" flow could be

through "a number" of downstream waters including non-jurisdictional tributaries, ephemeral streams, impoundments, ditches, or waste treatment systems, so long as "part of a tributary system that **eventually** flows to" a Traditional Water.[2] 88 Fed. Reg. at 3080. (emphasis added). Manmade features like ditches[3] or canals may be tributaries—notwithstanding that those features are supposedly excluded—"so long as they contribute flow to" a Traditional Water. 88 Fed. Reg. at 3080. Those tributaries are Jurisdictional Tributaries when they meet either the Relatively Permanent or Significant Nexus Standard. "This interpretation would ultimately result in any, and potentially all, waterways falling within the jurisdiction of the Rule." *See* Exhibit 1, TxDOT Declaration. Such inclusion is not unauthorized by the Clean Water Act and "infeasible," requiring the Texas Department of Transportation to "seek authorization from the USACE for every single waterway impacted by every single project." *Id.*

4. Jurisdictional Wetlands, or "(a)(4) waters," improperly include "adjacent" wetlands—even if the wetlands are not actually adjacent.

This category includes any wetland "adjacent" to Traditional Waters, including interstate waters, (whether or not it meets the Relatively Permanent or Significant Nexus Standard) and any wetland "adjacent" to a Jurisdictional Impoundment or Jurisdictional Tributary if it meets either the Relatively Permanent or Significant Nexus Standard. 88 Fed.

---

[2] To guess at whether a stream is part of a tributary system, the Federal Agencies suggest the public engage in direct observation or try their hand at "various remote sensing resources" like stream gauge data, elevation maps, flood zone maps, and satellite imagery. 88 Fed. Reg. at 3084, fn. 99. This insistence on using computer software encourages the Federal Agencies to assign their own jurisdiction without ever viewing the supposed "water" in real world, present-day conditions.

[3] The Federal Agencies purported to make a concession to the many commenters opposed to federal jurisdiction over ditches by excluding ditches, but the exclusion extends only to ditches "excavated wholly in and draining only dry land **and** that do not carry a relatively permanent flow of water." 88 Fed. Reg. at 3144 (emphasis added).

Reg. at 3143. The inclusion of wetlands adjacent to every Jurisdictional Impoundments or certain Jurisdictional Tributaries is inconsistent with even Justice Kennedy's concurrence in *Rapanos* which limited the extension of federal jurisdiction to wetlands of "certain major tributaries" that "due to their volume of flow (either annually or on average), their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an aquatic system incorporating navigable waters." *Rapanos* at 780-81 (J. Kennedy concurring). The Federal Agencies go beyond Justice Kennedy's extension of jurisdiction to adjacent wetlands to "certain major tributaries" by asserting jurisdiction over every wetland adjacent to large swaths of impoundments and tributaries, as those terms are broadly defined in the Rule. In fact, such expansive inclusion of adjacent wetlands to tributaries was the basis of Justice Kennedy siding with the plurality and vacating the Corps' rule in the *Rapanos* case.

> Because the Corps' theory of jurisdiction in these cases—adjacency to tributaries, however remote and insubstantial—goes beyond the *Riverside Bayview* holding, its assertion of jurisdiction cannot rest on that case. The breadth of the Corps' existing standard for tributaries—which seems to leave room for regulating drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water-volumes toward it—precludes that standard's adoption as the determinative measure of whether adjacent wetlands are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood.

*Id.* at 718.

Furthermore, the Federal Agencies define "adjacent" as anything other than actually adjacent. For purposes of determining "adjacent wetlands," "adjacent" means "bordering, contiguous, or neighboring" and includes as adjacent per se "wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes,

and the like." 88 Fed. Reg. at 3144. The Rule does not define "neighboring" as a concept distinct from "contiguous" or "bordering." And the Federal Agencies take the position that the definition "does not require flow from the wetland to the jurisdictional water or from the jurisdictional water to the wetland." 88 Fed. Reg. at 3093. The Federal Agencies offer three definitions of the term "adjacent"—none of which are the term's plain meaning. Most concerningly, the Federal Agencies deem a wetland adjacent per se if it is "physically separated from a jurisdictional water by human-made dikes or barriers, or natural landforms (e.g., river berms, beach dunes)." 88 Fed. Reg. at 3089. In this circumstance, "no additional identification of a hydrologic connection between the wetland and the jurisdictional water is required. . ." 88 Fed. Reg. at 3094. Even more confusing, according to the Federal Agencies a wetland that is itself divided by artificial structures is considered to be "one wetland." 88 Fed. Reg. at 3094. This definition of "adjacent" finds no support from the *Rapanos*-plurality and is inconsistent with Justice Kennedy's opinion that adjacency carried "a reasonable inference of ecologic interconnection." *Rapanos,* 547 U.S. at 780 (Kennedy concurring). It is likewise almost impossible to apply, in violation of the Due Process Clause.

     5.   <u>"Other Jurisdictional Intrastate Waters" or "(a)(5) waters" is an overly broad catch all category.</u>

This troublingly broad catch-all unnamed category includes "intrastate lakes and ponds, streams, or wetlands" not already identified in the other four categories, but that satisfy either the Relatively Permanent Standard or Significant Nexus Standard. 88 Fed. Reg. at 3143. By definition, these Other Jurisdictional Intrastate Waters are not traditional navigable waters, interstate waters, and the territorial seas, nor are they impoundments, adjacent wetlands, or even tributaries to traditional navigable waters, interstate waters, and the territorial seas,

impoundments, or wetlands. This category seemingly exists only to ensure that the Federal Agencies can assert their jurisdiction wherever they see fit. Recognizing that this overly vague category will require more water features to be evaluated, the Federal Agencies acknowledge "that the number of significant nexus analyses will increase under this rule due to the assessment of waters under paragraph (a)(5) pursuant to the significant nexus standard," whether or not the feature is ultimately deemed jurisdictional. 88 Fed. Reg. at 3123.

6.  <u>The "Relatively Permanent Standard" encompasses dry land and disconnected features and is not the standard espoused by the *Rapanos*-plurality.</u>

Although this standard comes in name from the *Rapanos* plurality, as defined by the Federal Agencies, it strays considerably. As defined in *Rapanos*:

> On this definition, "the waters of the United States" include only relatively permanent, standing or flowing bodies of water. The definition refers to water as found in "streams," "oceans," "rivers," "lakes," and "bodies" of water "forming geographical features." All of these terms connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows. Even the least substantial of the definition's terms, namely, "streams," connotes a continuous flow of water in a permanent channel—especially when used in company with other terms such as "rivers," "lakes," and "oceans." None of these terms encompasses transitory puddles or ephemeral flows of water.

*Rapanos*, 547 U.S. at 732–33.

As defined by the Federal Agencies, this standard refers to relatively permanent, standing or continuously flowing waters connected to Traditional Waters, and waters with a continuous surface connection to such relatively permanent waters. 88 Fed. Reg. 3006.

The "Relatively Permanent Standard" includes flows that occur seasonally, but also encompasses "tributaries in which extended periods of standing or continuously flowing water are not linked to naturally recurring annual or seasonal cycles," as well as flows driven by water

management practices and effluent-dependent streams. 88 Fed. Reg. 3085. The inclusion of "seasonally" flowing waters in this standard "creates another layer of ambiguity, as the timing and impact of seasons vary widely across years and throughout Texas." *See* Exhibit 1, TxDOT Declaration.

Further complicating implementation, the Rule notes that a continuous surface connection "does not require surface water to be continuously present between the wetland and the tributary." 88 Fed. Reg. at 3096. Thus, "relatively permanent" tributaries include streambeds that remain dry for much of the year. This directly contradicts the *Rapanos* plurality, which conceded only that "by describing "waters" as "relatively permanent," we do not necessarily exclude streams, rivers, or lakes that might dry up in **extraordinary circumstances**, such as drought."[4]

7. The Significant Nexus Standard as applied by the Federal Agencies strays from Justice Kennedy's concurrence.

The Federal Agencies use the Significant Nexus Standard to assert jurisdiction over waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas. 88 Fed. Reg. at 3006. The Rule does not define "similarly situated" or "in the region."

---

[4] *Rapanos*, 547 U.S 732 at fn.5 (emphasis added). Writing for the plurality, Justice Scalia further explained: "We also do not necessarily exclude seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months—such as the 290–day, continuously flowing stream postulated by Justice Stevens's dissent (hereinafter the dissent), post, at 2259–2260. Common sense and common usage distinguish between a wash and seasonal river." *Id.*

Justice Kennedy would not recognize the Significant Nexus Standard described by the Federal Agencies. To start, Justice Kennedy proposed including wetlands that "significantly affect the chemical, physical, **and** biological integrity" of Traditional Waters whereas the Federal Agencies propose regulating any water that affects "the chemical, physical, **or** biological integrity" of Traditional Waters. 88 Fed. Reg. at 3006.

Moreover, the Federal Agencies defined "significantly affect" as a material influence on the chemical, physical, or biological integrity of Traditional Waters. To determine if there is a material influence, five functions[5] must be assessed and five factors[6] must be considered. 88 Fed. Reg. 3144. Most of the functions and all of the factors devised by the Federal Agencies to define "significantly affect" are entirely absent from Justice Kennedy's plurality opinion and are creatures of the Federal Agencies themselves, not the case law. These functions and factors only add additional layers of confusion, vagueness, and attendant administrative costs and inconsistent application, to the already vague and overly broad categories of jurisdictional waters under the Rule. *See* Exhibit 1, TxDOT Declaration.

---

[5] (1) Contribution of flow; (2) Trapping, transformation, filtering, and transport of materials (including nutrients, sediment, and other pollutants); (3) Retention and attenuation of floodwaters and runoff; (4) Modulation of temperature in Traditional Waters; and (5) Provision of habitat and food resources for aquatic species located in Traditional Waters. 88 Fed. Reg. 3144.

[6] (1) Distance from a Traditional Water; (2) Hydrologic factors, such as frequency, duration, magnitude, timing, and rate of hydrologic connections, including shallow subsurface flow; (3) Size, density, or number of waters that have been determined to be similarly situated; (4) Landscape position and geomorphology; and (5) Climatological variables such as temperature, rainfall, and snowpack. 88 Fed. Reg. 3144.

**B.     Texas and its agencies are irreparably harmed by the Rule.**

With the Rule's looming effective date of March 20, 2023, Texas and its agencies seek protection from the irreparable harm that the Rule will impose without court intervention. A showing of irreparable harm requires a demonstration of "harm for which there is no adequate remedy at law" that is more than speculative. *Daniels Health Scis., L.L.C. v. Vascular Health Scis.*, L.L.C., 710 F.3d 579, 585 (5th Cir. 2013). Further, "it is not so much the magnitude but the irreparability that counts." *Louisiana v. Biden*, 55 F. 4th 1017, 1034-35 (5th Cir. 2022)(quoting *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433-34 (5th Cir. 2016)). The Plaintiffs' irreparable harms take many forms, including intrusion into Texas's sovereignty over intrastate land and waters, and the unrecoverable compliance costs that will unnecessarily burden Texas despite the improbability the Rule will survive judicial review.

*i.     The Rule irreparably infringes on Texas's sovereignty.*

The Clean Water Act provides that the states will maintain the primary responsibility of developing land and water resources. 33 U.S.C. § 1251(b). The Supreme Court has affirmed the importance of maintaining the federal-state balance baked into the Clean Water Act. *SWANCC*, 531 U.S. at 174. Yet despite Congress's direction and Supreme Court interpretation, the Federal Agencies crafted this Rule to counter the principles of federalism. The Rule, if allowed to take effect, would deprive Texas its sovereignty over intrastate land and waters that will become subject to federal regulation.

Courts have consistently recognized that a regulatory scheme that results in a loss of sovereignty causes irreparable harm. *Texas v. United States Env't Prot. Agency*, 829 at 433-34 (EPA's rule caused irreparable harm to Texas's sovereignty "from the inversion of the

federalism principles" provided in the Clean Air Act); *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (federal classification infringed on Kansas's ability to regulate gaming within the state); *see also Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (loss of state sovereignty as a result of "waters of the United States" definition is an irreparable harm); *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278, 1294 (D. Wyo. 2004) (federal snowmobile regulation infringed on Wyoming's management of their own trails and fish programs).

And there is no doubt that the Rule expands federal jurisdiction within state borders. The current definition of "waters of the United States" asserts jurisdiction over non-navigable, intrastate waters "based solely on whether the use, degradation, or destruction of the water could affect interstate or foreign commerce," but the Rule "replaces the interstate commerce test with the relatively permanent standard and the significant nexus standard." 88 Fed. Reg. at 3029. The vagueness of the Rule "expands the scope of jurisdiction to potentially include almost every waterway in the Texas and the nation." *See* Exhibit 1, TxDOT Declaration. Therefore, if the Rule is allowed to go into effect, Texas will experience irreparable harm by losing sovereignty over intrastate land and waters never contemplated by Congress to be within federal purview.

ii.     *The Rule frustrates the core projects and missions of Texas's agencies.*

In addition to the loss to Texas's sovereignty, its agencies will suffer irreparable harm attempting to implement the Rule among the variety of regulatory programs they administer. For example, the Texas Department of Transportation ("TxDOT") expects to undertake roughly 3,000 transportation projects in 2023. TxDOT anticipates the number of projects

requiring authorization from USACE will increase by up to 40% over the next five years. Many of these will require review and action by USACE, which will increase the backlog of projects in review. TxDOT estimates that mitigation required to complete transportation projects following the Rule will increase by 30% at an increased cost of $3 million dollars per year. *See* Exhibit 1, TxDOT Declaration.  Likewise, the General Land Office, which manages over 13 million acres of state land and mineral interests for the benefit of Texas's schools expects a negative impact on its Permanent School Fund deposits (which totaled over $2.1 billion from oil and gas revenues last fiscal year). *See* Exhibit 2, Declaration of Brian S. Carter, Senior Deputy Director of Asset Enhancement at the General Land Office ("GLO Declaration").

Similarly, the Texas Department of Agriculture promotes agriculture in Texas with duties including protecting the value and use of agricultural land, promoting and protecting agricultural capacity and output, promoting rural economic development and agricultural industries, and regulating agricultural pesticides. The Rule's broad expansion of federal jurisdiction will result in less agricultural land available for production, decrease the value of certain agricultural land, and increase the costs associated with agriculture due to the regulatory uncertainty. *See* Exhibit 3, Declaration of Sid Miller, Commissioner of the Texas Department of Agriculture ("TDA Declaration").

     *iii.*    *The Rule imposes unrecoverable costs on Texas to comply with a regulation unlikely to survive review.*

As articulated by the Fifth Circuit, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Louisiana v. Biden*, 55 F. 4th at 1034 (finding the diversion of state resources "necessary to identify covered employees and manage their vaccination status" was an irreparable harm); *Texas v.*

*EPA*, 829 at 433 (confirming the Public Utility Commission's expenditure of state resources to enforce compliance with a voided federal implementation plan was an irreparable harm). The costs to Texas are compounded because the resources devoted to complying with this Rule will detract from the meaningful work Texas's agencies undertake in the public interest. These resources cannot be recovered and constitute an irreparable harm.

TxDOT estimates that the amount of labor hours to review each project for compliance with the Rule will increase by approximately 20%, equating to over 30,000 additional staff labor hours for review *See* Exhibit 1, TxDOT Declaration.  And procuring the "various remote sensing resources" and other tools lauded by the Federal Agencies, 88 Fed. Reg. at 3084, fn. 99, presents additional costs as those tools are not currently used by TxDOT and their procurement costs, industry acceptance, and training needs remain unknown. *See* Exhibit 1, TxDOT Declaration. Likewise, the General Land Office will need to assess its holdings for jurisdiction, significantly interfering with the use of Public School Fund lands and imposing costly burdens on its divisions and staff charged with managing these lands. *See* Exhibit 2, GLO Declaration. The Texas Department of Agriculture will similarly have to waste state resources developing specialized education and training for staff and the broader public based on the Rule. *See* Exhibit 3, TDA Declaration.

The Texas Commission on Environmental Quality and the Railroad Commission of Texas conduct Clean Water Act Section 401 certification reviews for federal permits issued in Texas.  Both agencies can expect to draw on their resources to address the Rule's impact via their certification review processes. *See* Exhibit 4, Declaration of Leslie L. Savage, Chief Geologist and Water Quality Certification Agent in the Railroad Commission of Texas's Oil

and Gas Division ("RRC Declaration") ("expansion of the rule will lead to the requirement for more NPDES permits and Corps actions under Section 404 of the CWA, which will require more CWA-driven water quality certifications from the RRC"); *see also* Exhibit 5, Declaration of Gregg W. Easley, Manager of the Water Quality Assessment Section of the Texas Commission on Environmental Quality's Water Quality Division ("TCEQ Declaration") ("TCEQ will need to devote additional resources to clarifying questions regarding Section 401 certification reviews.").

Exacerbating these harms is the Supreme Court opinion pending in *Sackett v. EPA* addressing the issue whether certain adjacent wetlands are within the domain of the Clean Water Act using the significant nexus test as described in *Sackett v. EPA*, 8 F. 4th 1075, 1092 (9th Cir. 2021). Oral argument occurred on October 3, 2022, and an opinion is expected within the next few months. The Supreme Court's decision will provide further direction on "waters of the United States" and likely significantly impact the Rule's implementation. That is why the governors of 25 states, including Governor Abbott, asked the Biden Administration delay implementation of the Rule. *See* Exhibit 6, January 30, 2023 letter to President Biden.  Texas and its agencies should not have to spend precious state resources implementing the Rule on March 20, 2023, only to pivot again based on a post-*Sackett* interpretation. Accordingly, the Rule should be stayed to prevent this irreparable harm to Texas and its agencies.

## C.    The equities and public interest weigh in favor of an injunction.

While Texans, Texas, and its agencies will suffer irreparable harm if the Rule is not enjoined, the Federal Agencies—who waited over a year between proposing and promulgating the Rule—and the public interest will not be harmed by a preliminary injunction.

Texas law broadly protects "water in the state." In stark contrast to Federal Agencies' limited jurisdiction under the Clean Water Act, the Texas definition of "water in the state" is expansive. It includes

> groundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, wetlands, marshes, inlets, canals, the Gulf of Mexico, inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or nonnavigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state.

Texas Water Code § 26.001(5). These waters will continue to be protected under state law if the Rule is enjoined. The balance of equities therefore favors granting an injunction.

Texas law contains a comprehensive regulatory scheme governing water quality in the state under Chapter 26 of the Texas Water Code. Under Chapter 26, TCEQ maintains water quality in Texas and accepts delegation of the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES") in Texas. *See* Tex. Water Code §§ 26.011(authorizing TCEQ to administer and establish water quality standards), 26.017(5)(authorizing TCEQ to obtain NPDES authority), 26.027(a)(authorizing TCEQ to issue permits for the discharge of waste or pollutants into or adjacent to water in the State), 26.127(a)(designating TCEQ as principal authority on water quality in the State). TCEQ develops and implements a comprehensive plan for water quality control and sets water quality standards for water in the state. *Id.* § 26.012. TCEQ issues permits for discharges of pollutants to any water in the state, *Id.* § 26.027(a), otherwise,  "no person may discharge any pollutant, sewage, municipal waste, recreational waste, agricultural waste, or industrial waste from any point source into any water in the state." *Id.* § 26.121(d). The Railroad Commission prevents and abates the pollution of

surface waters associated with oil and gas exploration, development, and production operations, including pipeline transportation of crude oil and natural gas. Tex. Nat. Res. Code § 91.101(a); Tex. Water Code § 26.131(a)(1). Under Railroad Commission rules, "no person conducting activities subject to regulation by the commission may cause or allow pollution of surface or subsurface water in the state." 16 Tex. Admin. Code § 3.8(b).

Accordingly, waters well beyond the scope of "waters of the United States" are already protected from discharges under Texas law via Texas's familiar water quality regulations, which are approved by EPA and certified by the Texas Attorney General to be at least as stringent and extensive as the federal program. *See* Exhibit 5, TCEQ Declaration.; s*ee also* 40 C.F.R. §§ 123.1-123.64. Indeed, the Rule recognizes that states like Texas protect waters beyond the reach of the federal government. 88 Fed. Reg. at 3050 ("The agencies recognize that waters that are not jurisdictional under the Clean Water Act do not necessarily lack environmental protections under potential Tribal, State, or local laws."). Thus, the Federal Agencies will not be harmed by a preliminary injunction prohibiting the unlawful expansion of "waters of the United States" into waters that are already protected under state law.

The public interest also favors an injunction because the Rule exceeds the jurisdictional scope of the Clean Water Act. *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) (recognizing "an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate."). Here, the Rule exceeds the scope of federal authority under the Clean Water Act and the Commerce Clause in Article I of the Constitution and intrudes upon Texas's sovereignty guaranteed under the 10th Amendment and due

process rights guaranteed under the Fifth Amendment and there is a public interest in limiting the Federal Agencies' authorities in accordance with Congress's grant of power.

The public interest concerns regarding the Rule are much like those considered in Texas's challenge of the 2015 Rule defining "waters of the United States." When asked to preliminarily enjoin the implementation of the similarly expansive 2015 Rule, this Court found that "the fourth factor pertaining to the public's interest in this matter that tipped the balance in favor of granting an injunction—and did so to an overwhelming degree" because to not do so would be risking "the states, their governmental subdivisions, and their citizens to expend valuable resources and time operationalizing a rule that may not survive judicial review." *Texas v. United States Env't. Prot. Agency*, No. 3:15-CV-00162, 2018 WL 4518230, at *1 (S.D. Tex. Sept. 12, 2018). The Court chose to "avoid the harmful effects of a truncated implementation, and enjoin the Rule's effectiveness until a permanent decision regarding the Rule's constitutionality can be made." *Id.* The public interest similarly weighs in favor of an injunction in this case.

While "important public interests are served by the [Clean Water Act]," *Rapanos*, 547 U.S. at 777, delaying implementation of the Rule would simply preserve Clean Water Act jurisdiction under existing and long-standing regulations. Thus, if implementation is enjoined, the Clean Water Act will continue to be implemented as it has for years. On the contrary, allowing the Rule to go into effect—when it will likely be vacated—disserves the public and the purpose of the Clean Water Act by creating unnecessary confusion and inconsistent regulatory structures that exceed the statutory mandate.

## CONCLUSION

This Court should grant Texas's request for a preliminary injunction enjoining the effectiveness, implementation, and enforcement of the Rule.

Dated: February 7, 2023

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

AARON F. REITZ
Deputy Attorney General for Legal Strategy

SHAWN COWLES
Deputy Attorney General for Civil Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

Respectfully submitted,

*/s/ J. Amber Ahmed*
J. AMBER AHMED
*Attorney-in-Charge*
Assistant Attorney General
State Bar No. 24080756
Southern District No. 3135176
amber.ahmed@oag.texas.gov

MARK A. STEINBACH
Assistant Attorney General
State Bar No. 24056653
Southern District No. 2705161
mark.steinbach@oag.texas.gov

LOGAN HARRELL
Assistant Attorney General
State Bar No. 24106054
PRO HAC VICE
logan.harrell@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
Environmental Protection Division
P. O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel:    (512) 463-2012
Fax:    (512) 320-0911

***COUNSEL FOR STATE OF TEXAS, TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, RAILROAD COMMISSION OF TEXAS, TEXAS DEPARTMENT OF AGRICULTRE, TEXAS GENERAL LAND OFFICE, AND TEXAS DEPARTMENT OF TRANSPORTATION***

## CERTIFICATE OF COMPLIANCE

In accordance with Court Procedure 15, the undersigned certifies that Texas believes that an expedited ruling on this motion prior to March 20, 2023, the effective date of the Rule it has requested the Court enjoin, is an emergency and that the undersigned notified the case manager in advance of this filing.

/s/ J. Amber Ahmed
J. AMBER AHMED
Assistant Attorney General

## CERTIFICATE OF CONFERENCE

In accordance with Local Rule 7.1.D and Court Procedure 6.C.2, the undersigned certifies that she has conferred with counsel for the Federal Agencies and determined that they are opposed to the relief requested in this Motion.

/s/ J. Amber Ahmed
J. AMBER AHMED
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on February 7, 2023, a copy of the foregoing document was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all attorneys in this case.

/s/ J. Amber Ahmed
J. AMBER AHMED
Assistant Attorney General