

**Texas Department of Transportation**

125 EAST 11TH STREET, AUSTIN, TEXAS 78701-2483 | 512.463.8588 | WWW.TXDOT.GOV

## DECLARATION OF DOUG BOOHER

I, Doug Booher, hereby declare as follows:

1. I am the Director of the Environmental Affairs Division ("ENV") for the Texas Department of Transportation (TxDOT). I have been employed in this position since October 2021. Prior to October 2021, I was employed as the Deputy Director of ENV since 2013.

2. Each year, TxDOT completes the environmental review and environmental permitting for approximately 2,800 proposed transportation projects, a process that is managed by the Environmental Affairs Division. The Division provides policy, procedures, training, guidance, and technical assistance to other sections of TxDOT, including on identifying projects subject to the Clean Water Act. It also manages environmental programs, works to streamline the environmental review process, and monitors changing laws and regulations.

3. A great majority of TxDOT's proposed transportation projects use federal funding or otherwise require federal approval, and therefore are subject to the environmental review requirements of the National Environmental Policy Act ("NEPA"). In December 2014, the Federal Highway Administration assigned to TxDOT the responsibility to comply with NEPA and other environmental laws concerning proposed federal transportation projects in Texas.

4. Permitting transportation projects requires substantial cost in both monetary and labor hours and represents significant investments by TxDOT. The average cost to TxDOT to prepare a Pre-Construction Notification for a 404 nationwide permit, including delineation, is approximately $75k, while the average cost to prepare an Individual Standard Permit, including delineation, is approximately $125k. The average cost to prepare an Approved Jurisdictional Determination request for confirmation of delineation from the U.S. Army Corps of Engineers ("USACE") ranges from approximately $35k-$150k.

5. To obtain 404 permits, TxDOT is often required to purchase mitigation credits from third-party mitigation banks or provide permitee-responsible mitigation. Third-party mitigation costs TxDOT on average approximately $1.1 million per project, and permittee-responsible mitigation costs TxDOT on average approximately $715k per project and requires 80-300 labor hours per project to secure and track. Collectively,

**EXHIBIT 1**

*Declaration of Doug Booher*                  2                  February 7, 2023

TxDOT has spent approximately $96 million on wetland and waters mitigation since 2009.

6. Based on my position, I have personal knowledge and experience to understand the many steps TxDOT will likely undertake in direct response to the Environmental Protection Agency's and the U.S. Army Corps of Engineers' *Revised Definition of "Waters of the United States"* published on January 18, 2023 (hereinafter "the Rule").

7. In my opinion, the Rule encompasses an overly-broad definition of "waters of the United States". Rather than being a clarification of what logically falls under regulatory jurisdiction, as intended, the Rule is ultimately more vague and complicated, rendering certain components of it incomprehensible to even seasoned staff members. Ultimately, this vagueness expands the scope of jurisdiction to potentially include almost every waterway in the Texas and the nation. The Rule was meant to clarify the definitions and assist in the application of the rule, not further muddy the proverbial waters.

8. With four USACE districts in Texas alone, TxDOT will continue to face challenges relating to the need to seek USACE guidance regarding jurisdiction on a project-by-project basis. It is common to hear inconsistent answers from differing USACE districts.  Given the lack of consistency it is difficult for TxDOT to prepare effective guidance for our districts and consultants.

   Vagueness and inconsistency increase costs and delay for transportation projects, requiring additional labor hours and expense in conducting TxDOT's environmental assessments and consulting with USACE.  As stated above, TxDOT has made and continues to make significant monetary and labor hour investments on obtaining the required permits. It is imperative that a rule defining "waters of the United States" provide concrete definitions and examples of the jurisdictional scope so that these investments are not jeopardized and critical transportation projects are not delayed.

9. While the Rule presents five factors to consider when assessing the functions of a water feature and determining whether it has a significant nexus to a Traditional Navigable Water, these factors introduce an even greater level of uncertainty and administrative cost. The assessment of functions that is required in application of the significant nexus standard, and the consideration of factors that inform that assessment, is presented as a continuum, with no clear direction on when a water feature crosses over to having a significant nexus. This builds ambiguity into and contradicts the intended clarifying nature of the Rule. If an actual assessment is required in application of the significant nexus standard, an assessment methodology would be required to be developed. Learning and applying a new assessment (using a

prescribed methodology or as a continuum) would require a substantial increase in labor hours and training costs. At the very least, USACE would need to provide training, a protocol, application guidance, consistent data sheets, etc., to support this assessment of functions or capture the results of the assessment. Otherwise, the requirement to apply the significant nexus standard reads as another case-by-case opportunity for USACE to introduce inconsistency into a Rule that is meant to offer clarity. Moreover, the numerous tools listed in the preamble for gathering data to inform consideration of factors and assessment of functions are not currently used by wetland delineators or permit preparers across the U.S. in determining jurisdiction and raise multiple additional uncertainties, such as: 1) whether the tools have been vetted and shown to be free of issues, 2) whether the tools are expensive to purchase or access, 3) whether the tools are accepted as the industry standard for all agencies addressing water resources evaluation and permitting, 4) whether there are inconsistencies among them various tools, and 5) whether training is readily and equally available for all tools.

10. Additionally, the Rule does not adequately define the "Relatively Permanent Standard"; rather, the introduction of the term "seasonally" creates another layer of ambiguity, as the timing and impact of seasons vary widely across years and throughout Texas itself, let alone the entire nation.

11. In defining a "tributary", the Rule specifies that any waterway that flows indirectly through any number of other waterways but eventually ends up in a Traditional Navigable Water would fall within the scope of the definition. This language would ultimately result in any, and potentially all, waterways falling within the jurisdiction of the Rule. Such an interpretation is impermissibly broad and materially infeasible. This could require TxDOT to seek authorization from the USACE for every single waterway impacted by every single project, at enormous cost and labor hours spent in applying for and obtaining such permits. At minimum, an even greater number of labor hours would likely be required for TxDOT staff to communicate with USACE regulatory staff to determine the status of each and every waterway impacted by every single project in order to determine which ones might be too far or too tenuous to fall within the scope of the definition.

12. Just as problematic is the Rule's treatment of ditches, with jurisdiction not being clearly defined, even with the ditch exclusion. The exclusion is based on physical and flow characteristics, but the Rule asserts jurisdiction over any ditches that are otherwise consistent with the definition of the other categories of waters of the U.S. This means that a ditch that feeds into a tributary that "eventually" leads to a Traditional Navigable Water would be jurisdictional.  Because ditches often run

adjacent to roads and highways, TxDOT would need to assess every transportation project near a ditch to assess it for federal permitting requirements.

13. The language of the Rule introduces uncertainty regarding whether an impoundment is jurisdictional. Additionally, the fact that the status of impoundments would be ever-changing would require an enormous amount of extra staff labor hours spent tracking conditions on all impoundments, updating the status of such impoundments, and re-evaluating each potentially impacted impoundment for jurisdictional status prior to each project.

14. Regarding wetlands, the terminology and analysis explained in the Rule asserts jurisdiction in situations that include an assumption of subsurface connectivity as opposed to an observable, measurable surface water connection. Implementation of this flawed reasoning would result in TxDOT estimating and USACE staff asserting jurisdiction without being able to observe, measure, and document the relationship between an "adjacent" wetland and the jurisdictional feature it is adjacent to.

15. TxDOT expects to spend several hundred staff labor hours revising guidance and preparing and providing training to staff and consultants on the *Revised Definition of "Waters of the United States"* as it relates to the review and permitting of TxDOT projects. TxDOT expects to undertake roughly 3,000 transportation projects in 2023. TxDOT estimates that the amount of labor hours to review each project for compliance with the final rule will increase by approximately 20%, equating to over 30k additional staff labor hours for review. TxDOT anticipates the number of projects requiring authorization from USACE will increase by up to 40% over the next five years. Many of these will require review and action by USACE, which will further increase the constant backlog of projects in review.

16. In addition, the expansion of jurisdiction will greatly increase the amount of mitigation required to deliver projects. TxDOT estimates the amount of mitigation needed will increase by 30% which translates to an increased cost of approximately $3 million dollars per year. In some areas of Texas, there are no mitigation banks available, which forces TxDOT to provide permittee-responsible mitigation, which is the least preferrable, most expensive over time, and has the lowest success rate of all mitigation forms. The requirement to deliver permittee-responsible mitigation will further increase the cost to deliver projects, potentially up to an additional $5-10 million per year.

17. TxDOT will be significantly and irreparably harmed if the Rule is not stayed during the pendency of this litigation. As stated herein, I do not believe that the Rule is an adequate and clear interpretation of federal statute. As this Rule is currently being litigated and may well be overturned or modified, it would be wasteful to require

*Declaration of Doug Booher*                    5                    February 7, 2023

agencies to spend countless hours rewriting policy manuals, conducting training, and having innumerable conversations with USACE regarding this Rule until its fate is known.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this __7ᵗʰ__ day of __FEB__, 2023 in Austin, Texas.

Doug Booher