

**WAYNE CHRISTIAN,** *CHAIRMAN*
**CHRISTI CRADDICK,** *COMMISSIONER*
**JIM WRIGHT,** *COMMISSIONER*

**ALEXANDER C. SCHOCH,** *GENERAL COUNSEL*
*GENERAL LAW SECTION*

# RAILROAD COMMISSION OF TEXAS
## OFFICE OF GENERAL COUNSEL

February 7, 2022

Michael S. Regan, Administrator
Environmental Protection Agency

Jaime A. Pinkham, Acting Assistant Secretary
Office of the Assistant Secretary of the Army for Civil Works
Department of the Army

**Docket Number EPA-HQ-OW-2021-0602**
*Filed via Regulations.gov*

Re:   Comments by Railroad Commission of Texas on Proposed Waters of the United States Rule Published in Federal Register Dated December 7, 2021

Dear Administrator Regan and Assistant Secretary Pinkham:

We appreciate the opportunity to comment with our perspective on defining "waters of the United States" under the Clean Water Act and how to implement that definition as the U.S Environmental Protection Agency ("EPA") and the Department of the Army (collectively "the Agencies") consider rulemaking.

The Railroad Commission of Texas ("RRC") has effectively regulated the oil and natural gas industry in the State of Texas since 1919. The RRC's primary statutory responsibilities in the regulation of Texas oil, gas and geothermal resources, as well as lignite mining, are to conserve the State's natural resources; prevent the waste of natural resources; protect the correlative rights of mineral interest owners; protect the environment from pollution associated with oil, gas, geothermal, and surface mining activities; and ensure safety by mitigating hazards inherent to the oil and gas industry, including but not limited to, hydrogen sulfide in wells. The RRC works closely with the Texas Commission on Environmental Quality ("TCEQ").

Texas is the nation's largest producer of oil and natural gas with over 160,000 active oil wells and nearly 87,000 active gas wells. This energy production supports 2 million jobs in Texas and a quarter of the State's economy. The industry not only benefits Texas, but the entire United States. Nationally, the energy industry supports over 9.2 million jobs, providing billions of dollars in employee wages during a period of economic difficulty.

EXHIBIT 4

Docket Number EPA-HQ-OW-2021-0602
Railroad Commission of Texas Comments
February 7, 2022

**General Comments**

In response to President Biden's January 20, 2021, Executive Order 13990, the Agencies reviewed the Navigable Waters Protection Rule and determined that the rule must be replaced. On June 9, 2021, the Agencies announced their intent to revise the definition of "waters of the United States." On December 7, 2021, the Agencies published their proposed Water of the United States ("WOTUS") rule. The Agencies have stated that the rulemaking process will be guided by the following considerations: ensuring that the rule will further the principal objective of the Act as set forth by Congress, which is to ''restore the chemical, physical, and biological
integrity of the Nation's waters,'' considering the latest peer-reviewed and relevant science; prioritizing practical implementation approaches for state and tribal co-regulators; and reflecting the experiences of, and input received from, landowners, the agricultural community, states, tribes, local governments, community organizations, environmental groups, and disadvantaged communities with environmental justice concerns. Considering that the rule could have extremely far-reaching implications, we are concerned that the Agencies did not include in this list consideration of the experiences of, and input from, regulated entities as well as the direction from the Supreme Court.

We urge the Agencies to develop rules that directly address the concerns of the Supreme Court regarding the limits of federal jurisdiction. While science informs the approach of the Agencies to resolving critical environmental questions, the Agencies' jurisdiction under the Clean Water Act must be exercised within the boundaries of the statute itself, along with court decisions interpreting the same. Justice Antonin Scalia's plurality opinion in *Rapanos v. United States*, stated that federal jurisdiction is limited to "relatively permanent, standing or continuously flowing bodies of water" and wetlands that have a "continuous surface connection" to those waters. While we understand the interconnectivity of the wetlands and streams, and the intermittent and ephemeral nature of the majority of these waters, there must be a clear and intelligible delineation between jurisdictional and nonjurisdictional waters. That delineation also must be consistent with Congressional intent as interpreted by the Supreme Court of the United States.

In *Rapanos*, the Court referenced its prior decision in United States v. *Riverside Bayview Homes, Inc.* in noting the difficulty of defining "where water ends and land begins." 547 U.S. 715, 724 (2006) (citing 474 U.S. 121, 132 (1985). However, the Court also expressed concern that federal agency practices prior to the *Rapanos* decision did not adequately limit federal jurisdiction. The rules should comply with the limited scope of jurisdiction that resulted from these decisions.

The 2015 rule relied chiefly on the last two U.S. Supreme Court cases—*Rapanos* and *SWANCC v. United States Army Corps of Engineers*—that confronted the meaning of 'waters of the United States." Lost in the Agencies' analysis, however, was that in both cases, the Supreme Court attempted to reign in the federal government's perceived jurisdiction under the Act. The Supreme Court has twice reigned in the expansive jurisdictional interpretation envisioned by the Agencies.

Docket Number EPA-HQ-OW-2021-0602
Railroad Commission of Texas Comments
February 7, 2022

**Specific Comments**

The RRC expresses comment on the following issues implicated in the proposed rulemaking.

**<u>Application of the Significant Nexus Analysis Under the Pre-2015 Regulatory Regime, the 2015 Clean Water Rule, and the Proposed Rule</u>**

In proposing any changes to existing regulations, the Agencies must consider the history of those changes up to this point. This history, including the flurry of litigation over the years, cautions against a departure from the existing rule toward a vague standard so open-ended that it imposes not only a heavy compliance burden, but also an equally burdensome enforcement regime that will result in significant waste of public resources.

The Clean Water Act authorizes the Agencies to exercise jurisdiction over "navigable waters" of the United States. See, e.g., 33 U.S.C. §1251(a). 1342(a), 1344(a). Congress defined navigable waters as "waters of the United States." 33 U.S.C. §1362(7). Subsequent attempts by federal Agencies to define and redefine the phrase have resulted in a myriad of rulemakings since the Act's passage in 1972.

The 2015 rule expanded the scope of the federal Agencies' regulatory authority by invoking the Supreme Court's decision in *Rapanos v. United States*. 547 U.S. 715 (2006). The legal issue confronting the Court in *Rapanos* was the meaning of "waters of the United States." In a decision that produced a total of five opinions, the majority held that wetlands adjoining a non-navigable stream did not meet the Clean Water Act's standard for waters of the United States". A four-vote plurality held that 'navigable waters." as regulated under the Clean Water Act, are limited to only those relatively permanent, standing or continuously flowing bodies of water forming geographic features, such as streams, oceans, rivers and lakes. Id. at 739, 742. Justice Kennedy concurred in the judgment, but in doing so suggested a broader "significant nexus" test, granting federal jurisdiction when there is a case specific showing of a significant nexus between lesser water bodies and traditional navigable waters, interstate waters, or territorial seas. See Id. at 759-87 (Kennedy, J., concurring in the judgment). In the 2015 rulemaking, the federal Agencies relied in large part on the single Justice's concurring opinion in *Rapanos*. In promoting the 'significant nexus" test, the 2015 rule defined "waters of the United States" as including seven broad categories of waters:

> 1. All waters which are currently used, were used in the past. or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
> 2. All interstate waters, including interstate wetlands;
> 3. The territorial seas;
> 4. All impoundments of a traditional navigable water, interstate water, the territorial seas or a tributary;
> 5. All tributaries of a traditional navigable water, interstate water, the territorial seas or impoundment;
> 6. All waters, including wetlands, adjacent to a traditional navigable water, interstate water, the territorial seas, impoundment or tributary; and

3

> 7. On a case-specific basis, other waters, including wetlands, provided that those waters alone, or in combination with other similarly situated waters., including wetlands, located in the same region, have a significant nexus to a traditional navigable water, interstate water or the territorial seas.

Under the 2015 rule, the first six categories would effectively establish a set of "waters of the United States" by rule, while the final category would grant the Agencies authority to determine all "other waters" by using the highly subjective "significant nexus" analysis on a case-by-case basis.  The definition of "significant nexus" makes it clear that all waters in the same watershed are in the same region, so the 2015 rule would allow the Agencies to "aggregate" such waters.  It is difficult to envision any lands that are not potentially within the bounds of federal Clean Water Act jurisdiction under the 2015 rule.

The 2015 rules eliminated the existing regulatory provision that defines "water of the U.S." as including other waters on the basis of interstate or foreign commerce, and instead required a "significant nexus" determination based on ecological impacts, expanding the category to one that the courts have determined is overly broad.

The Clean Water Act was enacted pursuant to Congress's authority to regulate interstate commerce under Article 1, section 8 of the Constitution.  As a result, regulatory Agencies violate the Constitution when their enforcement of the Act extends beyond the regulation of interstate commerce.  Yet, it is by no means clear that all waters with a significant nexus to navigable waters also have a substantial effect on interstate commerce. *See United States v Darby*, 312 U.S. 100, 119-20 (1941) (holding that Congress may regulate intrastate activity only where the activity has a 'substantial effect" on interstate commerce).  In other words, there are likely waters—not to mention dry ditches—that the 2015 rule subjects to Clean Water Act jurisdiction, but that, under a commerce clause analysis, would not be subject to federal authority.  Regulating these waters falls outside the scope of Congress'—and therefore federal Agencies'—constitutional authority.  The 2015 rule failed to take into account the "interstate commerce" basis of the Clean Water Act, and thereby the Constitution's limits on federal regulatory authority.

In defining jurisdiction, the Kennedy opinion relies on an analysis of the significant nexus between tributaries and connected traditional navigable waters, rather than on a simple classification of stream type (i.e. perennial versus intermittent).

Under the 2015 rule, for waters that escape the expanded definitions of tributary or adjacency, the Agencies may still find a "significant nexus" on a case-by-case basis, considering all "similarly situated waters located in the same region."  Under the 2015 rule, the Agencies found that a "significant nexus" exists when "a water, including wetlands either alone or in combination with similarly situated waters in the region (defined as the watershed), significantly affects the chemical, physical or biological integrity of water identified in (1)-(3) above." The Agencies cited EPA's "connectivity study" as the method the Agencies will use to determine that the nexus is more than insubstantial.  By designating all tributaries and adjacent wetlands and waters as having a significant nexus, the Agencies concluded that these waters, by definition, satisfy Justice

Kennedy's condition that Clean Water Act jurisdiction requires more than a speculative or insubstantial effect on navigable waters.

Although the proposed rule is not a direct copy of the 2015 rule and does not contain the same objectionable "case-by-case" language, the proposed rule reflects the weaknesses of both 2015 and pre-2015 regulations in that the rule restores the vague significant nexus test, which implicitly requires case-by-case determinations. The Agencies express a desire to take such factors into account as climate change, snowpack, rainfall, and temperature, conditions that of course vary from year to year. Here, the Agencies embark on an unprecedented course of speculation that will continue the trends just discussed.

The RRC is concerned that "other waters," such as isolated vernal pools and prairie potholes, may be jurisdictional subject to case-specific significant nexus evaluation assessing these waters in combination with similarly situated waters and wetlands in the same region. The 2015 rule provides that such waters are "similarly situated" when they "perform similar functions and are located sufficiently close together or sufficiently close to a water of the US so that they can be evaluated as a single landscape unit with regard to their effect on the chemical, physical and biological integrity" of a water identified in previously designated categories. Under this definition, agency reviewers would have great discretion in identifying certain waters, such isolated ponds and wetlands, and evaluating them together within a large "landscape unit." Under the 2015 rule, this is the only category of waters subject to an individual significant nexus determination. The 2015 rule is too subjective with respect to determining whether or not "other waters" are jurisdictional. Nevertheless, the proposed rule and the expressed intent of the Agencies in interpreting the same go far beyond the 2015 rule in that the significant nexus test is the ceiling for determining whether any water source whatsoever falls within the definition of Water of the United States.

The result of this ad-hoc analysis will be that landowners will often not know (or even know to consider) whether bodies of water on their private properties—potentially even dry fields and creek beds—are subject to Clean Water Act jurisdiction until a federal field agent arrives to conduct this highly subjective "significant nexus" analysis. The Agencies failed to consider the chilling effect the rule could have on the economic development of private property that, depending on an individual field agent's future determination may be deemed subject to federal regulation.

The Agencies' expansive definitions in the proposed rule runs counter to recent guidance provided by the United States Supreme Court to EPA when defining the limits of its authority. In *Utility Air Reg. Group v. EPA*, the Supreme Court cautioned that "[when] an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism." *Util. Air Reg. Group v. Environmental Protection Agency*, No. 12-1146, slip op. (U.S. June 23, 2014).

The Agencies should not rely on Justice Kennedy's "significant nexus" test in asserting Clean Water Act jurisdiction. The guide should be the plurality's narrower hydrographic test,. See *Marks v. US*., 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*. 428 U.S. 153, 169 n.15 (1976) ". . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds..."). The Kennedy test is vague and provides

5

**Docket Number EPA-HQ-OW-2021-0602**
**Railroad Commission of Texas Comments**
**February 7, 2022**

no guidance or certainty to landowners. The 2015 rule establishes a test for jurisdiction that has no observable qualities and was developed by a single justice in the concurrence of one case. The plurality's hydrographic test should be adopted by the Agencies. It garnered the most support from the Supreme Court, and perhaps more importantly it represents a clearer and narrower statement of the federal government's powers.

RRC agrees with the regulatory certainty of the Navigable Waters Protection Rule through categorical treatment of adjacent wetlands rather than on the case-by-case application of Justice Kennedy's significant nexus test. Determination of the boundaries of wetlands should be based on hydrology, hydrophytic vegetation, and hydric soils under normal circumstances. There is sufficient objective criteria in the definition of "adjacent wetland" to allow for such categorical (as opposed to case by case) treatment. Defining the term "adjacent wetlands" to mean wetlands that "abut or have a direct hydrologic surface connection to other 'waters of the United States' in a typical year," with "abut" meaning when a wetland touches a water of the United States at either a point or side, and with "direct hydrologic surface connection" as occurring as a result of inundation from a jurisdictional water to a wetland or via perennial or intermittent flow between a wetland and a jurisdictional water" establishes specific, rule-based criteria that can be universally applied.

Wetlands that are physically separated from jurisdictional waters by upland or by dikes, barriers, or similar structures and also lack a direct hydrologic surface connection to jurisdictional waters, should not be considered adjacent, with "upland" referring to any land area above the ordinary highwater mark or high tide line that does not satisfy all three wetland delineation factors (i.e., hydrology, hydrophytic vegetation, and hydric soils) under normal circumstances. Ephemeral connections and subsurface connections between wetlands and jurisdictional waters should not constitute a direct hydrologic surface connection.

**Typical Year Analysis Under the Navigable Waters Protection Rule**

The term "typical year" may raise the greatest specter of ambiguity in the definition. However, the statement "within the normal range of precipitation over a rolling 30-year period for a particular geographic area" of the Navigable Waters Protection Rule is an acceptable, if imperfect, accommodation for the variety of regional conditions to which the rule applies. A statistical element could add certainty to the phrase "normal range of precipitation." In addition, the phrase "particular geographic area" should include reference to distances and/or eco regions or a combination of the two.

**How or whether states have taken any actions in response to changes in the jurisdictional scope of ''Waters of the United States'' under the Navigable Waters Protection Rule**

The Agencies have not been tasked with determining whether and how States manage non-jurisdictional waters within their borders. The Agencies are simply tasked with determining what waters are jurisdictional within the limits of the statutes and court opinions. This is an issue that should not be considered during the proposed rulemaking.

Docket Number EPA-HQ-OW-2021-0602
Railroad Commission of Texas Comments
February 7, 2022

One of the paramount objectives of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 125 1(a). However, that objective does not grant the federal government carte blanche to achieve those goals by any means necessary. Instead, the Agencies must consider an equally important objective of the Clean Water Act: To recognize, preserve, and protect the primary responsibilities and rights of Stales to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources. 33 U.S.C. § 125 1(b).
The *Rapanos* plurality observed that "the Government's expansive interpretation would 'result in a significant impingement of the States' traditional and primary power over land and water use." *Rapanos*. 547 U.S. at 738 (quoting SWANCC). The Court stated, further, that only a "clear and manifest" statement from Congress could authorize an unprecedented intrusion into traditional state authority and that "waters of the United States hardly qualifies." Id. (citing *BFP v. Resolution Trust Corp*., 511 U.S. 531, 544 (1994)).

The Clean Water Act also states that "the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter" and that "[federal] Agencies shall co-operate with State and local Agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution." 33 U.S.C. § 1251(g). In granting the 'primary responsibilities and rights" of the Clean Water Act to the States, and in designating allocation authority to the States, Congress made it clear that the goal of pollution prevention must be accomplished through the states.

### Whether there are Certain Waters that Could be Addressed by Regionalized Approaches

The proposed rule evinces a desire to account for regional differences in hydrology. While the RRC recognizes the need for a national framework and national standards, regional differences reflecting local hydrology, geography, and climate must be considered. In this respect, the RRC is in agreement with the Agencies. However, the rule to be adopted should provide clear criteria for identifying the upper boundary and the limits of federal jurisdiction. In its current form, the proposed rule does not provide sufficient guidance on how regional differences will be taken into account.

### Scope of Jurisdictional Tributaries

Multiple rules, judicial decisions, and longstanding practice protected ephemeral, intermittent, and perennial streams that met applicable criteria for jurisdiction as tributaries that are ''waters of the US.'' Ephemeral streams were then categorically excluded from jurisdiction in the Navigable Waters Protection Rule, and some intermittent streams and even some perennial streams are no longer jurisdictional under the Navigable Waters Protection Rule. The Agencies in their pre-publication request for comment sought public feedback on whether certain characteristics, such as indicators of channelization; physical indicators such as indicators of ordinary high water mark; flow regime; flow duration; watershed size; landscape position; stream network density; or distance from a traditional navigable water, territorial sea, or interstate water should inform determinations about which tributaries could be considered jurisdictional as a class, and which decisions are best left to individual, case-specific significant nexus determinations similar to the Agencies' practice from 2007 through 2015.

**Docket Number EPA-HQ-OW-2021-0602**
**Railroad Commission of Texas Comments**
**February 7, 2022**

Defining the scope of the CWA in a manner consistent with Justice Scalia's opinion in *Rapanos* would greatly clarify the scope and requirements of the Federal regulations. Such an approach would create greater certainty for the States and reduce the frustration and uncertainty of the public by eliminating the ambiguity regarding the reach of the CWA. It would protect private property rights and encourage economic development. And, it would ensure that the regulatory burden is proportionate to reasonable water protection benefits.

Justice Scalia's opinion in *Rapanos v United States*, 547 U.S. 715 (2006) found that Clean Water Act jurisdiction includes relatively permanent waters and wetlands with a continuous surface connection to relatively permanent waters. As determined by Justice Scalia, the term "relatively permanent" should not include dry channels "through which water flows intermittently ephemerally, or channels that periodically provide drainage for rainfall." The term should include only those waters that flow year round or continuous seasonal.

With respect to the term "continuous surface connection", Justice Scalia stated that such a connection would make it "difficult to determine where the "water" ends and the "wetland" begins. In other words, there should be no clear distinction between the "waters" and the "wetlands."

The 2015 rule defined "tributary" based on some evidence of flow, however indirect, to a traditional navigable water. If a water has an ordinary high water mark or a bed or bank, even where the flow is broken up by a road or other barrier, the 2015 rule categorically found that it is a "tributary," has a "significant nexus", and is therefore jurisdictional. Similarly, waters and wetlands adjacent to tributaries (e.g., a seasonally wet pond or swale) were categorically jurisdictional. The tributary definition covers both natural and man-altered or man-made waters such as canals and ditches not otherwise excluded.

The 2015 definition potentially replaced the prior jurisdictional determination guidance used in the arid West. And while the Agencies asserted that the rule would expand the scope of jurisdictional waters by three percent, the impact on arid regions such as much of Texas would be much greater. The 2015 rule increased federal oversight of smaller bodies of water, including intermittent streams, in Texas and across the nation, even though the majority of the Supreme Court clearly stated that to be jurisdictional, such streams should contain water on a more or less continuous basis. The 2015 rule captured waters a great distance from navigable waters previously considered isolated or exempt, particularly impacting the arid West. Thus, significantly more property, particularly in arid regions, would be subject to Clean Water Act jurisdiction under the 2015 rule. In such areas, the increased regulatory burden will be out of proportion to reasonably foreseeable water protection gains.

The Agencies should apply the principles and rationale of the *Rapanos* plurality and concurring opinions. The general proposition that "[t]he Federal government should avoid pressing against the outer limits of its authority when doing so would infringe upon the traditional rights and responsibilities of States to manage their own waters." 84 Fed. Reg. 4174 (citing *SWANCC*, 531 U.S. at 172-73 and Section III.A, *supra* of the Proposal). Thus, RRC supports limiting the scope of the "tributary" definition to perennial or intermittent fixed waterbodies that contribute flow to traditional navigable waters or the territorial seas, including through other jurisdictional waters and through certain excluded waters and features. RRC agrees this provides clear and predictable

8

**Docket Number EPA-HQ-OW-2021-0602**
**Railroad Commission of Texas Comments**
**February 7, 2022**

jurisdictional boundaries to guide the Agencies and the regulated community. The Agencies should not adopt the case specific "significant nexus" analysis, but should adopt a clearer definition of tributary, with its identification of specific objective factors such as flow duration for intermittent and perennial flow, which will enhance the ability of all stakeholders to predict whether a water in question is jurisdictional.

The rules must clearly delineate to the public the limits of federal jurisdiction, and do so by identifying bright line rules and clear criteria with respect to classes of water that are subject to federal regulation. We recommend that the rules clearly define tributaries based on the scientific understanding of stream channel formation and structure.

The federal Agencies' 2015 rule included, for the first time, a sweeping definition of the term "tributary." This definition is problematic for landowners for a number of reasons. From a practical standpoint, determining the "ordinary high water mark" of a bed and bank is a notoriously difficult task. The *Rapanos* plurality stated that the ordinary high water mark standard "extended the waters of the United States to virtually any land feature over which rainwater or drainage passes and leaves a visible mark—even if only the presence of litter and debris". *Rapanos*, 547 U.S. at 725 (internal quotations omitted). Justice Kennedy disparaged the ordinary high water mark as providing "no such assurance" of a reliable standard for determining a significant nexus. Id. at 780-8 1 (Kennedy. J., concurring in the judgment).

While embracing Justice Kennedy's vague "significant nexus" test for expanding federal jurisdiction over land and waters, the Agencies ignore that Justice Kennedy eschewed the "ordinary high water mark" as an appropriate standard for determining that tributaries are "waters of the United States," noting that "the breadth of this standard.. . leave[s] wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it." *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring in the judgment).

**Scope of Jurisdictional Ditches**

Historically, the Agencies have recognized that ditches that reroute otherwise jurisdictional tributaries are themselves jurisdictional as tributaries. In practice, many other ditches have been considered generally not jurisdictional. The 2015 Clean Water Rule and later the Navigable Waters Protection Rule, for the first time, excluded many ditches explicitly in rule language. The Agencies solicited feedback on whether flow regime, physical features, excavation in aquatic resources versus uplands, type or use of the ditch (e.g., irrigation and drainage), biological indicators like presence of fish, or other characteristics could provide clear and implementable distinctions between jurisdictional and non-jurisdictional ditches.

Perhaps more troubling than this reliance on the "ordinary high water mark" standard is the Agencies' explicit inclusion of "ditches" as "waters of the United States." Under this untenable and legally baseless definition, any landowner who has a ditch on his or her private property is at risk of having the federal government exert regulation over that ditch and impose burdensome and expensive federal regulations over dry land that does not remotely resemble any common-sense understanding of "waters of the United States." At a bare minimum, this will require farmers to pay to determine whether their ditch is a "water of the United States." These landowners will then

**Docket Number EPA-HQ-OW-2021-0602**
**Railroad Commission of Texas Comments**
**February 7, 2022**

be required to obtain permits just to till the soil near gullies, ditches or dry streambeds where water only flows when it rains. It seems inconceivable that this is what Congress intended when it penned the term "navigable waters." The Agencies have argued that this explicit inclusion of "ditches" will result in no additional waters or lands being subject to federal jurisdiction, as "ditches" are still explicitly exempted under Clean Water Act Section 404(f). See e.g. 33 U.S.C. § 1344(f)(1)(C). However, the Agencies failed to take into account that ditches are not similarly and explicitly exempted under the Clean Water Act Section 402 program, which, like the 404 program, will be subject to this new definition of "waters of the United States."

The RRC encourages the Agencies to adopt a separate category of jurisdictional ditches. Over the years, the distinction between "ditches" and "tributaries" has been a source of confusion, so establishing a regulatory framework that distinguishes between the two is advisable. The statement in the definition of tributary in the Navigable Waters Protection Rule that "[T]he alteration or relocation of a tributary does not modify its status as a tributary as long as it continues to satisfy the elements of the definition" is a path by which certain ditches may still be determined to be jurisdictional as tributaries.

**Scope of Adjacency**

As the Agencies noted, each regulatory definition of ''waters of the US'' has taken a different approach to determining adjacency for purposes of jurisdiction under the Act and to the jurisdiction of non-adjacent waters.

The language in the rule itself should notify the public what the rule does and does not cover. The proposed rule resurrects deficiencies in the pre-2015 and 2015 rules concerning the meaning of adjacency.

Wetlands that may have been considered adjacent under some but not all definitions of ''waters of the US'' include wetlands behind artificial berms, which were considered adjacent under the pre-2015 regulatory regime and the 2015 Clean Water Rule regardless of the presence or absence of a hydrologic surface connection. These water bodies required a surface water connection under the Navigable Waters Protection Rule. The pre-2015 regulatory regime and the 2015 Clean Water Rule also included ''neighboring'' wetlands within the definition of ''adjacent,'' while the Navigable Waters Protection Rule generally did not.

Under the 2015 rulemaking, "adjacent" waters are—by rule—subject to federal Clean Water Act jurisdiction. As in the proposed rule, the Agencies retained the regulatory definition of 'adjacent" as meaning "bordering, contiguous or neighboring." However, the Agencies proposed for the first time a regulatory definition of "neighboring" as meaning "waters located within a riparian area or floodplain of [a jurisdictional water].. .or waters with shallow subsurface hydrologic connection or confined surface hydrologic connection to such jurisdictional water." The proposed rule does not use the "riparian area" or "floodplain language." Nevertheless, the inclusion of the same "shallow subsurface hydrologic connection" language combined with speculative climate change criteria gives a ceiling for federal jurisdiction limited only by the imagination of a factfinder. Under the vague criteria provided,it is difficult to envision any lands—especially those that lie near the coast—that are not potentially within the ambit of federal jurisdiction. This broad and

10

**Docket Number EPA-HQ-OW-2021-0602**
**Railroad Commission of Texas Comments**
**February 7, 2022**

overreaching definition would impose virtually no limit on federal jurisdiction, despite the fact that the *Rapanos* plurality disapproved of the federal Agencies' reliance on this sweeping definition as "extended beyond reason to include, inter alia, the 100-year floodplain of covered waters." *Rapanos*, 547 U.S. at 746. As a result, States and landowners could be subject to the threat of assertions of federal jurisdiction over their property based on dragnet criteria.

Adjacent lakes and ponds that were not jurisdictional as tributaries were covered under the other waters category in the pre-2015 regulations if they met certain criteria. Adjacent lakes and ponds were included with adjacent wetlands in an adjacent waters category in the 2015 Clean Water Rule. Lakes and ponds with certain surface water connections are jurisdictional under the Navigable Waters Protection Rule.

Non-adjacent, intrastate, non-navigable waters, such as certain prairie potholes and playa lakes, that are not proximate to jurisdictional waters or lack natural tributary connections or ditching to connect them to a tributary network are typically nonjurisdictional under the Navigable Waters Protection Rule and, as a matter of practice, following Supreme Court decisions the Agencies did not assert jurisdiction over them under the pre-2015 regulatory regime. These waters would have been jurisdictional under the 2015 Clean Water Rule where they met specific criteria and were found to have a significant nexus to downstream traditional navigable waters, interstate waters, or territorial seas. Despite assurances by the Agencies not to cast a wide net over waters without a significant affect on jurisdictional waters, the RRC is not convinced that nonjurisdictional waters are clearly delineated.

## Exclusions Under the Proposed Rule

The RRC is concerned with the removal of exclusions present in the Navigable Waters Protection Rule under the proposed rule.

We recommend excluding from the definition of "waters of the United States" water-filled depressions created in upland incidental to mining or construction activity, and pits excavated in upland for the purpose of obtaining fill, sand or gravel.

Wastewater recycling structures constructed in upland should be excluded, and the exclusion should also apply to associated detention and retention basins as well as groundwater recharge basins and infiltration ponds built for wastewater recycling. The exclusion should also cover water distribution structures that are built in upland for water recycling, which often connect or carry flow to other water recycling structures, and which the Agencies have not historically considered jurisdictional.

The rule should exclude groundwater, including groundwater drained through subsurface drainage systems. The Agencies should continue the practice of not interpreting "waters of the United States" to include groundwater.  There are existing laws, such as the Safe Drinking Water Act, specifically intended to protect groundwater. Furthermore, state agencies such as TCEQ are competent to regulate groundwater quality.

**Docket Number EPA-HQ-OW-2021-0602**
**Railroad Commission of Texas Comments**
**February 7, 2022**

Last, we recommend excluding ephemeral features, ditches, stormwater control features, and artificial lakes and ponds that do not result from an impoundment of jurisdictional waters. These features were never intended to fall within the scope of waters of the United States, and to decide otherwise is an unnecessary intrusion into non-jurisdictional matters.

The public generally recognizes the importance of water and the need to protect those waters. However, the public has less understanding of the legal decisions and the more technical scientific standards. The rules must meet the test of common sense, as well as the legal tests and science. The resulting regulations should neither *exclude* waters the public finds obvious and important nor *include* areas that are not intended to be regulated.

### Environmental Justice

The Agencies expressed concerns on whether the jurisdictional status of waters can be linked to environmental justice concerns, and, if so, under what basis. Although we agree that additional effort could be made to ensure that impacted minority communities have the opportunity to comment on impacts to "waters of the US," environmental justice cannot be used as a scientific or legal basis for defining jurisdictional waters. The Agencies are limited by their statutory authority, and as such are not competent to decide abstract philosophical questions of environmental justice and the concrete solutions to the same.

### Effects of Climate Change

The landscape of the Nation has been constantly changing over time and will continue to do so. The Agencies should develop a rule that addresses the issue at hand – what types of waters are under the protection of the Clean Water Act. The Agencies should not attempt to predict the future. Further, climate change is not a factor found anywhere in the Clean Water Act.

Finally, the Agencies must sufficiently determine the cost of the proposed rules. The Agencies state that the 2015 rule would provide more benefits to the public than costs. However, although the Agencies' cost-benefit analysis of the 2015 rule includes a discussion of additional permitting costs to the public and industry, it does not include any discussion of "takings" or the costs to the public and industry when a permit is denied for a proposed activity within areas newly determined to be jurisdictional under the proposed rule. Nor does the cost-benefit analysis fully consider the additional costs to State programs.

While public benefits should far exceed increased costs associated with regulation, costs to state Agencies must also be acknowledged. A greatly enlarged scope of federal jurisdiction could increase the states' costs for Section 401 water quality certification, water quality standards and total maximum daily load (TMDL) development, and National Pollutant Discharge Elimination System (NPDES) permitting.

The 2015 rule greatly expanded federal jurisdiction under the Clean Water Act and did nothing to clarify the issues with which the courts, the Agencies, the States, and the public have been faced over the years concerning such jurisdiction. Although the Agencies stated in the preamble that federal jurisdiction would be limited, the 2015 rule would potentially extend the reach of federal jurisdiction to surface waters that have generally *not* been considered "waters of the United States"

**Docket Number EPA-HQ-OW-2021-0602**
**Railroad Commission of Texas Comments**
**February 7, 2022**

and could result in agency staff exercising open-ended discretion in making such jurisdictional determinations. As such, this expansion of jurisdiction significantly threatens private property rights. In addition, the proposal will further frustrate and open the public to possible enforcement by further obscuring the boundary between what is jurisdictional and what is not. Furthermore, the proposal did not demonstrate sufficient deference to State water protection laws or consideration of additional burdens to state programs.

Furthermore, the regulated community has come to rely on the Navigable Waters Protection Rule, and as the present rulemaking admits, the decision in *Pascua Yaqui Tribe v. EPA* vacating this rule by nationwide injunction is likely to be reversed or remanded for further proceedings, which could resurrect this rule. No. 4:20–cv–00266, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021). This rulemaking reflects a misguided rush to overturn a rule that brought urgently needed clarification to regulated entities while litigation is pending without having demonstrated by empirical evidence any deleterious effects flowing from this rule. The Railroad Commission of Texas foresees that a sudden regulatory tightening will invariably have an adverse impact on the post-pandemic economic recovery, especially within the petroleum and natural gas industries, which will of course pass on these costs to the consumer in the form of higher fuel and energy prices, an outcome inconsistent with the Administration's other important goals.

We appreciate the effort extended by the Agencies to obtain input from the states and supporting Agencies and organizations during the development of agency regulations. We urge the Agencies to keep the lines of communication open with state co-regulators as this effort goes forward. Should you have questions or concerns, please feel free to contact David Cooney at (512) 463-6977 or david.cooney@rrc.texas.gov .

**Railroad Commission of Texas**