Office of Attorney General
State of West Virginia



Patrick Morrisey
Attorney General

February 7, 2022

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, DC 20460

The Honorable Jaime A. Pinkham
Acting Assistant Secretary of the Army (Civil Works)
U.S. Department of the Army
108 Army Pentagon
Washington, DC 20310

Submitted via https://www.regulations.gov

Re:     **Comments of the States of West Virginia, Alabama, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming, the Commonwealth of Kentucky, and the Commonwealth of Virginia, on the proposed rule entitled *Revised Definition of "Waters of the United States*," 86 Fed. Reg. 69,372 (Dec. 7, 2021) (Docket Nos. EPA-HQ-OW-2021-0602; FRL-6027.4-03-OW).**

Dear Administrator Regan and Acting Assistant Secretary Pinkham:

In the Clean Water Act of 1972 ("CWA"), Congress struck a deliberate balance between federal and state authority over our nation's waters.  From the start, Congress intended to "recognize, preserve, and protect the primary responsibilities and rights of States ... to plan the development and use ... of land and water resources."  33 U.S.C. §§ 1251(b).  At the same time, Congress gave the Environmental Protection Agency and the Army Corps of Engineers (together, "the Agencies") regulatory authority over certain "navigable waters" only—that is, "the waters of the United States." *Id.* §§ 1344, 1362(7).

**EXHIBIT**
**7**

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 2

Congress did not expressly define "the waters of the United States" in the CWA's text, so courts and agencies have wrestled with the definition for years. In the CWA's predecessor statutes, "navigable waters of the United States" referred to "interstate waters that are 'navigable in fact' or readily susceptible of being rendered so." *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (plurality op.) (quoting *The Daniel Ball*, 10 Wall. 557, 563 (1871)). And since 2001, the Supreme Court has twice rejected the Agencies' attempts to expand their scope of regulatory authority under the CWA by defining "the waters of the United States" too broadly. *See Rapanos*, 547 U.S. 715 (4-1-4 split ruling with a plurality and Justice Kennedy rejecting the Corps' broad assertion of authority over wetlands, but remanding for consideration under different standards); *Solid Waste Agency of N. Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*") (declining to include as "waters of the United States" isolated waters used as a habitat by migratory birds).

After *Rapanos*, the Agencies announced that they planned to identify jurisdictional waters using reasoning drawn from the *Rapanos* dissenters' view of the operative test. *See* U.S. EPA & U.S. Army Corps of Engineers, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States & Carabell v. United States, at 3 (Dec. 2, 2008). Specifically, the Agencies concluded that CWA jurisdiction "exists over a water body if either the plurality's [relatively permanent standard] or Justice Kennedy's [significant nexus] standard is satisfied." *Id.* at 3 & n.15 (citing *Rapanos*, 547 U.S. at 810 (Stevens, J., dissenting) ("judgments should be reinstated if *either* of those tests is met")); *contra Marks v. United States,* 430 U.S. 188, 193 (1977) (the holding of a divided court "may be viewed as that position taken by those Members who concurred in the judgments on the *narrowest* grounds" (emphasis added)).

In 2015, the Agencies issued a rule embracing a novel and sweeping view of their jurisdiction under the CWA. 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). The 2015 Rule said that its "technical basis"—including the Agencies' interpretation of the "'waters of the United States' protected under the CWA"—flowed from an EPA Science Advisory Board report. That report in turn purported to synthesize peer-reviewed literature that the Agencies used to justify exercising their expanded view of their jurisdiction. *Id.* at 37,057. But the 2015 Rule did not hold up in court; several judges stayed its implementation after many of the undersigned States challenged it as contrary to the CWA, the Administrative Procedure Act, and the Constitution. *See, e.g., Georgia v. Pruitt,* 326 F. Supp. 3d 1356 (S.D. Ga. 2018); *North Dakota v. EPA*, 127 F. Supp. 3d 1047 (D.N.D. 2015). The Agencies then issued separate rules delaying the applicability date of the 2015 Rule, 83 Fed. Reg. 5200 (Feb. 6, 2018), stating the Agencies' intent to repeal the 2015 Rule in full and replace it with the pre-2015 standards, 83 Fed. Reg. 32,227 (July 12, 2018), and formally repealing the 2015 Rule, 84 Fed. Reg. 56,626 (Oct. 22, 2019).

After the courts' rebukes, the Agencies tried again in February 2019. Then, the Agencies issued a proposed rule with a revised definition of "the waters of the United States." 84 Fed. Reg. 4154 (Feb. 14, 2019). West Virginia and many of the undersigned States submitted comments in support of the Agencies' newly restrained—and statutorily required—view of their powers. *See* States of West Virginia, Alabama, Arkansas, Georgia, Idaho, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Texas, and Utah, Comment letter on the proposed rule entitled Revised Definition of "Waters of the United States,"

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 3

(Apr. 15, 2019), https://www.regulations.gov/comment/EPA-HQ-OW-2018-0149-5400 ("States' April 15, 2019 Comments"). In April 2020, the Agencies turned that proposal into a final rule, the Navigable Waters Protection Rule ("NWPR"), 85 Fed. Reg. 22,250 (Apr. 21, 2020).

But here again, the effort failed—at least for the time being. In August 2021, for example, an Arizona district court judge vacated the NWPR and remanded it to the Agencies for reconsideration. *See Pascua Yaqui Tribe v. U.S. EPA*, No. 20-cv-00266, ___ F. Supp. 3d ___, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021). The Agencies then announced that they would halt NWPR implementation nationwide and interpret "the waters of the United States" "consistent with the pre-2015 regulatory regime" until they can promulgate a rule that tracks President Biden's January 20, 2021, Executive Order 13990 on "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." *Current Implementation of Waters of the United States*, EPA, https://www.epa.gov/wotus/current-implementation-waters-united-states ("Current Implementation").

In November 2021, the Agencies announced a proposal to revise the definition of "Waters of the United States." The proposed rule purports to revise and replace the NWPR. It ostensibly returns the definition of "the waters of the United States" to its pre-2015 status, with updates to reflect the Supreme Court's rulings in *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985), *SWANCC*, and *Rapanos*. *See* "Revised Definition of 'Waters of the United States,'" 86 Fed. Reg. 69,372 (Dec. 7, 2021) ("Proposed Rule").

These comments explain the undersigned States' serious concerns with this latest effort to redefine the Agencies' jurisdiction.

## DISCUSSION

The Agencies say that "prompt replacement of the NWPR" with the Proposed Rule is "vital" because "further developments in litigation over the [NWPR] could bring the rule back into effect." 86 Fed. Reg. at 69,373. Even spotting the Agencies that this would be a bad outcome, it would not excuse rushing to expand their jurisdiction over the nation's waterways at the expense of the limits Congress set.

The Proposed Rule purports to interpret "the waters of the United States" in line with "the longstanding 1986 regulations, [and] with amendments … to reflect the [A]gencies' interpretation of the statutory limits on the scope of [that definition] and informed by Supreme Court case law." 86 Fed. Reg. at 69,373. If the Proposed Rule is finalized, "the waters of the United States" would include:

Traditional navigable waters, interstate waters, and the territorial seas, and their adjacent wetlands; most impoundments of 'waters of the United States'; tributaries to traditional navigable waters, interstate waters, the territorial seas, and impoundments that meet either the relatively permanent standard or the significant nexus standard; wetlands adjacent to impoundments and tributaries, that meet either

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 4

the relatively permanent standard or the significant nexus standard; and 'other waters' that meet either the relatively permanent standard or the significant nexus standard.

*Id.*

The undersigned States strongly oppose replacing the NWPR—and even more, replacing it with the Proposed Rule.

## I.   The States Oppose Scrapping The NWPR's Clear Definition And Stable Framework.

After a decades-long wait, the NWPR delivered a definition of "the waters of the United States" that is faithful to the CWA's text and the spirit of cooperative federalism that animates it. The Proposed Rule, however, maligns the NWPR as "diminishing the appropriate role of science and Congress's objective" in the CWA. 86 Fed. Reg. at 69,373. And by seeking to replace the NWPR with the Proposed Rule, the Agencies would cast aside the stable regulatory framework the NWPR provides in favor of a distorted view of their authority that the statute cannot support.

Many of the undersigned States explained in their April 2019 comment letter why they supported so many of the features that eventually made their way into the NWPR. Among other things, *that* proposed rule corrected the 2015 Rule's jurisdictional overreach by tracking the plurality opinion in *Rapanos*; defining "the waters of the United States" in a way that respected the CWA's text and limits; respected the States' regulatory expertise and power over their own lands and waters; avoided flying too close to the limits of the Agencies' authority under the Commerce Clause; and corrected two flaws inherent to the 2015 Rule that rendered it unconstitutionally vague. *See* States' April 15, 2019 Comments; *cf.* 85 Fed. Reg. at 22,265, 22,287-88.

As the Agencies recognized then, "case-specific application of the [A]gencies' previous interpretation of Justice Kennedy's significant nexus test" in their post-*Rapanos* guidance created confusion. 85 Fed. Reg. at 22,273. In contrast, the NWPR embraced "clear categories of jurisdictional waters that adhere to the … *Riverside Bayview*, *SWANCC*, and *Rapanos* decisions while respecting the overall structure and function of the CWA." *Id.* Of particular nation-wide importance was the limited exclusion of ditches from jurisdictional waters which helped provide certainty to landowners. *Id.* at 22,340. These "categorical bright lines," coupled with a definition of "the waters of the United States" that tracked the principles laid out by the *Rapanos* plurality, gave critical "clarity and predictability for regulators and the regulated community." *Id.* at 22,273. These benefits were absent from the Agencies' prior guidance. They will disappear again if the Agencies finalize the Proposed Rule.

Although the Agencies say abandoning the NWPR to "return generally to the familiar pre-2015 definition" of "the waters of the United States" will provide States and stakeholders with a "known and familiar framework," 86 Fed. Reg. at 69,373-74, the older standard is not a better one. Under it, the "precise reach of the [CWA] remains unclear." *Sackett v. EPA*, 566 U.S. 120, 133 (2012) (Alito, J., concurring). The Agencies admitted the confusion stemming from the pre-2015 standards during their failed effort to expand their jurisdictional authority through the 2015 Rule:

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 5

Their post-*Rapanos* guidance fell short by not giving key information to "ensure timely, consistent, and predictable jurisdictional determinations." 80 Fed. Reg. at 37,056. The ambiguity that followed meant "almost all waters and wetlands across the country theoretically could be subject to a case-specific jurisdictional determination." *Id.* But this potentially limitless reach was the exact outcome that Congress sought to avoid by referring to "*the waters* of the United States" rather than just "water of the United States." *Rapanos*, 547 U.S. at 737 (plurality op.) (cleaned up; emphasis added) (repudiating intent to bring "virtually all planning of the development and use of land and water resources by the States under federal control").

Thankfully, more answers should be coming soon. The Supreme Court recently granted the petition for a writ of certiorari in *Sackett v. EPA*, 8 F.4th 1075 (9th Cir. Aug. 16, 2021), *cert. granted*, No. 21-454, ___ S. Ct. ___, 2022 WL 199378 (U.S. Jan. 24, 2022) ("*Sackett II*"). The question presented is whether the Ninth Circuit used the proper test to determine that "the waters of the United States" included the Sacketts' "soggy residential lot" across from a "large wetlands complex" that eventually drained into a lake. *Sackett II*, 8 F.4th at 1079, 1081. The lot's supposed adjacency to a "relatively permanent" unnamed tributary and its relationship to "similarly situated" wetlands were all the Ninth Circuit needed to give EPA jurisdiction. *Id.* at 1091-93. The court refused to "second guess" the agency's technical judgment that the lot affected the "chemical, physical, and biological integrity" of the lake. *Id.* at 1093. By taking up the case, the Supreme Court has the clearest opportunity in years to provide the Agencies, the States, and the regulated public clarity about which waters—or, as here, *lands*—fall within the Agencies' regulatory sweep. The Agencies may be well advised to stay this rulemaking until the Court offers those answers, and thus avoid issuing a rule that may be invalidated just as soon as it is finalized.

In any event, whether a rule based on this proposal is in place for the short- or long-term, the only thing "known and familiar" it will return to the public is an unsustainable state of regulatory confusion. 86 Fed. Reg. at 69,373-74. By keeping the NWPR's approach—or at least by waiting until after the Supreme Court decides *Sackett II*—the Agencies can "readily … avoid[]" a stable situation spinning out. *Rapanos*, 547 U.S. at 758. Returning to the principles found in the NWPR would keep in place the most constitutional and CWA-compatible definition of "the waters of the United States" the Agencies have ever promulgated.

## II.   The States Oppose Many Aspects Of The Proposed Rule.

In the Proposed Rule, the Agencies purport to define "the waters of the United States" to include certain categories of waters and wetlands—plus a cryptic category of "other waters"—that meet "either the relatively permanent standard *or* the significant nexus standard" from *Rapanos*. 86 Fed. Reg. at 69,373 (emphasis added). The Agencies contend that, as they see them, at least, the Proposed Rule's collective "limitations" "are consistent with the statutory text, advance the objective of the Act, are supported by the scientific record and Supreme Court case law, and appropriately consider the policies of the Act." *Id.* at 69,374. Beyond that, the Agencies build up the Proposed Rule as "avoid[ing] constitutional and federalism concerns," *id.* at 69,402, and offering "[c]ontinuity with the 1986 regulations [that] will minimize confusion and provide regulatory stability for the public," *id.* at 69,416. The Agencies are wrong on all counts.

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 6

### A. The Agencies should elevate, not minimize, the "relatively permanent" standard.

The Agencies claim to honor the CWA's terms and limitations by using "both the relatively permanent standard and the significant nexus standard." 86 Fed. Reg. at 69,395. But the Proposed Rule downgrades the relatively permanent standard to one that is "administratively useful" yet ultimately "insufficient to meet the [CWA's] objective[s]." *Id.* at 69,395-98. And by doing so in the name of realizing the CWA's "environmentally protective aim," *id.* at 69,395, the Agencies are "substituting the purpose of the statute for its text," *Rapanos*, 547 U.S. at 755 (plurality op.). This tactic is improper.

Unlike the Proposed Rule's "two is better than one" approach, the plurality's relatively permanent test stays faithful to the text of the CWA and provides the very limits the Agencies seem poised to ignore. As the plurality explained, "[t]he use of the definite article ('the') and the plural number ('waters') shows plainly that § 1362(7) does not refer to water in general." *Rapanos,* 547 U.S. at 732 (plurality op.). Further, "waters" is ordinarily understood to mean "permanent, standing or flowing bodies of water 'forming geographical features' that are described in ordinary parlance as 'streams[,] ... oceans, rivers, [and] lakes,'" and "wetlands with a continuous surface connection to" those waters. *Id.* at 739, 742. This definition is an especially good fit given Congress' choice to link "waters of the United States" with the word "navigable." *SWANCC*, 531 U.S. at 172. It is hard to navigate ephemeral streams and lands only occasionally wet.

In a similar way, the plurality's test respects Congress' decision to "categorize[] the channels and conduits that typically carry intermittent flows of water separately from 'navigable waters'" themselves. *Rapanos*, 547 U.S. at 735 (plurality op.) (describing separate statutory definition of "point source"). Ordinary terms for intermittent watercourses (*e.g.*, ditches, channels, and conduits) appear in the CWA already—in definitions and concepts distinct from the definition of "the waters of the United States." *Id.* at 735-36.

The plurality's test also gives more than just lip service to the States' sovereign interests in "*the* quintessential state activity" of regulating local lands and waters. *FERC v. Mississippi*, 456 U.S. 742, 767 n.30 (1982). Cooperative federalism is baked into the CWA; Congress directed the Agencies to ensure that the Agencies "recognize, preserve, and protect the primary responsibilities and rights of States ... to plan the development and use ... of land and water resources." 33 U.S.C. § 1251(b); *see also California v. United States*, 438 U.S. 645, 662 (1978) ("except where the reserved rights or navigation servitude of the United States are invoked, the State has total authority over its internal waters"). In other words, the CWA does more than task federal agencies with securing clean water—it also preserves "primary state responsibility for ordinary land-use decisions." *Rapanos,* 547 U.S. at 755-56 (plurality op.) (citing 33 U.S.C. § 1251(b)).

Nor is it appropriate to discard this state-preserving language and infer that Congress meant instead to displace States' roles. If Congress wished to throw the federal-state power balance out of whack, it needed to include "exceedingly clear language" in the CWA to do so, *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020)—and that language simply isn't there. *Rapanos*, 547 U.S. at 738 (plurality op.) ("the phrase 'the waters of the United States' hardly qualifies" as a sufficiently clear statement of an intent to abrogate state authority).

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 7

**B.  The Proposed Rule overlooks the flaws inherent to the significant nexus test.**

Making the significant nexus standard effectively dispositive exacerbates the Proposed Rule's problems.  According to the Agencies, this standard would read "the waters of the United States" to include "waters that either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas."  86 Fed. Reg. at 69,373, 69,397.

Justice Kennedy read the definition to include only "waters that are or were navigable in fact or that could reasonably be so made," or waters with a "significant nexus" to such bodies. *Rapanos*, 547 U.S. at 779-81.  He concluded that this nexus offered "assurance" that the nonnavigable water "significantly affects the chemical, physical, and biological" integrity of navigable waters. *Id.*  From the plain text of the Proposed Rule, the Agencies have interpreted Justice Kennedy's test incorrectly—nonnavigable jurisdictional water must "significantly affect[] the chemical, physical, *and* biological" integrity of navigable waters, *id.* (emphasis added), not the "chemical, physical, *or* biological" integrity of the navigable waters, 86 Fed. Reg. at 69,373, 69,387, 69,394-97, 69,418 (emphasis added).  This swap might triple the Agencies' jurisdiction over water and land with an already tenuous connection to anything commonly viewed as "navigable."  It will not receive any deference if challenged in court, either. *See Citizens for Resp. & Ethics in Wash. v. FEC*, 209 F. Supp. 3d 77, 87 (D.D.C. 2016) (courts "should not[] defer to agency interpretations of opinions written by courts").

The Proposed Rule would also be on shaky ground even if it accurately reflected Justice Kennedy's test.  As the *Rapanos* plurality pointed out, that test is not drawn from the text of the CWA, but comes instead from *SWANCC*'s "cryptic characterization" of *Riverside Bayview*. *Rapanos*, 547 U.S. at 755 (plurality op.).  Its indeterminate language could permit the Agencies to extend the CWA to transient waters three (or more) degrees separated from any water traditionally understood to be navigable.  This muddling of the same statutory categories that the *Rapanos* plurality clarified, *id.* at 735-36, renders one or the other superfluous.

What's more, the significant nexus test disregards the meaningful, constitutional boundary Congress set by employing the phrase "the waters of the United States" in the first place.  This term functions as the connective tissue between the CWA and "Congress's Commerce Clause powers." *United States v. Lucero*, 989 F.3d 1088, 1095 (9th Cir. 2021).  Applying it loosely permits the federal government to extend its reach to all manner of lands that have no traditional ties to navigable waters and thus interstate commerce.  A standard as ambiguous as the Proposed Rule's could let the Agencies rationalize their way into jurisdiction in almost any case, commerce-related or not.  Yet "we would expect a clearer statement from Congress to authorize an agency theory of jurisdiction that presses the envelope of constitutional validity." *Rapanos*, 547 U.S. at 738 (plurality op.).

These problems are not hypothetical.  The *Rapanos* plurality would conclude, for example, that West Virginia's 8,000 miles of ephemeral and intermittent waters are outside "the waters of the United States." *Rapanos*, 547 U.S. at 739 (plurality op.).  By decoupling jurisdiction from

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 8

unusual weather events or "ephemeral" hydrological connections, that standard gives States and the regulated public certainty that the definition of "the waters of the United States" will not ebb and flow with those same events.  Some lower courts, on the other hand, have applied Justice Kennedy's significant nexus test to hold that the phrase can include "intermittent streams" and other oft-changing land and water features.  *See*, *e.g.*, *Black Warrior River-Keeper, Inc. v. Drummond Co., Inc.*, 387 F. Supp. 3d 1271, 1287 (N.D. Ala. 2019); *United States v. Lippold*, No. 06-30002, 2007 WL 3232483, at \*6 (C.D. Ill. Oct. 31, 2007).

Quite simply, the Agencies' refusal to offer clarity presents real problems for real people.  What is a landowner to make of this "critical ambiguity" when the Agencies respond "that many jurisdictional determinations" hanging on it "can only be made on a case-by-case basis by" agency field staff?  *Sackett*, 566 U.S. at 133 (Alito, J., concurring).  Where can developers turn for help when the Agencies determine that they have polluted some of the "other waters" swept within the Proposed Rule's updated version of Justice Kennedy's test, 86 Fed. Reg. at 69,373—especially when the Supreme Court has only applied that test in the context of wetlands?  An indeterminate standard offers them no answers and no recourse.  They must take their chances they can guess correctly their lands are *not* covered, or else grit through the financial squeeze of the arduous permitting process, or the five-year headache that precedes agency reassessment of a jurisdictional determination made under an almost certainly invalid standard.  *See* Current Implementation (jurisdictional determinations "are generally valid for five years" unless earlier revision is warranted (citing U.S. Army Corps of Engineers, Regulatory Guidance Letter No. 05–02, § 1(a), p. 1 (June 2005) (Regulatory Guidance Letter (RGL) 05–02))).

## C.  The Agencies' attempt to rewrite the CWA in the name of policy will lead to serious consequences.

The Proposed Rule also teems with the Agencies' attempts to expand their jurisdictional authority in the name of "climate change," the "climate crisis," and "environmental justice."  *See*, *e.g.*, 86 Fed. Reg. at 69,382-86, 69,393, 69,446-47.  But the CWA does not mention (much less define) "climate change" or "environmental justice."  Addressing these concepts by "substituting the purpose of the statute for its text" is neither correct nor allowed.  *Rapanos*, 547 U.S. at 755 (plurality op.).  The *Rapanos* concurrence and plurality alike recognized that such policy aims have nothing to do with the jurisdictional limits Congress set.  As Justice Kennedy explained, "environmental concerns provide no reason to disregard limits in the statutory text."  *Id.* at 778 (Kennedy, J., concurring in the judgment).  And as the plurality made clear, an "exclusive focus on ecological factors, combined with [a] total deference" to the Agencies' "ecological judgments" would let the Agencies "regulate the entire country as 'waters of the United States.'"  *Id.* at 749 (plurality op.); *see also id.* at 752-53 (plurality op.) (whether "benefits of particular conservation measures outweigh their costs is a classic question of public policy that should not … be answered by appointed officers … in contradiction of congressional direction"); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1816-17 (2016) (Kennedy, J., concurring) ("reach and systemic consequences" of the CWA "remain a cause for concern").

This statutory rewrite is no small matter.  If one thing is clear following *Rapanos*, it's that the definition of "the waters of the United States" has limits.  Yet in the Proposed Rule, the

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 9

Agencies lay claim to wide discretion to interpret the CWA in a way that could mean "[a]ny piece of land that is wet at least part of the year is in danger of being classified by EPA employees as wetlands covered by the Act." *Sackett*, 566 U.S. at 132 (Alito, J., concurring); *see*, *e.g.*, 86 Fed. Reg. at 69,373 (sweeping in "other waters," which can "meet either the relatively permanent standard or the significant nexus standard"). Even Justice Kennedy had doubts along these lines following *Rapanos*: "[T]he reach and systemic consequences of the Clean Water Act remain a cause for concern"—in other words, the Act "continues to raise troubling questions." *Hawkes Co.*, 136 S. Ct. at 1816-17 (Kennedy, J., concurring).

If left unchecked, the Agencies could launch an endless stream of jurisdictional determinations marred by the squishy conditional language both Justice Kennedy and the plurality rejected in *Rapanos*. The Agencies could regulate without having to show the "'significant nexus' of physical connection" the plurality required *or* the non-speculative or substantial effect on water quality needed to fall within Justice Kennedy's sense of "the zone fairly encompassed by the statutory term 'navigable waters.'" *Rapanos*, 547 U.S. at 755 (plurality op.), 780 (Kennedy, J., concurring in the judgment). This outcome is unacceptable.

**D.  The Proposed Rule disregards the States' role and the burden on the regulated public.**

The Proposed Rule treats the States' "primary" role in preventing, reducing, and eliminating pollution as "not incompatible with overlapping federal and state authority over [certain] waters," and thus shuns "a general policy in favor of preserving for states a zone of exclusive regulatory authority." 86 Fed. Reg. at 69,400-01 (quoting 85 Fed. Reg. 22,270). Feigning respect for state authority while preaching the necessity of overbroad federal protections flouts the CWA's cooperative federalism framework. 33 U.S.C. § 1251(b).

The Supreme Court has said that States' rights over rivers and other intrastate waters are "obvious, indisputable," and "omnipresent." *Hudson Cty. Water Co. v. McCarter*, 209 U.S. 349, 356 (1908). Congress has thus shown a "purposeful and continued deference to state water law." *California*, 438 U.S. at 653. The Agencies must hold up their end of the bargain to prevent "significant impingement of the States' traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 174. And there must be "a partnership between the States and the Federal Government." *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). None of that is consistent with an extravagant shift of state conservation power to federal regulators.

The Proposed Rule also fails to adequately consider that many States enforce laws and regulations that are *more* protective of their waters than the CWA alone. *See*, *e.g.*, W. Va. Code § 22-11-8(b)(1) ("It is unlawful for any person" without a state-issued permit to "allow sewage, industrial wastes or other wastes, or the effluent therefrom, produced by or emanating from any point source, to flow into the waters of this state."). States define jurisdictional "state waters" more broadly than "the waters of the United States," *see*, *e.g.*, Minn. Stat. § 115.01(22); Neb. Rev. Stat. § 81-1502(21); N.D. Cent. Code § 61-01-01; independently enforce their own water-quality

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 10

laws, *see*, *e.g.*, Fla. Stat. § 403.088[*]; Or. Rev. Stat. § 390.835; administer comprehensive wetland-protection programs, *see*, *e.g.*, Ark. Code § 15-22-1007; Ind. Code §§ 13-18-22-1 to -11; and uphold water-purity and pollution standards, *see*, *e.g.*, Ariz. Rev. Stat. §§ 45-401 to 45-704; Ky. Rev. Stat. §§ 224.70-100 to -150; Wyo. Stat. § 35-11-301.

These measures aren't coincidental or minor. State and local officials understand their local environments' unique hydrological challenges better than federal regulators. They can respond faster to changing conditions, too. And they are more closely accountable to constituents and stakeholders who have the sense of local needs.

Local accountability is all the more important because it is often these same local constituents and stakeholders who, as regulated parties, bear the brunt of agency overreach under the CWA. These landowners and developers must obtain a permit from one of the Agencies to discharge a "pollutant" (including dirt or sand) into regulated waters or else face criminal and civil penalties. *Cty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1489 (2020) (Alito, J., dissenting); *see* 33 U.S.C. §§ 1311, 1319, 1342, 1344, 1362, 1365. The permit process is already expensive and time-consuming. *Rapanos*, 547 U.S. at 721 (plurality op.) ("The average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915—not counting costs of mitigation or design changes."). And through the Proposed Rule's indeterminate standard and the "case-by-case test of ecological significance," *id.* at 754 (plurality op.), the Agencies seem intent on adding uncertainty to an already burdensome situation. Landowners and developers are now forced into the unenviable posture of wondering whether each passing day is the day they will face "crushing" "criminal penalties and steep civil fines" for an "inadvertent violation[]" of the CWA. *Cty. of Maui*, 140 S. Ct. at 1489 (Alito, J., dissenting).

The Agencies say that the Proposed Rule "would provide protections that are generally comparable to current practice; as such, the agencies find that there would be no appreciable cost or benefit difference." 86 Fed. Reg. at 69,375. This statement is misleading. The Agencies should compare the anticipated costs of the Proposed Rule with the costs of implementing the NWPR (which they have stopped implementing even though "further developments in litigation … could bring it back into effect," 86 Fed. Reg. at 69,373), *not* the costs of implementing "the pre-2015 regulatory regime" since September 3, 2021. *See* Current Implementation (announcing halt of NWPR implementation). According to at least one organization, the Proposed Rule's economic analysis includes "a secondary analysis against a baseline of the NWPR for the Section 404 permitting program, one of the most popular CWA permitting programs," which shows that the Proposed Rule "will cost between $113 and $276 million for increased permit and mitigation costs on an annualized basis." Dan Bosch, *The Biden WOTUS: Breadth and Uncertainty*, AMERICAN ACTION FORUM: INSIGHT (Nov. 19, 2021), https://www.americanactionforum.org/insight/the-biden-wotus-breadth-and-uncertainty. The Agencies cannot possibly expect to have the States' support by both downplaying the Proposed Rule's inevitable burden on the public and failing to accurately frame the Proposed Rule's increased costs to those same people.

---

[*] Florida supports the efforts of the multi-state coalition. It is preparing a letter addressing issues specific to Florida.

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 11

**CONCLUSION**

The undersigned States urge the Agencies to reject or stay the Proposed Rule, especially now as affected parties await a Supreme Court decision that will likely clarify the CWA's definition of "the waters of the United States."  For the reasons discussed above and in the States' prior comments in these and related proceedings, the Proposed Rule is unlawful.  It redefines "the waters of the United States" inconsistent with the CWA, takes this jurisdictional hook outside the parameters of the Constitution, and reveals substandard respect for the States' traditional authority to protect local lands and water resources—not to mention the regulated parties who live and work within our borders.  Doubling down on an "essentially boundless view of the scope" of the Agencies' authority, the Proposed Rule is very likely headed for "another defeat."  *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring).  We urge the Agencies to right the ship.

Sincerely,

Patrick Morrisey
West Virginia Attorney General

Steve Marshall
Alabama Attorney General

Mark Brnovich
Arizona Attorney General

Leslie Rutledge
Arkansas Attorney General

Christopher M. Carr
Georgia Attorney General

Lawrence G. Wasden
Idaho Attorney General

Todd Rokita
Indiana Attorney General

Derek Schmidt
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

Hon. Michael S. Regan & Hon. Jaime A. Pinkham
February 7, 2022
Page 12

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Eric Schmitt
Missouri Attorney General

Austin Knudsen
Montana Attorney General

Doug Peterson
Nebraska Attorney General

John Formella
New Hampshire Attorney General

Dave Yost
Ohio Attorney General

John O'Connor
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Jason Ravnsborg
South Dakota Attorney General

Herbert H. Slatery III
Tennessee Attorney General

Ken Paxton
Texas Attorney General

Sean D. Reyes
Utah Attorney General

Jason S. Miyares
Virginia Attorney General

Bridget Hill
Wyoming Attorney General