IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| STATES OF TEXAS AND IDAHO, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) No. 3:23-cv-00017 |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) (consolidated with 3:23-cv-00020) |
| | ) |
| Defendants. | ) |
| | ) |

## **BUSINESS PLAINTIFFS' REPLY SUPPORTING PRELIMINARY INJUNCTION**

The Agencies' description of their new Rule is long on rhetorical characterizations—claiming clarity, predictability, consistency, and only slight changes from the status quo—but understandably short on the details of the regulatory regimes that easily refute those claims. Texas and Idaho explain ways in which the Rule differs from the pre-2015 regulatory regime; Business Plaintiffs adopt their arguments, and further address the Agencies' new "significant nexus" test below. We add here two observations.

First, if the 2023 Rule maintains the status quo, it is hard to understand why the Agencies devoted enormous resources merely to reaffirm an existing regime; why they object to a short stay while the merits are adjudicated; or why they finalized the Rule when the Supreme Court will shortly address the meaning of WOTUS in *Sackett*.[1]

---

[1] The Agencies say (n.1) that *Sackett* presents a narrow as-applied question whether a wetland is "adjacent" to navigable waters. Like *Rapanos*—which produced both tests the Agencies now purport to codify—*Sackett* also involves the question "adjacent to what," which depends on the meaning of WOTUS. Indeed, the Agencies *agreed* at oral argument

1

Second, the pre-2015 regime was unlawfully vague and inconsistent with the CWA—with parts struck down in *SWANCC*, discredited in *Rapanos*, or set forth in post-*Rapanos* "guidance" that was insulated from judicial review. Business Plaintiffs' members never knew where they stood prior to 2015, and cannot know now under the new Rule. It is only because the pre-2015 and 2023 regimes are each so vague and all-encompassing that the Agencies can claim that—using individual agents' "practice," "training," "and "experience," not clear rules—they might reach the same conclusion as to a feature under both regimes. The Agencies should not be permitted to hide behind a principal defect of the different regimes it has adopted, which is that each is "'so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'" *United States v. Abbate*, 970 F.3d 601, 603-04 (5th Cir. 2020).

## I. Business Plaintiffs Do Not Need To Show Standing But, In Any Case, They Have Shown Standing To Challenge The Rule And Imminent Harm.

The Agencies assert (at 11-13) that Business Plaintiffs lack organizational standing because they have not shown concrete harms from the Rule. Now that the challenges to the Rule are consolidated, Business Plaintiffs do not need to independently establish standing because they seek the same relief as the States, who do have standing to challenge the Rule. *Town of Chester v. Laroe Estates*, 581 U.S. 433, 435, 439-40 (2017).

---

with Justice Barrett's observation that for them "to win, we have to find that you're right about significant nexus." No. 21-454, Oral Arg. Tr. at 115. A majority of Justices suggested that the Agencies' vague approach to jurisdiction raises serious statutory and constitutional concerns. *E.g.*, Oral Arg. Tr. at 65-67 (Roberts, C.J), 70-71 (Kagan, J.), 73-76, 106-110 (Alito, J.), 77-79 (Kavanaugh, J.), 83-86, 97-99 (Gorsuch, J.), 103-105 (Thomas, J.). *Sackett* squarely involves issues raised by the 2023 Rule; the Agencies' refusal to await the decision shows the same disdain for Supreme Court precedent as the Rule itself.

Anyway, Business Plaintiffs establish standing. Only "one plaintiff must have standing to seek each form of relief requested in the complaint." *Id*. at 439. Standing doctrine ensures that federal courts "resolve … 'real controvers[ies] with real impact on real persons.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Business Plaintiffs' members and their clients comprise a large swath of the regulated community. Many of the same organizations challenged the 2015 Rule, as plaintiffs or intervenors, and many defended the 2020 Rule. There was no question in those rounds of WOTUS litigation that the business organizations had a sufficient stake in the outcome. Indeed, the Agencies never claimed that the business organizations lacked sufficient interest in the definition of WOTUS when those organizations joined the Agencies' defense of the 2020 Rule.

The declarations establish that Business Plaintiffs and their members and members' clients are concretely harmed. The Chilton Declaration (at ¶¶ 7-9) explains with particularity the effect of the 2023 Rule on the operations of Chilton Ranch because dry washes may be considered jurisdictional under the 2023 Rule. The Reed Declaration (at ¶¶ 11-12) explains that, on his farm in Matagorda County, ditches that carry water only after rains now may be deemed "tributaries" or "other waters," though they have never before been considered WOTUS and no regulator has determined that they have a significant nexus to navigable waters. Other declarants emphasize—with a focus on industry-specific applications of the Rule—that, due to the Rule's vagueness and breadth, members will either be required to undertake costly jurisdictional investigations or else alter their use of their land. Briggs Decl. ¶¶ 44, 51; Coyner Decl. ¶ 13; McGrew Decl. ¶¶ 11-12; Pilconis Decl. ¶¶ 20, 22; Reed Decl. ¶ 14; Rorick Decl. ¶ 13; Sweeney Decl.

¶ 10. No standing principle requires that Plaintiffs' members make themselves enforcement targets by declaring that under the Rule they in fact have WOTUS on their property.

The Agencies are incorrect to dismiss the unrecoverable costs the Rule imposes as no harm to Plaintiffs' members. "Free" jurisdictional determinations are a trap. Only a fool would put himself in the hands of agency bureaucrats relying on vague definitions, "experience," and "training" to determine the fate of his property without presenting his own evidence. Costly consultants are an inevitable part of the process—because the definitions used by the Agencies have no ordinary understanding or clear legal or scientific meaning, but require expert advice. The Agencies' lowball estimates of permitting costs (which exclude costs incurred to determine *whether* permits are needed, and costs of implementing permit conditions) are fanciful, according to the Supreme Court. *See Hawkes*, 578 U.S. at 596 ("Corps officials signaled that the permitting process would be very expensive and take years to complete" and "advised respondents that, if they wished to pursue their application, they would have to submit numerous assessments of various features of the property" which would "cost more than $100,000"); *Rapanos*, 547 U.S. at 721 ("The average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915" in completing the process). Business Plaintiffs' declarants confirm that compliance comes at great cost. Mem. 8-14 (citing declarations); *id.* at 27-28.[2]

---

[2] The Agencies' claim that costs will not increase from the pre-2015 regime cannot be reconciled with their admission (at 24) that they "expect [the WOTUS (a)(5) 'other waters'] category to generate more significant nexus analysis (because the Agencies, following *SWANCC*, generally did not assess these waters using the standards the Rule employs)."

That costs are not "quantifiable" (US Opp. 18) is a symptom of the Rule's vagueness—landowners can only guess what is needed for compliance, or whether the Agencies will "demand[] that they undertake, among other things, a 'hydrogeologic assessment …;' groundwater flow spatially and vertically; discharge and recharge areas; a 'functional/resource assessment of the site including a vegetation survey…'; [and] an 'inventory of similar wetlands in the general area (watershed) including some analysis of their quality,'" as they did in *Hawkes*, 578 U.S. at 601. Agency-driven uncertainty about *amount* of costs is no barrier to recognizing that significant unrecoverable costs are inevitable under the Rule and harm Plaintiffs' members.

## II. Business Plaintiffs Are Likely To Prevail On The Merits.

*Deference.* Business Plaintiffs explained (Mem. 15-16) that under the Fifth Circuit's en banc decision in *Cargill*, the Rule warrants no deference because it is a criminal statute, is subject to the rule of lenity, and the Agencies "construed the same statute in … inconsistent ways at different points in time." 57 F.4th at 467-69. The Agencies' first respond (at 37) that "[u]nlike possession of a 'machinegun,' the presence of [WOTUS] does not by itself subject a person to criminal liability." But the CWA imposes criminal penalties for violating its provisions requiring permits before undertaking ordinary farming, construction, or other land-use activities affecting WOTUS. The CWA is therefore a criminal statute to which the *Cargill* rule applies.[3] The Agencies' next assert

---

[3] The Agencies repeatedly argue to the Supreme Court that WOTUS jurisdiction is distinct from the consequences for landowners of carrying out activities in WOTUS, and uniformly lose. *See Hawkes*, 578 U.S. at 600 (jurisdictional determination has "legal consequences" because it "warns [landowners] that if they discharge pollutants onto their property without

5

that "the Rule represents the best interpretation" of WOTUS. But whether it is even a permissible interpretation is the issue before this Court. Finally, they argue (at 37) the Rule "is consistent" with the "pre-2015 regime. But the Rule is *different* from that regime, and the Agencies interpreted WOTUS differently in the 2020 Rule, the 2015 Rule, as well as decades ago in an interpretation invalidated in *SWANCC*. Because the Agencies have often, and recently, shifted their interpretation, their current view is not entitled to deference.

*Interstate waters*. The Agencies (at 20) cite 33 U.S.C. § 1313(a)(1), but fail to respond to Business Plaintiffs' point (Mem. 19) that the provision means only that certain state rules were grandfathered and were to remain effective regardless of whether the waters would be within federal jurisdiction under the CWA. The Agencies also refer (at 20) to predecessor statutes to the CWA that applied to interstate waters, but fail to respond to Business Plaintiffs' point that Congress' decision to remove "interstate" from categorical jurisdiction while retaining "navigable" in enacting the CWA must be given its plain effect.

*State authority*. The Agencies (at 28-29) parrot their statements from the preamble that Section 101(a) sets out the "sole objective" of the CWA and assert that they properly considered Section 101(b). At bottom, that is a claim that their lopsided balancing of statutory purposes is entitled to deference; as already discussed, that is not so. As the State

---

obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties"); *Sackett v. EPA*, 566 U.S. 120, 129 (2012) (rejecting argument that "a compliance order '[i]s a step in the deliberative process[,] . . . rather than . . . a coercive sanction.'"). The Agencies' argument here also contradicts their admission in *National Ass'n of Mfrs. v. Dep't of Defense*, that "the WOTUS Rule is 'functionally similar' to issuing or denying a permit" and has the "'legal and practical effect'" of "mak[ing] effluent and other limitations . . . applicable to the waters that the Rule covers.'" 138 S. Ct. 617, 630-31 (2018).

Plaintiffs explain (and 25 additional States argue in suits in North Dakota and Kentucky), the Rule strips them of sovereignty guaranteed by Congress—which deprives Business Plaintiffs' members of having land-use decisions made at the most appropriate local level.

*Commerce Clause.* The Agencies claim (at 34-35) to have cured their Commerce Clause problems by regulating WOTUS to the full extent of authority over "channels" of interstate commerce. 88 Fed. Reg. 3045. They fail to rebut Business Plaintiffs' argument (Mem. 23) that the Rule violates the constraint on the "channels" authority that it must address navigability, which the Rule does not.

*Vagueness.* The Agencies' latest iteration of a significant nexus test heaps vague term on top of vague term. The Agencies say (at 36) it provides "*more* clarity and predictability" than before 2015, but that is incorrect. The Rule:

--defines interstate waters as covered under paragraph (a)(1), which requires the significant nexus test to be applied to many waters beyond the intended reach of the CWA;

--expands the test beyond Justice Kennedy's, requiring a significant effect not on "the chemical, physical, *and* biological integrity of the water," *Rapanos*, 547 U.S. at 780, but on chemical, physical, "*or*" biological integrity. 88 Fed. Reg. 3006; and

--defines "significant affect" as a "material influence," based on standardless "functions" and "factors" such as "contribut[ion of] flow." 88 Fed. Reg. 3119-3120. The Agencies offer no explanation how these terms by themselves, still less together, provide meaningful notice about what features are WOTUS under the significant nexus test.

Contrary to Intervenor's claim (at 14-15), Business Plaintiffs are properly concerned about whether puddles are WOTUS. Although the Rule states that a puddle is not a "lake,

7

pond, stream, or wetland," the next sentence states that wetlands are features that contain certain hydrology. 88 Fed. Reg. 3131. Land-users are left to guess whether puddles that form in depressions after rains (*see* Briggs Decl. ¶ 36) are wetlands or are "similarly situated" to other "waters" "in the region" that perform "functions" such as "contribut[ing] flow" to a covered water. Likewise, the exclusion of some ditches is illusory: under the significant nexus test, a ditch may still be a "tributary" of a covered water. (Mem. 10 n.3).

*Major questions*.[4] The Agencies cannot point to "clear congressional authorization" to allow them to answer a major question. *W. Va.*, 142 S. Ct. at 2614-15. They recite only the general grant of authority to "prescribe such regulations" as necessary to carry out their authority (citing 33 U.S.C. § 1361). The major questions doctrine demands more. And if Congress did clearly authorize them to define WOTUS, that would be an unconstitutional delegation. In arguing (at 27) that Congress provided an "intelligible principle" to guide decision-making because it directed a "general policy" to protect "the Nation's waters" in Section 101(a), the Agencies make a mockery of the concept. Their flip-flopping regarding the meaning of WOTUS shows that this "general policy"—which disregards the policy of preserving state authority—provides no meaningful guidance.

---

[4] The Agencies falsely state (at 25 n.9) that "no commenter asserted problems with the nondelegation or major questions doctrine." The Waters Advocacy Coalition, of which many Business Plaintiffs are members, commented that "the Supreme Court [has] stated: '[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance'" (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*); that "[the CWA's] mandate qualifies as an exercise of such authority"; that "this proposal" lacks "a clear statement from Congress" to authorize the Rule; and that without a clear statement, the scope of Congress's delegation in the CWA is limited by the concept of commercial navigation. WAC Corrective Comments 9-10.

**III. The Entire Rule Should Be Preliminarily Enjoined Nationwide.**

The Agencies do not contest that the Court has power to issue a national injunction. They claim (at 40) such an injunction is improper because Business Plaintiffs offer "generalized programmatic impacts" to "unspecified and unknown members." Of course, that uncertainty is one aspect of Plaintiffs' complaint: the Rule leaves decisions about land use to the discretion of bureaucrats without clear guides, putting all of Business Plaintiffs' members at risk, because none can know the extent of WOTUS. For example, any of AFBF's nearly six million member families may have a wet patch of land or defined path of runoff, as depicted at Briggs Decl ¶¶ 36-37, and can have no idea whether those are jurisdictional. The Rule does not tell land-users how it affects their property.

That aside, Business Plaintiffs provided numerous organization declarations confirming that they have members in each State who will be harmed by the Rule. *See* Am. Compl. ¶¶ 15-32 & Mem. Exh. A. Those declarants provide specific examples where harm will be felt from old textile mills in New England to coal mines in North Dakota, to ranches throughout the West, and housing in all 50 States. (Mem. 7-14). Far from foreclosing a nationwide injunction (US Opp. 42), the principle of party-specific relief *favors* nationwide relief here. Business Plaintiffs' members nationally face immediate costs, uncertainty, and disruption to their land-use. It would be inequitable to enjoin the Rule only in Texas and Idaho, leaving the majority of Plaintiffs' members and their clients subject to the Rule.

The Agencies say (at 42 n.16) that the Court should enjoin only specific provisions of the Rule. That is impossible for so highly-reticulated a Rule, full of cross references linking one provision to another. Jurisdiction over wetlands, for example, is tied to whether

9

they "neighbor" ((c)(2)) tributaries ((a)(3)) or impoundments ((a)(2)) and whether the wetlands ((a)(4)) alone or in combination significantly affect ((c)(6)) navigable waters, territorial seas, or interstate waters ((a)(1)(i),(ii) & (iii)). The Rule's defects are too pervasive and central to its operation to allow its highly-interdependent provisions to be parsed. *See MD/DC/DE Broads. Ass'n v. FCC*, 253 F.3d 732, 734-36 (D.C. Cir. 2001) (rejecting severability because the agency inadequately explained how the remaining parts of the rule would operate). Anyway, flaws infect the Rule throughout. The Rule as a whole exceeds the Agencies' Commerce Clause authority and violates the major questions and non-delegation of legislative powers doctrines. It is unconstitutionally vague in every key element. And it strips States of their regulatory authority, guaranteed by the CWA.[5]

## CONCLUSION

For the foregoing reasons and those set forth by the State Plaintiffs, this Court should preliminarily enjoin the Rule nationwide.

---

[5] The Agencies assert that each category "of jurisdictional waters in this rule is capable of operating independently" and "partial invalidation will not render the remainder of this rule invalid." 88 Fed Reg at 3135. That statement appears in the preamble, not the Rule, and did not appear in the Rule proposal. It was never tested by notice and comment, so it violates the APA's procedural requirements, 5 U.S.C. § 706(2)(D), and should be ignored. As explained in *Administrative Conference of the United States Recommendation 2018-2*, at 2, "[g]eneral principles of administrative law suggest that the agency's views on severability should be most persuasive when," among other things, "(1) the agency includes its severability proposal in the text of the proposed rule and the agency's initial rationale for severability is explained in the preamble to the proposed rule; (2) these initial positions are made available for comment by interested parties; (3) the agency addresses its determination of severability in the text of the final rule." The Agencies did none of those things here. *Cf., e.g.*, 8 CFR 1212.13; 16 CFR 316.6.

| | |
|---|---|
| Dated: March 10, 2023 | Respectfully submitted, |
| | */s/ Kevin S. Ranlett* |
| | Kevin S. Ranlett |
| | Texas Bar No. 24084922 |
| | SDTX No. 1124632 |
| Timothy S. Bishop (*pro hac vice*) | James B. Danford, Jr. |
| Brett E. Legner (*pro hac vice*) | Texas Bar No. 24105775 |
| MAYER BROWN LLP | SDTX No. 3150442 |
| 71 South Wacker Drive | MAYER BROWN LLP |
| Chicago, Illinois 60606 | 700 Louisiana Street, Suite 3400 |
| Tel: (312) 782-0600 | Houston, TX 77004 |
| Email: tbishop@mayerbrown.com | Tel: 713-238-2700 |
| Email: blegner@mayerbrown.com | Email: kranlett@mayerbrown.com |
| | Email: jdanford@mayerbrown.com |

*Counsel for Business Plaintiffs*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 10, 2023, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ James B. Danford, Jr.*
James B. Danford, Jr.