United States District Court
Southern District of Texas
**ENTERED**
March 19, 2023
Nathan Ochsner, Clerk

# In the United States District Court
# for the Southern District of Texas

## GALVESTON DIVISION

### No. 3:23-cv-17

STATE OF TEXAS, *ET AL.*, *PLAINTIFFS*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER
## GRANTING PRELIMINARY INJUNCTION

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

A federal rule revising the definition of "waters of the United States" under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, will take effect on March 20, 2023. Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("the Rule" or "the 2023 Rule"). Two states—Texas and Idaho ("the States")—and eighteen national trade associations ("the Associations") have asked the court to preliminarily enjoin the Rule while the court considers their consolidated request to vacate and remand. Dkts. 13,

34; 20 Dkt. 15.[1] The States have asked to enjoin the Rule within their borders, Dkts. 13, 34; the Associations have asked for a nationwide injunction, 20 Dkt. 15. The court grants the States' motion[2] but denies the Associations'.

## I.   Background

### A. The Act

Congress passed the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Congress also carefully crafted the Act "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce,

---

[1] The States and Associations filed their original complaints and motions for preliminary injunction before the parties requested, and this court granted, their motion to consolidate the Associations' case, Civil Action No. 3:23-cv-20, *American Farm Bureau Federation, et al. v. United States Environmental Protection Agency, et al.*, with the States' case. Dkts. 23, 27. When the court refers in this opinion to docket entries from the merged case, Civil Action No. 3:21-cv-20, the numeral "20" will precede the docket entry (e.g., "20 Dkt. [number]"). All citations to a docket entry not preceded by "20" refer to documents filed in the lead case, Civil Action No. 3:23-cv-17.

[2] Though the States did not request it in their preliminary-injunction motion, Dkts. 13, 34, counsel for the Associations represented at the injunction hearing that the States now seek nationwide relief. Hearing Tr. 38:18–19. The plaintiffs' joint surreply following the hearing reiterates this. Dkt. 59. The first hint of such a request by the States was a passing reference tucked in a footnote in the States' reply brief. *See* Dkt. 50 at 10 n.14 ("The States incorporate [the Associations'] discussion of the scope of injunction."). But the States have not independently requested nationwide relief—in their motion for preliminary injunction, in the cited reply brief, or at the hearing. And they have made "no argument why relief outside their borders is 'necessary to prevent irreparable injury' *to them*." Dkt. 57 at 2 (emphasis added) (citing 5 U.S.C. § 705).

and eliminate pollution [and] to plan the development and use (including restoration, preservation, and enhancement) of land and water resources." *Id.* § 1251(b).

Discharging pollutants into, dredging, or filling "navigable waters" without a federal permit may expose a person to civil or criminal penalties under the Act. *Id.* §§ 1311, 1319, 1342, 1344. For instance, one who violates the Act's permitting requirements may suffer monetary penalties of up to $25,000 per day, imprisonment for up to one year, or both. *Id.* at § 1319(c)(1). The phrase "discharge of a pollutant" encompasses "any addition of any pollutant to navigable waters from any point source," and "pollutant" includes not only traditional contaminants but also solids such as "dredged spoil, . . . rock, sand, [and] cellar dirt." *Id.* § 1362(6), (12).

The Act defines "navigable waters" as "waters of the United States, including the territorial seas." *Id.* § 1362(7). "Because many of the Act's substantive provisions apply to 'navigable waters,' the statutory phrase 'waters of the United States' circumscribes the geographic scope of the Act in certain respects." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 624 (2018).

Congress authorized the Environmental Protection Agency to administer the Act, 33 U.S.C. § 1251(d), and the U.S. Army Corps of

Engineers to issue permits for projects on land or water under the Act's jurisdiction, *id.* § 1344. But the EPA and the Corps ("the Agencies") do not have unbridled jurisdiction to regulate all the nation's waters. Rather, "[i]n regulating discharge, the Act 'anticipates a partnership between the States and the Federal Government,' with both sovereigns sharing regulatory responsibilities for water protection." *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 230 (5th Cir. 2015) (quoting *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992)).

### B. Supreme Court Precedent

The Supreme Court has taken a few opportunities to interpret the meaning of "waters of the United States" under the Act. First, in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), the Court held that a wetland directly abutting a traditionally navigable creek qualified as "waters of the United States." *Rapanos v. United States*, 547 U.S. 715, 765–66 (2006) (Kennedy, J., concurring) (citing *Riverside Bayview*, 474 U.S. at 139). But the *Riverside Bayview* Court reserved "the question of the Corps' authority to regulate wetlands other than those adjacent to open waters." *Rapanos*, 547 U.S. at 766 (citing *Riverside Bayview*, 474 U.S. at 131–32, 131 n.8).

Sixteen years later, *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), presented another opportunity. The *SWANCC* Court rejected the Corps' interpretation of isolated sand and gravel pits that "seasonally ponded" as "waters of the United States," *id.* at 164, 172–74, and held that the phrase excluded "nonnavigable, isolated, intrastate waters," *id.* at 172.

Finally, the Court most recently considered this question in *Rapanos*. In a plurality opinion by Justice Scalia, the *Rapanos* Court vacated and remanded a rule extending the meaning of "waters of the United States" under the Act to "wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters." *Rapanos*, 547 U.S. at 729; *see also id.* at 787 (Kennedy, J., concurring in the judgment). The four-justice plurality proposed the so-called "relatively permanent" test for determining whether wetlands were "waters of the United States." *Id.* at 739, 742. Justice Kennedy's concurrence suggested a different approach: the "significant nexus" test. *Id.* at 779–80.

In October 2022, the Supreme Court heard oral argument in *Sackett v. EPA*, 142 S. Ct. 896 (2022) (No. 21-454). *Sackett* is on appeal from the Ninth Circuit, where the court "appl[ied] Justice Kennedy's 'significant nexus' inquiry to evaluate whether EPA has jurisdiction to regulate" wetlands.

*Sackett v. EPA*, 8 F.4th 1075, 1091 (9th Cir. 2021), *cert. granted in part*, 142 S. Ct. 896 (2022). In granting the petition for writ of certiorari, the Court characterized the *Sackett* issue as "[w]hether the Ninth Circuit set forth the proper test for determining whether wetlands" amount to "waters of the United States" under the Act. *Sackett*, 142 S. Ct. 896 (2022) (No. 21-454). The Court is anticipated to decide *Sackett* before the end of the term.

### C. The 2023 Rule

The Rule defines "waters" to include the five following categories:

- traditional navigable waters, the territorial seas, and interstate waters ("paragraph (a)(1) waters");
- impoundments of 'waters of the United States' ("paragraph (a)(2) impoundments");
- tributaries to traditional navigable waters, the territorial seas, interstate waters, or paragraph (a)(2) impoundments when the tributaries meet either the relatively permanent standard or the significant nexus standard ("jurisdictional tributaries");
- wetlands adjacent to paragraph (a)(1) waters, wetlands adjacent to and with a continuous surface connection to relatively permanent paragraph (a)(2) impoundments, wetlands adjacent to tributaries that meet the relatively permanent standard, and wetlands adjacent to paragraph (a)(2) impoundments or jurisdictional tributaries when the wetlands meet the significant nexus standard ("jurisdictional adjacent wetlands"); and
- intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) that meet either the relatively permanent standard or the significant nexus standard ("paragraph (a)(5) waters").

88 Fed. Reg. at 3005–06. The Rule also lists eight exclusions, including waste-treatment systems, artificially irrigated areas that are naturally dry, and ditches that are "excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water." *Id.* at 3067.

Two of the 2023 Rule's features are particularly salient to the plaintiffs' claims. First, the Rule codifies a modified version of Justice Kennedy's significant-nexus test. *Compare id.* at 3006, *with Rapanos*, 547 U.S. at 780. Second, the Rule imposes jurisdiction on *all* "interstate waters, regardless of their navigability." 88 Fed. Reg. at 3072.

### D. This Litigation

In January 2023, the Agencies published the 2023 Rule to define "the scope of waters protected under" the Act. *Id.* at 3004. This consolidated case challenges and seeks to enjoin the Rule's implementation. Dkts. 13, 32; 20 Dkts. 12, 15.

Asserting that the 2023 Rule will burden state agencies and violate state sovereignty, the State of Texas and five Texas state agencies sued the Agencies on January 18. Dkt. 1 ¶¶ 4–9. Meanwhile, the Associations—on behalf of their members—also sued the Agencies in a separate action. 20 Dkt. 1 ¶¶ 15–31. The Associations amended their complaint on February 2. 20

Dkt. 12. On February 27, Texas amended its complaint to add the State of Idaho and Idaho's interested agencies as plaintiffs. Dkt. 32.

The two sets of plaintiffs have sued on both statutory and constitutional grounds. First, the plaintiffs challenge the 2023 Rule under the Administrative Procedure Act ("the APA") on four bases:

> (1) arbitrary & capricious, 5 U.S.C. § 706(2)(A);
>
> (2) "contrary to a constitutional right, power, [or] privilege," *id.* § 706(2)(B);
>
> (3) exceeding statutory authority, *id.* § 706(2)(C); and
>
> (4) promulgated "without observance of procedure required by law," *id.* § 706(2)(D).

Dkt. 32 ¶¶ 67–83; 20 Dkt. 12 ¶¶ 93–98, 102–03.

The plaintiffs also allege that the 2023 Rule is unconstitutional in at least four ways: it violates the Commerce Clause, the Tenth Amendment, the Due Process Clause, and the Non-Delegation Doctrine. Dkt. 32 ¶¶ 75–83; 20 Dkt. 12 ¶¶ 104–05. Finally, the Associations claim the Rule violates the Regulatory Flexibility Act of 1980, as amended, 5 U.S.C. §§ 601–612.[3] 20 Dkt. 12 ¶¶ 102–03.

---

[3] The court acknowledges that the Associations also alleged a separate "claim" that the Rule violates the "major questions" doctrine. 20 Dkt. ¶¶ 98–100. To the extent that doctrine applies, it is more aptly categorized as a tool for deciding whether an agency exceeded its statutory authority than as a stand-alone claim. *See, e.g.*, Dkt. 32 ¶ 74.

The court consolidated the States' and Associations' actions on February 13. Dkt. 27. The next day, it granted intervenor–defendant Bayou City Waterkeeper's unopposed motion to intervene. Dkts. 20, 30.

Now before the court is the plaintiffs' request to preliminarily enjoin the Rule before it goes into effect on March 20. Dkt. 13; 20 Dkt. 15 at 4. The intervenor and federal defendants have filed response briefs, Dkts. 39, 40, and the States and Associations have replied to those responses, Dkts. 49, 50. After reviewing the parties' filings, the court convened a hearing on March 15, where all parties presented argument. Finally, the parties submitted short post-hearing briefs at the court's invitation. Dkts. 58, 59.

## II.   Legal Standards

### A. Standing

#### 1. Generally

To meet the constitutional minimum for standing, a plaintiff must show the following:

(1)   "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical";

(2)   "a causal connection between the injury and the conduct complained of"; and

(3)   a likelihood—as opposed to a mere speculation—that a favorable decision will redress the injury.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

The first element, injury in fact, requires "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (internal quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

The second element, causation, "requires a 'traceable connection' between the plaintiff's injury and the defendant's conduct." *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). And the third element, redressability, "requires a likelihood that the requested relief will redress the alleged injury." *Shaw*, 775 F.3d at 648 (internal quotation marks omitted).

"[E]ach form of relief requested in the complaint" must be supported by "[a]t least one plaintiff" with standing. *Town of Chester* v. *Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). But a plaintiff seeking relief apart from that sought by other plaintiffs must show its own standing to obtain that relief. *Id.* ("[A] plaintiff who has standing to seek damages must also demonstrate

standing to pursue injunctive relief."); *see also Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

### 2. States' Standing

"States are not normal litigants for the purposes of invoking federal jurisdiction" and are owed "special solicitude." *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007). "When special solicitude is appropriate, a state can establish standing 'without meeting all the normal standards for redressability and immediacy.'" *Texas v. United States (DACA)*, 50 F.4th 498, 514 (5th Cir. 2022) (quoting *Massachusetts*, 549 U.S. at 517–18). Instead, state standing requires merely "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Texas (DACA)*, 50 F.4th at 514 (quotation omitted). "Special solicitude" requires that (1) the state "have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the [s]tate's quasi-sovereign interests." *Id.*

For the first requirement, the Fifth Circuit has held that "[i]n enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *Id.* (quotation omitted); *see also* 5 U.S.C. § 702. The second requirement considers whether the state has an interest in protecting "public

or governmental interests that concern the state as a whole," such as those "involving boundaries and jurisdiction over lands and their inhabitants, and in cases directly affecting the property rights and interests of a State." *Massachusetts*, 549 U.S. at 520 n.17 (quotations omitted).

### 3. Organizational and Associational Standing

Organizations can show standing two ways: organizational standing or associational standing. *Vote.Org v. Callanen*, 39 F.4th 297, 303 n.2 (5th Cir. 2022). "Organizational standing requires the organization to establish its own standing premised on a cognizable Article III injury to the organization itself." *Id.* Associational standing, on the other hand, occurs when the organization's individual members have standing and the interests the organization seeks to protect on their behalf are "germane to its purpose." *Id.* (quotation omitted).

### B. Preliminary Injunction

The party seeking a preliminary injunction must show the following:

> (1) a substantial likelihood that it will prevail on the merits, (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted, (3) that its threatened injury outweighs the threatened harm to the party whom it seeks to enjoin, and (4) that granting the preliminary injunction is in the public's interest.

*Texas v. EPA*, No. 3:15-CV-00162, 2018 WL 4518230, at *1 (S.D. Tex. Sept. 12, 2018) (citing *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535,

545 (5th Cir. 2005)). An injunction is "an extraordinary remedy" that a court should not grant "unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (quotation omitted).

## III.  Analysis

### A. Standing

The defendants have challenged the States' and Associations' standing. Dkt. 40 at 26–29. Because the court has determined that the States have standing, it need not determine whether the Associations do. *See Laroe Ests., Inc.*, 581 U.S. at 439.

The defendants first argue that the States lack standing because "federal regulation of water or land for the purpose of pollution control is not a cognizable harm to 'state sovereignty.'" Dkt. 40 at 28 (citing *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 284–93 (1981)). But *Hodel* does not support the defendants' broad contention. The *Hodel* Court considered Tenth Amendment limits on congressional power to pre-empt or displace state regulation of *private* activities affecting interstate commerce. *Id.* at 288–90. Moreover, *Hodel* is premised on the fact that the challenged regulation did not regulate "States as States." *Id.* at 286–89, 293. Because the States challenge the Rule as violating their quasi-sovereign

interests in regulating the land and water within their borders, *Hodel* is inapplicable.

The defendants next rely on *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015), to argue that the States' projected mitigation and implementation costs are not specific enough to show standing. Dkt. 40 at 28 (citing *Crane*, 783 F.3d at 252). In *Crane*, Mississippi sued federal agencies implementing the Deferred Action for Childhood Arrivals (DACA) program, claiming DACA injured the state by forcing it "to spend money on providing social services." *Crane*, 783 F.3d at 247. In support, Mississippi offered one piece of evidence: a decades-old study about the state's general costs stemming from illegal immigration. *Id.* at 252. Mississippi produced no evidence about the costs—if any—that DACA imposed on it. *Id.*

Conversely, Texas has submitted detailed declarations outlining projected mitigation and compliance costs the 2023 Rule will impose. *See, e.g.*, Dkts. 13-1 ¶ 16 ("[The Texas Department of Transportation] estimates the amount of mitigation needed will increase by 30%[,] which translates to an increased cost of approximately $3 million dollars per year."); 50-2 ¶ 6 (estimating that mitigation costs for an active highway project in Dallas County will increase from $292,600 to $80,591,000); *see also* Dkts. 13-2, 13-3, 13-4. Idaho's declarations are less detailed. Dkts. 34-1, 34-2, 34-3, 34-4.

But the Fifth Circuit has—more recently than *Crane*—accepted "big-picture evidence" and noted that "large-scale policy" is "amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents." *See Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021), *rev'd and remanded on other grounds*, 213 L. Ed. 2d 956 (2022).

In sum, the States have constitutional standing.

## B. Preliminary Injunction

The defendants assert that the plaintiffs have not carried their burden of persuasion on each factor necessary for the court to grant preliminary relief. The court finds that the States have satisfied each factor, but the Associations have not shown irreparable harm.

### 1.  Likelihood to Succeed on the Merits

"If the party requesting a preliminary injunction cannot show a substantial likelihood of success on the merits, the injunction should be denied . . . ." *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021) (emphasis omitted) (quotation omitted). But the plaintiff neither has "to demonstrate that he is certain to win" nor that he "is entitled to a summary judgment." *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 595–96 (5th Cir. 1974)); *see also* 11A Charles Alan Wright &

Arthur Miller, Federal Practice and Procedure § 2948.3 (3d ed. 2022). Rather, "[i]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult[,] and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Donovan*, 830 F. Supp. 2d at 227 (quotation omitted). In evaluating the likely success on the merits, "the court considers the 'standards provided by the substantive law.'" *Id.* (quoting *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011)).

Both sides devote extensive portions of their briefs to this factor. Dkts. 13 at 7–21; 39 at 14–31; 40 at 34–53; *see also* 20 Dkt. 15 at 18–31. Though there is much the court could say, two aspects of the 2023 Rule make the plaintiffs particularly likely to succeed on the merits—first, the Rule's significant-nexus test, and second, the Rule's categorical extension of federal jurisdiction over all interstate waters, regardless of navigability. Before reaching those issues, the court pauses to consider the deference owed to the Agencies in exercising their delegated authority to implement the Act.

### a. Deference Owed

The foundational question undergirding the court's assessment of the plaintiffs' claims is whether the Act authorizes the Agencies to interpret "waters of the United States" in the manner set forth in the 2023 Rule. *City*

*of Arlington v. FCC*, 569 U.S. 290, 297 (2013) ("No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*.") (Scalia, J.).

This inquiry usually invokes the familiar two-step framework[4] introduced in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At step one, the court determines whether the statute's text clearly expresses Congress's intent as to the statute's meaning. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021). If the text is ambiguous, the court proceeds to step two and asks if the agency's interpretation is "a permissible construction of the statute." *Id.* (quotation omitted). "*Chevron*'s purpose is to recognize the institutional competence of executive agencies and to defer to their expertise where appropriate." *Cargill v. Garland*, 57 F.4th 447, 466 n.10 (5th Cir. 2023). But *Chevron* is not appropriate here for at least two reasons.

---

[4] Admittedly, *Chevron* has "become something of the-precedent-who-must-not-be-named—left unmentioned by the Supreme Court in two recent decisions addressing the reasonableness of agency action." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 963 n.3 (5th Cir. 2023) (citing *Am. Hosp. Ass'n. v. Becerra*, 142 S. Ct. 1896 (2022), and *Becerra v. Empire Health Found.*, 142 S. Ct. 2354, (2022)). But *Chevron* remains relevant "until and unless it is overruled by our highest Court." *Mexican Gulf Fishing*, 60 F.4th at 963 n.3.

First, *Chevron* does not apply because the Act implicates criminal penalties. *See* 33 U.S.C. § 1319(c).[5] Recently, the Fifth Circuit—by the vote of twelve of sixteen judges sitting *en banc*—reversed an agency's rule on lenity grounds, holding that "*Chevron* does not apply [where] the statutory language at issue implicates criminal penalties." *Cargill*, 57 F.4th at 449, 468. "The rule of lenity is a 'time-honored interpretive guideline'" that requires courts to resolve ambiguity in favor of the party that may face criminal penalties.[6] *Id.* at 471 (quoting *Liparota v. United States*, 471 U.S. 419, 429 (1985)).

Second, this court must interpret the Act "as written to avoid the significant constitutional and federalism questions" that the Agencies' interpretation raises concerning the "outer limits" of Congress's power. *SWANCC*, 531 U.S. at 172–74 (Rehnquist, J.) (rejecting the Corps' request for *Chevron* deference). This interpretive approach is especially important "where the administrative interpretation alters the federal-state framework

---

[5] Notably, for criminal penalties to apply—including a fine, imprisonment, or both—a party need only "negligently" violate the Act's permitting requirements. 33 U.S.C. § 1319(c)(1).

[6] "As Chief Justice Marshall explained long ago, the rule 'is founded on the tenderness of the law for the rights of individuals . . . . It is the legislature, not the Court, which is to define a crime, and ordain its punishment.'" *Cargill*, 57 F.4th at 451 (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820)).

by permitting federal encroachment upon a traditional state power." *Id.* at 173.

In *SWANCC*, the Court also considered the meaning of "waters of the United States" and an agency interpretation that concerned the proper application of Congress's Commerce Clause power under the Act. *Id.* at 166, 172–73. In both *SWANCC* and in this case, the boundaries—if any—that the word "navigable" places on "waters of the United States" unavoidably "alters the federal-state framework," *id.* at 173, because the Rule invokes "categorical protections for interstate waters, regardless of their navigability," 88 Fed. Reg. at 3072. The Agencies' effort to read navigability out of the statute's text to permit categorical encroachment on States' rights raises constitutional questions this court should—if any other reasonable interpretation of the Act exists—avoid. *See SWANCC*, 531 U.S. at 173.

### b. The Significant-Nexus Test

The 2023 Rule trades the interstate-commerce test for two new tests, the significant-nexus and relatively-permanent tests, which the Agencies— under the Rule—would use to decide whether certain waters fall within the Act's jurisdiction. Under the interstate-commerce test, the Agencies must consider "whether the use, degradation, or destruction of . . . water could affect interstate or foreign commerce" before claiming jurisdiction to

regulate it under the Act. *See* 88 Fed. Reg. at 3029. The Rule's significant-nexus test instead asks whether waters "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, the territorial seas, or interstate waters." *Id.* at 3006. And the Rule's relatively-permanent test would empower the Agencies to regulate "relatively permanent, standing or continuously flowing waters connected to paragraph (a)(1) waters, and waters with a continuous surface connection to such relatively permanent waters or to traditional navigable waters, the territorial seas, or interstate waters." *Id.*

The Agencies draw the 2023 Rule's new tests from *Rapanos*, but neither the *Rapanos* plurality nor its concurrence advocates applying *both* tests. Nevertheless, courts applying *Rapanos* have either determined that (1) Justice Kennedy's concurrence is the controlling opinion[7] or (2) the Agencies can use either the plurality or concurrence test to establish their jurisdiction under the Act.[8] Assuming without deciding that either of these

---

[7] *Sackett*, 8 F.4th at 1089; *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006); *United States v. Robison*, 505 F.3d 1208, 1221 (11th Cir. 2007).

[8] *United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009); *United States v. Donovan*, 661 F.3d 174, 184 (3d Cir. 2011).

approaches is correct,[9] the Rule is unlikely to withstand judicial review because its version of the significant-nexus test is materially different from the standard Justice Kennedy articulated in *Rapanos*. *See* 20 Dkt. 12 (arguing that "the Rule expands federal jurisdiction over features that Justice Kennedy [did not], such as ephemeral drainages, many ditches, and non-navigable interstate waters") (citing *Rapanos*, 547 U.S. at 784 (Kennedy, J., concurring)).

The 2023 Rule's significant-nexus standard identifies "waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity **of traditional navigable waters, the territorial seas, or interstate waters**." 88 Fed. Reg. at 3006 (emphasis added). Justice Kennedy's test would not extend federal jurisdiction to nontraditional waters unless the water "either alone or in combination with similarly situated lands in the region, significantly affects the chemical, physical, and biological integrity **of**

---

[9] See M. Reed Hopper, *Running Down the Controlling Opinion in Rapanos v. United States*, 21 U. Denv. Water L. Rev. 47 (2017), for a compelling criticism of these courts' applications of *Marks v. United States*, 430 U.S. 188 (1977), to derive the controlling opinion from the fractured *Rapanos* decision. When the *Rapanos* tests were presented to the Fifth and Sixth Circuits, those courts did not weigh in on which controlled because the facts before the courts satisfied either standard. *United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009); *see United States v. Lucas*, 516 F.3d 316, 327 (5th Cir. 2008).

**other covered waters more readily understood as 'navigable**.'"
*Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring) (emphasis added).

The Agencies' construction of the significant-nexus test ebbs beyond the already uncertain[10] boundaries Justice Kennedy established for it. Specifically, by extending the significant-nexus test to "interstate waters," and not just to those "waters . . . understood as 'navigable,'" the Rule disregards the Act's "central requirement"—"the word 'navigable.'" *Id.* at 778. As explained more thoroughly below, linking the significant-nexus test to "interstate waters" greatly expands its breadth beyond what Justice Kennedy envisioned; the Rule—unlike his suggested test—defines "interstate waters" as jurisdictional regardless of navigability. 88 Fed. Reg. at 3072.

Even if the court assumes that Justice Kennedy's significant-nexus test appropriately measures the Agencies' jurisdiction under the Act, the Rule does not accurately reflect his test. Indeed, the Rule's substantial variance

---

[10] The court has considerable concerns with the significant-nexus test, even as contrived in Justice Kennedy's *Rapanos* concurrence. Justice Scalia's plurality highlighted the following problems (among others) with Justice Kennedy's significant-nexus test: it misreads and misapplies Supreme Court precedent interpreting the Act, *Rapanos*, 547 U.S. at 753–55; it "ignore[es] the text of the statute," *id.* at 755; and it improperly disregards the Act's policy to preserve the "primary state responsibility for ordinary land-use decisions," *id.* at 755–56 (citing 33 U.S.C. § 1251(b)).

from Justice Kennedy's test compels the court to question its legitimacy—and persuades the court that the plaintiffs will likely succeed on the merits.[11]

### c. Categorical Extension to All Interstate Waters

Under the 2023 Rule, the Agencies may regulate "interstate waters, regardless of their navigability." *Id.* at 3072. Additionally, because interstate waters are "paragraph (a)(1) waters," the Agencies do not have to rely on either the significant-nexus or relatively-permanent test to apply the Act to interstate waters—jurisdiction is automatic. *Id.* at 3066–67 ("If a waterbody is determined to be a paragraph (a)(1) water, then it is jurisdictional with no need for further evaluation.").

The plaintiffs argue that the plain language of the Act simply does not extend the Agencies' jurisdiction to (1) non-navigable interstate waters, (2) impoundments and wetlands with no hydrologic connection to navigable waters, or (3) isolated ponds and mudflats. Dkt. 59 at 1 (citing *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1355–60 (S.D. Ga. 2019), *Rapanos*, 547 U.S.

---

[11] The court is also concerned that the significant-nexus test poses due-process concerns. Securing a permit under the Act is an expensive and time-consuming endeavor, *Rapanos*, 547 U.S. at 721, and failing to secure such a permit can result in significant fines, *id.*; 33 U.S.C. § 1319(c)(1). Even determining whether one needs to pursue a permit has long been a tall order: "[t]he outer limit of the phrase 'waters of the United States' remains fuzzy." *See Gulf Restoration Network*, 783 F.3d at 230 n.3. The Rule's proposed significant-nexus test, with its numerous factors and malleable application, seems to muddy the water even more.

at 718, and *SWANCC*, 531 U.S. at 174). The defendants argue that categorically extending federal jurisdiction to all interstate waters is consistent "with the Act's history, text, and purpose." Dkt. 40 at 35 (quoting 88 Fed. Reg. at 3072–75).

Specifically, the defendants point out that the Act's "predecessors . . . explicitly protected interstate waters independent of their navigability." Dkt. 40 at 35 (citing 33 U.S.C. §§ 466a(d)(1) & 466i(e) (1952), 33 U.S.C. § 466g(a) (1964), and 33 U.S.C. §§ 1160(c)(1) & 1173(e) (1970)). But the Agencies are not exercising jurisdiction under those older statutes; they derive their authority from the current Act's plain text—extending jurisdiction to "navigable waters." 33 U.S.C. § 1362(7). The court agrees with the defendants that "the scope of 'waters of the United States' extends beyond traditional navigable waters." Dkt. 40 at 46. But "navigable" is unavoidably an "important" limiting principle against "a significant impingement of the States' traditional and primary power over land and water use." *Rapanos*, 547 U.S. at 731, 738 (Scalia, J.); *see also id.* at 778 (Kennedy, J., concurring).

The Agencies' interpretation of the Act to include all interstate waters irrespective of any limiting principle raises serious federalism questions; accordingly, the court will prefer any "otherwise acceptable construction" not

"plainly contrary" to Congress's intent. *See SWANCC*, 531 U.S. at 173 (quotation omitted). Certainly, the court agrees with the defendants that federally regulating some interstate waters may be necessary to carry out Congress's intent to protect the nation's waters, Dkt. 39 at 27, but the court is not convinced that the Act's text supports unrestrained federal jurisdiction over all interstate waters.

The defendants also argue that Congress's intent that the Act categorically include interstate waters is evident in 33 U.S.C. § 1313(a)(1). Under that provision, "water quality standard[s]" governing "interstate waters" that pre-dated the Act would "remain in effect unless the Administrator determined that such [a] standard is not consistent" with the Act. *Id.* Contrary to the defendants' position, however, the plain text of 33 U.S.C. § 1313(a)(1) indicates that Congress anticipated that federal jurisdiction over at least some interstate waters would *not* be consistent with the Act and its "purpose" to preserve the "primary state responsibility for ordinary land-use decisions." *See Rapanos*, 547 U.S. at 755–56 (citing 33 U.S.C. § 1251(b)).

This is not the first time the Agencies have read navigability out of the Act. Relying on *Rapanos*, a Georgia district court vacated and set aside the Agencies' previous attempt to extend their jurisdiction to "all interstate

waters . . . regardless of navigability" in a final rule. *See Wheeler*, 418 F. Supp. 3d at 1358–60. The Agencies' most recent attempt to read navigability out of the Act's plain text is unlikely to fare better.

*     *     *

In sum, the Rule's particular version of Justice Kennedy's significant-nexus test and its categorical inclusion of interstate waters are at least two aspects that are unlikely to withstand judicial review. Thus, the court is satisfied that the plaintiffs have carried their burden on this factor and weigh it in their favor.

### 2. Irreparable Harm

The plaintiffs raise two types of irreparable harm: (1) intrusion into the States' "sovereignty over intrastate land and waters and ([2]) unrecoverable compliance costs that will unnecessarily burden the plaintiffs despite the improbability the Rule will survive judicial review." Dkt. 13 at 21; *see also* 20 Dkt. 15 at 31–32. The defendants respond that (1) the Rule does not harm the States' sovereignty and (2) neither party has submitted declarations that sufficiently detail immediate irreparable compliance costs. Dkts. 39 at 14–25; 40 at 29–34.

As to the compliance costs, the court finds that the States—but not the Associations—have shown that the Rule poses irreparable harm. "Where

costs are nonrecoverable because the government–defendant enjoys sovereign immunity from monetary damages, as is the case here, irreparable harm is generally satisfied." *VanDerStok v. Garland*, No. 4:22-CV-00691-O, 2022 WL 4809376, at *3 (N.D. Tex. Oct. 1, 2022) (citing *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)). Moreover, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)).

"Such harm, however, must be more than speculative; there must be more than an unfounded fear on the part of the applicant." *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (internal quotations omitted). The scale of the projected harm must be "more than de minimis," but "it is not so much the magnitude but the irreparability that counts." *Id.* at 1035 (quotations omitted).

As discussed above, the States have produced numerous declarations that detail specific anticipated costs—monetary and otherwise—of complying with the Rule. Dkts. 13-1, 13-2, 13-3, 13-4, 34-1, 34-2, 34-3, 34-4, 50-2. Specifically, the Texas Department of Transportation anticipates the Rule imposing millions of dollars in mitigation costs within just the first year.

Dkts. 13-1 ¶ 16; 50-2 ¶ 6. And Idaho has submitted a declaration predicting that the Rule would "increase cost in both monetary and labor hours" by staff. Dkt. 34-3, Terilizzi Decl. ¶ 4. Contrary to what the defendants argue, the Fifth Circuit regularly accepts such costs—even projected and *nonmonetary* costs—as posing irreparable harm. *See, e.g.*, *Louisiana*, 55 F.4th at 1034 ("The loss of an employee and the associated costs—monetary and otherwise—are nonrecoverable costs.").

The Fifth Circuit has been less generous with private-sector plaintiffs' efforts to show irreparable harm. In upholding the district court's irreparable-harm finding in *Texas v. EPA*, the Fifth Circuit noted both the significant financial costs the Clean Air Act would impose on the business community and the likelihood of plant closures. 829 F.3d at 433 (noting that "compliance with the Final Rule would impose $2 billion in costs on power companies, businesses, and consumers"). In addition to requiring more specificity, the law generally compels industry plaintiffs to ascribe more urgency to the consequences of a challenged action. *E.g.*, *Div. 80, LLC v. Garland*, No. 3:22-CV-148, 2022 WL 3648454, at *4 (S.D. Tex. Aug. 23, 2022) ("[A] preliminary injunction is not appropriate where the potential harm to the movant is strictly financial, unless the potential economic loss is so great as to threaten the existence of the movant's business.") (quotation

omitted); *see also EPA*, 829 F.3d at 434 (holding that financial losses posed irreparable injury where "plant closures" would "threaten the very existence of" the plaintiffs' businesses). Finally, self-inflicted harm is not irreparable. *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021).

The conclusory and speculative allegations in the Associations' declarations simply do not show that they or their members face irreparable harm. *E.g.*, 20 Dkt. 15-1, Chetti Declaration ¶ 14 (generally noting that the Rule will "*likely* cause permitting delays, add development costs[,] and create additional legal risks"). Additionally, the Associations' claim that the Rule imposes a "chilling" effect on business decisions, 20 Dkt. 15 at 11 (citing Pilconis Decl. ¶ 20), falls within the realm of self-inflicted harm, making it irreparable.

As to the injury to the States' sovereignty, the Fifth Circuit has held that the "institutional injury" to a state "from the inversion of the federalism principles enshrined in" legislation "may constitute irreparable injury." *EPA*, 829 F.3d at 434. The States persuasively argue that the Rule's threat to their sovereign rights may amount to irreparable harm, Dkt. 13 at 21–22 (collecting cases), but the court need not reach that issue. The States have already shown irreparable harm because they will expend unrecoverable

resources—monetary and otherwise—complying with a rule unlikely to withstand judicial scrutiny.[12]

In sum, the court finds that the States, but not the Associations, have shown irreparable harm.

### 3. Equities and Public Interest

"Once an applicant satisfies the first two factors," the equities and public-interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The equities favor an injunction if the benefits to the movants outweigh the harm to the nonmovants. *See Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022). "[P]reserving the status quo 'is an important' equitable consideration in the stay decision." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (citing *Dayton Bd. of Educ. v. Brinkman*, 439 U.S. 1358, 1359 (1978)). And there is public interest "in having governmental agencies abide by the federal laws that

---

[12] The concern over the States' sunk compliance costs is particularly strong in this case because the Supreme Court is anticipated to release an opinion later this term clarifying whether the significant-nexus test is a proper tool to measure the EPA's jurisdiction to regulate under the Act. *Sackett*, 142 S. Ct. 896 (No. 21-454). Indeed, the Agencies represented during an exchange with Justice Barrett at oral argument that for them "to win, [the Court] ha[s] to find that [the Agencies are] right about significant nexus." Transcript of Oral Argument at 115, *id.* (No. 21-454).

govern their existence and operations." *Wages & White Lion*, 16 F.4th at 1143 (quotation omitted).

The defendants take starkly different positions with respect to the competing equities and public interests. The intervenor–defendant says there are intrastate waters in Texas and Idaho that the States are not adequately regulating that will fall under the 2023 Rule's jurisdiction. *See* Dkt. 39 at 42. On the other hand, the federal defendants repeatedly emphasize in their response that the 2023 Rule essentially codifies the regulatory "status quo." Dkt. 40 at 29, 32, 34, 37–38, 51. Taking as genuine the federal defendants' convictions that the Rule's differences from the status quo are "slight," *id.* at 17, it is difficult to see how an injunction will harm the Agencies as this court considers the merits. And if the intervenor–defendant is correct that the Rule will expand the waters that come under the Agencies' jurisdiction, then the equities would favor *granting* an injunction—rather than denying one—to preserve the status quo.

The court is sympathetic to the intervenor–defendant's interest in and devotion to protecting Texas's wetlands, but even the most admirable aspirations "do[] not permit agencies to act unlawfully." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 585–86

(1952), for the proposition "that even the Government's belief that its action 'was necessary to avert a national catastrophe' could not overcome a lack of congressional authorization"). As explained above, the court finds a substantial likelihood that the 2023 Rule exceeds the Agencies' statutory authority under the Act.

On the other hand, granting the injunction eliminates the risk of enforceable penalties that set the Rule apart from the status quo. And there is little public interest or efficiency gained with implementing a rule codifying the significant-nexus test mere months before the Supreme Court decides whether the *Rapanos* version of that test is an appropriate exercise of the Agencies' jurisdiction under the Act.

When a similar rule came before this court, Judge George C. Hanks found an "overwhelming" public interest in favor of granting a preliminary injunction that would prevent Texas and its citizens from "expend[ing] valuable resources and time operationalizing a rule that may not survive judicial review." *EPA*, 2018 WL 4518230, at *1. This concern persists. The court weighs this factor in the States' favor.

### C. The Injunction's Scope

"Principles of judicial restraint control" when deciding a motion for preliminary injunction. *Becerra*, 20 F.4th at 263. In *Becerra*, the Fifth

Circuit narrowed a nationwide injunction to apply to just the states appearing as plaintiffs, reiterating that the circumstances must justify an injunction's scope. *Id.* at 263–64. Though the "constitutional command" for consistency in immigration laws may warrant such extreme relief, *id.* at 263, there was no similarly compelling need for uniform relief there; nor is there such a need here.

At least twenty-five other states have filed complaints and motions for preliminary injunctions against the Rule. *See West Virginia v. EPA*, No. 3:23-cv-32 (D.N.D.), Dkt. 44; *Kentucky v. EPA*, No. 3:23-cv-7 (E.D. Ky.), Dkt. 10. The judicial process will benefit from the reasoning and conclusions of other courts weighing in:

> The traditional system of lower courts issuing interlocutory relief limited to the parties at hand may require litigants and courts to tolerate interim uncertainty about a rule's final fate and proceed more slowly until this Court speaks in a case of its own. But that system encourages multiple judges and multiple circuits to weigh in only after careful deliberation, a process that permits the airing of competing views that aids this Court's own decisionmaking process.

*Becerra*, 20 F.4th at 264 (quoting *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of a stay)).

Moreover, the states that have not challenged the Rule may actually welcome it. The court is reluctant to deprive states that embrace the Rule from exercising their sovereign rights to conform their conduct accordingly—

at least until the Rule's statutory and constitutional validity has been determined.

Finally, only the Associations offered any argument in favor of nationwide relief. And the court has determined that they are not entitled to any injunctive relief apart from that granted the States. Accordingly, the court limits its injunction to the states of Texas and Idaho.

*   *   *

In sum, the court grants the States' motion for injunctive relief within their sovereign borders, Dkt. 13, and denies the Associations' request for a nationwide injunction, 20 Dkt. 15. Therefore, within the states of Texas and Idaho, the court enjoins the defendants from implementing or enforcing the final rule entitled "Revised Definition of 'Waters of the United States,'" 88 Fed. Reg. 3004 (Jan. 18, 2023), pending further order of this court.

Signed on Galveston Island this 19th day of March, 2023.


JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE