UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

|  |  |  |
|---|---|---|
| COMMONWEALTH OF KENTUCKY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 3:23-cv-00007-GFVT |
| v. | ) ) | **OPINION** |
| ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) ) ) ) | **&** **ORDER** |
| Defendants. | ) | |

*** *** *** ***

The Environmental Protection Agency and Army Corps of Engineers have promulgated a rule redefining "waters of the United States."  This term defines the scope of the Clean Water Act.  The Rule has not yet been enforced.  Nevertheless, the Commonwealth of Kentucky and various business groups want to challenge it.  And they want the Court to put the Rule on hold while they litigate the matter.  [R. 10; R. 17.]  Their allegations may very well present a federal cause of action.  But not yet.

Without a certainly impending injury, the matter is not ripe for review.  Simply put, there is no standing.  Judges may not pull a case off the shelf because the policy issue is compelling.  Their work is limited to "cases and controversies," words of limitation.  The Court has no power to decide this matter and so, for the reasons set out below, the Motions for Preliminary Injunction [R. 10; R. 17] are **DENIED WITHOUT PREJUDICE**.

**I**

Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  It governs

"navigable waters," which it defines as "the waters of the United States." 33 U.S.C. § 1362(7). The Act contemplates a joint state and federal enforcement scheme. States establish water quality standards and administer the National Pollutant Discharge Elimination System for "waters of the United States" found in their borders. *Id.* at §§ 1313, 1342. The states govern all other waters on their own, consistent with traditional notions of land and water governance. *See Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 631-32 (2013); *Ky. Waterways All. v. Ky. Utils. Co.*, 905 F.3d 925, 928 (6th Cir. 2018). The Act specifically states that its intent is not to impede states' responsibilities and rights in governing pollution and land use. 33 U.S.C. § 1251(b).

Defining "waters of the United States" has been a near fifty-year project which, as this litigation demonstrates, remains ongoing. The first major change was in 1986, when the agencies promulgated the 1986 Regulations. 33 C.F.R. § 328.3 (1986). These regulations established seven categories of waters covered by the CWA: (1) traditional navigable waters; (2) interstate waters; (3) "other waters," i.e., intrastate waters which could affect interstate or foreign commerce; (4) impoundments; (5) tributaries; (6) the territorial seas; and (7) adjacent wetlands. *Id.* These regulations were in effect until 2015. [R. 31 at 22.]

Three Supreme Court cases notably interpret "waters of the United States." The Court decided *United States v. Riverside Bayview Homes, Inc.* the year before the 1986 Regulations. 474 U.S. 121, 134-35 (1985). It found that wetlands adjacent to a navigable waterway are "waters of the United States" and may be governed under the CWA. *Id.* at 139. This ruling confirmed that "waters of the United States" is broader than "traditionally navigable" waters. *Id.* at 133. The Court observed that the CWA uses a "broad systemic view of the goal of maintaining and improving water quality." *Id.*

2

The Court weighed in on the 1986 Regulations in *Solid Waste Agency of Northern Cook County v. USACE*.  531 U.S. 159 (2001).  The Army Corps asserted CWA jurisdiction over isolated ponds because they were used by migratory birds.  *Id.* at 171-72.  The Court found that this stretched "waters of the United States" too far.  *Id.*  It noted that the CWA's jurisdictional scope is limited by the term "navigable," the Commerce Clause, and respect for traditional state domain over internal waters.  *Id.* at 172-74.  It also stated that *Riverside Bayview* rests on the "significant nexus" between wetlands and adjacent waters. *Id. at* 167.

This "significant nexus" observation informed the Supreme Court's next CWA case: *Rapanos v. United States*, 547 U.S. 715 (2006).  In a fractured opinion, the Court rejected the Army Corps's determination that certain Michigan wetlands were "waters of the United States."  *Id.* at 742.  Justice Scalia's plurality opinion created the "relatively permanent" test. *Id*. at 719-57.  He limited "waters of the United States" to "relatively permanent, standing or flowing bodies of water" and secondary waters with a "continuous surface connection" to such waters.  *Id.* at 733, 742.  Justice Kennedy's concurrence created the broader "significant nexus" test.  *Id.* at 759-87.  This test limits "waters of the United States" to those "navigable in fact or that could reasonably so be made" and secondary waters with a "significant nexus" to such waters.  *Id.* at 759.

The Agencies issued the "*Rapanos* Guidance" to explain how the 1986 Regulations operated in light of these cases.  [R. 31-2.]  The Defendants state that "[g]enerally, the Guidance explained that non-navigable waters are jurisdictional if they met either the relatively permanent or significant nexus standard."  [R. 31 at 22.]  This scheme was in place until 2015.

2015 kicked off a years-long process to re-define "waters of the United States."  That year, the Agencies promulgated a Rule defining three categories of "waters of the United

States."  [R. 1-1 at 12.]  Due to legal challenges, it was in minimal effect.  [R. 31 at 22.]  In 2017, Executive Order 13778 directed the Agencies to review the 2015 Rule with certain policy objectives.  [R. 1-1 at 13.]  This led to the 2019 Rule, which "repeal[ed] the 2015 Clean Water Rule and recodif[ied] the 1986 regulations without any changes to the regulatory text."  *Id.*

On January 23, 2020, the Agencies promulgated the "Navigable Waters Protection Rule: Definition of 'Waters of the United States,'" defining "waters of the United States" based on Justice Scalia's plurality opinion in *Rapanos. Id.*  Two courts vacated the Rule and the Agencies returned to the pre-2015 regime, which is the current status quo.  [R. 31 at 23.]

On January 20, 2021, President Biden signed Executive Order 13990, which revoked the Executive Order that had initiated the 2020 NWPR.  [R. 1-1 at 15.]  Accordingly, the Agencies reviewed the 2020 NWPR and decided to revise the rule.  *Id.* at 16.  The Final Rule, "Revised Definition of 'Waters of the United States,'" "specifies five categories of 'waters of the United States,' eight exclusions, and six defined terms."  [R. 23 at 7.]

The Commonwealth brought this action alleging that the Rule violates the Clean Water Act, Administrative Procedure Act, and U.S. Constitution.  [R. 1.]  On the same day, the private-sector plaintiffs filed a separate suit with the same allegations.  *Ky. Chamber of Comm. v. EPA*, 3:23-cv-00008 at [R. 1.]  On the parties' agreement, the Court consolidated the cases.  [R. 16.]  The Commonwealth and the private-sector plaintiffs both also filed Motions for a Preliminary Injunction asking the Court to preliminarily enjoin the agencies from enforcing the Rule.  [R. 10; R. 18.]  The Rule went into effect on March 20, 2023, while the Motions were under advisement.  [*See* R. 1-1 at 2.]

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)) (cleaned up) ("[A] preliminary injunction involv[es] the exercise of a very far-reaching power . . .")).  To issue a preliminary injunction, the Court must consider whether: (1) the movant shows a strong likelihood of success on the merits; (2) the movant will suffer irreparable harm if the injunction is not issued; (3) the issuance of the injunction would cause substantial harm to others; and (4) the public interest would be served by issuing the injunction.  *Overstreet*, 305 F.3d at 573 (citations omitted).

The Defendants argue that the Plaintiffs are unlikely to succeed on the merits because they do not have standing to pursue this action.  [R. 31 at 11-21.]  Standing requires (1) an injury-in-fact that is (2) traceable and (3) redressable.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The Defendants focus on the Plaintiffs' claimed injuries, arguing that they are "conjectural and hypothetical," not "actual and imminent."  *Id.* at 339; [R. 31 at 18-21].  Relatedly, the Defendants argue that the Plaintiffs do not establish an irreparable injury sufficient to justify a preliminary injunction.  *Id.* at 11-18.

The Plaintiffs seek injunctive relief before the agencies have begun enforcing the Rule.  This implicates decades of precedent considering when an expected injury affords standing.  Pre-enforcement review is permissible if threatened enforcement is "sufficiently imminent."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law."  *Id.* at 158.  A movant must establish "an intention to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Id.* at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

Determining whether a pre-enforcement challenge is sufficiently imminent to confer standing implicates the closely related doctrine of ripeness.  Ripeness asks whether the alleged injury-in-fact is "certainly impending." *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 280 (6th Cir. 1997).  To establish ripeness, the plaintiff must show "actual present harm or a significant possibility of future harm." *Id.* at 279.

Ultimately, "standing and ripeness issues 'boil down to the same question:'" whether the threatened injury is "certainly impending." *Driehaus*, 573 U.S. at 157 n.5, 158.  This inquiry upholds the very foundation of the federal judiciary: Article III of the United States Constitution. Federal courts only have the power to hear "cases and controversies."  U.S. Const. art. III § 2; *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Standing is the "irreducible constitutional minimum" required for a Court to consider a dispute. *Lujan*, 504 U.S. at 560. Absent the kind of injury sufficient to confer standing, a party does not have an adequate stake in the outcome of the litigation to make it a "case or controversy." *See Baker v. Carr*, 369 U.S. 186, 204 (1962).

The injury requirement cabins the federal courts' power. *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1177 (D.C. Cir. 1982) (Bork, J., concurring) ("[I]njury in fact, far from being a simple, descriptive term, is a concept freighted with policies that limit the kinds of injury courts may consider.").  Both its constitutional and prudential elements are "founded in concern about the proper—and properly limited—role of the court in a democratic society." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Hewing close to "cases of a form historically viewed as capable of judicial resolution" affirms the democratic value of separation of powers by avoiding

the expansion of judicial power. *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 101 (1968)).  After all, deciding a matter in which the plaintiff has no standing would result in the court "decid[ing] abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions." *Warth*, 422 U.S. at 500.  Though courts may be tempted to relax standing requirements to reach the merits of a particular issue, avoiding that temptation is an important exercise of judicial restraint which maintains the separation of powers.

Plaintiffs bear the burden of establishing standing. *Lujan*, 504 U.S. at 561.  And because the elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," the plaintiff must support each element with "the manner and degree of evidence required at the successive stages of the litigation." *Id.*  Movants must substantiate their claimed injury with evidence establishing that injury. *Mich. Coal. of Radioactive Materials, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).  Accordingly, the issue is whether the Plaintiffs provide evidence that the Rule threatens a certainly impending injury.

**A**

The private-sector plaintiffs fail to make this showing.  As organizations, they must establish either organizational or associational standing. *See Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020).  The private-sector plaintiffs claim that they have associational standing.  [R. 37-1 at 4.]  Associational standing allows an entity to sue over injury suffered by its members if: (1) its members would have standing on their own, (2) its interest in the suit is germane to its purpose, and (3) neither the claim nor the requested relief

requires the participation of individual members.[1] *Ass'n of Am. Phys. & Surgeons v. FDA*, 13 F.4th 531, 538 (6th Cir. 2021).

The Defendants do not argue that the private-sector plaintiffs' interests are not germane to their purposes or that their individual members need to participate. [R. 31 at 27-37.] Rather, they allege that the private-sector plaintiffs have not established that any of their members would have standing to pursue this case on their own. *Id.* at 34-36. Specifically, they argue that the members' claimed injuries are too "speculative, hypothetical, or otherwise lacking" to establish standing. *Id.* at 34. The private-sector plaintiffs claim that their members face injury-in-fact because they are "indisputably regulated" by the Rule and provide declarations explaining their injuries. [R. 37-1 at 4.]

The declarations come in two forms: statements on behalf of the organizations, none of which identify a specific affected member, and statements by the organizations' members. [R. 17-1.] The former do not establish associational standing because it is insufficient to claim "that the defendant's conduct will harm an unknown member." *AAPS*, 13 F.4th at 531. The organization "must instead identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct." *Id.*

Two of the private-sector plaintiffs failed to identify an individual member. The Portland Cement Association states that its members may need to hire consultants, apply for permitting which was not required before the Rule, and relocate or change current projects. [R. 17-1 at 7.] The Home Builders' Association of Kentucky claims that its members will need to obtain more

---

[1] The Sixth Circuit cast serious doubt on this test in *AAPS*. 13 F.4th at 538-42. It observed that the associational standing test is "not obviously reconcilable" with the Supreme Court's guidance on which standing elements are "prudential" and which are constitutional. *Id.* Nevertheless, it followed guidance to "stick to . . . directly on-point precedent even if the logic from other cases has called that precedent into doubt." *Id.* at 542. The Circuit still applied this test because it is "directly on-point precedent" from the Supreme Court. *Id.* So too will this Court.

permits because more waters fall under the CWA's jurisdiction. *Id.* at 42. Neither declaration identifies a specific affected member, nor did any such member submit their own declaration. The PCA and HBAK do not have associational standing. *AAPS*, 13 F.4th at 531

 At least one member of each of the remaining private-sector plaintiffs submitted a declaration. Alliance Coal, a member of the Kentucky Chamber of Commerce, claims it is currently working on three projects that the Rule will impact. [R. 17-1 at 18.] It states it will now "have to spend time and money to determine the extent of federal jurisdiction" over those projects. *Id.* at 20. Alliance also identifies a specific land purchase and states that, because of the Rule, related fees "are anticipated to rise by greater than 75%." *Id.* at 20. Logan Aluminum, a member of the Kentucky and U.S. Chambers of Commerce, is "concerned that further expansion of the jurisdictional scope . . . would add unnecessary costs and delays to future expansion plans and uncertainty to its planning process" and states that it owns properties with waters whose status "will be unclear to Logan should the new Rule become effective." *Id.* at 25. O'Bryan Grain Farms, also a member of the Kentucky and U.S. Chambers of Commerce, asserts it "will have to hire consultants and attorneys to determine whether [the Rule will affect] current and future farming activities." *Id.* at 31. Innovative Demolition, a member of the Associated General Contractors of Kentucky, fears that "[t]he Rule could affect" bridge demolition projects for which it has contracts and that the resulting uncertainty "could cause delays." *Id.* at 45. SEDA, a member of the Georgia Chamber of Commerce believes that some properties it "purchased and planned for development may no longer be viable development projects" and that it "will have to invest significant time and money to determine whether and to what extent water features and wetlands on its property will be subject to federal jurisdiction." *Id.* at 48.

These alleged injuries can be broken into two categories: (1) costs resulting from more waters being subject to the CWA than in the pre-2015 regime and (2) costs of conducting new surveys to determine whether waters are now subject to the CWA.

**1**

The first category of allegations is too speculative to confer standing.  Members claim that they are "likely to be impacted," fees "are anticipated to rise," the status of water features will be "unclear," the Rule will "likely trigger additional analysis that may sweep in water features," and the Rule "may jeopardize" the feasibility of property development.  *Id.* at 18, 20, 24, 45, 50.  These claims are mere speculation, not evidence that the Rule's impact will "be felt immediately."  *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967).

*Abbott Labs* and its companion case *Toilet Goods* demonstrate the degree of certainty necessary to challenge a regulation before it goes into effect.  The Plaintiffs in *Abbott Labs* had pre-enforcement standing because the challenged regulation was "directed at them in particular," required them to make "significant changes in their everyday business practices," and "clearly exposed [them] to the imposition of strong sanctions" if they failed to comply.  *Abbot Labs. v. Gardner*, 387 U.S. 136, 153 (1967).  In contrast, the plaintiffs in *Toilet Goods* did not have standing because the court had "no idea whether or when" factory inspections would occur under a new rule.  *Toilet Goods*, 387 U.S. at 163.  Ultimately, a claim is ripe and pre-enforcement standing exists when the statute "can realistically be expected to be enforced against a plaintiff singled out for regulation" and the plaintiff can show "the statute's direct and immediate impact on his business" and that compliance "will cause significant economic harm."  *Magaw*, 132 F.3d at 290.

The private-sector plaintiffs are far more similar to those in *Toilet Goods* than *Abbott Labs*. The Court has "no idea whether or when" the Rule will change how the CWA applies to any particular member because they do not identify any specific water feature or related project and explain how the Rule will affect it. *Toilet Goods*, 387 U.S. at 163. Rather, they raise general fears that the Rule covers more waters and that increased costs may result. Unlike in *Abbot Labs*, they identify no "immediate and significant change in the . . . conduct of their affairs" and the Rule is not "directed at them *in particular*." 387 U.S. at 153-54 (emphasis added). As Innovation Demolition itself states, "it is unclear whether the parameters affected by permitting for [projects it is creating bids for] will change." *Id.* at 46. These speculative claims are "allegations of possible future injury," not "certainly impending injuries." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Alliance Coal comes closest to, but still falls short of, identifying a certainly impending injury. It identifies three permit projects on which it is "presently" working with the Army Corps. [R. 17-1 at 19.] Each project involves ephemeral streams or isolated wetlands. *Id.* It states that all "are likely to be impacted by the Rule." *Id.* at 18. Perhaps Alliance could establish standing if it explained why or how the Rule change impacts these projects. But a "likely" impact is merely an "allegation of possible future injury" absent an explanation of why the entity believes the impact will occur. *Clapper*, 568 U.S. at 409.

Alliance also claims that it has had to "withdraw and resubmit permit applications," causing delays, due to the "changing and inconsistent definitions provided by the Rule." [R. 17-1 at 19.] But this allegation refers to the varied efforts to define "waters of the United States" over the past few years, not the new Rule specifically. Alliance refers to a "changing and

inconsistent definition." *Id.* The definition of "waters of the United States" changed numerous times in the years preceding the Rule, but the Rule itself provides one definition. Further, Alliance claims the "changing and inconsistent definition" has already caused it harm. *Id.* Perhaps previous regulatory changes influenced its projects and required it to resubmit permit applications. But the Rule itself could not have done so before it went into effect. Accordingly, it does not appear that the Rule, which is the subject of this action, caused Alliance's permit withdrawals and resubmissions.

The private-sector plaintiffs claim that their members' standing is "self-evident" because they are regulated entities. [R. 40 at 3.] The cases they rely on find that standing is "self-evident" when the petitioner is an "object of the action." For example, the plaintiff in *Bonacci* challenged TSA policies intended to expedite pilot and flight attendant screenings. *Bonacci v. Trans. Sec. Admin.*, 909 F.3d 1155, 1159 (D.C. Cir. 2018). He was an "object" of those policies because it was "undisputed" that TSA agents had *already* subjected him to the policy. *Id.* None of the private-sector plaintiffs allege that any agency has already applied the Rule to them.

The private-sector plaintiffs also invoke *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (6th Cir. 2015). In *Lew*, the plaintiff challenged the constitutionality of the Consumer Financial Protection Bureau. *Id.* It could bring that challenge before the Bureau initiated an enforcement action against it because there was "no doubt" that the Bureau regulated it, as it was subject to ongoing regulations which the Bureau promulgated. *Id.* at 53. This case is distinguishable because the plaintiffs are not challenging the constitutionality of the agencies which actively regulate them.

Ultimately, the private-sector plaintiffs' members are not "objects" of the Rule simply because they own land with water features which may or may not be subject to it. They may

become objects of the Rule if the agencies determine that waters on their land are now "waters of the United States" and are subject to regulation.  Absent such a determination or a specific showing that, if the agencies were to review specific waters, they would come to this conclusion, the members are not yet "objects of" the Rule.  Because potentially greater costs are not a "certainly impending" injury and the members are not yet "objects" of the Rule, the members' claims are not ripe.

## 2

Second, the members raise the related but distinct allegation that they will have to expend resources to determine whether the Rule makes waters on their properties newly jurisdictional. [R. 17-1 at 20, 25-26, 31, 45, 50.]  At the preliminary injunction hearing, the private-sector plaintiffs indicated that their best case on standing is *Commonwealth v. Biden*, which addresses compliance costs.  [R. 45 at 28-30.]  There, the Commonwealth faced an irreparable injury because it was "likely to incur unrecoverable compliance costs" once allegedly unlawful vaccine mandates went into effect.  *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  The Court recognized that other circuits "have held that compliance costs do not qualify as irreparable harm because they commonly result from new government regulation."  *Id*.  But it found that compliance costs *may* constitute injury depending on "the peculiarity and size of a harm."  *Id.*

Some of the compliance costs that the members allege they will incur are costs of permitting and jurisdictional assessments for future projects.  These costs are not "peculiar" because the members all state that obtaining such reviews is a normal part of their business.  *Id.* For example, Alliance states that throughout the permitting process for one of its properties, it has "expend[ed] considerable time and resources in the engagement of private consultants" and

has "had to withdraw and resubmit permit applications" due to the "changing and inconsistent definitions provided by the Rule. [R. 17-1 at 19.] O'Bryan also states that it was "required to hire attorneys to defend and advise [it] concerning" the jurisdictional bounds of the CWA *before* the issuance of the Rule. *Id.* at 31. Finally, Logan Aluminum "has already spent significant staff time trying to understand the various new standards and terms introduced by the rule." *Id.* at 26.

"In *Abbott Labs*, the hardship requirement was satisfied by the fact that the affected companies either had to expend substantial amounts of money to comply with the regulations or not comply and risk serious criminal and civil penalties." *Magaw*, 132 F.3d at 286. The members of the private-sector plaintiffs are not in a comparable position because, as they state themselves, jurisdictional assessments and consultations are a common element of doing business in a way which implicates the CWA. Before the Rule, these businesses had to assess their land to determine whether it contains jurisdictional waters, apply for permits, and expend resources analyzing whether the CWA applies. They anticipate needing to do so under the new Rule as well. These costs are not "peculiar" because they exist before and after the Rule goes into effect. *Biden*, 57 F.4th at 556. Accordingly, the Rule is not *causing* the alleged compliance cost injury.

The members also allege that, on the day the Rule goes into effect, they must hire consultants to determine whether waters are now subject to the CWA which were not previously. These are not the sort of compliance costs which the cases contemplate as establishing standing. The cost of assessing whether one needs to comply with a regulation is different than the costs imposed by actually complying. For example, in *Commonwealth v. Biden*, the challenged mandate required employers to "designate individuals to distribute information about the vaccination mandate and to collect documentation for the purpose of ensuring compliance." 57

14

F.4th at 556.  There was no question whether the mandate applied to the employer-plaintiffs and required them to immediately alter their business to comply or risk penalties.  *Id.*  The compliance costs arose out of actually complying with the mandate, not determining whether they needed to comply with the mandate.

The private-sector plaintiffs' members are not similarly situated because the costs they will allegedly immediately incur do not arise from complying with the Rule.  Rather, they may incur costs in answering the preliminary question of whether they need to change anything about their business practices to comply with the Rule.  They provide no specifics on the extent of these costs.  They cite, and the Court is aware of, no authority for the notion that an unspecified amount of costs incurred in determining whether compliance is necessary constitutes a certainly impending injury.

The standing analysis would be different if the members knew, or had a compelling legal argument, that the Rule makes specific waters on their lands newly jurisdictional and could demonstrate that substantial or peculiar compliance costs would result.  *Biden*, 57 F.4th at 556.  But as it stands, the members allege that they will incur costs that are either ongoing costs or are preliminary to the Rule's actual or suspected application.  The private-sector plaintiffs fail to identify a certainly impending injury, so their claims are not ripe, they have no standing, they are unlikely to succeed on the merits, and they are not entitled to a preliminary injunction.

**B**

The Defendants also argue that the Commonwealth faces no injury-in-fact sufficient to establish standing.  [R. 31 at 36-37.]  The Commonwealth believes that the Rule threatens immediate injuries to its sovereignty and to its finances as both regulator and landowner.  [R. 10 at 10-13.]

**1**

First, the Commonwealth believes that, by expanding CWA jurisdiction, the Rule infringes upon its sovereignty. *Id.* at 10-11. Specifically, by allegedly unlawfully expanding CWA jurisdiction to encompass more waters, the Rule "usurp[s]" the Commonwealth's "traditional and primary power over land and water use." [R. 39 at 2 (quoting *SWANCC*, 531 U.S. at 174).] The Commonwealth cites *Texas v. EPA* and *Kansas v. United States* to support its claim that this infringement "is an injury-in-fact." *Id.* Neither is availing.

In *Texas v. EPA*, Texas challenged an agency action replacing states' plans for regulating emissions. 829 F.3d 405, 414-17. Texas demonstrated irreparable injury by pointing to specific actions that regulated companies would have to undertake to comply, specific plants which would shut down, and specific rates which would increase. *Id.* at 433. The court observed that "the institutional injury to Texas from the inversion of the federalism principles enshrined in the Clean Air Act *may* constitute irreparable injury." *Id.* at 434 (emphasis added). The Commonwealth makes no similarly specific showing on the Rule's impact. And one line in an out-of-circuit case stating that threats to sovereignty "may" constitute injury is insufficient to establish standing.

In *Kansas v. United States*, the Tenth Circuit affirmed a district court's preliminary injunction of the National Indian Gaming Commission's determination that a tract of land was "Indian land." 249 F.3d 1213, 1218 (10th Cir. 2001). Kansas established irreparable injury by claiming that "the NIGC's decision places its sovereign interests and public policies at stake." *Id.* at 1227. Kansas was not pursuing pre-enforcement review and there were no questions as to whether the injury to its sovereignty was certainly impending. The NIGC had made a clear determination that land which Kansas alleged was its own was in fact "Indian land." *Id.* at

1218.  Injury was certainly impending because the tribal landowners intended to proceed with constructing a gaming facility absent an injunction.  *Id.* at 1228.

The Commonwealth's allegation that CWA jurisdiction may expand and may infringe on waters over which it is sovereign is not comparable.  Perhaps the Commonwealth could establish an infringement on its sovereignty by identifying a water which should be in its exclusive control over which the agencies assert jurisdiction under the new Rule.  Absent such a showing, injury to its sovereignty is not certainly impending.  *Clapper*, 568 U.S. at 409.

**2**

The Commonwealth also argues that it faces economic injury because it will incur compliance costs in incorporating the Rule into its water quality standards and permitting process.  [R. 10 at 11.]  It claims that the Rule requires the Commonwealth to expend more resources to identify new jurisdictional waters, determine whether they meet the water quality standards, and act if they do not.  *Id.* at 11-12.  As explained above, compliance costs resulting from new government regulation can constitute irreparable injury, depending on their size and peculiarity.  *Biden*, 57 F.4th at 556.

The Commonwealth does not establish the amount (or "size") of compliance costs which it will allegedly incur.  It submitted a declaration stating that it will have to "immediately assess which waters (and lands)" are now jurisdictional, requiring "careful legal and technical analysis" and "field and survey work."  [R. 10-1 at 4.]  It will also have to "develop a plan to address the implications of the Final Rule on a number of programs administered by the Commonwealth" and "will likely need to hire additional manpower or divert" resources.  *Id.* at 5.

A "likely" need to increase hiring or divert resources is speculative, not certain, because the allegation is unsupported by any specifics.  Compare these assertions to those of Mississippi

in *Crane v. Johnson.* 783 F.3d 244, 252 (5th Cir. 2015). There, Mississippi submitted a study showing that illegal immigration costs it more than $25 million per year. *Id.* That report was insufficient to give the state standing to challenge DACA because it contained "no concrete evidence that Mississippi's costs had increased or will increase *as a result of DACA*." *Id.* (emphasis added). To show a "concrete and particularized" injury, Mississippi would have had to show facts establishing that costs would result from the rule change itself. *Id.* Stated otherwise, a rule change must cause peculiar compliance costs which the state would not otherwise incur. *Id.*; *Biden*, 57 F.4th at 556. The Commonwealth does not establish this. It only alleges that it will "likely," but not "certainly," have to expend resources to comply with the Rule which it would not have had to expend previously. And the degree of those costs is not only unproven, but unalleged.

Similar challenges to the one at hand are currently pending in the Southern District of Texas and District of North Dakota. [*See* R. 31 at 25-26.] While the instant Motions were under advisement, the Southern District of Texas issued an Order granting Texas and Idaho's Motion for Preliminary Injunction challenging the Rule. [R. 46-1.] It found that the states established standing because Texas "submitted detailed declarations outlining projected mitigation and compliance costs." *Id.* at 14. It specifically alleged that mitigation costs would collectively increase by $3,000,000 and, for a specific project, from $292,600 to $80,591,000. *Id.* Kentucky makes no similar showing. [R. 10-1.]

The Texas court also concluded that Idaho also had standing although its "declarations [were] less detailed." [R. 46-1 at 15.] It relied on the Fifth Circuit's ruling in *Texas v. Biden*, which stated that "large-scale policy" is "amenable to challenge using large-scale statistics and figures." 20 F.4th 928, 971 (5th Cir. 2021). Even if this were controlling precedent on this

Court, it would not grant the Commonwealth standing. *Texas v. Biden* did not do away with the requirement that a movant produce evidence of impending injury. *Id.* Rather, it found that "big-picture evidence" can establish that injury is certainly impending. *Id.* The Commonwealth did not provide big or small picture *evidence*, it merely submitted a speculative claim that it will "likely" face increased costs. This speculation does not show a "certainly impending" injury. *Clapper*, 568 U.S. at 409.

### 3

Finally, the Commonwealth claims that it will incur compliance costs as a landowner which must comply with the CWA. [R. 10 at 13.] It claims that its projects "are more likely to require permitting" under the Rule, increasing the expense of obtaining permits. *Id.* Like the private-sector plaintiffs' similar allegations, this is too speculative to establish standing. Injury to the Commonwealth's coffers is not "certainly impending." *Clapper*, 568 U.S. at 409. It does not identify any project for which it will need to obtain a permit which it would not have before the Rule. Accordingly, the Commonwealth fails to establish an injury-in-fact.

### C

Recent developments in Congress underscore the ripeness concerns that this case presents. On March 29, as the Motions were under advisement, Congress passed a resolution overturning the Rule. H.R.J. Res. 27, 118th Congress (2023). The resolution is not final. Next, it will proceed to President Biden, who is expected to veto it. *See* 5 U.S.C. § 801; Kristina Peterson, *Senate Votes to Overturn Biden Clean-Water Rule*, Wall St. J. (Mar. 29, 2023, 6:18 PM), https://www.wsj.com/articles/senate-votes-to-overturn-biden-clean-water-rule-d94e7aeb.

The Rule's propriety is the sort of "abstract question[] of wide public significance" that "other governmental institutions may be more competent to address." *Warth*, 422 U.S. at 500.

And they are.  Both chambers of Congress have given their input.  The Executive is expected to

weigh in as well.  This dynamic encapsulates the risk that, by ruling on a dispute with "no

concrete injury," the Court could "distort the role of the Judiciary in its relationship to the

Executive and the Legislature and open the Judiciary to an arguable charge of providing

'government by injunction.'"  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208,

222 (1974).

This is not to say that the Plaintiffs would never have standing to litigate the questions

they present.  As explained throughout this Order, certain developments, pleadings, or

allegations could ripen this matter into a controversy fit for judicial review.  But at this point, the

plaintiffs allege only uncertain concerns about the Rule's impact.  Those concerns are improper

for this Court to resolve and are better suited for "other governmental institutions."  *Warth*, 422

U.S. at 500.  Fortunately for the Plaintiffs, those institutions are actively engaging in that

process.

**D**

Having found that the Plaintiffs lack standing, the Court must dismiss this matter for lack

of jurisdiction.  Standing is a "bedrock requirement" of the Court's jurisdiction to hear cases

under Article III.  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,

*Inc.*, 454 U.S. 464, 471 (1982).  "Jurisdiction is power to declare the law, and when it ceases to

exist, the only function remaining to the court is that of announcing the fact and dismissing the

case."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte

McCardle*, 7 Wall. 506, 514 (1868)).  The Defendants do not seek dismissal but "because the

standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*."  *Loren

v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007).  Having "announced

the fact" that the Plaintiffs do not have standing, the Court's "only function remaining" is to dismiss this matter. *Steel Co.*, 523 U.S. at 94. Dismissal will be without prejudice, allowing the Plaintiffs to re-raise their claims if they become ripe.

### III

Neither the Commonwealth nor the private-sector plaintiffs' claims are ripe for review. Perhaps they could establish a "sufficiently imminent," "certainly impending" injury once the agencies are enforcing the Rule. But at this point, the claimed financial and sovereignty injuries are too speculative to constitute imminent injuries in fact. Absent a certainly impending injury, the claims are not ripe, the parties do not have standing, and they are unlikely to succeed on the merits of their claim. Accordingly, they are not entitled to a preliminary injunction. And having found that there is no standing, the Court must also dismiss the action.

This case is a compelling example of when a Court may be tempted to skirt standing requirements to reach the merits. It presents important issues, argued by well-qualified lawyers, that any court would be privileged to resolve. But judges are not librarians wandering around the reading rooms looking for a topic that catches their fancy. The Constitution limits their reading list. This dispute is not *yet* a "case or controversy." Therefore, Article III does not permit this Court to resolve it. Recognizing this reality respects "the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Vander Jagt*, 699 F.2d at 1179 (Bork, J., concurring). Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1.  The Commonwealth's Motion for Preliminary Injunction **[R. 10]** is **DENIED WITHOUT PREJUDICE**;

2. The private-sector plaintiffs' Motion for Preliminary Injunction **[R. 18]** is **DENIED WITHOUT PREJUDICE**;

3. The claims in this matter are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction; and,

4. This matter is **STRICKEN** from the Court's active docket.

This the 31st day of March, 2023.

Gregory F. Van Tatenhove
United States District Judge