# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| States of West Virginia, North Dakota, Georgia, Iowa, Alabama, Alaska, Arkansas, Florida, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, Virginia, and Wyoming, | ) ) ) ) ) ) ) ) | **ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| American Farm Bureau Federation, American Petroleum Institute, American Road and Transportation Builders Association, Associated General Contractors of America, Cass County Farm Bureau, Leading Builders of America, National Apartment Association, National Association of Home Builders of the United States, National Association of Realtors, National Cattlemen's Beef Association, National Corn Growers Association, National Mining Association, National Multifamily Housing Council, National Pork Producers Council, National Stone, Sand and Gravel Association, North Dakota Farm Bureau, Public Lands Council, and U.S. Poultry and Egg Association, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Intervenor-Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:23-cv-032 |
| | ) | |
| U.S. Environmental Protection Agency, Michael S. Regan, in his official capacity as Administrator of the U.S. Environmental Protection Agency, Michael L. Connor, in his official capacity as Assistant Secretary of the Army for Civil Works, and LTG Scott A. Spellmon, in his official capacity as Chief of Engineers and | ) ) ) ) ) ) ) ) | |

1

**EXHIBIT 1**

|  |  |
|---|---|
| Commanding General, U.S. Army | ) |
| Corps of Engineer, | ) |
|  | ) |
|        Defendants, | ) |
|  | ) |
|    and | ) |
|  | ) |
| Chickaloon Village Traditional Council, | ) |
| Rappahannock Tribe, Tohono O'odham | ) |
| Nation, and White Earth Band of | ) |
| Minnesota Chippewa Tribe, | ) |
|  | ) |
|        Intervenor-Defendants. | ) |

Now before the Court is the Plaintiffs' "Motion for Preliminary Injunction" filed on February 21, 2023. <u>See</u> Doc. No. 44. The Plaintiffs seek the entry of a preliminary injunction prohibiting the Defendants from enforcing, implementing, applying, or giving effect to the Revised Definition of "Waters of the United States." <u>See</u> 88 Fed. Reg. 3004 (Jan. 18, 2023). The Defendants filed a response in opposition to the motion on March 10, 2023. <u>See</u> Doc. No. 92. The Plaintiffs filed a reply to the Defendants' response on March 14, 2023. <u>See</u> Doc. No. 98. The Intervenor-Defendants filed a response in opposition to the motion on March 31, 2023. <u>See</u> Doc. No. 120. The Plaintiffs filed a reply to the Intervenor-Defendants' response on April 5, 2023. <u>See</u> Doc. No. 130. For the reasons set forth below, the Plaintiffs' motion for preliminary injunction (Doc. No. 44) is granted.

## I.    <u>BACKGROUND</u>

This is a lawsuit for declaratory and injunctive relief challenging a federal rule revising the definition of "waters of the United States" under the Clean Water Act, 33 U.S.C. § 1521 et seq., which took effect on March 20, 2023. The Plaintiffs, a coalition of 24 states, filed their complaint on February 16, 2023. <u>See</u> Doc. No. 1. Eighteen trade groups ("Business Intervenors") moved to

intervene as plaintiffs on February 22, 2023, and were granted leave to intervene on March 22, 2023.

See Doc. Nos. 54 and 110.  Four Native American tribes moved to intervene as defendants on March

8, 2023, and were granted leave to intervene on March 31, 2023.  See Doc. Nos. 87 and 118.

The Clean Water Act was passed by Congress in 1972 to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The Clean Water

Act, and the various definitions of "waters of the United States" ("WOTUS"), has spawned a vast

array of regulations that define the extent to which the United States Environmental Protection

Agency and the United States Army Corps of Engineers (hereinafter referred to collectively as the

"EPA") possess regulatory jurisdiction over the Clean Water Act.  Congress has authorized the EPA

to administer the Clean Water Act, 33 U.S.C. § 1251(d), and the United States Army Corps of

Engineers to issue permits for projects on land or water under the Act's jurisdiction.  Congress has

attempted to craft the Clean Water Act "to recognize, preserve, and protect the primary

responsibilities and rights of States to prevent, reduce, and eliminate pollution [and] to plan the

development and use (including restoration, preservation, and enhancement) of land and water

resources."  33 U.S.C. § 1251(b).

The latest Revised Definition of "Waters of the United States" (" the 2023 Rule"), 88 Fed.

Reg. 3004 (Jan. 18, 2023) defines "waters" to include the following categories:

■ traditional navigable waters, the territorial seas, and interstate waters ("paragraph (a)(1) waters");

■ impoundments of 'waters of the United States' ("paragraph (a)(2) impoundments");

■ tributaries to traditional navigable waters, the territorial seas, interstate waters, or paragraph (a)(2) impoundments when the tributaries meet either the relatively permanent standard or the significant nexus standard ("jurisdictional tributaries");

3

      ▪ wetlands adjacent to paragraph (a)(1) waters, wetlands adjacent to and with a continuous surface connection to relatively permanent paragraph (a)(2) impoundments, wetlands adjacent to tributaries that meet the relatively permanent standard, and wetlands adjacent to paragraph (a)(2) impoundments or jurisdictional tributaries when the wetlands meet the significant nexus standard ("jurisdictional adjacent wetlands"); and

      ▪ intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) that meet either the relatively permanent standard or the significant nexus standard ("paragraph (a)(5) waters").

88 Fed. Reg. at 3005–06.

      This case challenges and seeks to enjoin the implementation of the new 2023 Rule, which went into effect on March 20, 2023. The Plaintiffs have commenced suit on statutory and constitutional grounds. The Plaintiffs allege the 2023 Rule runs roughshod over the Administrative Procedure Act ("APA") in the following manner: (1) the 2023 Rule is arbitrary & capricious, 5 U.S.C. § 706(2)(A); (2) the 2023 Rule is "contrary to constitutional right, power, privilege, or immunity," id. § 706(2)(B); (3) the 2023 Rule exceeds statutory authority, id. § 706(2)(C); and (4) the 2023 Rule was promulgated without observance of required procedure id. § 706(2)(D). See Doc. No. 1, ¶ 6. In addition, the Plaintiffs contend the new 2023 Rule violates the Commerce Clause, the Tenth Amendment, the Due Process Clause, and the Non-Delegation Doctrine. Id.

## II.     THE HISTORY OF "WOTUS"

      The Clean Water Act is one of the country's most important environmental laws. Unfortunately, the Act has also created a litany of chaos and uncertainty around the country. There have been an endless stream of lawsuits and legal challenges since at least 2015 which have primarily dealt with issues concerning agency authority and what specific "waters of the United States" are subject to federal jurisdiction versus state protections and control. Congress crafted the

Clean Water Act to restore and maintain the country's water, but it also recognized that the States have primary responsibility and rights over their land and resources. 33 U.S.C. § 1251(b). The EPA can certainly regulate water resources with statutory authorization. The confusion that has pervaded the Clean Water Act over the years, combined with its varied rules and regulations, is that only some of the country's waters are subject to federal jurisdiction, namely "navigable waters" as defined by Congress as "waters of the United States." 33 U.S.C. § 1362 (7), (12).

Over the years there have been a multitude of legal challenges, administrative appeals, lawsuits, and more appeals that have led to many different definitions of "waters of the United States." The EPA, in its response to this case, attached a memorandum which outlines the extensive litigation that has occurred as a result of the federal agencies' rulemaking over the last decade. See Doc. No. 92-3.

On April 21, 2014, the EPA and the U.S. Army Corps of Engineers issued a proposed rule to change the definition of "waters of the United States" under the Clean Water Act. Following a period of comment, the EPA promulgated a final rule on June 29, 2015, which became effective August 28, 2015.

Thereafter, several parties initially brought suit in both federal district courts and appellate courts. The day before the 2015 Clean Water Rule's August 28, 2015, effective date, the District Court for the District of North Dakota (Judge Ralph Erickson) preliminarily enjoined the rule in 13 states. The North Dakota district court enjoined the 2015 Clean Water Rule from going into effect in Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, South Dakota, and Wyoming. North Dakota v. EPA, 127 F. Supp. 3d 1047 (D.N.D. 2015).

Petitions filed in the courts of appeals seeking review of the 2015 Clean Water Rule were consolidated in the United States Court of Appeals for the Sixth Circuit. The federal agencies argued that the Sixth Circuit had subject matter jurisdiction to review the rule, while other parties argued that jurisdiction lay with the federal district courts. Some parties argued that the rule should be stayed. On October 9, 2015, the Sixth Circuit issued an order staying the 2015 Clean Water Rule nationwide "pending determination of [the court's] jurisdiction" and recognizing that its order would restore the "familiar, if imperfect" pre-2015 regulatory regime. In re EPA & Dep't of Def. Final Rule, 803 F.3d 804, 806, 808 (6th Cir. 2015).

On January 13, 2017, the United States Supreme Court granted certiorari on the question of whether the courts of appeals had original jurisdiction to review challenges to the 2015 Clean Water Rule. See Nat'l Ass'n of Mfrs. v. Dep't of Def., 137 S. Ct. 811 (2017). A year later—on January 22, 2018—the Court issued a unanimous opinion holding that the rule was subject to direct review in the federal district courts. Nat'l Ass'n of Mfrs. v. Dep't of Def., 138 S. Ct. 617, 624 (2018). In response to the Supreme Court's decision the Sixth Circuit lifted its nationwide stay of the 2015 Clean Water Rule and dismissed the corresponding petitions for review. See In re Dep't of Def. & EPA Final Rule, 713 Fed. App'x. 489 (6th Cir. 2018).

Following the dissolution of the Sixth Circuit's nationwide stay, the 2015 Clean Water Rule did not go back into effect due to the "Applicability Date Rule"—a rule that the agencies had issued on February 6, 2018, that added an applicability date of February 6, 2020. The Applicability Date Rule restored the pre-2015 regulatory regime. On August 16, 2018—six months after the rule had been issued—the District Court for the District of South Carolina vacated and enjoined the rule nationwide. See South Carolina Coastal Conservation League v. Pruitt, 318 F. Supp. 3d 959 (D.S.C. 2018).

After the Applicability Date Rule was vacated in August 2018, the 2015 Clean Water Rule went back into effect, except in those jurisdictions where the rule had been enjoined. Pursuant to the North Dakota district court's preliminary injunction, the 2015 Clean Water Rule did not go into effect in Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, South Dakota, and Wyoming. North Dakota v. EPA, 127 F. Supp. 3d 1047 (D.N.D. 2015). As the result of another preliminary injunction, the 2015 Clean Water Rule also did not go into effect in Alabama, Georgia, Florida, Indiana, Kansas, Kentucky, North Carolina, South Carolina, Utah, West Virginia, and Wisconsin. Georgia v. Pruitt, 326 F. Supp. 3d 1356 (S.D. Ga. 2018). In these 24 states, the EPA continued to implement the pre-2015 regulatory regime following vacatur of the Applicability Date Rule.

In September 2018, three more states obtained a preliminary injunction against the 2015 Clean Water Rule—Texas, Louisiana, and Mississippi—and the North Dakota district court expanded the scope of its preliminary injunction to cover the state of Iowa. The result was there were 28 states in which the 2015 Clean Water Rule was not in effect. See Texas v. EPA, No. 3:15-cv-162, Dkt. No. 140 (S.D. Tex. Sept. 12, 2018); North Dakota v. EPA, No. 3:15-cv-59, Dkt. No. 250 (D.N.D. Sept. 18, 2018).

In July 2019, the Oregon district court issued a preliminary injunction barring implementation of the 2015 Clean Water Rule in Oregon. Or. Cattlemen's Ass'n v. EPA, No. 3:19-cv-564, Dkt. No. 58 (D. Or. July 26, 2019), vacated as moot Dkt. No. 81 (Mar. 2, 2020).

As a result of the legion of court orders, the EPA continued to implement both the 2015 Clean Water Rule and the pre-2015 regulatory regime in a patchwork of states until the 2019 Repeal Rule went into effect on December 23, 2019. 84 Fed. Reg. 56626 (Oct. 22, 2019). The EPA then returned to implementing the pre-2015 regulations.

The EPA implemented the pre-2015 regulatory regime nationwide until the 2020 Navigable Waters Protection Rule ("NWPR") went into effect on June 22, 2020, in all states except Colorado. 85 Fed. Reg. 22250 (Apr. 21, 2020). In Colorado, the 2020 NWPR was subject to a preliminary injunction issued by the United States District Court for the District of Colorado. Colorado v. EPA, 445 F. Supp. 3d 1295 (D. Colo. 2020); see also California v. Wheeler, 467 F. Supp. 3d 864 (N.D. Cal. 2020) (denying motion for preliminary injunction as to other states). The Tenth Circuit later reversed the Colorado district court's order on appeal; and, as a result, the 2020 NWPR went into effect in Colorado on April 26, 2021. Colorado v. EPA, 989 F.3d 874 (10th Cir. 2021); Colorado v. EPA, No. 20-1238, ECF No. 010110512604 (Doc. 10825032) (10th Cir. Apr. 26, 2021).

Following the reversal of the Colorado district court's preliminary injunction against the 2020 NWPR, the EPA implemented the 2020 NWPR nationwide until the rule was vacated on August 30, 2021, by the United States District Court for the District of Arizona. Pascua Yaqui Tribe v. EPA, 557 F. Supp. 3d 949 (D. Ariz. 2021). The EPA then returned to implementing the pre-2015 regulatory regime nationwide. See U.S. EPA, "Current Implementation of Waters of the United States," https://www.epa.gov/wotus/current-implementation-waters-united-states. Another court issued an order vacating the 2020 NWPR on September 27, 2021. Navajo Nation v. Regan, 563 F. Supp. 3d 1164 (D.N.M. 2021).

On January 20, 2021, President Biden signed Executive Order 13990, which revoked the earlier Executive Order that had initiated the 2020 NWPR. The EPA then decided to revise the Rule that is the subject of this litigation. That Rule took effect on March 30, 2023. Congress passed a resolution overturning the Rule. H.R.J.Res. 27, 118th Congress (2023). The joint resolution was designed to nullify the new 2023 Rule. The resolution was vetoed by the President on April 6, 2023, with the following message.

I am returning herewith without my approval H.J. Res. 27, a resolution that would disapprove the revised definition of "Waters of the United States".

The 2023 revised definition of "Waters of the United States" carefully sets the bounds for which bodies of water are protected under the Clean Water Act. It provides clear rules of the road that will help advance infrastructure projects, economic investments, and agricultural activities — all while protecting water quality and public health.

The resolution would leave Americans without a clear definition of "Waters of the United States". The increased uncertainty caused by H.J. Res. 27 would threaten economic growth, including for agriculture, local economies, and downstream communities. Farmers would be left wondering whether artificially irrigated areas remain excluded or not. Construction crews would be left wondering whether their waterfilled gravel pits remain excluded or not. The resolution would also negatively affect tens of millions of United States households that depend on healthy wetlands and streams.

Therefore, I am vetoing this resolution.

Suffice it to say the Clean Water Act, and the varied and different definitions of "waters of the United States," have created nothing but confusion, uncertainty, unpredictability, and endless litigation throughout this country to date.

## III.   THE CLEAN WATER ACT AND *RAPANOS v. UNITED STATES*

The Supreme Court has also struggled for decades trying to interpret the phrase "waters of the United States" under the Clean Water Act. See 33 U.S.C. § 1362(7). The meaning of "waters of the United States" was considered by the United States Supreme Court in the consolidated cases of *Rapanos v. United States* and *Carabell v. United States*. 547 U.S. 715 (2006). This case addressed the jurisdiction over waters of the United States under the Clean Water Act. 33 U.S.C. § 1251. As previously noted, the Clean Water Act was enacted by Congress "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Id. One of the means to

achieve that purpose is a prohibition on the discharge of any pollutants, including dredged or fill material, into "navigable waters" except if done in compliance with certain specified sections of the Act. 33 U.S.C. § 1311(a) and 33 U.S.C. § 1362(12)(a). In most cases that means compliance with and obtaining a permit under Sections 402 or 404 of the Clean Water Act.

The Clean Water Act defines the term "discharge of a pollutants as" "any addition of any pollutants to navigable waters from any point source" and further provides that "[t]he term 'navigable waters' means the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). See also 33 C.F.R. § 328.3(a) and 40 C.F.R. § 230.3(s). The term "pollutant" includes traditional contaminants as well as solids such as "dredged soil,…rock, sand, [and] cellar dirt." 33 U.S.C. § 1362(6).

The Act further provides that discharging pollutants into, dredging, or filling "navigable waters" without a federal permit may result in significant civil or criminal penalties. See 33 U.S.C. §§ 1311, 1319, 1342, 1344. A person or entity who violates the Clean Water Act's permit requirement faces monetary penalties up to $25,000 per day, imprisonment up to one year, or both. 33 U.S.C. § 1319(c)(1). The consequences of the new 2023 Rule at issue are severe and significant.

As revealed in the Plaintiff's Memorandum in Support of the Motion for Preliminary Injunction (Doc. No. 44-1), the federal permit process can take years and upwards of six figures to secure. See United States Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 594 (2016) (an average specialized individual applicant for permits spends 788 days and $271,596). A general permit takes applicants an average of 313 days and $28,915 to complete. Id. at 595. The States each have major obligations under the permit programs and must enact and revise the required water quality standards under the Act.

10

In the past the Supreme Court has been critical of the agency's interpretation of "waters of the United States." For example, in *Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159 (2001), the Supreme Court rejected the Corps' interpretation of isolated sand and gravel pits that "seasonably ponded" as falling within the definition of "waters of the United States." 531 U.S. 159, 164, 172-74. This was an effort by the EPA and the Corps to reach "nonnavigable, isolated, interstate waters" that migratory birds used as habitat. The Supreme Court said such efforts raised significant constitutional questions that encroach upon traditional state powers. Id. In *Rapanos v. United States*, the Supreme Court addressed the issue of when the federal government can apply the Clean Water Act by determining whether a wetland or tributary is a "water of the United States." 547 U.S. 715 (2006). The justices issued five separate opinions in *Rapanos* (one plurality opinion, two concurring opinions, and two dissenting opinions), with no single opinion commanding a majority of the Court.

Four justices, in a plurality opinion authored by Justice Scalia, rejected the argument that the term "waters of the United States" is limited to only those waters that are navigable in the traditional sense and their abutting wetlands. Rapanos, 547 U.S. 715, 731 (2006). The plurality concluded the EPA's regulatory authority should extend only to "relatively permanent, standing or continuously flowing bodies of water" connected to traditional navigable waters, and to "wetlands with a continuous surface connection to" such relatively permanent waters. Id. at 739-43. Justice Scalia's opinion created what is commonly referred to as the "relatively permanent" test.

Justice Kennedy did not join the plurality's opinion but authored a concurring opinion vacating and remanding the case to the Sixth Circuit Court of Appeals. Justice Kennedy agreed with the plurality that the statutory term "waters of the United States" extends beyond waters that are traditionally considered navigable. However, Justice Kennedy found the plurality's interpretation

of the scope of the Clean Water Act to be "inconsistent with the Act's text, structure, and purpose[,]" and he presented a different standard for evaluating jurisdiction over wetlands and other water bodies. Justice Kennedy concluded that wetlands are "waters of the United States" "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' In contrast, when wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" Id. at 780. Thus, Justice Kennedy's concurrence created the broader "significant nexus" test. This standard essentially asks whether there is a "significant nexus" between the wetlands in question and navigable waters in the traditional sense.

Four justices, in a dissenting opinion authored by Justice Stevens, concluded the EPA's interpretation of "waters of the United States" was a reasonable interpretation of the Clean Water Act. Id. at 787-810. When there is no majority opinion in a Supreme Court case, controlling legal principles may be derived from those principles espoused by five or more justices. Marks v. United States, 430 U.S. 188 (1977). Thus, regulatory jurisdiction under the Clean Water Act exists over a water body if either the plurality's or Justice Kennedy's standard is satisfied. The Eighth Circuit has held that jurisdiction is proper under the Clean Water Act if "either the plurality or Justice Kennedy's test is met." United States v. Bailey, 571 F. 3d 791, 799 (8th Cir. 2009).

As a result of the *Rapanos* decision, the four-justice plurality concluded the "relatively permanent" test for determining whether wetlands were "waters of the United States." 547 U.S. 715, 739, 742. On the other hand, Justice Kennedy's concurrence suggested a different test referred to as the "significant nexus" test. Id. at 779-80. This test limits "waters of the United States" to

those waters which are "navigable in fact or that could reasonably so be made" and secondary waters with a 'significant nexus' to those waters.  Id. at 759.

In October 2022, the Supreme Court heard oral arguments in *Sackett v. EPA*, 142 S. Ct. 896 (2022), which is a case on appeal from the Ninth Circuit Court of Appeals.  In *Sackett*, the Ninth Circuit applied Justice Kennedy's "significant nexus" test to evaluate whether the EPA has jurisdiction to regulate wetlands.  Sackett v. United States EPA, 8 F.4th 1075 (9th Cir. 2021). The issue currently before the Supreme Court is whether the Ninth Circuit set forth the proper test to determine whether wetlands are "waters of the United States" under the Clean Water Act.  All parties expect the *Sackett* case will be decided by the end of the term.  The issues presented in *Sackett* go to the heart of this lawsuit.

## IV.   LEGAL DISCUSSION

### A.   STANDING

The EPA contends the Plaintiffs have not adequately demonstrated irreparable harm or standing.  See Doc. No. 99, pp. 8-12.  The EPA argues that for this reason alone the request for a preliminary injunction should be denied.

At the core of standing "is the principle that in order to invoke the power of a federal court, a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution."  Braden v. Wal-Mart Stores, Inc., 588 F.3d 585 (8th Cir. 2009).  To meet the constitutional minimum for standing, a plaintiff must show the following:

> (1) an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical;
>
> (2) a causal connection between the injury and the conduct complained of, and

13

(3) a likelihood – as opposed to a mere speculation – that a favorable decision will redress the injury.

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992); Nat'l Parks Conservation Ass'n v. E.P.A., 759 F.3d 969, 973 (8th Cir. 2014); see also Sarasota Wine Mkt., LLC v. Schmitt, 987 F.3d 1171 (8th Cir. 2021).

As to the issue of the State's standing, it is well-established that "States are not normal litigants for the purposes of invoking federal jurisdiction" and are owed "special solicitude." Massachusetts v. EPA, 549 U.S. 497, 518-20 (2007). "When special solicitude is appropriate, a state can establish standing 'without meeting all the normal standards for redressability and immediacy.'" Texas v. United States (DACA), 50 F.4th 498, 514 (5th Cir. 2022) (quoting Massachusetts, 549 U.S. at 517-18).

The EPA argues the States lack standing because "federal regulation of water or land for the purpose of pollution control is not a cognizable harm to 'state sovereignty.'" See Doc. No. 92, p. 23. However, this argument is rejected for the same reasons articulated by Judge Jeffrey Brown in the case of Texas v. United States Env't Prot. Agency, No. 3:23-cv-17, 2023 WL 2574591 (S.D. Tex. Mar. 19, 2023). As noted by Judge Brown:

> The defendants have challenged the States' and Associations' standing. Because the court has determined that the States have standing, it need not determine whether the Associations do. See Laroe Ests., Inc., 584 U.S. 439. The defendants first argue the States lack standing because 'federal regulation of water or land for the purpose of pollution control is not a cognizable harm to state sovereignty.' Dkt. 40 at 28 (citing Hodel v. Va. Surface Mining & Reclamation Ass'n., 452 U.S. 264, 284-93 (1981)). But Hodel does not support the defendants' broad contention. The Hodel Court considered Tenth Amendment limits on constitutional power to preempt or displace state regulation of private activities affecting interstate commerce. Id. at 288-90. Moreover, Hodel is premised on the fact that the challenged regulation did not regulate States as States." Id. at 286-89, 293. Because the States challenge the Rule as violation their quasi-sovereign interest in regulating the land and water within their borders, Hodel is inapplicable.

14

Texas, 2023 WL 2574591, at *5.  The federal district court in Texas concluded that "the States have constitutional standing."  Id. at *6.  The Court is of the opinion the States in this litigation also have Article III standing.

The Clean Water Act clearly contemplates a state and federal enforcement scheme.  States must establish water quality standards for "waters of the United States" within their borders, subject to EPA approval.  33 U.S.C. §§ 1313(a) and 1342.  States administer the National Pollution Discharge Elimination System.  The intent of the Clean Water Act is not to impede state's rights and responsibilities in governing pollution, land use, and water use.  33 U.S.C. § 1251(b).

The numerous declarations filed in this case by state officials outline in detail the specific costs of state compliance with the EPA's new 2023 Rule, as well as the significant infringement on state sovereignty that confers standing on the named plaintiffs.  See Doc. Nos. 44-2 through 44-11.  The 2023 Rule does cause injury to States because they are the direct object of its requirements.  And the States are also landowners with direct obligations under the Clean Water Act.  There is not a mere possibility the new regulations will impact the States - it is a given.  The irreparable harm to the states that occurs with the implementation of the new 2023 Rule is clear and undisputed, and is outlined in more detail in this Order at pages 29-41.  More important, the 2023 Rule arguably asserts jurisdiction over interstate waters not covered by the Clean Water Act as well as intrastate waters that may have some "significant nexus" to non-jurisdictional waters.  See Doc. Nos. 44-2, ¶¶ 10-11; 44-3, ¶¶ 3 and 5; 44-6, ¶ 3; 44-7, ¶ 7-8; 44-9, ¶ 7; 44-10, ¶ 14, and 44-11, ¶ 7.

These declarations reveal the new stringent compliance requirements of the Rule (and associated costs) will result in the significant expenditure of additional state funds.  This also confers standing on the impacted states under the current state of the law in the Eighth Circuit.  See City of Kennett, Missouri v. Env't Prot. Agency, 887 F.3d 424, 431 (8th Cir. 2018).

The Court concludes the coalition of 24 States involved in this dispute clearly meet the constitutional minimum for standing.  To hold otherwise would leave them with little recourse.[1]

## B.    PRELIMINARY INJUNCTION

This Court applies the well-known four-factor inquiry to determine whether a preliminary injunction should issue. Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 112-13 (8th Cir. 1981). Commonly referred to as the *Dataphase* factors, the Court must weigh (1) the threat of irreparable harm to the movant; (2) the balance of harms; (3) the movant's likelihood of success on the merits; and (4) the public interest.  Id.

It is well-established that the movant has the burden of establishing the necessity of a preliminary injunction. Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994).  All factors must be weighed to determine whether a preliminary injunction should issue.  Lankford v. Sherman, 451 F.3d 496 (8th Cir. 2006).  "While no single factor is determinative, the probability of success factor is the most significant."  Home Instead, Inc. v. Florance, 721 F.3d 494 (8th Cir. 2013) (internal citations omitted).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

### 1.    LIKELIHOOD OF SUCCESS ON THE MERITS

The Court initially considers the likelihood of success on the merits because if the movant fails to establish a likelihood of success, the quest for a preliminary injunction fails.  The likelihood

---

[1]The undersigned has reviewed the recent case of *Kentucky v. Env't Prot. Agency*, No. 3:23-CV-00007-GFVT, 2023 WL 2733383 (E.D. Ky. Mar. 31, 2023).  In that case, the federal district court denied without prejudice the State's motion for a preliminary injunction based on lack of standing.  The Kentucky case is easily distinguishable from the facts of this case.

of success on the merits is the most important factor in the analysis. Brady v. Nat'l Football League, 640 F.3d 785, 789 (8th Cir. 2011). This factor requires that the States show a "fair chance of prevailing," *Planned Parenthood Minnesota, N. Dakota, S. Dakota, v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) – that is no "greater than fifty percent" likelihood, *PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007) – on "even one [of their] claims," *Weather Modifcation LLC v. Brackin*, No. 3:20-CV-73, 2020 WL 4606843, at 3 (D.N.D. June 12, 2020).

The EPA contends their latest interpretation of WOTUS is entitled to deference. This inquiry invokes the two-step framework in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The Texas court's recent decision in *Texas v. United States Env't Prot. Agency*, No. 3:23-cv-17, 2023 WL 2574591 (S.D. Tex. Mar. 19, 2023) is a thoughtful and well-reasoned decision. See Doc. No. 104-1. The federal district court in Texas concluded *Chevron* does not apply. This Court agrees. Although *Chevron* is designed to recognize the competence of executive agencies and to defer to their expertise where appropriate, it does not apply when the statutory language of the law at issue (the 2023 Rule) implicates criminal penalties as it does in this case. There are significant criminal penalties that may apply under the 2023 Rule – fines, imprisonment, or both – even for negligent violations of the rule. See 33. U.S.C. § 1319(c)(1). The principle derives from the established rule of lenity, which requires that ambiguities be resolved against the application of criminal penalties. See United States v. Parker, 762 F.3d 801, 806 (8th Cir. 2014).

The federal district court in Texas went on to hold that the states (Texas and Idaho) are likely to succeed on the merits because "at least two aspects" of the 2023 Rule "are unlikely to withstand judicial review." Texas, 2023 WL 2574591 at *10. One of the many problems recognized by the Texas court is the 2023 Rule's categorical inclusion and extension to all interstate waters. Id. at *9-10. The Texas court said:

17

Under the 2023 Rule, the Agencies may regulate 'interstate waters, regardless of their navigability.' *Id.* at 3072. Additionally, because interstate waters are 'paragraph (a)(1) waters,' the Agencies do not have to rely on either the significant-nexus or relatively-permanent test to apply the Act to interstate waters–jurisdiction is automatic. *Id.* at 3066-67 ('If a waterbody is determined to be a paragraph (a)(1) water, then it is jurisdictional with no need for further evaluation.')…The Agency's interpretation of the Act to include all interstate waters irrespective of any limiting principle raises serious federalism questions; accordingly, the court will prefer any 'otherwise acceptable construction' not 'plainly contrary' to Congress's intent. *See SWANCC*, 531 U.S. at 173 (quotation omitted). Certainly, the court agrees with the defendants that federally regulating some interstate waters may be necessary to carry out Congress's intent to protect the nation's waters, Dkt. 39 at 27, but the court is not convinced that the Act's text supports unrestrained federal jurisdiction over all interstate waters.

Id. at *9.

The district court in Texas concluded the 2023 Rule reads "navigability out of the Act," and this Court agrees with that analysis   Id.   More important, the Texas court said the EPA's interpretation lacks any limiting principle; raises serious federalism questions; and "poses due-process concerns."   Id.   Contrary to the EPA's position, "the plain text of 33 U.S.C. § 1313(a)(1) indicates that Congress anticipated that federal jurisdiction over at least some interstate waters would not be consistent with the Act and its 'purpose' to preserve the 'primary state responsibility for ordinary land-use decisions.'"   Id. at 9.

The other major problem identified by the federal district court in Texas was the material differences between the version of the "significant-nexus" test under the 2023 Rule and the standard articulated by Justice Kennedy in *Rapanos*.   Texas, 2023 WL 2574591 at 7-8.   Judge Brown in Texas wisely noted the following problems in that regards:

The 2023 Rule trades the interstate-commerce test for two new tests, the significant-nexus and relatively-permanent tests, which the Agencies—under the Rule—would use to decide whether certain waters fall within the Act's jurisdiction. Under the interstate-commerce test, the Agencies must consider 'whether the use, degradation, or destruction of ... water could affect interstate or foreign commerce' before claiming jurisdiction to regulate it under the Act. *See* 88 Fed. Reg. at 3029. The

Rule's significant-nexus test instead asks whether waters 'either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, the territorial seas, or interstate waters.' *Id.* at 3006. And the Rule's relatively-permanent test would empower the Agencies to regulate 'relatively permanent, standing or continuously flowing waters connected to paragraph (a)(1) waters, and waters with a continuous surface connection to such relatively permanent waters or to traditional navigable waters, the territorial seas, or interstate waters.' *Id.*

. . .

The 2023 Rule's significant-nexus standard identifies 'waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity **of traditional navigable waters, the territorial seas, or interstate waters.**' 88 Fed. Reg. at 3006 (emphasis added). Justice Kennedy's test would not extend federal jurisdiction to nontraditional waters unless the water 'either alone or in combination with similarly situated lands in the region, significantly affects the chemical, physical, and biological integrity of **other covered waters more readily understood as 'navigable.''** *Rapanos*, 547 U.S. at 780, (Kennedy, J., concurring) (emphasis added).

The Agencies' construction of the significant-nexus test ebbs beyond the already uncertain boundaries Justice Kennedy established for it. Specifically, by extending the significant-nexus test to 'interstate waters,' and not just to those 'waters ... understood as 'navigable,' 'the Rule disregards the Act's 'central requirement'—'the word 'navigable.'' *Id.* at 778. As explained more thoroughly below, linking the significant-nexus test to 'interstate waters' greatly expands its breadth beyond what Justice Kennedy envisioned; the Rule—unlike his suggested test—defines 'interstate waters' as jurisdictional regardless of navigability. 88 Fed. Reg. at 3072.

Even if the court assumes that Justice Kennedy's significant-nexus test appropriately measures the Agencies' jurisdiction under the Act, the Rule does not accurately reflect his test. Indeed, the Rule's substantial variance from Justice Kennedy's test compels the court to question its legitimacy—and persuades the court that the plaintiffs will likely succeed on the merits.

The Court finds that the new 2023 Rule is neither understandable nor "intelligible," and its boundaries are unlimited.  Beyond the many problems with the new 2023 Rule recognized by the considered  decision of the federal district court in Texas, this Court is of the opinion the 2023 Rule raises a litany of other statutory and constitutional concerns.

19

### (a)    The EPA Has Arguably Acted Beyond Statutory Authority

Congress prescribed that the EPA's authority under the Clean Water Act to extend to "navigable waters," which is defined as "the waters of the United States."  33 U.S.C. § 1362(7).  Congress used the word "navigable" to show "what [it] had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made."  Solid Waste Agency of N. Cook Cnty. v. United States Army Corps of Engineers, 531 U.S. 159, 172 (2001) ("SWANCC").  In other words, waters that bear a "speculative or insubstantial" connection with other waters falling within Congress's traditional jurisdiction do not constitute "waters of the United States."  Rapanos, 547 U.S. at 780 (Kennedy, J., concurring).  And waters that may "eventually flow into traditional navigable waters" do not necessarily qualify.  Id. at 778.  Congress obviously did not intend for the EPA to claim "jurisdiction over nonnavigable, isolated, intrastate waters" or waters that are devoid of a federal interest.  SWANCC, 531 U.S. at 171.

The category of covered waters under the 2023 Rule is problematic.  The first category under the new Rule (at 88 Fed. Reg. 3005-06) are traditional navigable waters, territorial seas, and interstate waters.  The EPA has now taken the position that "interstate waters" includes *all* such waters—even those that are not "connected to navigable waters" in any manner.  Id. at 3074.  There are serious questions whether this is a permissible construction of the Clean Water Act as the Rule essentially reads non-navigability out of the Act.  And does the Clean Water Act support making every wetland, stream, tributary or other water traversing a border subject to federal jurisdiction?

The treatment of impoundments presents conflicts between the new 2023 Rule and the text of the Clean Water Act.  The EPA will assert jurisdiction over impounded waters that were "jurisdictional under [the new 2023 Rule]'s definition at the time the impoundment was created."

20

88 Fed. Reg. at 3075.  As a result, even waters that have "no outlet or hydrologic connection to the tributary network" may now be considered jurisdictional impoundments if some hydro-history can show the waters previously would have qualified as WOTUS under the new 2023 Rule.  Id. at 3077-78.  The Court is skeptical that Congress intended the Clean Water Act to empower the EPA to regulate impounded waters merely because they were once "waters of the United States."  The EPA states that improvements typically do have a hydrologic connection to a navigable water, but that is not always the case.

The treatment of tributaries under the new 2023 Rule is suspect.  The rule's definition of a "tributary" is extremely broad; a watercourse can qualify as a tributary so long as it makes its way, "directly or indirectly," to a traditional navigable water, territorial sea, or interstate water by any wet *or dry* waterway, such as wetlands or ditches.  88 Fed. Reg. at 3080.  Thus, any water that eventually gets to a traditional navigable water, territorial sea, or interstate water may qualify.  Id.  Even tributaries that "may run dry [for] years" can be treated as relatively permanent.  Id. at 3085.  Ephemeral and intermittent streams can also become "waters of the United States."  Judge Ralph Erickson of this Court enjoined the 2015 Rule for doing exactly the same thing.  See North Dakota, 127 F. Supp. 3d at 1056 (noting the "breadth of the definition of a tributary … allows for regulation of any area that has a trace amount of water so long as the physical indicators of a bed and banks and an ordinary high-water mark exist").

The Court notes that the treatment of wetlands is plagued with uncertainty.  "Adjacent" wetlands are covered if they bear a "continuous surface connection" with "relatively permanent" impoundments or tributaries.  88 Fed. Reg. at 3095.  The EPA has redefined "continuous surface connection" to cover waters that lack even minimal "constant hydrologic connection."  Id.  The EPA now lumps together waters "in the region" that are "reasonably close" and may have a "material"

effect on jurisdictional impoundments or tributaries.  Id. at 3089-90.  And lands that may arguably be damp on occasion can combine with other only occasionally wet areas in "neighboring" vicinities to create some nominal effect on ordinary jurisdictional waters.  In other words, even "remote" wetlands—which the Supreme Court has said should *not* be covered—would arguably be covered under the 2023 Rule.  See North Dakota, 127 F. Supp. 3d at 1057.

The Supreme Court has said that the definitional use of the phrase "waters of the United States" does not provide a basis for reading the term "navigable waters" out of the statute.  Solid Waste Agency of N. Cook Cnty., 531 U.S. at 172.  Under the new definition, "similarly situated" waters "in the region" can be used to establish a "material influence" on other covered waters, and even isolated prairie potholes may become "navigable waters" under the Clean Water Act.  Even more confusing is the idea that because "subsurface connections" can provide a "substantial nexus," a landowner may not know they have "waters of the United States" simply by looking at their property.  88 Fed. Reg. at 3093.

Under the new 2023 Rule, the EPA defines the "relatively permanent standard"test of the plurality opinion in *Rapanos* to mean "waters that are relatively permanent, standing or continuously flowing waters" connected to paragraph (a)(1) traditional navigable waters, interstate waters, and the territorial seas, "and waters with a continuous surface connection to such relatively permanent waters or to paragraph (a)(1) waters."  88 Fed. Reg. 3038.  This definition is far from understandable, and the 2023 Rule does not  define "relatively permanent."

The EPA defines the "significant nexus standard" test of Justice Kennedy's concurrence in *Rapanos* as "waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, the territorial seas, or interstate waters."  88 Fed. Reg. 3006.  However, the 2023 Rule does not define

what it means to be "similarly situated," nor does it define what constitutes "in the region," or what is the standard to measure a "significant affect," or what "chemical, physical, or biological integrity" means.

The 2023 Rule does go on to define "significantly affect" as a "material influence on the chemical, physical, or biological integrity" of a paragraph (a)(1) water. 88 Fed. Reg. 3143. However, the EPA then looks to vague factors such as "distance from a paragraph (a)(1) water," "hydrologic factors," the waters that have been determined to be "similarly situated," and "climatological variables." Id. These murky definitions are unintelligible and provide little guidance to parties impacted by the regulations.

Finally, and even more troublesome, is the fact the 2023 Rule allows for case-specific assertions of jurisdiction by the EPA over a broad category of "waters." 88 Fed. Reg. 3024. The "paragraph (a)(5) waters" category encompasses intrastate, non-navigable features that were previously considered to be "isolated" and not within the Clean Water Act's jurisdiction. See SWANCC, 531 U.S. at 167, 171.

The EPA's 2023 Rule will require States, landowners, and countless other effected parties to undertake expensive compliance efforts when their property may implicate navigable waters in ill-defined ways. The phrase "waters of the United States", a term that has been hopelessly defined for decades, remains even more so under the 2023 Rule. It is doubtful Congress endorsed the current efforts to expand the limits of the Clean Water Act. The joint resolution passed by Congress on March 29, 2023, was expressly designed to nullify the EPA's new 2023 Rule. To delegate its power to another branch Congress must, at a minimum, "lay down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." Mistretta v. United States, 488 U.S. 361, 372 (1989). There is little that is intelligible

about the 2023 Rule and the broad scope of its jurisdiction. The EPA's interpretation of the 2023 Rule does not provide any clarity nor equate with an intelligible principle to which the States can easily conform. And the Rule does not provide fair notice to the States as to what will be considered "waters of the United States."

### (b)      The EPA's Actions Are Arguably Arbitrary and Capricious

An agency action is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The States have identified the following major concerns which they contend support the grant of injunctive relief.

First, the States argue the 2023 Rule offers no clear guidance on how it should be implemented. To survive an arbitrary-and-capricious review, an agency must offer "understandable" findings and rationales, not "unclear or contradictory" ones. Associated Gas Distribs. v. FERC, 893 F.2d 349, 361 (D.C. Cir. 1989). In other words, "ambiguity and lack of clarity in [an agency's] official position" can justify remand. FTC v. Atl. Richfield Co., 567 F.2d 96, 100 (D.C. Cir. 1977). For example, the multi-step "guidance for landowners" that the 2023 Rule provides for landowners who question whether they need a Clean Water Act permit, is of little assistance. The guide concludes with a final suggestion to contact the EPA to confirm jurisdiction and permitting requirements. 88 Fed. Reg. at 3130-35. The Plaintiffs' argue such vague guidance leaves the States and landowners guessing whether their millions of acres fall within the new regulatory scheme.

Second, the States argue the 2023 Rule arbitrarily and capriciously mishandles its cost-benefit analysis. The EPA advised the 2023 Rule would lead to only "*de minimis* costs," while imposing no "new costs or other requirements [as to] states," 88 Fed. Reg. at 3007, 3049, and 3141.

The EPA apparently reached this conclusion because it thought the 2023 Rule was consistent with the pre-2015 enforcement regime.  However, the 2023 Rule and the EPA's pre-2015 practice are at odds in several key ways.

The States contend the EPA did not comply with important procedural requirements.  The APA requires administrative rules to be procedurally sound.  See 5 U.S.C. § 706(2)(D) (a final agency action shall be held "unlawful and set aside" if found to be "without observance of procedure required by law").  The Regulatory Flexibility Act "requires an agency undergoing informal rulemaking to prepare and publish a regulatory flexibility analysis that details, among other things, the rule's 'significant economic impact on small entities' and the steps the agency has taken to minimize that impact."  Northport Health Servs. of Ark., LLC v. U.S. Dep't of Health & Hum. Servs., 14 F.4th 856, 876 (8th Cir. 2021) (quoting 5 U.S.C. § 604).  An agency can only skip that analysis if the "head of the agency certifies that the rule will not ... have a significant impact on a substantial number of small entities."  Id. at 876.  A "cursory explanation" for this decision to certify is not enough.  Id. at 877.  The EPA summarily concluded the 2023 Rule would not significantly impact small entities.  88 Fed. Reg. at 3140.  From the declarations filed in this case by state officials, it appears the 2023 Rule directly affects many States/landowners who now find themselves potentially subject to federal jurisdiction and permitting requirements.  These landowners will need to undertake expensive assessments or forego their activities.

It is also unclear whether the EPA provided full notice and comment on all relevant aspects of the new 2023 Rule.  "To satisfy the APA's notice requirement, the [notice of proposed rule making] and the final rule need not be identical[;]" however, a final rule must be "a 'logical outgrowth' of its notice.  CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1079 (D.C. Cir. 2009).  A previously unannounced and more expansive definition first offered in a final rule can run

25

afoul of the notice requirement. See, e.g., North Dakota, 127 F. Supp. 3d at 1058 (finding that definition of "neighboring" in 2015 WOTUS rule was not a logical outgrowth of the proposed rule); see also Texas v. EPA, 389 F. Supp. 3d 497, 504-06 (S.D. Tex. 2019) (detailing the 2015 Rule's violations of notice-and comment requirements). The States argue that several new elements that are not "logical outgrowths" of the proposed rule appeared for the first time in the 2023 Rule. The new terms and definitions include the use the idea of a "wetland mosaic" to explain how the EPA will identify adjacent wetlands, the redefinition of "significant nexus" to mean any "material influence," and defining tributaries in with similar tributaries in their same "catchment." These terms and definitions are found in the 2023 Rule but were not included in the proposed rule, raising serious concerns about whether proper procedures were followed.

### (c)      Constitutional Concerns

The APA will not permit a rule to stand if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The States contend the 2023 Rule conflicts with at least three different constitutional limitations. See Doc. No. 44-1, pp. 19-21.

Specifically, the States outline the following constitutional concerns:

> 1. The Final Rule impermissibly reaches land and waters without requiring that they bear a direct connection to navigable waters or otherwise bear some substantial relationship with (or otherwise substantially affect) interstate commerce. In fact, the Final Rule removes portions of the 1986 Regulations that spoke directly to interstate commerce, replacing that category with the catch-all "other waters" category that does not carry with it any meaningful connection with commerce. It did so even though "Clean Water Act jurisdiction is not co-extensive with Congress' Commerce Clause authority." *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 183 (D.D.C. 2008). And it extends the Agencies' reach to nonnavigable, isolated, intrastate waters, even though the Supreme Court has warned that regulating such places raises serious Commerce Clause concerns. *SWANCC*, 531 U.S. at 173.

26

2. The Tenth Amendment presents yet another constitutional obstacle for the Final Rule. That amendment says that "[t]he powers not delegated to the United States by the Constitution ...are reserved to the States respectively, or the people." U.S. CONST. amend. X. In applying this prescription, a court should ask whether a federal act "invades the province of state sovereignty." New York v. United States, 505 U.S. 144, 155 (1992). The authority to regulate intrastate land use and water resources is one such province. *See, e.g.*, *SWANCC*, 531 U.S. at 174 ("[R]egulation of land use [is] a function traditionally performed by local governments."). As should be clear by now, the Final Rule strikes at the heart of the States' reserved power over land and water. Under the Final Rule, States become secondary regulatory players as to a variety of purely intrastate waters with only the most tenuous connections to waters imbued with some national interest. Federal standards will now become the de facto rule for environmental regulation. Those standards will in turn dictate how States and their residents employ their own property, making land and water development a de facto federal issue, too.

3. The Final Rule faces a third constitutional strike against it: the Fifth Amendment's Due Process Clause. The Due Process Clause dooms certain laws that are unduly vague. And a law crosses that threshold when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. *Connally v. Gen. Const. Co*, 269 U.S. 385, 391 (1926). The Final Rule is rife with administrative jargon that would confuse even an exceptionally intelligent reader: "adjacent," "certain times of year," "interstate waters," "impoundments," "material influence," "mosaic," "relatively permanent," "seasonally," "significantly affect," "significant nexus," "similarly situated," and "tributaries" are but a few examples. These terms are then paired with fuzzy we-know-it-when-we-see-it standards—often implicating multi-factor tests—that make it next to impossible for the typical landowner to know what to do. And if the landowner guesses wrong, the consequences are dire: crushing civil penalties and potential criminal punishment for individuals who discharge or dredge in "waters of the United States." 33 U.S.C. § 1319; *Hawkes*, 578 U.S. at 600. Circumstances like these render the Final Rule void for vagueness. *See* Paul J. Larkin, *The Clean Water Act and the Void-for-Vagueness Doctrine*, 20 GEO. J.L. & PUB. POL'Y 639, 659-62 (2022).

See Doc. No. 44-1, pp. 19-21.

This Court agrees there are serious constitutional concerns triggered by the implementation of the EPA's new 2023 Rule. The categorical extension of federal jurisdiction over all interstate waters, regardless of navigability is of significant constitutional import. The 2023 Rule's "significant-nexus" standard poses important due process concerns which may not be clarified until

the United States Supreme Court issues a decision in *Sackett* this term.  As Judge Brown noted in *Texas*, "the Rule's proposed significant-nexus test, with its numerous factors and malleable application seems to muddy the waters even more."  See *Texas*, 2023 WL 2574591.

The EPA's 2023 Rule seems to ignore the "navigable waters" requirement under the Clean Water Act.  The Rule impermissibly covers "all interstate waters, including "wetlands" and "all rivers, lakes, and other waters that flow across, or form a part of, State boundaries."  88 Fed. Reg. at 3072. As a result, water or wetlands are considered to be "waters of the United States" if it crosses a state line, no matter how small or isolated and regardless of whether the water is "navigable."

Other federal courts have recognized that the EPA's assertion of jurisdiction over all interstate waters is not a permissible construction of the Clean Water Act because they assert jurisdiction over waters that are not navigable-in-fact, or have no significant nexus to other navigable-in-fact waters.  Georgia v. Wheeler, 418 F. Supp. 3d 1336, 1359 (S.D. Ga. 2019).  The Georgia court also recognized that an exercise of such jurisdiction brings into play tributaries no matter how remote they are from traditional navigable water.  Id.

The EPA's interpretation of the 2023 Rule to include all interstate waters irrespective of any limiting principle raises serious federalism questions and concerns.  Simply stated, does the 2023 Rule interpreting "Waters of the United States" support unrestrained federal jurisdiction over all interstate waters?  This Court recognizes that the exercise of Commerce Clause authority under the Clean Water Act has some limits, and the regulations must in some manner be tied to navigability to withstand a constitutional challenge.  The exercise of jurisdiction over all rivers, lakes, and other waters that flow across state boundaries, no matter how small or isolated and regardless of navigability is constitutionally troublesome.  There is nothing in the text of the Clean Water Act that supports making every wetland, stream, or other water crossing a border subject to federal

jurisdiction.  The definitions of WOTUS involve the regulation of a significant portion of American land mass, water, and economy.  However, a grant of general authority to the EPA is not without limits, and there exist serious questions whether Congress intended to allow the EPA to make such major policy decisions as are codified in the 2023 Rule through the rulemaking process.  As the Supreme Court said in *West Virginia v. EPA*, 142 S.Ct. 2587, 2608-09 (2022), federal agencies are not permitted to exercise regulatory power "over a significant portion of the American economy" or "make a radical or fundamental change to a statutory scheme" through rulemaking without clear authorization by Congress.  Id.  Instead, the Court presumes that "Congress intends to make major policy decisions itself, and not leave those decisions to agencies."  Id. at 2609.

## 2.    IRREPARABLE HARM

The Plaintiffs contend that with respect to the *Dataphase* factor of irreparable harm, the loss of the State's sovereignty is an irreparable harm which rises to the need for preliminary equitable relief.  See Doc. No. 44-1, pp. 21-27.

The argument of the coalition of 24 States are summarized as follows:

> *First*, "[l]oss of sovereignty is an irreparable harm," *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018)—particularly where the States are deprived "of those interests without first having a full and fair opportunity to be heard on the merits," *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).  *See also Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (recognizing loss of state sovereignty as an irreparable harm).  The Final Rule imposes just this sort of injury—recall the Tenth Amendment and federalism canon considerations.  By improperly expanding federal jurisdiction to substantial numbers of intrastate waters, the Final Rule saps the States of their "traditional and primary power over land and water use." *North Dakota*, 127 F. Supp. 3d at 1059 (quoting *SWANCC*, 531 U.S. at 174).  This power is "obvious, indisputable," and "omnipresent." *Hudson Cnty. Water Co. v. McCarter*, 209 U.S. 349, 356 (1908). Each of the States manages and protects the lands and waters within their borders, and many own some of these intrastate resources directly.  *See* ECF 1, ¶¶ 20-53.  But the Final Rule limits the States' exercise of this "essential attribute of sovereignty." *Tarrant Reg'l Water*

*Dist. v. Herrmann*, 569 U.S. 614, 631 (2013). *See, e.g.*, Exs. A, ¶¶ 3-4; F, ¶¶ 11-13; G, ¶¶ 4-6; H, ¶¶ 12-14; and I, ¶¶ 8-14. That loss is irrecoverable.

*Second*, expanded federal jurisdiction swells the States' obligations under several CWA programs. When it comes to water quality standards, for instance, States must identify newly jurisdictional waters within their borders, assess their uses, and determine if they meet an already existing standard or establish a Total Maximum Daily Load if they do not. *See* ECF 1, ¶¶ 55-56. The States must also evaluate, issue, and enforce new National Pollution Discharge Elimination System permits for businesses and homeowners before they can discharge pollutants into a newly covered water. *See* ECF 1, ¶ 58. Both of these time- and resource-intensive endeavors will become heavy burdens under the Final Rule. *See, e.g.*, Exs. A, ¶¶ 5-7, 13, 15, 17; B, ¶¶ 2-3, 5 (burden from projected increase of permits); C, ¶¶ 2-7; D, ¶¶ 3-6; E, ¶¶ 3, 5; G, ¶¶ 6-10 (resources that must now be spent to decipher Final Rule's "ambiguous standards"); H, ¶¶ 7, 15; and J, ¶¶ 3-6.

Courts have looked to similar costs when finding irreparable harm before. *See Georgia*, 326 F. Supp. 3d at 1367; *North Dakota*, 127 F. Supp. 3d at 1059. If anything, these costs are worse here because of the added burdens from assessing what the Final Rule's opaque case-by-case determination approach covers in the first place. *See, e.g.*, Exs. A, ¶¶ 6, 9-12 ("extremely heavy burden" from rule's "woefully inadequate" consideration of "Alaska-specific conditions"); C, ¶¶ 6-13 (significant nexus factors "seem ... subjective," introduce "greater level of uncertainty"); E, ¶¶ 3, 5; F, ¶¶ 9, 11; G, ¶¶ 6-10; and J, ¶¶ 7. The States and their environmental agencies have already tallied significant costs parsing the two rules that came before; the regulatory whiplash from three rules in eight years makes the harm that much more severe. See, e.g., Exs. A, ¶ 8; G, ¶¶ 11-13; H, ¶ 7 ("considerable burden" from "[k]eeping current with the continually changing federal WOTUS rules"); I, ¶¶ 15-16; and J, ¶ 8. And add to that the wasted effort of trying to understand and comply with a regulatory regime that may well be set aside—under either existing precedent or the Supreme Court's soon-anticipated *Sackett* decision. Depending on *Sackett's* reach, for instance, the Agencies might ask for voluntary remand to adjust the regulatory landscape again. All this means that even if the Agencies' (bordering disingenuous) insistence were true that the Final Rule will have no "substantial direct effect[] on the States" or "on the distribution of power and responsibilities" between the States and the Agencies, 88 Fed. Reg. at 3140-41, the States will still face significant costs learning and applying a new framework that may ultimately be for nothing. *See, e.g.*, Exs. C, ¶¶ 13 ("wasteful ... time and effort in applying this Rule ... until its fate is known"); D, ¶ 7; E, ¶ 4; F, ¶¶ 17-18; G, ¶¶ 11-13; H, ¶¶ 7, 16; I, ¶¶ 15-16; and J, ¶ 8.

Worse yet, the States stand no chance to get these "undeniable ... monetary losses" back. *North Dakota*, 127 F. Supp. 3d at 1059; *see also Georgia*, 326 F. Supp. 3d at 1367 ("no avenue exists to recoup those losses"). "[U]nrecoverable economic loss" like this is a classic form of irreparable harm. *Iowa Utils. Bd.*, 109 F.3d at 426;

*see also Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (sovereign immunity not waived for APA damages actions).

> *Third*, the Final Rule's burdens and confusion stack on costs for projects and development throughout the States. Some of these are taxpayer-funded, and new jurisdictional assessments and permitting processes from the Final Rule's expanded reach will make them more expensive and slower to finish. *See, e.g.*, Exs. A, ¶ 14; C, ¶¶ 7-8, 11-12; E, ¶ 3 (projects suffered costs, delays); F, ¶¶ 6-10, 15-16 (project "immediately threaten[ed]" because it "runs through the prairie pothole region" that is "now potentially WOTUS"); G, ¶ 7; I, ¶¶ 10-14, 16 (massive harm to pipeline, water supply, and dam projects). The same is true when the States are not directly involved in a given project: Delay and budget increases will lead to lost tax revenue from projects cancelled or delayed. See, e.g., Exs. A, ¶ 16 ("[t]his uncertainty negatively affects our investment climate"); E, ¶ 4 ("potential to deter important investment in the state"); and H, ¶¶ 7-11, 13, 17. All these costs are steep and (unless the Court steps in first) irreparable.

See Doc. No. 44-1, pp. 21-24.

With respect to the compliance costs associated with the implementation of the 2023 Rule, the Court finds the Plaintiffs have easily shown the 2023 Rule poses irreparable harm. Specifically, the Plaintiffs have produced numerous declarations that outline in detail some of the specific costs of complying with the new 2023 Rule. See Doc. Nos. 44-2, 44-3, 44-5, 44-6, 44-7, 44-8, 44-9, 44-10, and 44-11.

For example, the Director of the Division of Water in the Alaska Department of Environmental Conservation outlined the following impact on the state as a result of the EPA's treatment of wetlands:

> 11. The Final Rule's consideration of Alaska-specific conditions is woefully inadequate. Of particular concern to Alaska is the federal agencies' treatment of groups of wetlands that exist in close proximity to each other, but miles away from any traditionally navigable waters. This ambiguity is particularly troublesome to Alaska, which is home to over 174 million acres of wetlands. Alaska's wetlands comprise 43% of the state's surface area and 63% of the nation's wetlands. Ascertaining the extent of federal jurisdiction over 174 million acres on a case-by-case basis places an extremely heavy burden on my Division.

12. Ascertaining the extent of the Final Rule is important for my Division to fulfill its obligations to the public, who are subject to civil and criminal penalties if they do not obtain a permit.

See Doc. No. 44-2, ¶¶ 11-12.

The General Manager of the Garrison Diversion Conservancy District in North Dakota submitted a declaration that outlines, in part, the significant impact on North Dakota.

5. Congress enacted the Flood Control Act of 1944, which authorized construction of the Garrison Dam as well as the GDU principal supply works, consisting of a system of pumps and canals (GDU Project) to bring Missouri River water to eastern North Dakota. 16 U.S.C. § 460d. In exchange for allowing the federal government to flood 300,000 acres of rich, river valley lands within North Dakota, federal legislation authorized the State of North Dakota (State) to develop water supplies stored behind the Garrison Dam for the purposes identified in paragraph 2, above.

6. In 2011, Garrison Diversion, with SWC input, began planning a non-federal project to bring water to the Red River Valley (State RRV Project); one that would not trigger federal Clean Water Act (CWA) jurisdiction and avoid delay due to federal agency action or litigation. The State RRV Project preliminary design is complete, with final design being completed as funding is available for constructed. Construction started in 2021 and continues through today. The design intentionally avoids any wetlands that are under federal CWA jurisdiction. The State RRV Project was initially designed to fall under the Corps Nationwide Permit 12, applicable to utility lines, so it would not trigger additional National Environmental Policy Act (NEPA) review, litigation, and other obstacles. *See*, 33 C.F.R. pt. 330.

7. The Final Rule immediately threatens the State RRV Project since it imposes new and expanded federal jurisdiction over land and water not previously subject to federal regulation. This expanded federal jurisdiction under the Final Rule may require the State RRV Project to obtain a CWA Section 404 permit and require costly and time consuming NEPA compliance. The State RRV project pipeline runs through the prairie pothole region. While prairie potholes have traditionally not been subject to federal jurisdiction, the Final Rule broadens the jurisdiction of the Agencies, assuming all prairie potholes are jurisdictional if relatively permanent or have a significant nexus to certain water bodies, until proven otherwise.

8. Under the Final Rule, prairie potholes, which cover a significant portion of the North Dakota landscape as shown in Figure 1, now are potentially WOTUS, contingent upon a case-by-case determination. This "in, unless you're demonstrated to be out" conundrum places North Dakota and Garrison Diversion in a position of needing to commission an extensive jurisdictional study for many projects

commenced in the prairie pothole region that previously would not have been jurisdictional. 88 Fed. Reg. 3,097 (Jan. 18, 2023) (to be codified at 33 C.F.R. pt. 328 and 40 C.F.R. pt. 120).

9. The Final Rule creates a case-by-case jurisdictional determination for waters within the 100-year floodplain and waters within 4,000 feet of the ordinary high water mark (OHWM) of a tributary. Federal Emergency Managements Agency has only delineated the 100-year floodplain around major metropolitan areas. The OHWM has not been surveyed along the majority of navigable waters, which are only a small fraction of the waters covered by the Final Rule. As such, Garrison Diversion needs to affirmatively study jurisdiction in detail to determine the application of the federal permitting process in connection with the State RRV Project. 88 Fed. Reg. 3,080 (Jan. 18, 2023) (to be codified at 33 C.F.R. pt. 328 and 40 C.F.R. pt. 120).

10. The Final Rule represents an immediate and significant change to the status quo for water project development in North Dakota. If the Final Rule takes effect on March 20, 2023, Garrison Diversion's substantial investment, development plans, and efforts to date to bring water to eastern North Dakota will be threatened. Significant adverse impacts could immediately result for the State RRV Project, with $78 million spent to date on this $1.4 billion project, lost time, lost effort and, most importantly, the loss of benefit from the completion and operation of this critical project. Without this project, significant irreparable social and economic harm will be occasioned upon the citizens in the event of a drought. Over 49 percent of North Dakota's residents live within the project's water service territory, so it impacts a significant amount of North Dakota's population. Planning for projects to minimize these risks is underway and takes years to put in place. The Final Rule's implementation on March 20, 2023 impairs creates an obstacle to these efforts.

14. Failure to obtain proper permits for projects that operate in and around newly jurisdictional Final Rule are subject to the federal enforcement provisions, which include administrative penalties (up to $16,000 per violation with a total penalty capped at $177,500), civil penalties (up to $37,500 per violation or per day), and criminal penalties (creating liability of up to $1,000,000 and 15 years of prison for knowing violations by organizations). CWA § 309(0(2) & (d) & (b); 33 U.S.C. § 1319(g)(2) & (d) & (b) as superseded in relevant part by 40 C.F.R. § 19.4

See Doc. No. 44-7, ¶¶ 5-10, 14.

The North Dakota Director of the Department of Environmental Quality noted the following impacts on the North Dakota Department of Health-which supports a finding of irreperable harm to the State, the agricultural economy, and North Dakota farmers and ranchers:

33

6.   The Department is concerned that the Final Rule will increase the federal government's jurisdiction over waters that have traditionally been under the sole jurisdiction of the state.  Under the Final Rule, once a water is determined to be WOTUS, it is within federal authority and North Dakota's regulation of that water is subject to EPA's oversight.  Any expansion of federal jurisdiction infringes on the Department's enforcement authority and ability to exercise its discretion in managing state water quality.

7.   The Final Rule imposes significant burdens upon North Dakota by forcing it to shift attention and resources to the federal scheme to the disadvantage of local, state-based programs.

8.  The Department will have to expend its limited resources to immediately determine which waters were added to federal jurisdiction under the Final Rule so that it can understand the impact on the Department's various water pollution control programs. Determining the scope of the Final Rule is especially difficult in North Dakota due to the many areas with intermittent moisture, particularly in the prairie pothole region.  For example, when determining if a prairie pothole is WOTUS, the Department will need to consider whether the waterbody, together with any otherwaters in an ill-defined "region," will have a "material" effect on an aspect of a traditional navigable or interstate water.

9.   Since the Department, with its staff of engineers and scientists, struggles to understand what is considered WOTUS under the Final Rule, North Dakota landowners will certainly have difficulty determining which waters are subject to federal jurisdiction. The consequences of misapplying the Final Rule are serious for these individuals, with substantial civil and criminal penalties under the CWA.

10.  In addition, because of the expansion of federal jurisdiction, the Final Rule will force the Department to expend additional resources for conducting CWA Section 401 certification reviews. Under the CWA's certification program, the Department must review the Corps' Section 404 permit applications for the discharge of dredged or fill materials into WOTUS, including wetlands, to determine whether the discharge complies with North Dakota's Water Quality Standards.  Not only will the Department have to complete additional CWA 401 certification reviews, but it will also have to expend resources to determine which waters are WOTUS — and therefore subject to CWA Section 401 — using the Final Rule's ambiguous standards.

11.  Keeping current with the continually changing federal WOTUS rules over the past decade has created an extreme burden on the Department.  It is likely that the Department will need to again reevaluate the implications of the Final Rule when the Supreme Court issues a key decision on the scope of WOTUS in the coming months. *See Sackett v. EPA*, 8 F.4th 1075 (9th Cir. 2021), *cert. granted in part*, 142 S. Ct. 896 (Jan. 24, 2022) (No. 21-454).  Every hour of staff time devoted to trying to make

sense of the ever-changing federal regime is an hour that cannot be spent addressing other pressing environmental issues in North Dakota.

See Doc. No. 44-8, ¶¶ 6-11.

The North Dakota Department of Agriculture has further shown how that state agency will be significantly impacted by the 2023 Rule.

4.  North Dakota has well over 26,000 farms and ranches, comprising nearly 39.3 million acres, or approximately 90 percent of the total land area in North Dakota. North Dakota agriculture contributes considerably over 30 billion dollars in economic activity annually to the state. As a prime exporter of agricultural products, North Dakota is often cited as the "breadbasket of the world." North Dakota is the country's 10th largest agricultural exporting state. North Dakota produces over 50 different commodities. North Dakota farmers lead the nation in the production of more than a dozen important commodities, among them spring and durum wheat, rye, food grains, assorted beans, barley, flaxseed, canola, honey, sunflowers, pulse crops and more. Of North Dakota's approximately 775,000 residents, only about three percent are farmers and ranchers. Nonetheless, agriculture broadly supports nearly 25 percent of the state's workforce, which is higher than the national average of 19 percent. Agriculture remains the leading industry in North Dakota.

5.  Our mission statement at the Department is to "[s]erve, advocate, protect and promote agriculture to benefit everyone." In furtherance of that mission, we promote agriculture to protect both the value and use of agricultural lands, protect agricultural capacity and output, and promote rural economic development and agricultural industries.

6.  I have the personal knowledge and experience to understand how the U.S. Environmental Protection Agency's (EPA) and the U.S. Army Corps of Engineers' (the Corps) final rule entitled "Revised Definition of 'Waters of the United States'" (Final Rule), 88 Fed. Reg. 3004 (Jan. 18, 2023) (to be codified at 33 C.F.R. pt. 328 and 40 C.F.R. pt. 120) that becomes binding on March 20, 2023, will affect the Department and agriculture in North Dakota.

7.  As Agriculture Commissioner, I am greatly concerned about the substantial negative impact of the WOTUS Rule. The WOTUS Rule will unnecessarily negatively impact and irreparably harm North Dakota, the Department, North Dakota agriculture, and North Dakota farmers and ranchers. In my opinion, the Final Rule would have the following adverse effects on the State of North Dakota, the Department, North Dakota residents, and our agricultural industry:

a.  North Dakota has many areas with intermittent moisture. This is especially true in our prairie pothole region. With the broad expansion of the

35

definition of "Waters of the United States" (WOTUS) in the Final Rule, North Dakota landowners with any intermittent moisture on their property will need to consider whether the waters, alone or together with other waters in an ill-defined "region," constitute WOTUS. Landowners who fail to identify WOTUS could be subject to substantial civil and criminal penalties.

b. The uncertainty over which waters are WOTUS – together with the time and expense of getting a federal permit – would cause a significant reduction in the amount of land available in North Dakota for crop production and grazing. The Final Rule apparently remains unclear by design. The use of highly complex, very broad, and extremely vague language apparently indicates an attempt to subject North Dakota landowners to potential limitless regulatory jurisdiction. Due to this lack of clarity within the Final Rule, North Dakota farmers and ranchers, as a practical matter, will have to assume that all of North Dakota agricultural lands are under EPA CWA jurisdiction. This would be highly detrimental to North Dakota's agricultural industry and rural communities, and ultimately, result in a loss of agriculturally related and rural jobs, along with decreased agricultural production throughout the entire state.

c. In addition, the Final Rule's changes to longstanding agricultural exclusions, such as the change in the meaning of prior converted cropland (PCC), create additional regulatory uncertainty. The Final Rule significantly narrows the application of the PCC exclusion by foregoing past practices associated with determining when PCC has been abandoned or has changed its use. Farmers will now have to worry if changing from one crop to another on PCC will trigger a requirement for a wetlands permit. Farmers will have to halt grazing in a pasture, plow that land, and plant a new crop just to maintain the land's PCC excluded status. This requirement could seriously conflict with efforts to maintain soil health and retain carbon in the soil.

d. The Department will have to devote valuable staff time and resources to reviewing the lengthy and confusing Final Rule so that it can provide advice to North Dakota farmers and ranchers and ensure proper implementation of its pesticide and fertilizer regulations. Keeping current with the continually changing federal WOTUS rules over the past decade has imposed a considerable burden on the Department (as well as North Dakota's agricultural industry). Moreover, the Department will need to again reevaluate the implications of the Final Rule when the Supreme Court issues a key decision on the scope of WOTUS in the coming months. *See Sackett v. EPA*, 8 F.4th 1075 (9th Cir. 2021), *cert. granted in part*, 142 S. Ct. 896 (Jan. 24, 2022) (No. 21-454). Every hour of staff time devoted to trying to make sense of the ever-changing federal WOTUS CWA regulatory regimen is an hour that cannot be spent much more productively fulfilling the Department's mission.

36

8.  The EPA statement in the Final Rule that it currently intends to exempt "normal farming and ranching practices" provides little comfort to North Dakota farmers and ranchers.  The Final Rule does not exclude agricultural practices from federal CWA jurisdiction.  Instead, the Final Rule first asserts complete expansive jurisdiction over such practices, and then, as a discretionary act of grace, acts as if it is benevolently exempting them.

9.  Whenever the EPA gratuitously grants an exemption, the EPA can simply later narrow, suspend, or revoke that exemption at any time for any reason.  The EPA proffers these exemptions as ex gratia. These exemptions remain merely EPA agency guidance, have no force of law, and can be effortlessly tightened, deferred, or negated at any time without notice thus providing no legal protection or certainty.

13.  North Dakota's agricultural industry will be significantly and negatively harmed through lost agricultural production and increased regulatory and compliance costs if the Final Rule is not stayed during the pendency of this litigation. Further, the Final Rule's overly broad and ambiguous definition of WOTUS will require North Dakota's agricultural industry to divert precious financial resources to expensive lawyers, consultants, and engineers in order to comply with the Final Rule's requirements.

15.  The Final Rule is overly complex, broad, and vague, and accordingly, fails to place North Dakota regulated agriculture-related parties on adequate notice as to if and when their conduct might or would violate the law. It makes it nearly impossible for farmers and ranchers to know whether and when they may carry on their most basic agricultural activities without applying for and obtaining an extremely expensive federal permit, otherwise subjecting them to potentially drastic criminal and civil penalties under the CWA.  Unfortunately, obtaining any such federal permit is a highly expensive, lengthy, and uncertain process. It can take years and cost thousands, and even tens of thousands, of dollars.

See Doc. No. 44-9, ¶¶ 4-9, 13, 15.

Of additional significance in assessing this *Dataphase* factor is the Declaration of North Dakota's Department of Water Resources, Andrea Travnicek.  Ms. Travnicek explains the irreparable harm associated with trying to understand and comply with the federal regulations and jurisdictional questions related to the new 2023 Rule and the Clean Water Act.

5.  In North Dakota, "[a]ll flowing streams and natural watercourses shall forever remain the property of the state for mining, irrigating and manufacturing purposes." N.D. Const. art. XI, § 3; *see* N.D. Cent. Code § 61-01-01 (surface and ground waters "belong to the public and are subject to appropriation for beneficial use").

6. "Waters of the state" is defined broadly for purposes of N.D. Cent. Code ch. 61-28 to include almost all waters above and below the ground surface. N.D. Cent. Code § 61-28-02(15). It means "all waters within the jurisdiction of this state, including all streams, lakes, ponds, impounding reservoirs, marshes, watercourses, waterways, and all other bodies or accumulations of water on or under the surface of the earth, natural or artificial, public or private, situated wholly or partly within or bordering upon the state, except those private waters that do not combine or effect a junction with natural surface or underground waters just defined." *Id.* Waters of the state are subject to N.D.C.C. ch. 61-28 and the rules implementing the chapter.

7. The Clean Water Act (CWA) provides that it is the "policy of the Congress to recognize, preserve, and protect the primary responsibilities of States to . . . plan the development and use . . . of land and water resources . . . ." 33 U.S.C. § 1251(b).

8. A major concern of the Department is that increased jurisdiction under the Final Rule opens the regulated community – including the State of North Dakota – to enforcement actions brought by the federal government relating to waters that have traditionally been under the sole jurisdiction of the state. The Final Rule establishes requirements, applicability determinations, and jurisdictional questions that adversely impact North Dakota's sovereign rights, interests, and the regulatory regime the Department has developed to meet these interests.

9. In addition, the Final Rule intrudes upon the congressionally protected right of states to "plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b). The Department is the primary body in North Dakota for such planning and development of land and water resources. The Department currently manages numerous large water infrastructure projects and assists with flood control and water supply projects throughout the state.

10. In this capacity, the Department is often in the position of applying for permits from the Corps under CWA Section 404, the dredge and fill permitting program. 33 U.S.C. § 1344. While many of these projects previously only involved waters of the state, expanded federal jurisdiction increases the burden on the Department in ongoing and pending projects. Additionally, obtaining a CWA Section 404 permit automatically triggers the provisions of the National Environmental Policy Act ("NEPA"), which creates additional expense and delay for state planning and infrastructure as the agency must provide necessary information to support an Environmental Impact Statement or Environmental Assessment.

11. Since 1986, the SWPP has been constructing an efficient network of pipelines, pump stations, reservoirs, and treatment facilities to bring southwest North Dakota an adequate quantity of quality water. To date, 33 communities, more than 7,500 rural service locations, 25 contract customers, 26 raw-water customers, and two additional rural water systems are served by the SWPP. To date, over $430 million have been invested in the SWPP, and approximately 58,000 North Dakotans are

38

served. Future planned SWPP projects include expanding the treatment plant capacity, intake capacity, raw water transmission capacity, and distribution capacity expansion, including rural expansion into underserved areas, with over $261 million estimated in construction costs. The state will now be forced to undertake an expensive jurisdictional analysis for these construction projects to determine if the projects impact WOTUS under the expanded definition in the Final Rule and are thus subject to CWA Section 404 permitting requirements and NEPA. This additional burden infringes upon the sovereign capacity of North Dakota to plan for the provision of water to its citizens. The uncertainty the Final Rule places on partially completed projects impacts North Dakota's already shortened construction seasons. While previous jurisdictional determinations will supposedly remain valid, many of the current construction projects interact with waters that, while waters of the state and subject to state water quality regulations, do not have jurisdictional determinations because they were not previously federally regulated.

12. The NAWS project also intends to bring water to under-served North Dakota citizens in the prairie pothole region. Many cities and rural areas in the NAWS project area have domestic water supplies that do not meet minimum drinking water standards. The benefits of NAWS include not only a clean and abundant supply of water for the residents of North Dakota, but more opportunities for potential industries and a stronger economy. The Final Rule may compel the Corps or EPA to review previous jurisdictional studies to determine whether portions of the project require further CWA Section 404 analysis because of their presence in the prairie pothole region, causing sovereign injury to the state in its capacity to allocate waters of the state to serve the public. NAWS projects potentially adversely impacted by this Final Rule would include approximately $100 million worth of investment, including two reservoirs, multiple pump stations, and treatment and intake facilities. NAWS is anticipated to serve approximately 81,000 North Dakotans upon project completion.

13. There are approximately 3,200 known dams in North Dakota used for fish and wildlife, recreation, flood control, livestock, irrigation, water supply, etc. Of these dams, approximately 105 are owned, operated, and maintained by the state. Though no study has been conducted to analyze the impacts of the Final Rule, the majority of these dams were not previously covered by the CWA but may now be jurisdictional under the Final Rule. None of the ongoing dam rehabilitation and repair projects have been federally regulated. However, given the uncertainty regarding the impact of the Final Rule and the fact that the dams may be jurisdictional under the Final Rule, further construction will now be uncertain and potentially subject to federal permitting requirements. It is also unknown what adverse impacts such uncertainty could have on dam safety.

14. In sum, the Final Rule will immediately interfere with and disrupt North Dakota's governance of the lands and waters within its borders. The Final Rule will adversely affect laws and regulations that are vital to the overall health and welfare

of the state of North Dakota and its citizens.   By altering longstanding understandings of jurisdiction and authority over different bodies of water within North Dakota's boundaries, the Final Rule will harm North Dakota's sovereign interests and disrupt regulations established to protect these interests.

See Doc. No. 44-10, ¶¶ 5-14.

Finally, a declaration from the Chief Engineer of Development with the West Virginia Department of Transportation ("WVDOT") summarizes the impact of the new 2023 Rule on that state.

3.  The Rule will significantly burden the WVDOT in several ways.  The Rule purports to follow the pre-2015 definition of waters of the United States, but the implementation procedures it describes appear to significantly expand the scope of federal jurisdiction to potentially include almost every waterway in the nation, including the thousands of miles of ephemeral and intermittent waters present in West Virginia. Instead of clarifying the scope of federal authority and assist in the application of the Rule, the Rule expands it and adds confusion, complexity, and ultimately greater uncertainty in its implementation.  This increased uncertainty will lead to unpredictable outcomes, increased administrative costs, and potential project delays.

4.  Every year, WVDOT completes the environmental review and environmental permitting for over 350 proposed transportation projects, a process that is managed by the Technical Support Division, NEPA Compliance and Permitting Section.  The Division provides policy, procedures, training, guidance, and technical assistance to other sections of WVDOT, including on identifying projects subject to the Clean Water Act. It also manages environmental programs, works to streamline the environmental review process, and monitors changing laws and regulations.

5.  Permitting transportation projects requires substantial cost in both monetary and labor hours and represents significant investments by WVDOT.  WVDOT employs six staff members to manage all Section 404 permitting and 17 biologists, archeologists, and historians for NEPA review generally. In addition, WVDOT spends millions of dollars on consultants to assist WVDOT in gathering data, generating calculations and preparing documentation necessary for Section 404 permitting for each project. Despite using best efforts to avoid and minimize impacts to aquatic resources, WVDOT spends approximately $1 million per mile on mitigation for roadway improvements and approximately $2.1 million per mile on new roadway development.  Ephemeral streams account for 45% to 55% of that cost. WVDOT receives an average of 160 Regional/Nationwide General Permits and 3-5 Individual Section 404 permits per year.   WVDOT also requests Approved Jurisdictional Determinations (AJD) on projects each year.  Including delineation,

40

it takes, on average, approximately \$160,000 to \$560,000 per project, depending on the size of the project, to prepare materials for the AJD. The Rule will significantly increase the resources required from WVDOT to assess new jurisdictional waters under the Rule.

6. The Rule also expands federal jurisdiction in a way that will significantly increase the amount of mitigation required to deliver projects. WVDOT has used at least 24 third-party mitigation banks in West Virginia to satisfy compensatory mitigation requirements. While the number of banks has increased significantly in the last 5 to 7 years, the number of available credits in certain parts of the state has not, largely because pending banks are not receiving timely approval, and USACE has not been releasing enough credits to satisfy demand in certain service areas.

7. The Rule will also cause WVDOT to seek federal agency guidance regarding jurisdiction on a burdensome and time-consuming project-by-project and case-by-case basis. Guidance from USACE headquarters following a rule change is typically slow, and it is common to hear inconsistent answers from the USACE at the district level because they have not been provided with the appropriate guidance regarding the implementation of the new rule. This inconsistency adds additional labor hours and expense to the process of conducting WVDOT's environmental assessments and consulting with USACE, thus increasing project costs and creating delays for transportation projects. As to the thousands of miles of ephemeral and intermittent streams in West Virginia, in particular, having to assess every transportation project or minor maintenance activity to determine if the land is regulated under the Clean Water Act would be a significant burden to the WVDOT.

8. WVDOT will be significantly and irreparably harmed if the Rule is not stayed during the pendency of this litigation. As this Rule is currently being litigated and may well be overturned or modified in this litigation and/or following a Supreme Court ruling that affects the definition of "waters of the United States," it would be wasteful to require agencies like WVDOT to put forth time and effort in applying this Rule or having conversations with USACE staff regarding this Rule until its fate is known.

See Doc. No. 44-11, ¶¶ 3-8.

The twenty-four States in this case have persuasively shown that the new 2023 Rule poses a threat to their sovereign rights and amounts to irreparable harm. The States involved in this litigation will expend unrecoverable resources complying with a rule unlikely to withstand judicial scrutiny. The Court concludes that there is no question this *Dataphase* factor weighs strongly in favor of the Plaintiffs and supports the granting of injunctive relief.

### 3.     BALANCE OF HARMS AND THE PUBLIC INTEREST

The EPA submits the balance of the equities strongly disfavor an injunction.  See Doc. No. 92, pp. 28-29.   The EPA argues "the public will benefit from the added clarity that the Rule provides."  Id. at p. 28.  Common sense would lead any reasonable person to reach a far different conclusion.  The volume of litigation that has generated from the Clean Water Act over the last decade from federal district courts, federal courts of appeals, and the Supreme Court of the United States reveals nothing but chaos and uncertainty.  The Clean Water Act has generated nationwide inconsistency, ambiguity, lack of reliable jurisdictional determinations, and unpredictability for those waters the EPA and the United States Army Corps of Engineers assert jurisdiction over.  Even a cursory review of the last ten years of caselaw  - where many courts have  attempted to address the EPA's varied interpretations of the Clean Water Act since 2015 - leads one to the conclusion that common sense is not as common as it used to be.

A careful regard of the public consequences of the new 2023 Rule leads to the conclusion the balance of harms weighs in favor of the States.  It benefits the public to "ensure that federal agencies do not extend their power beyond the express delegation from Congress."  North Dakota, 127 F. Supp. 3d at 1060.

An injunction at this early stage can avoid the massive waste of resources and delayed projects in pursuit of permits that may soon be legally irrelevant.  By contrast, the EPA will not suffer any real harm that would justify a denial of injunctive relief.  And any potential harm the federal agencies may suffer from compliance with an injunction is not enough to tip the scales at this stage.  In fact, it is difficult to see what those potential harms may be.  The EPA has presented the new 2023 Rule as essentially a codification of the *status quo*.  The EPA takes the position the new Rule is founded on the same familiar pre-2015 regulatory scheme.  See Doc. No. 92, pp. 9-10.

42

One of the purposes of a preliminary injunction is to preserve the *status quo*. W. Plains, LLC v. Retzlaff Grain Co. Inc., 870 F.3d 774, 785 (8th Cir. 2017) (citing Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981)). The ripple effects caused by the 2023 Rule strongly favor maintaining the *status quo* for now. Preserving the status quo is always an important equitable consideration. Cf. Dayton Bd. of Educ. v. Brinkman, 439 U.S. 1358, 1359 (1978) (staying judgment). There is no legitimate concern that natural resources are threatened because all local lands and waters remain under the State's traditional protection. A delay allows for a full and final resolution on the merits, and is in the best interests of the public. The Court finds that a far broader segment of the public would benefit from a preliminary injunction because it would ensure that federal agencies do not extend their power beyond the express delegation from Congress. First Premier Bank v. United States Consumer Fin. Prot. Bureau, 819 F. Supp. 2d 906, 922 (D. S.D. 2011).

A balancing of the harms and an analysis of the public interest supports a finding that the risk of harms to the States is great. There is little public interest or any efficiency gained by implementing a new rule which codifies the "significant nexus" test before the United States Supreme Court issues a decision in *Sackett*. Common sense dictates that it only makes sense to wait. There is no urgency to implement the 2023 Rule. The Supreme Court's decision in *Sackett* will be issued by June 2023 and will likely address many of the unresolved legal issues and jurisdictional determinations at the heart of this lawsuit. This *Dataphase* factors weigh strongly in favor of the States and support granting a preliminary injunction.

In summary, the Court grants the Plaintiff States motion for a preliminary injunction within their sovereign borders. The *Dataphase* factors all weigh strongly in favor of granting injunctive relief at this early stage.

43

As the Texas court recognized in *State of Texas, et al. v. United States Environmental Protection Agency, et al.*, principles of judicial restraint warrant against a nationwide injunction. See Texas v. United States Env't Prot. Agency, No. 3:23-CV-17, 2023 WL 2574591, *12 (S.D. Tex. Mar. 19, 2023). The court in *Texas* ruled that the EPA is enjoined from implementing or enforcing the 2023 Rule in Texas and Idaho. Currently, there are more than 20 states that have not challenged the new 2023 Rule to date. The record before the Court is not sufficiently complete to justify a broader application. Further, the Plaintiffs have not requested nationwide application. Accordingly, this Court limits this injunction to the 24 States named as plaintiffs in this litigation. The request for a nationwide injunction or nationwide relief makes little sense when many states have not challenged the 2023 Rule and the United States Supreme Court has yet to decide whether the *Rapanos* version of the "significant nexus" test is an appropriate exercise of the EPA's jurisdiction under the Clean Water Act. Suffice it to say there is a dire need for some clarification as to what constitutes "navigable water" under the Clean Water Act. Neither the federal government nor the States know what the controlling test is, and Supreme Court precedent to date has been of scant assistance. Hopefully, the Supreme Court decision in *Sackett* will provide some clarity. The outcome of the *Sackett* case may have significant implications for the EPA's authority to determine jurisdictional waters under the Clean Water Act. It may also determine the EPA's ability to enforce the 2023 WOTUS Rule. Until then, every state will continue to swim in waters of uncertainty, ambiguity, and chaos.

## V.    CONCLUSION

In sum, as to the 24 States who are parties to this lawsuit, the Court enjoins the Defendants from implementing or enforcing the 2023 Rule entitled "Revised Definition of 'Waters of the United

States,'" 88 Fed. Reg. 3004 (Jan. 18, 2023).  The coalition of 24 States have established the *Dataphase* factors all weigh strongly in favor of granting injunctive relief.  The Plaintiffs' motion for preliminary injunction (Doc. No. 44) is **GRANTED**.  The motion for oral argument (Doc. No. 45) is **DENIED**.

        **IT IS SO ORDERED.**

Dated this 12th day of April, 2023.

                                  */s/ Daniel L. Hovland*
                                  Daniel L. Hovland, District Judge
                                  United States District Court