**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL. | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 3:23-cv-00017 |
| | § | |
| U.S. ENVIRONMENTAL | § | |
| PROTECTION AGENCY, ET AL. | § | |
| | § | |
| *Defendants.* | § | |

---

## STATES' MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iv

NATURE AND STAGE OF PROCEEDING .......................................................................1

BACKGROUND ...................................................................................................................2

    A.    The Clean Water Act. .............................................................................................2

    B.    The Supreme Court's historic interpretations of "waters of the United States." ..........................................................................................................2

    C.    The Rule. .................................................................................................................4

    D.    *Sackett.* ...................................................................................................................7

STANDARD OF REVIEW....................................................................................................7

SUMMARY OF ARGUMENT..............................................................................................8

ARGUMENT.........................................................................................................................9

    A.    Every element of the Rule fails *Sackett.* .................................................................9

        1.    Traditional Waters, referred to as "(a)(1) waters," improperly includes all "interstate waters."................................................9

        2.    Jurisdictional Impoundments, referred to as "(a)(2) impoundments," improperly include off-channel and fully dammed impoundments and disregard the navigability of the water impounded...............................................................................10

        3.    Jurisdictional Wetlands, or "(a)(4) waters," improperly include "adjacent" wetlands—even if the wetlands are not actually adjacent..............................................................................11

        4.    The Federal Agencies assert jurisdiction over Jurisdictional Tributaries, or "(a)(3) waters," and Other Jurisdictional Intrastate Waters" or "(a)(5) waters" through invalidated jurisdictional tests: the Relatively Permanent Standard or the Significant Nexus Standard. ......................12

    B.    The Rule must be vacated because it exceeds the Clean Water Act. ...................................................................................................................16

C.    The Rule must be vacated because it is contrary to the States' sovereignty........................................................................................18

D.    The Rule must be vacated because it violates due process afforded by the Constitution...........................................................19

CONCLUSION AND PRAYER..............................................................23

# TABLE OF AUTHORITIES

## Cases

*BFP v. Resol. Tr. Corp.*,
  511 U.S. 531 (1994) ...................................................................................................19

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...................................................................................................18

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...................................................................................................17

*Gen. Land Off. v. United States Dep't of the Interior*,
  947 F.3d 309 (5th Cir. 2020) .....................................................................................17

*Georgia v. Wheeler*,
  418 F. Supp. 3d 1336 (S.D. Ga. 2019) .................................................................. 10, 11

*McDonnell v. United States*,
  579 U.S. 550 (2016) ...................................................................................................20

*Nat'l Welfare Rts. Org. v. Matthews*,
  533 F.2d 637 (D.C. Cir. 1976) ...................................................................................17

*Printz v. United States*,
  521 U.S. 898 (1997) ...................................................................................................18

*Rapanos v. United States*,
  547 U.S. 715 (2006) ............................................................................. 3, 4, 7, 14, 15, 19

*Sackett v. EPA*,
  143 S. Ct. 1322 (2023) ...........................................7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20

*Sec. & Exch. Comm'n v. Chenery Corp.*,
  318 U.S. 80 (1943) .....................................................................................................18

*Solid Waste Agency of N. Cook Cnty. v. Army Corps of Engineers*,
  531 U.S. 159 (2001) ............................................................................................... 3, 19

*The Daniel Ball*,
  10 Wall. 77 U.S. 557, 563 (1870) ................................................................................2

*U.S. Army Corps of Engineers v. Hawkes Co.*,
  578 U.S. 590 (2016) ...................................................................................................20

*United States v. Davis,*
   139 S. Ct. 2319 (2019) ................................................................................................19

*United States v. Lopez,*
   514 U.S. 549 (1995) ........................................................................................... 18, 19

*United States v. Riverside Bayview Homes, Inc.,*
   474 U.S. 121 (1985) ..............................................................................................3, 8

*W. Virginia v. Evn't. Prot. Agency,*
   142 S. Ct. 2587 (2022) ..........................................................................................17

**Statutes**

33 U.S.C. § 1251(a) .......................................................................................................2

33 U.S.C. § 1251(b) ................................................................................................. 2, 18

33 U.S.C. § 1319 .........................................................................................................20

33 U.S.C. § 1342(a) .......................................................................................................2

33 U.S.C. § 1344(a) .......................................................................................................2

33 U.S.C. § 1362(7) .....................................................................................................2, 9

33 U.S.C. § 1365 .........................................................................................................20

5 U.S.C. § 706(2)(A) ......................................................................................... 8, 16, 17

5 U.S.C. § 706(2)(A)-(C) ...............................................................................................7

5 U.S.C. § 706(2)(B) ....................................................................................8, 18, 19, 22

5 U.S.C. § 706(2)(C) ........................................................................................... 8, 16

**Regulations**

33 C.F.R. § 209.120(d)(1)(1974) ..................................................................................2

40 C.F.R. § 19.4 .........................................................................................................20

**Constitutional Provisions**

U.S. Const. amend. X ..................................................................................................18

## NATURE AND STAGE OF PROCEEDING

Plaintiffs, the State of Texas, the State of Idaho, and their state agencies (the "States"), challenge the legality of the final administrative rule titled "Revised Definition of 'Waters of the United States'" (the "Rule") promulgated by the Defendants United States Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers ("Corps" or "USACE") (together, the "Federal Agencies"). On January 18, 2023, the Federal Agencies published the Rule in the Federal Register at 88 Fed. Reg. at 3004. On its face, the Rule exceeds the scope of the Clean Water Act and Supreme Court precedent interpreting the Act because it asserts jurisdiction over wetlands and water features with no continuous surface connection to navigable waters. Accordingly, on March 19, 2023, this Court granted the States' motion for preliminary injunction and enjoined the Federal Agencies from implementing or enforcing the Rule within the boundaries of the States of Texas and Idaho.

With the Supreme Court's decisive word in hand in *Sackett v. EPA*, the States now move for summary judgment asking the Court to vacate the Rule. Summary judgment is the appropriate mechanism for deciding cases challenging a regulation under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701-706. The parties agree that this litigation may be fully resolved on summary judgment briefing. Dkt. 40 at 39, n. 13. The case turns on the legal issues of whether the Rule falls outside the Federal Agencies' authority under the Clean Water Act, as interpreted by the Supreme Court, and whether the Rule violates the Constitution.

## BACKGROUND

### A.    The Clean Water Act.

In enacting the Clean Water Act, Congress was clear that primary authority over land and waters belongs with the states.

> It is the policy of the Congress to recognize, preserve, and protect the **primary responsibilities and rights of States** to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b)  (emphasis added). The Clean Water Act gives the Federal Agencies limited authority to regulate discharges and dredging in "navigable waters," s*ee*, *e.g.*, 33 U.S.C. § 1251(a), 1342(a), 1344(a). Congress defined "navigable waters" in turn as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Construction of the term "the waters of the United States," thus establishes the scope of "navigable waters" (or land) where the Federal Agencies may administer and enforce their programs.

### B.    The Supreme Court's historic interpretations of "waters of the United States."

More than 100 years before the Clean Water Act, the Supreme Court defined the phrase "navigable waters of the United States" as "navigable in fact" interstate waters. *The Daniel Ball*, 10 Wall. 77 U.S. 557, 563 (1870). In 1974, USACE issued a rule defining "navigable waters" as those waters that have been, are, or may be used for interstate or foreign commerce. 33 C.F.R. § 209.120(d)(1)(1974) . In 1986, USACE issued another rulemaking, expanding its jurisdiction to include traditional navigable waters, tributaries of those waters, wetlands adjacent to those waters and tributaries, and waters used as habitat by migratory birds that

either are protected by treaty or cross state lines. *See* Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41,206 (Nov. 13, 1986).

In *United States v. Riverside Bayview Homes, Inc.*, the Supreme Court first addressed the proper interpretation of "the waters of the United States." 474 U.S. 121 (1985). *Riverside Bayview* concerned a wetland that "was adjacent to a body of navigable water," because "the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent's property to . . . a navigable waterway." *Id.* at 131. The Supreme Court upheld the USACE's interpretation of "the waters of the United States" to include wetlands that "actually abut[ted]" traditional navigable waters, finding that "the Corps must necessarily choose some point at which water ends and land begins." *Id.* at 132.

Fifteen years later, in *Solid Waste Agency of N. Cook Cnty. v. Army Corps of Engineers ("SWANCC")*, the Supreme Court rejected USACE's assertion of jurisdiction over any waters "[w]hich are or would be used as habitat" by migratory birds. 531 U.S. 159, 164 (2001) (quoting 51 Fed. Reg. 41,217 (1986)). The Court held that the Clean Water Act cannot be read to confer jurisdiction over physically isolated, wholly intrastate waters or to ponds that are not adjacent to open water. *Id.* at 168. The Court reiterated its conclusion from *Riverside Bayview* that federal jurisdiction extends to wetlands that abut navigable waters, because protection of these adjacent, actually abutting wetlands was consistent with congressional intent to regulate wetlands that are "inseparably bound up with 'waters of the United States.'" *Id.* at 167 (quoting *Riverside Bayview*, 474 U.S. at 134).

In *Rapanos v. United States*, the Supreme Court again rejected USACE's assertion of expanded authority over non-navigable, intrastate waters that are not significantly connected

to navigable, interstate waters. 547 U.S. 715 (2006). Writing for the plurality, Justice Scalia emphasized that the traditional concept of "navigable waters" must inform and limit the construction of the phrase "the waters of the United States." The plurality found that in going beyond this "commonsense understanding" and classifying waters like "ephemeral streams," "wet meadows," "man-made drainage ditches," and "dry arroyos in the middle of the desert" as "waters of the United States," USACE stretched the statutory text "beyond parody." *Id.* at 734. The plurality also rejected the view that wetlands adjacent to ditches, when those ditches do not meet the definition of "waters of the United States," may nevertheless be subjected to federal regulation on the theory that they are "adjacent to" the remote "navigable waters" into which the ditches ultimately drain. *Id.* at 739–40. Justice Kennedy concurred in the judgment but instead employed a "significant nexus" analysis when determining jurisdictional waters. Justice Kennedy concluded that wetlands possess the requisite nexus if they "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780 (Kennedy, J., concurring in the judgment).

### C.    The Rule.

The Rule, 88 Fed. Reg. at 3143-44, defines "waters of the United States" to include five categories, each of which contain sub-categories and additional defined terms. The Rule and its preamble span a whopping 141 pages in the Federal Register, often requiring any individual wishing to understand what waters are jurisdictional to parse a codified definition and then refer to the preamble to determine the Federal Agencies' nebulous application. The Federal

Agencies contend that the Rule largely codifies their implementation of the 1986 regulations[1] following the Supreme Court's decision in *Rapanos*. In particular, the Rule allegedly tracks the Federal Agencies post-*Rapanos* implementation as laid out in the "Rapanos Guidance."[2]  88 Fed. Reg. at 3014.

Relying on the *Rapanos* dissenters who "concluded [] the term 'waters of the United States' encompasses, inter alia, all tributaries and wetlands that satisfy 'either the plurality's or Justice Kennedy's test,'" 88 Fed. Reg. at 3013, the Rule asserts jurisdiction in the broadest way possible: any water feature that passes the Relatively Permanent or Significant Nexus Standard. The Rule "replaces the interstate commerce test with the relatively permanent standard and the significant nexus standard." 88 Fed. Reg. at 3029.

The "Relatively Permanent Standard" includes "relatively permanent, standing or continuously flowing waters connected to [Traditional Waters], and waters with a continuous surface connection to such relatively permanent waters or to [Traditional Waters]." 88 Fed. Reg. at 3066. The "Significant Nexus Standard" means waters that, "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, the territorial seas, or interstate

---

[1] See Dkt 40 at 17 ("the regulatory status quo is the regime that was in place for years prior to 2015, and that the Agencies restored in 2019, and that is largely codified in the 2023 Rule, with slight modifications for needed clarity to aid in implementation."); Dkt. 40 at 14 ("the Rule "would not change current implementation sufficiently to quantifiably alter overall costs to the regulated public or States" Dkt 40 at 31 ("the Agencies have long implemented the significant nexus standard in substantially the same manner as the Rule").

[2] "After *Rapanos*, the Agencies issued, and later updated, guidance on how certain provisions of the 1986 Regulations applied in light of Supreme Court precedent. 'Rapanos Guidance,' Ex. 2. Generally, the Guidance explained that non-navigable waters are jurisdictional if they met either the relatively permanent or significant nexus standard and outlines how the Federal Agencies may identify a significant nexus. Dkt 40 at 33.

waters." *Id.*[3] Waters that meet the Relatively Permanent Standard "will virtually always" meet the Significant Nexus Standard. 88 Fed. Reg. at 3038.

The five categories of jurisdictional waters in the Rule include the following:

A.    Traditional navigable waters, territorial seas, and interstate waters, including interstate wetlands; ("Traditional Waters");

B.    Impoundments of any other "waters of the United States," whether or not the impoundment demonstrates a connection to a jurisdictional water feature by either the Relatively Permanent Standard, or Significant Nexus Standard ("Jurisdictional Impoundments");

C.    Tributaries to Traditional Waters or Jurisdictional Impoundments that demonstrate a connection to a Traditional Water or Jurisdictional Impoundment by either the Relatively Permanent Standard, or Significant Nexus Standard ("Jurisdictional Tributaries");

D.    Wetlands adjacent to Traditional Waters (whether or not connected by either the Relatively Permanent Standard, or Significant Nexus Standard); or wetlands adjacent to Jurisdictional Tributaries or Jurisdictional Impoundments that demonstrate a connection to the Jurisdictional Tributaries or Jurisdictional Impoundment by either the Relatively Permanent Standard, or Significant Nexus Standard ("Jurisdictional Adjacent Wetlands"); and

E.    Intrastate lakes and ponds, streams, or wetlands not already identified in the other four categories but satisfy the Relatively Permanent Standard with Traditional Waters and Jurisdictional Tributaries, or satisfy the Significant Nexus Standard with Traditional Waters ("Other Jurisdictional Intrastate Waters").

88 Fed. Reg. at 3143-44.

---

[3] The Significant Nexus Standard, as described in the Rule, is even broader and more arbitrary than Justice Kennedy's iteration. Justice Kennedy proposed including wetlands that "significantly affect the chemical, physical, **and** biological integrity" of navigable waters whereas the Federal Agencies propose regulating any water that affects "the chemical, physical, **or** biological integrity" of Traditional Waters. 88 Fed. Reg. at 3006. Moreover, the Federal Agencies defined "significantly affect" as a material influence on the chemical, physical, or biological integrity of Traditional Waters. To determine if there is a material influence, five functions must be assessed, and five factors must be considered. 88 Fed. Reg. 3144. Most of the functions and all of the factors devised by the Federal Agencies to define "significantly affect" are entirely absent from Justice Kennedy's concurrence and are creatures of the Federal Agencies themselves, not the Clean Water Act or case law.

### D.   *Sackett.*

On May 25, 2023, the Supreme Court announced its decision in *Sackett v. EPA*, 143 S. Ct. 1322 (2023). In *Sackett*, the majority removed any doubt about the scope of the Clean Water Act:

> the *Rapanos* plurality was correct: the CWA's use of "waters" encompasses only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers, and lakes.

*Sackett*, 143 S. Ct. at 1336.  As to wetlands in particular, the Court settled on a jurisdictional test for wetlands adjacent to navigable waters and therefore subject to the Clean Water Act, those that are:

> as a practical matter indistinguishable from waters of the United States, such that it is difficult to determine where the 'water' ends and the 'wetland' begins. That occurs when wetlands have a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands.

*Id.* at 1341 (citing *Rapanos*, 547 U.S. at 742, 755 ).

All nine justices reversed the Ninth Circuit's acquiescence to USACE's assertion of authority, based in the *Rapanos* Guidance, over a complex of wetlands on the Sackett's property, which is located across a road from a lake.

## STANDARD OF REVIEW

The Court should hold unlawful and set aside the Rule if it finds any aspects are:

(A)    Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)    Contrary to constitutional right, power, privilege, or immunity; or

(C)    In excess of statutory jurisdiction, authority, or limitations or short of statutory right.

5 U.S.C. § 706(2)(A)-(C).

## SUMMARY OF ARGUMENT

The Supreme Court clarified any outstanding questions about the scope of the Clean Water Act and expressly wrote that the Rule does not pass muster because: (1) there is an absence of a clear statement from Congress; and (2) it gives rise to serious vagueness concerns in light of the Clean Water Act's criminal and civil penalties. *Sackett*, 143 S. Ct. at 1341-43. The duty to vacate the Rule is now necessary for three reasons.

*Sackett*, *Rapanos*, and the Clean Water Act limit federal authority to traditionally navigable waters and those with a continuous surface connection to them. But the Rule ignores this limit, using elaborately defined terms like "interstate waters," "impoundments," "tributaries," "adjacent wetlands," that repudiate any relationship between the water feature and a navigable water. The Rule unlawfully expands the definition of "waters of the United States" and therefore is arbitrary and capricious and exceeds statutory authority. 5 U.S.C. § 706(2)(A), (C).

Lacking authority in the Clean Water Act, the Federal Agencies in turn infringe on the States' traditional power over their land and water resources and violate the Tenth Amendment and the Commerce Clause. 5 U.S.C. § 706(2)(B); *Riverside Bayview,* 474 U.S. at 133.

Finally, because the Clean Water Act imposes steep criminal and civil penalties for even negligent failure to obtain permits before discharging or dredging in an unknowable array of "waters of the United States," the Rule is so incomplete, vague, indefinite, or uncertain that persons of common intelligence must necessarily guess at its meaning and as to its application. Accordingly, the Rule violates due process. 5 U.S.C. § 706(2)(B); *Sackett*, 143 S. Ct. at 1342-43.

## ARGUMENT

### A.      Every element of the Rule fails *Sackett*.

The Rule's definition of the term "waters of the United States" cannot be squared with the text of the Clean Water Act and the Supreme Court's interpretation of that term.  As the Clean Water Act makes clear, "waters of the United States" is synonymous with "navigable waters." 33 U.S.C. § 1362(7) ("The term 'navigable waters' means the waters of the United States, including the territorial seas"). The Rule removes any requirement of "navigability" and therefore the Federal Agencies act arbitrarily and not in accordance with the law in its promulgation.  The Supreme Court made this evident in *Sackett*, even directly criticizing the Rule. *Sackett*, 143 S. Ct. at 1341-43. Every category of water in the Rule fails the *Sackett* test.

### 1.   *Traditional Waters, referred to as "(a)(1) waters," improperly includes all "interstate waters."*

This category includes waters that are "currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide," "the territorial seas," and "interstate waters, including interstate wetlands." 88 Fed. Reg. at 3143. The Federal Agencies identify "interstate waters" as "all rivers, lakes, and other waters that flow across, or form a part of, State boundaries," which remarkably includes all types of waters "regardless of their navigability," and does not consider whether the interstate water supports commerce. 88 Fed. Reg. at 3072. The Federal Agencies include "interstate wetlands" in this category—regardless of whether the wetland is adjacent to any other jurisdictional water—simply for the fact that the wetland crosses state

or tribal[4] lines. 88 Fed. Reg. at 3072. According to the Federal Agencies, "[i]f a waterbody is determined to be a [Traditional Water], then it is jurisdictional with no need for further evaluation." 88 Fed. Reg. at 3067. Therefore, the Federal Agencies may conclude without any evaluation that all "interstate waters" are subject to their federal authority, including those that are not navigable or lack any connection to navigability.

In *Sackett*, the majority identified a water of the United States as a "relatively permanent body of water connected to traditional *interstate navigable waters*." (emphasis added). *Sackett*, 143 S. Ct. at 1341. Adding that "[a]lthough we have acknowledged that the CWA extends to more than traditional navigable waters, we have refused to read 'navigable' out of the statute, holding that it at least shows that Congress was focused on 'its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made.'" *Id.* at 1337. Thus, the majority reaffirmed throughout the decision that an interstate ephemeral stream is not a water of the United States merely because it crosses state lines. Where the Rule asserts authority over interstate waters that are not navigable, it inarguably exceeds the Clean Water Act. *See Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1355–60 (S.D. Ga. 2019).

   2. *Jurisdictional Impoundments, referred to as "(a)(2) impoundments," improperly include off-channel and fully dammed impoundments and disregard the navigability of the water impounded.*

The Rule includes all impoundments of Traditional Waters (including interstate water), Jurisdictional Tributaries, or Jurisdictional Wetlands. The Federal Agencies claim federal jurisdiction over impoundments "regardless of the water's jurisdictional status at the time the

---

[4] Recognizing the sometimes-absurd results of classifying waters this way, the Federal Agencies have arbitrarily chosen to hold off on classifying waters that cross tribal lines as jurisdictional, deciding instead "to conduct additional analysis and outreach to inform a future action related to considering designating waters that cross a State/Tribal boundary as interstate waters under the definition of "waters of the United States." 88 Fed. Reg. at 3075.

impoundment was created." 88 Fed. Reg. at 3078. If the water body impounded was not a "water of the United States" at the time it was impounded, but has since become a "water of the United States" (as a result of its impoundment), then the impoundment is jurisdictional, even many years later. 88 Fed. Reg. at 3078. And, in the case of an impoundment for which the water body impounded was jurisdictional at the time of impoundment, but is no longer jurisdictional, the impoundment remains jurisdictional—even if the contributing water body is not. 88 Fed. Reg. at 3078. Thus, the Rule necessarily encompasses impoundments that, in present day, do not bear on interstate commerce.

The Federal Agencies also assert jurisdiction over off-channel impoundments ("an impoundment with no outlet or hydrologic connection to the tributary network"), 88 Fed. Reg. at 3077-3078, and waters wholly separated by dams because dams "generally do not prevent all water flow, but rather allow seepage under the foundation of the dam and through the dam itself," 88 Fed. Reg. at 3076. The Federal Agencies include these off-channel impoundments and dams, despite expressly lacking connection to navigability.

Federal authority does not extend to these categories of water. A lawfully impounded water that in present day bears no "continuous surface connection" to a traditionally navigable water is outside the scope of the Clean Water Act.[5]   *Wheeler*, 418 F. Supp. 3d at 1336-37.

> 3.  *Jurisdictional Wetlands, or "(a)(4) waters," improperly include "adjacent" wetlands—even if the wetlands are not actually adjacent.*

The Rule includes any wetland "adjacent" to Traditional Waters, including interstate waters, (whether or not it meets the Relatively Permanent or Significant Nexus Standard) and

---

[5] To be sure, an illegal impoundment, like an illegal barrier separating a wetland, would not alone remove federal jurisdiction, and the States do not contend otherwise. *See Sackett*, 143 S. Ct. at 1341, n. 16.

any wetland "adjacent" to a Jurisdictional Impoundment or Jurisdictional Tributary if it meets either the Relatively Permanent or Significant Nexus Standard. 88 Fed. Reg. at 3143. The Federal Agencies define "adjacent" as many things other than actually adjacent. For purposes of determining "adjacent wetlands" under the Rule, "adjacent" means "bordering, contiguous, or neighboring" and includes as adjacent per se "wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like." 88 Fed. Reg. at 3144. The Rule does not define "neighboring" as a concept distinct from "contiguous" or "bordering." And the Federal Agencies take the position that the definition "does not require flow from the wetland to the jurisdictional water or from the jurisdictional water to the wetland." 88 Fed. Reg. at 3093. The Federal Agencies offer three definitions of the term "adjacent"—none of which are the term's plain meaning.

The Supreme Court rejected the Federal Agencies' interpretation, holding that "the CWA extends to only those 'wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right,' so that they are 'indistinguishable' from those waters." *Sackett*, 143 S. Ct. at 1344. *Sackett* squarely dispensed with this category of the Rule, finding that the Federal Agencies' interpretation is "inconsistent with the text and structure of the CWA. Beyond that, it clashes with 'background principles of construction' that apply to the interpretation of the relevant statutory provisions." *Id.* at 1341.

4. *The Federal Agencies assert jurisdiction over Jurisdictional Tributaries, or "(a)(3) waters," and Other Jurisdictional Intrastate Waters," or "(a)(5) waters," through invalidated jurisdictional tests: the Relatively Permanent Standard or the Significant Nexus Standard.*

The Rule relies on its version of a Relatively Permanent Standard and the Significant Nexus Standard as the basis for including Jurisdictional Tributaries and Jurisdictional

Intrastate Waters that are otherwise not navigable. But the tests are invalid, so these waters do not belong within Federal jurisdiction.

The Jurisdictional Tributary, or "(a)(3) waters" category, improperly includes distant water features, ditches, and ephemeral streams regardless of navigability. This category includes "rivers, streams, lakes, ponds, and impoundments, regardless of their flow regime, that flow directly or indirectly through another water or waters to" Traditional Waters. 88 Fed. Reg. at 3080. The Federal Agencies note that a tributary can flow "indirectly" to a Traditional Water by flowing first through "a number" of downstream waters including non-jurisdictional tributaries, ephemeral streams, impoundments, ditches, or waste treatment systems, but is jurisdictional so long as "part of a tributary system that **eventually** flows to" a Traditional Water.[6] 88 Fed. Reg. at 3080 (emphasis added). Manmade features like ditches[7] or canals may be tributaries—notwithstanding that those features are supposedly excluded—"so long as they contribute flow to" a Traditional Water. 88 Fed. Reg. at 3080. Tributaries fall into this category when they meet either the Relatively Permanent or Significant Nexus Standard, which, as discussed below, are not legally viable jurisdictional tests.

This troublingly broad Other Jurisdictional Intrastate Waters, or "(a)(5) waters," category includes "intrastate lakes and ponds, streams, or wetlands" not already identified in

---

[6] To guess at whether a stream is part of a tributary system, the Federal Agencies suggest the public engage in direct observation or try their hand at "various remote sensing resources" like stream gauge data, elevation maps, flood zone maps, and satellite imagery. 88 Fed. Reg. at 3084, n. 99. This insistence on using computer software encourages the Federal Agencies to assign their own jurisdiction without ever viewing the supposed "water" in real world, present-day conditions.

[7] The Federal Agencies purported to make a concession to the many commenters opposed to federal jurisdiction over ditches by excluding ditches, but the exclusion extends only to ditches "excavated wholly in and draining only dry land **and** that do not carry a relatively permanent flow of water." 88 Fed. Reg. at 3144 (emphasis added).

the other four categories, but that satisfy either the Relatively Permanent Standard or Significant Nexus Standard. 88 Fed. Reg. at 3143. By definition, these Other Jurisdictional Intrastate Waters are not traditional navigable waters, interstate waters, or territorial seas, nor are they impoundments, adjacent wetlands, or even tributaries to traditional navigable waters, interstate waters, or territorial seas.

The Federal Agencies' take on the Relatively Permanent Standard, using the name but not the substance of the *Rapanos* plurality test, is invalid. As defined in *Rapanos*:

> On this definition, "the waters of the United States" include only relatively permanent, standing or flowing bodies of water. The definition refers to water as found in "streams," "oceans," "rivers," "lakes," and "bodies" of water "forming geographical features." All of these terms connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows. Even the least substantial of the definition's terms, namely, "streams," connotes a continuous flow of water in a permanent channel—especially when used in company with other terms such as "rivers," "lakes," and "oceans." None of these terms encompasses transitory puddles or ephemeral flows of water.

*Rapanos*, 547 U.S. at 732–33 . As further clarified in *Sackett*,

> we conclude that the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'

*Sackett*, 143 S. Ct. at 1336.  Yet the Rule does not even provide a definition for the term "relatively permanent." Instead, the Federal Agencies attempt to explain its application in the Rule's preamble. *See* 88 Fed. Reg. at 3143-44. The Relatively Permanent Standard includes flows that occur seasonally, but also encompasses "tributaries in which extended periods of standing or continuously flowing water are not linked to naturally recurring annual or seasonal cycles," as well as flows driven by water management practices and effluent-dependent

streams. 88 Fed. Reg. at 3085. Further complicating the application of this standard, the Rule notes that a continuous surface connection "does not require surface water to be continuously present between the wetland and the tributary."  88 Fed. Reg. at 3096. Thus, "relatively permanent" tributaries could include stream beds that remain dry for substantial portions of the year. Waters are "relatively permanent" under the Rule if they flow during "certain times of the year" (an undefined term) instead of the 3-month season identified in the *Rapanos* Guidance, 88 Fed. Reg. at 3085, and that flow can be the result of nothing more than "back to back" or even just one inordinate "storm event." 88 Fed. Reg. 3086. The *Rapanos* plurality takes a markedly different view—implying that relatively permanent waters would only include those that dry up in "extraordinary circumstances, such as drought."[8] *Sackett* found the same, allowing only "temporary interruptions in surface connection may sometimes occur because of phenomena like low tides or dry spells." *Sackett*, 143 S. Ct. at 1341.

In other words, the Relatively Permanent Standard described in the Rule's preamble differs materially from that originating in *Rapanos,* and clarified in *Sackett*, and lacks any legal foundation now.

The Federal Agencies also use the Significant Nexus Standard to assert jurisdiction over waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas. 88 Fed. Reg. at 3006. The Rule does not provide a

---

[8] *Rapanos*, 547 U.S at 732 n.5 (emphasis added). Writing for the plurality, Justice Scalia further explained: "We also do not necessarily exclude seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months—such as the 290–day, continuously flowing stream postulated by Justice Stevens's dissent (hereinafter the dissent), post, at 2259–2260. Common sense and common usage distinguish between a wash and seasonal river." *Id.*

definition for the vague concepts of "similarly situated" or "in the region." *See* 88 Fed. Reg. at 3143-44. The Federal Agencies explain that "similarly situated waters" means a tributary and any adjacent wetlands and "in the region" means when these waters lie within the "catchment area" of the tributary in interest. 88 Fed. Reg. at 3088, 3097. Identifying the "catchment" requires further delineation and is described as the land surface that drains to a specific location for a water feature. 88 Fed. Reg. at 3088. These explanations fail to provide the necessary clarity. Accordingly, the Significant Nexus Standard merely provides the Federal Agencies a "freewheeling inquiry" to assert federal jurisdiction over an unknowable amount of water features without adequate notice to those subject enforcement for "mundane activities like moving dirt." *Sackett*, 143 S. Ct. at 1335, 1342. The Supreme Court squarely determined that this test is not lawful. Speaking directly to the Rule, the Supreme Court found that:

> the boundary between a "significant" and an insignificant nexus is far from clear. And to add to the uncertainty, the test introduces another vague concept—"similarly situated" waters—and then assesses the aggregate effect of that group based on a variety of open-ended factors that evolve as scientific understandings change. This freewheeling inquiry provides little notice to landowners of their obligations under the CWA.

*Sackett*, 143 S. Ct. at 1342.  The Supreme Court went on to find that "the CWA never mentions the 'significant nexus' test, so the EPA has no statutory basis to impose it." *Id.*

**B.    The Rule must be vacated because it exceeds the Clean Water Act.**

Because the Rule exceeds the Clean Water Act, it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and in excess of statutory jurisdiction, authority, or limitations or short of statutory right, and accordingly, must vacated under the APA. 5 U.S.C. § 706(2)(A), (C). As discussed element-by-element above, there is no way to reconcile the broad jurisdictional categories described in the Rule with the plain language of

the Clean Water Act and the Supreme Court's repeated admonishments that the Federal Agencies may not read "navigable" out of the statute. *Sackett*, 143 S. Ct. at 1337. "An agency decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A), if the agency applies an incorrect legal standard." *Gen. Land Off. v. United States Dep't of the Interior*, 947 F.3d 309, 320 (5th Cir. 2020). A regulation cannot conflict with the statute that it is implementing. *Nat'l Welfare Rts. Org. v. Matthews*, 533 F.2d 637, 646-48 (D.C. Cir. 1976). Because the controlling law only authorizes the Federal Agencies to regulate "navigable waters" or those with a "continuous surface connection thereto" and the Rule fails to recognize those limitations, the Federal Agencies have acted arbitrarily and not in accordance with the law in promulgating the Rule.

Additionally, under the major questions doctrine, the Federal Agencies are not authorized to determine their own jurisdiction. As the Supreme Court explained, an agency's claim of authority through the rulemaking process must be clearly supported by statute before providing an agency "'unheralded' regulatory power over a 'significant portion of the American economy.'" *W. Virginia v. Evn't. Prot. Agency*, 142 S. Ct. 2587, 2608 (2022). Therefore, an agency's claim of authority must be rejected when: (1) the rule concerns an issue of economic and political significance; and (2) Congress has not clearly empowered the agency with the statutory authority. The Court should "hesitate before concluding that Congress meant to confer such authority" that the Federal Agencies grant themselves in the Rule. *See W. Virginia v. Evn't Prot. Agency*, 142 S. Ct. at 2608 (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)). The Federal Agencies are casting a broad, amorphous shadow over the economy through the Rule—with no statutory basis—

much less a clear statement of support from Congress.  *Sackett*, 143 S. Ct. at 1341 ("the CWA never mentions the 'significant nexus' test, so the EPA has no statutory basis to impose it.")

### C.     The Rule must be vacated because it is contrary to the States' sovereignty.

Under the APA, a final agency action may be held unlawful and set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people." U.S. Const. amend. X. The federal government lacks a general police power and may only exercise powers expressly granted to it by the Constitution. *See* U.S. Const. amend. X.; *United States v. Lopez*, 514 U.S. 549, 566 (1995). Although the canon of constitutional avoidance favors construing ambiguous statutory language to avoid constitutional doubts, the legal question of the constitutionality of an agency action is subject to judicial review under the APA. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). An agency order may not stand if the agency has misconceived the law. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

"It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Printz v. United States*, 521 U.S. 898, 928 (1997). The Clean Water Act itself makes clear that regulation of land and water resources is "the primary responsibilities and rights of States," well within the States' sphere of authority.  33 U.S.C. § 1251(b).  In discussing the Rule in *Sackett*, the Supreme Court reaffirmed the States' authority:

> [T]his Court requires Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property. Regulation of land and water use lies at the core of

traditional state authority. An overly broad interpretation of the CWA's reach would impinge on this authority. The area covered by wetlands alone is vast—greater than the combined surface area of California and Texas. And the scope of the EPA's conception of "the waters of the United States" is truly staggering when this vast territory is supplemented by all the additional area, some of which is generally dry, over which the Agency asserts jurisdiction. Particularly given the CWA's express policy to "preserve" the States' "primary" authority over land and water use, this Court has required a clear statement from Congress when determining the scope of "the waters of the United States."

*Sackett*, 143 S. Ct. at 1341–42 (internal citations omitted).  The phrase "the waters of the United States" does not constitute such a clear and manifest statement. *Rapanos*, 547 U.S. at 738 (citing *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994)).

The Clean Water Act was enacted pursuant to Congress's authority to regulate interstate commerce under Article I, Section 8 of the Constitution. As a result, the Federal Agencies violate the Constitution when their enforcement or application of the Clean Water Act extends beyond the regulation of interstate commerce. *See SWANCC*, 531 U.S. at 173. But the Rule regulates intrastate and interstate waters without regard to whether those waters may have a substantial relation to interstate commerce.  *Cf. Lopez*, 514 U.S. at 558–59. And more expressly, the Rule goes beyond the Clean Water Act's reach: navigable waters.  *See infra A*, *Sackett*, 143 S. Ct. at 1342. Accordingly, the Rule is contrary to the Clean Water Act's protection of state sovereignty, and therefore, is contrary to the States' constitutional rights, powers, and privileges recognized by the Tenth Amendment and must be vacated. 5 U.S.C. § 706(2)(B).

### D.    The Rule must be vacated because it violates due process afforded by the Constitution.

"[A] vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). The Due Process Clause of the Fifth Amendment requires adequate notice of what conduct is

forbidden before criminal penalties may attach. And, the Supreme Court has consistently stated a law's language may not be so incomplete, vague, indefinite, or uncertain that ordinary people cannot understand the prohibitive conduct and does not encourage arbitrary and discriminatory enforcement. *Sackett,* 143 S. Ct. at 1342-43; *McDonnell v. United States*, 579 U.S. 550, 576 (2016).

The Clean Water Act authorizes criminal and civil enforcement, which includes the potential assessment of penalties more than $60,000 per violation, the possibility of imprisonment, or both. *See* 33 U.S.C. § 1319; 40 C.F.R. § 19.4. It is a "a potent weapon" with "'crushing' consequences 'even for inadvertent violations.'" *Sackett*, 143 S. Ct. at 1330 (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 602 (2016) (Kennedy, J., concurring)). Furthermore, citizens also wield the power of the Clean Water Act through the commencement of an enforcement action that seeks severe penalties. 33 U.S.C. § 1365. Therefore, the Clean Water Act, and the federal rules implementing it, must provide sufficient definiteness to comply with constitutional due process protections.

A plain reading of the Rule's language identifies several vague terms and dynamic phrases used to allegedly establish various categories of jurisdictional waters under the Clean Water Act, and accordingly the scope of the Federal Agencies' power. And, unfortunately, a review of the 141-page Federal Register publication accompanying the Rule only exacerbates the uncertainty. Specifically, the terms "Relatively Permanent Standard" and "Significant Nexus Standard," "impoundments," and "wetlands" fatally do not pass muster and cannot be salvaged by lengthy explanation.

The Relatively Permanent Standard means "relatively permanent, standing or continuously flowing waters connected to paragraph (a)(1) waters, and waters with a continuous surface connection to such relatively permanent waters or to paragraph (a)(1) waters." *See* 88 Fed. Reg at 3038. But as discussed above, "relatively permanent" is undefined and only vaguely illustrated. *See* 88 Fed. Reg. at 3143-44. According to the Rule, the defining characteristic of relatively permanent waters during certain times of the year is a temporary lack of surface flow, which may lead to isolated pools or dry channels during certain periods of the year, except in times of drought. 88 Fed. Reg. at 3085. The relatively permanent flow may also occur seasonally but are not necessarily linked to naturally occurring annual or seasonal cycles and may include flow driven by water management regimes, practices, and alterations. 88 Fed. Reg. at 3085. Paired with the undefined categorical terms of tributaries, adjacent wetlands, or other intrastate waters, this standard is untenable for an ordinary person attempting to identify the outer brim of the Clean Water Act's jurisdiction, which appears to include some areas of dry land that may be affected by unknown water management regimes.

The Significant Nexus Standard means waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, the territorial seas, or interstate waters. 88 Fed. Reg. at 3066. The Rule defines "significantly affect" to mean "a material influence on the chemical, physical, or biological integrity of" traditional waters. The Rule further relies on the assessment of five functions with the consideration of five factors to determine whether a water feature, either alone or in combination with similarly situated waters in the region, has a material influence. 88 Fed. Reg. at 3143-44. These functions and factors only muddy the waters further.

The Rule's broad categories compound the due process concerns.  The Rule identifies "impoundments" of water otherwise defined as waters of the United States as jurisdictional, but without a definition for the term. 88 Fed. Reg. at 3143. The Federal Agencies claim this category provides jurisdictional impoundments of any size can be: (1) created by impounding one of the "waters of the United States" that was jurisdictional under this rule at the time the impoundment was created; and (2) waters that at the time of assessment meet the definition of "waters of the United States" under (a)(1), (a)(3), or (a)(4), regardless of the water's jurisdictional status at the time of the impoundment was created. 88 Fed. Reg. at 3075-78. Therefore, to apply the Rule, an ordinary person must monitor hydrologic developments related to water features after their creation *and* investigate the historical classification of those waters, along with tributaries or wetlands linked the vague standards previously discussed.

The Rule also identifies "tributaries" of (a)(1) and (a)(2) waters that satisfy either the Relatively Permanent Standard or Significant Nexus Standard as a category of jurisdictional waters without defining the term. 88 Fed. Reg. at 3143. The Rule's preamble describes a tributary as "rivers, streams, lakes, ponds, and impoundments, regardless of their flow regime, that flow directly or indirectly through another water or waters to" (a)(1) waters. 88 Fed. Reg. at 3080. The Federal Agencies' choice of language obscures any path to compliance—an ordinary person is unlikely to know every possible jurisdictional and non-jurisdictional feature that could contribute flow between a water-in-question and a traditional water, and much less understand how to evaluate it in the light of the two previously discussed standards. Because complying with the Rule is practically impossible, the Rule violates constitutional guarantees to due process and must be vacated. 5 U.S.C. § 706(2)(B).

## CONCLUSION AND PRAYER

There are many reasons to vacate the Rule. It cannot be supported by the plain language of the Clean Water Act, it is inconsistent with Supreme Court precedent, it cannot be justified as a valid exercise of congressional authority under the Commerce Clause, it cannot be excused in the face of the Tenth Amendment, and it infringes on the due process rights afforded under the Fifth Amendment. The States pray for vacatur now.

Dated:   June 28, 2023                                 Respectfully submitted,

JOHN SCOTT                                 */s/ J. Amber Ahmed*
Provisional Attorney General              J. AMBER AHMED
                                          Attorney-in-Charge
BRENT WEBSTER                             Assistant Attorney General
First Assistant Attorney General          State Bar No. 24080756
                                          Southern District No. 3135176
GRANT DORFMAN                             amber.ahmed@oag.texas.gov
Deputy First Assistant Attorney
General                                   LOGAN HARRELL
                                          Assistant Attorney General
JAMES LLOYD                               State Bar No. 24106054
Acting Deputy Attorney General for Civil  PRO HAC VICE
Litigation                                logan.harrell@oag.texas.gov

PRISCILLA M. HUBENAK                      H. CARL MYERS
Chief, Environmental Protection Division  Assistant Attorney General
                                          State Bar No. 24046502
                                          Southern District No. 852368
                                          carl.myers@oag.texas.gov

                                          OFFICE OF THE ATTORNEY
                                          GENERAL OF TEXAS
                                          Environmental Protection Division
                                          P.O. Box 12548, MC-066
                                          Austin, Texas 78711-2548
                                          Tel:     (512) 463-2012
                                          Fax:     (512) 320-0911

                                          ***COUNSEL FOR STATE OF TEXAS***

RAÚL R. LABRADOR
Attorney General of Idaho

THEODORE J. WOLD
Solicitor General

SCOTT L. CAMPBELL
Deputy Attorney General
Chief, Energy and Natural
Resources Division

LINCOLN DAVIS WILSON
Deputy Attorney General
Chief, Civil Litigation and
Constitutional Defense Division
PRO HAC VICE

JOSHUA N. TURNER
Deputy Solicitor General
PRO HAC VICE
Josh.Turner@ag.idaho.gov

OFFICE OF THE ATTORNEY
GENERAL OF IDAHO
P.O. Box 83720-0010
Boise, Idaho 83720-0010
Tel:    (208) 334-2400
Fax:    (208) 854-8071

***COUNSEL FOR STATE OF IDAHO***

## CERTIFICATE OF SERVICE

I certify that on June 28, 2023, a copy of the foregoing document was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all attorneys in this case.

/s/ *J. Amber Ahmed*
J. AMBER AHMED
Assistant Attorney General