**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, STATE OF IDAHO, ET AL. | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Action No. 3:23-cv-00017 |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL. | § § § § | |
| *Defendants*. | | |

## SECONDED AMENDED COMPLAINT AND PETITION FOR REVIEW

To address the unlawful adoption of a now-amended final rule expanding and muddying federal jurisdiction over environmental regulation, land use planning, and development of agriculture and energy resources, the State of Texas, the State of Idaho, and their state agencies ("Plaintiffs"), file this Seconded Amended Complaint against the United States Environmental Protection Agency, its Administrator Michael S. Regan, in his official capacity, the United States Army Corps of Engineers, its Chief of Engineers and Commanding General Lieutenant General Scott A. Spellmon, in his official capacity and Assistant Secretary of the Army for Civil Works, Michael L. Connor, in his official capacity (collectively, "Defendants" or "Federal Agencies"). Plaintiffs allege on knowledge as to Plaintiffs, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This lawsuit challenges the legality of a final administrative rule as amended. On January 18, 2023, the Federal Agencies published a "Revised Definition of 'Waters of the

United States'" (the "2023 Rule").[1] Plaintiffs sued, and the Court preliminarily enjoined the 2023 Rule because it adopted an unlawful standard and applied to non-navigable interstate waters. *See* Dkt. 60. The Federal Agencies promulgated the 2023 Rule in the midst of the Supreme Court's consideration of the Federal Agencies' authority under the Clean Water Act ("CWA") in *Sackett v. EPA*, 598 U.S 651 (2023) ("*Sackett*"); and when, as anticipated, the Supreme Court rejected the Federal Agencies' broad overuse of authority, they used the *Sackett* opinion to justify depriving the public, and Plaintiffs, of notice and the opportunity to comment on a rule with nationwide importance. The Federal Agencies published—without any opportunity for notice and comment—a new rule, entitled "Revised Definition of 'Waters of the United States'; Conforming" ("Amended 2023 Rule").[2]

2.     The Clean Water Act ("CWA") requires federal permits to discharge pollutants into, 33 U.S.C. § 1342, or to dredge or fill, *Id.* § 1344, "navigable waters." "Navigable waters," in turn, is defined to mean "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Waters that do not fit into this definition are not within federal jurisdiction and may still be regulated by states and tribes.

3.     By this challenge, Plaintiffs assert that by amending the definition of "waters of the United States," as provided in the Amended 2023 Rule, the Federal Agencies unconstitutionally and impermissibly expand their own authority beyond Congress's

---

[1] Prior to adopting the 2023 Rule, the Federal Agencies published a Proposed Rule. *See* Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021) ("Proposed Rule"), attached hereto as Exhibit 1. The 2023 Rule was published in the Federal Register at 88 Fed. Reg. 3004, on January 18, 2023. A true and correct copy of the 2023 Rule is attached hereto as Exhibit 2.

[2] The Amended 2023 Rule was published in the Federal Register at 88 Fed. Reg. 61964, on September 8, 2023, attached hereto as Exhibit 3.

delegation in the CWA—intruding into state sovereignty and the liberties of the states and their citizens. The Amended 2023 Rule maintains the ambiguity of the 2023 Rule, leaving those wishing to identify the ambit of federal power over dry land or minor water features at the mercy of an expensive, vague, and arbitrary analysis, lest they face a staggering criminal or civil penalty. Plaintiffs further assert that they were deprived of the opportunity to comment on the Amended 2023 Rule, in violation of statutory rulemaking requirements.

## **THE PARTIES**

### A. **Plaintiffs.**

4.      Plaintiff the State of Texas, by and through its Attorney General, brings this suit to assert the rights of the state and on behalf of its citizens. *See* Tex. Const. art. IV, § 22; Tex. Gov't Code Ch. 402; *see also* Tex. H.B. 1, art. IX, § 16.01, 82nd Tex. Leg., R.S. (2011).

5.      Plaintiff the Texas Commission on Environmental Quality ("TCEQ") is charged with administering the state's water quality program including issuance of permits, enforcement of water quality rules, standards, orders, permits, and water quality planning. Tex. Water Code §§ 5.013, 5.051, 26.012. TCEQ is a coregulating agency to the United States Environmental Protection Agency and has been delegated the authority to administer the National Pollutant Discharge Elimination System program in Texas for decades. Tex. Water Code § 26.0136(a). TCEQ submitted comments on the Proposed Rule, attached hereto as Exhibit 4. If given the opportunity, TCEQ would have provided comments on the Amended 2023 Rule.

6.      Plaintiff the Railroad Commission of Texas ("RRC") is responsible for the control and disposition of waste and the abatement and prevention of pollution of surface and

subsurface water resulting from activities associated with the exploration, development, and production of oil or gas or geothermal resources and charged with administering the drilling or operating oil or gas wells in Texas for the prevention of waste and protection of correlative rights. Tex. Nat. Res. Code §§ 81.051, 85.045-85.046, 86.011-86.012. RRC is a coregulating agency to the United States Environmental Protection Agency. In doing so, it protects the environment from discharges associated with oil, gas, geothermal, and surface mining activities. Tex. Water Code § 26.131, Tex. Nat. Res. Code § 91.101. RRC submitted comments on the Proposed Rule, attached hereto as Exhibit 5. If given the opportunity, RRC would have provided comments on the Amended 2023 Rule.

7. Plaintiff the Texas Department of Agriculture ("TDA") is charged with the proper development and promotion of agriculture, horticulture, and other industries that grow, process, or produce products in Texas and to maintain economic development in the rural areas of Texas. Tex. Agric. Code §§ 12.002, 12.027, 12.038. TDA submitted comments on the Proposed Rule, attached hereto as Exhibit 6. If given the opportunity, TDA would have provided comments on the Amended 2023 Rule.

8. Plaintiff the Texas General Land Office ("GLO") is a constitutionally created agency empowered to supervise and manage state-owned lands dedicated to the Permanent School Fund. Tex. Const. art. VII, § 1; Tex. Nat. Res. Code §§ 31.051, 51.011, or 51.012. GLO manages millions of acres of state-owned lands and mineral interests to generate revenue for the Permanent School Fund—a constitutionally created fund that collects and distributes hundreds of millions of dollars annually to Texas public schools. Tex. Const. art. VII, §§ 2, 5, Tex. Nat. Res. Code § 11.041.

9.     Plaintiff the Texas Department of Transportation ("TXDOT") is charged with developing the policies for the location, construction, and maintenance of a comprehensive system of state highways and public roads in Texas. Tex. Transp. Code § 201.103. TXDOT partners with the federal government to develop the state highway system, Tex. Transp. Code § 222.031, and submits road projects for environmental reviews. TXDOT submitted comments on the Proposed Rule, attached hereto as Exhibit 7. If given the opportunity, TXDOT would have provided comments on the Amended 2023 Rule.

10.    Plaintiff the State of Idaho, by and through its Attorney General, brings this suit to assert the rights of the state and on behalf of Idaho's citizens. *See* Idaho Const. Art. IV, § 1; Idaho Code § 67-1401(1), (2), (15). Idaho submitted comments on the Proposed Rule, attached hereto as Exhibit 8. If given the opportunity, Idaho would have provided comments on the Amended 2023 Rule.

11.    The Idaho Department of Environmental Quality ("IDEQ") is a coregulator with the United States Environmental Protection Agency and has delegated authority to issue National Pollutant Discharge Elimination System permits. Idaho Code §§ 39-175A to -175F. The IDEQ also has primary responsibility for several other CWA programs, including issuing water quality certifications, setting water quality standards, and establishing water quality plans for "waters of the United States" across Idaho. Idaho Code §§ 39-3601 to -3640; 33 U.S.C. § 1431.

12.    The Idaho Department of Lands ("IDL") is an instrumentality of the Idaho Land Board, a constitutionally created entity consisting of the Governor, Secretary of State, Attorney General, Controller, and Superintendent of Public Instruction. Idaho Const., art. IX,

§ 7. The Land Board—and, by extension, the IDL—has the constitutional duty to "provide for the location, protection, sale or rental" of Idaho's endowment lands, and must manage those lands to maximize the long-term financial return to the various endowment beneficiaries. *Id.* § 8. Any entity that desires to lease state-owned land must obtain a lease from IDL. The IDL manages extensive mineral right properties and surface acreage across the State, including properties situated in, along, or near riparian areas. In addition, many IDL managed properties have streams, ditches, and other minor water features that are ephemeral, intermittent, or isolated in terms of water flow.

13.     The Idaho State Department of Agriculture ("ISDA") is the Idaho agency charged with promoting, developing, protecting the interests of, and regulating certain aspects of Idaho agriculture and horticulture, apiculture, aquaculture, the livestock industries, poultry and fowl raising, wool and fur-bearing animals and their allied industries and to maintain economic development in the rural areas of Idaho. *See* Idaho Code § 22-103.

14.     The Idaho Department of Transportation ("ITD") is charged with developing the policies for the location, construction, and maintenance of a comprehensive system of state highways and public roads in Idaho. Idaho Code § 40-310. ITD partners with the federal government to develop the state highway system, Idaho Code § 40-317, and submits road projects for environmental reviews.

**B. Defendants.**

15.     Defendant United States Environmental Protection Agency ("EPA") is a federal agency within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551(1). Under the CWA, EPA administers pollution control programs over navigable waters.

16.     Defendant Michael S. Regan is the Administrator of the EPA, acting in his official capacity. Administrator Regan signed the 2023 Rule on December 29, 2022 and authorized the publication of the Amended 2023 Rule on August 28, 2023.

17.     Defendant United States Army Corps of Engineers ("USACE") is a federal agency within the meaning of the APA. *See* 5 U.S.C. § 551(1). Under the CWA, USACE administers regulation of discharge of dredged or fill material in navigable waters.

18.     Defendant Lieutenant General Scott A. Spellmon is the Chief of Engineers and Commanding General for the USACE, acting in his official capacity.

19.     Defendant Michael L. Connor is the Assistant Secretary of the Army for Civil Works, acting in his official capacity. Assistant Secretary Connor signed the 2023 Rule on December 28, 2022 and authorized the publication of the Amended 2023 Rule on August 25, 2023.

## <u>JURISDICTION AND VENUE</u>

20.     This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question), 2202 (further necessary relief), and 5 U.S.C. §§ 701–706 (APA). There is a present and actual controversy between the parties, and Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13), and 704. The Court may issue further necessary relief

pursuant to 28 U.S.C. § 2202, 5 U.S.C. §§ 706(1), 706(2)(A) and (C), as well as pursuant to its general equitable powers.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C), because: (1) Defendants are (a) agencies or instrumentalities of the United States, (b) officers or employees of the United States, acting in their official capacities, and (c) operate four USACE Districts in Texas, including the Galveston District—the lead USACE district in Texas— which is located within the Southern District of Texas's Galveston Division, that issues jurisdictional determinations for much of Texas; (2) Plaintiff State of Texas and its agencies are residents of the Southern District of Texas; and (3) no real property is involved in this action.

## BACKGROUND

### A.   The CWA recognizes the States' authority over land and water within its borders.

22.     Congress was clear in enacting the CWA that primary authority over land and waters belongs with the states.

> It is the policy of the Congress to recognize, preserve, and protect the **primary responsibilities and rights of States** to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

> 33 U.S.C. § 1251(b) (emphasis added).

23.     The CWA gives the Federal Agencies limited authority to regulate discharges and dredging only in "navigable waters," s*ee, e.g.*, 33 U.S.C. § 1251(a), 1342(a), 1344(a), defined by Congress as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The meaning of "the waters of the United States, including the territorial seas,"

then, establishes the scope of waters (or land) where Federal Agencies administer discharge, dredge and fill programs, and issue state certifications thereunder.

24.     These federal permits are no small matter. Obtaining a discharge permit is a time-consuming, expensive, and uncertain endeavor. *See* 33 U.S.C. §§ 1342, 1344; *see also U.S. Army Corps of Engineers v. Hawkes Co. Inc.*, 578 U.S. 590, 594–95 (2016) (referencing studies finding that the average applicant spends 788 days and $271,596 for specialized "individual" permits and 313 days and $28,915 for the more readily available "general" permits). "[B]oth agencies have admitted that the permitting process can be arduous, expensive, and long.'" *Sackett*, 598 U.S. at 661 (citing *Hawkes Co.*, 578 U.S., at 594–595, 601). But discharging into a "water of the United States" without a permit can subject any person to civil penalties of up to $32,500 per violation, per day, as well as criminal penalties, including imprisonment. 33 U.S.C. §§ 1311, 1319, 1365; 40 C.F.R. § 19.4; *Hanousek v. United States*, 528 U.S. 1102, 1103 (2000); *see also Sackett*, 598 U.S. at 660 ("The CWA is a potent weapon. It imposes what have been described as 'crushing' consequences 'even for inadvertent violations.'"). Accordingly, the determination of whether a federal permit is required affects transportation, infrastructure, real estate, agriculture, and energy development, including development undertaken by Texas's and Idaho's agencies on state-owned or state-managed lands.

**B.     The meaning of "waters of the United States" has been examined, and reexamined, by the Supreme Court.**

25.     More than 100 years before the CWA, the Supreme Court defined the phrase "navigable waters of the United States" as "navigable in fact" interstate waters. *The Daniel Ball*,

10 Wall. 557, 563 (1871).

26.     In 1974, USACE issued a rule defining "navigable waters" as those waters that have been, are, or may be used for interstate or foreign commerce. 33 C.F.R. § 209.120(d)(1)(1974).

27.     In 1986, USACE issued another rulemaking, expanding its jurisdiction to include traditional navigable waters, tributaries of those waters, wetlands adjacent to those waters and tributaries, and waters used as habitat by migratory birds that either are protected by treaty or cross state lines. *See* Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41,206 (Nov. 13, 1986).

28.     In *United States v. Riverside Bayview Homes, Inc.*, the Supreme Court first addressed the proper interpretation of "the waters of the United States." 474 U.S. 121 (1985). *Riverside Bayview* concerned a wetland that "was adjacent to a body of navigable water," because "the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent's property to . . . a navigable waterway." *Id.* at 131. The Supreme Court upheld the USACE's interpretation of "the waters of the United States" to include wetlands that "actually abut[ted]" traditional navigable waters, finding that "the [USACE] must necessarily choose some point at which water ends and land begins." *Id.* at 132.

29.     Fifteen years later, in *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers ("SWANCC")*, the Supreme Court rejected USACE's assertion of jurisdiction over any waters "[w]hich are or would be used as habitat" by migratory birds. 531 U.S. 159, 164 (2001) (quoting 51 Fed. Reg. 41,217 (1986)). The Court held that the CWA cannot be read to confer jurisdiction over physically isolated, wholly intrastate waters or to ponds that are not

adjacent to open water. *Id.* at 168. The Court reiterated its conclusion in *Riverside Bayview* that federal jurisdiction extends to wetlands that abut navigable waters, because protection of these adjacent, actually abutting wetlands was consistent with congressional intent to regulate wetlands that are "inseparably bound up with 'waters of the United States.'" *Id.* at 172 (quoting *Riverside Bayview*, 474 U.S. at 134).

30.     In *Rapanos v. United States*, the Supreme Court again rejected USACE's assertion of expanded authority over non-navigable, intrastate waters that are not significantly connected to navigable, interstate waters. 547 U.S. 715 (2006). Writing for the plurality, Justice Scalia emphasized that the traditional concept of "navigable waters" must inform and limit the construction of the phrase "the waters of the United States." The plurality found that in going beyond this "commonsense understanding" and classifying waters like "ephemeral streams," "wet meadows," "man-made drainage ditches," and "dry arroyos in the middle of the desert" as "waters of the United States," USACE stretched the statutory text "beyond parody." *Id.* at 734. The plurality also rejected the view that wetlands adjacent to ditches, when those ditches do not meet the definition of "waters of the United States," may nevertheless be subjected to federal regulation on the theory that they are "adjacent to" the remote "navigable waters" into which the ditches ultimately drain. *Id.* at 739–40. Justice Kennedy concurred in the judgment but instead employed a "significant nexus" analysis when determining jurisdictional waters.

## C.   The modern attempts (and failures) of the Federal Agencies to define "waters of the United States."

31.     From 1986 to 2015, the regulatory definition of "the waters of the United States" remained unchanged. *See* 33 C.F.R. 328 (1986). Markedly, during that time, the only

development of the definition was in the judicial branch,[3] consistently narrowing scope of the term from the Federal Agencies' overly broad applications.

32.     In 2015, the Federal Agencies proposed a new definition of "waters of the United States" ("2015 Rule") 80 Fed. Reg. 37,054 (June 29, 2015) with distance-based criteria and categorical inclusion of interstate waters as jurisdictional, regardless of navigability and "tributaries" of traditional or interstate waters even if its connection is broken. Additionally, the 2015 Rule diverged from its proposed rule upon which interested parties commented by defining "adjacency" based on proximity rather than hydrological connection. This Court preliminarily enjoined and, on summary judgment, remanded the 2015 Rule to the Federal Agencies for violating the APA by preventing interested parties from commenting on substantive provisions of the 2015 Rule. *See Texas v. EPA*, No. 3:15-CV-00162, 2018 WL 4518230, at *1 (S.D. Tex. Sept. 12, 2018) (preliminary injunction); *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (summary judgment). The 2015 Rule was vacated by another court because it extended the Federal Agencies' jurisdiction beyond the scope of the CWA and because it read the term navigability out of the CWA by categorically extending jurisdiction to interstate waters regardless of navigability. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1358 (S.D. Ga. 2019). The Federal Agencies ultimately withdrew the 2015 Rule.

33.     In 2020, the Federal Agencies adopted the Navigable Waters Protection Rule ("2020 Rule") 85 Fed. Reg. 22,250 (Apr. 21, 2020), which narrowed the scope of federal jurisdiction and expressly excluded features like "ephemeral streams" and "ditches" and provided regulatory certainty. Although the 2020 Rule was preliminarily enjoined, that

---

[3] During this time, the Federal Agencies issued several guidance documents not codified in rule.

injunction was reversed in *Colorado v. EPA*, 989 F.3d 874, 890 (10th Cir. 2021). The 2020 Rule was vacated and remanded. *Pascua Yaqui Tribe v. EPA*, 557 F. Supp. 3d 949, 956 (D. Ariz. 2021), *appeal dismissed sub nom. Pasqua Yaqui Tribe v. EPA*, No. 21-16791, 2022 WL 1259088 (9th Cir. Feb. 3, 2022).

**D.    The 2023 Rule.**

34.    In December 2021, the Federal Agencies published a proposed rule entitled "Revised Definitions of 'Waters of the United States.'" 86 Fed. Reg. 69372. After providing the public an opportunity to comment, the Federal Agencies published the 2023 Rule on January 18, 2023. 88 Fed. Reg. 3004. Among other things, the Federal Agencies added a severability section to the 2023 Rule that was entirely absent in the proposed rule. 88 Fed. Reg. 3135. The Federal Agencies claimed to "clarify" their intent regarding the severability of the 2023 Rule, but the Federal Agencies failed to express any intent for the 2023 Rule to be severable in the Proposed Rule. 88 Fed. Reg. 3135.

35.    Texas challenged the 2023 Rule the day it was published, and this Court granted Plaintiffs' request for a preliminary injunction before the it became effective. Dkt. 1, and 60. In granting the preliminary injunction, the Court observed "at least two" aspects of the 2023 Rule unlikely to withstand judicial review: its adoption of Justice Kennedy's "significant nexus" analysis from *Rapanos* and the categorical inclusion of interstate waters regardless of navigability. Dkt 60 at 26.

**E.    The *Sackett* decision.**

36.    In 2022, on the first day of its current term, the Supreme Court heard oral argument in *Sackett*, a petition brought by Idaho landowners. That case asked the Supreme

Court to directly address the proper test for determining "waters of the United States" with respect to USACE's claim of authority over soggy land in a mostly built-out subdivision in North Idaho. No. 21-454 (argued Oct. 3, 2022).[4] All nine justices agreed that USACE exceeded its authority. Justice Alito delivered the opinion of the Court, joined by four other justices.

37.     The majority criticized the Federal Agencies' interpretation of the CWA that puts many property owners in a precarious position because it is often difficult to determine whether a particular piece of property contains "waters of the United States" and even "if a property appears dry, application of the guidance in a complicated manual ultimately decides whether it contains wetlands." *Sackett*, 598 U.S. at 669. The Supreme Court recognized that "because the CWA can sweep broadly enough to criminalize mundane activities like moving dirt, this unchecked definition of 'the waters of the United States' means that a staggering array of landowners are at risk of criminal prosecution or onerous civil penalties." *Id.* at 669–70.

38.     The Supreme Court concluded that:

> the CWA's use of "waters" encompasses "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Id.* at 671.

The Court continued to articulate that "we have refused to read 'navigable' out of the statute, holding that it at least shows that Congress was focused on 'its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made.'" *Id.* at 672. The Court repeatedly reaffirmed that States, not the Federal Agencies, have the primary responsibility of water protection. *Id.* at 674, 680, 683.

---

[4] Inexplicably, the Federal Agencies chose to hammer through the 2023 Rule after the argument, rather than await instruction pending from the Supreme Court.

39.     When speaking to wetlands, the Supreme Court found that for wetlands to be jurisdictional, they "must qualify as 'waters of the United States' in their own right. In other words, they must be indistinguishably part of a body of water that itself constitutes 'waters' under the CWA." *Id.* at 676. Meaning, wetlands with "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands," save for "temporary interruptions in surface connection" that may sometimes occur "because of phenomena like low tides or dry spells." *Id.* at 678. "Wetlands that are separate from traditional navigable waters cannot be considered part of those waters, even if they are located nearby." *Id.* at 676. And "a barrier separating a wetland from a water of the United States would ordinarily remove that wetland from federal jurisdiction" unless constructed illegally. *Id.* at 678 n. 16.

40.     The Supreme Court also spoke directly to the 2023 Rule.[5] The Supreme Court found that the 2023 Rule "gives rise to serious vagueness concerns in light of the CWA's criminal penalties" because the definition lacked "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 680. The Court determined specifically that the significant nexus test, as described in the 2023 Rule, was a "freewheeling inquiry" that provides little notice to landowners of their obligations under the CWA in part due to the vague concept

---

[5] It is worth noting that the Supreme Court declined EPA's request for deference in part because Congress would have needed to enact "exceedingly clear language if it wishe[d] to significantly alter the balance between federal and state power and the power of the Government over private property," which an overly broad definition of "waters of the United States" would do. *Sackett*, 598 U.S. at 679-680.

of "similarly situated waters" that was "based on a variety of open-ended factors that evolve as scientific understandings change." *Id.* at 681.

**F.     The Amended 2023 Rule.**

41.     After the *Sackett* opinion, this Court granted the Federal Agencies' motion to stay this litigation to afford the Federal Agencies an opportunity to amend the Final Rule consistent with *Sackett*. Dkt. 81. On September 8, 2023, without providing the public, or Plaintiffs, an opportunity to comment on any proposed rule, the Federal Agencies published another final rule entitled "Revised Definition of 'Waters of the United States'; Conforming." 88 Fed. Reg. 61964, Dkt. 84. The Amended 2023 Rule must be read in conjunction with the 2023 Rule in order to understand the how the Federal Agencies define "waters of the United States." 88 Fed. Reg. 3004. The Federal Agencies rely on the 2023 Rule's severability section and allege that this new rule amends the 2023 Rule so it conforms with the Supreme Court's decision in *Sackett*. 88 Fed. Reg. 61964.

42.     The Federal Agencies justify skipping the required notice and comment period by invoking the APA's good cause exception, claiming the opportunity for the public to comment on the Amended 2023 Rule is unnecessary because it did not involve the agencies' discretion and merely removed what they contend are the invalid portions of the 2023 Rule consistent with *Sackett*. The Federal Agencies further claim the Amended 2023 Rule does not impose any burdens on the regulated community and the quick implementation provides regulatory certainty and clarity.

**G.     The Amended 2023 Rule still exceeds the scope of jurisdiction contemplated in the CWA.**

43.     The Amended 2023 Rule, defines "waters of the United States" to include five

categories, each of which contain sub-categories and additional defined terms:

    i.    Traditional navigable waters, territorial seas, and interstate waters; ("Traditional Waters");

    ii.    Impoundments of any other "waters of the United States," whether or not the impoundment demonstrates connection to a jurisdictional water feature by the Relatively Permanent Standard, ("Jurisdictional Impoundments");

    iii.    Tributaries to Traditional Waters or Jurisdictional Impoundments that demonstrate connection to the Traditional Water or Jurisdictional Impoundment by the Relatively Permanent Standard, ("Jurisdictional Tributaries");

    iv.    Wetlands adjacent to Traditional Waters; or wetlands adjacent to Jurisdictional Impoundments or Jurisdictional Tributaries that demonstrate connection to the Jurisdictional Tributaries or Jurisdictional Impoundment by the Relatively Permanent Standard; and

    v.    Intrastate lakes and ponds not already identified in the other four categories but satisfy the Relatively Permanent Standard with Traditional Waters and Jurisdictional Tributaries.

### *i.* *Traditional Waters.*

44.    Traditional Waters, sometimes referred to as "(a)(1) waters" include waters that are "currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide," "the territorial seas," and "interstate waters." 88 Fed. Reg. at 3143, 88 Fed. Reg. 61968.

45.    The Federal Agencies identify "interstate waters" as "all rivers, lakes, and other waters that flow across, or form a part of, State boundaries," which expressly includes all types of waters "regardless of their navigability," and does not consider whether the interstate water supports commerce. 88 Fed. Reg. at 3027. According to the Federal Agencies, "[i]f a waterbody is determined to be a [Traditional Water], then it is jurisdictional with no need for further evaluation." 88 Fed. Reg. at 3067. Therefore, the Federal Agencies do not have to

perform any jurisdictional evaluation on "interstate waters" prior to exerting federal authority, including those that are not navigable.[6]

46.     Classifying all "interstate waters"— even a minor water features[7] like a ditch, ephemeral stream, or pond —as a "water of the United States," the Federal Agencies read out the cornerstone of the CWA's jurisdiction: "**navigable** waters." 33 U.S.C. § 1251(a), 1342(a), 1344(a). Blanket jurisdiction over non-navigable, "interstate waters" is inconsistent with the *Sackett* opinion. *See Sackett*, 598 U.S. at 672, 679. The Court provided "[a]lthough we have acknowledged that the CWA extends to more than traditional navigable waters, we have refused to read 'navigable' out of the statute, holding that it at least shows that Congress was focused on 'its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made.'" *Id.* at 672. In fact, the *Sackett* court noted that "[w]hile its predecessor encompassed "interstate or navigable waters," 33 U.S.C. § 1160(a) (1970 ed.), the CWA prohibits the discharge of pollutants into only "navigable waters." *Id.* at 661.

---

[6] Although the Federal Agencies removed "interstate wetlands" from this category in the Amended 2023 Rule, the Federal Agencies confirmed the rest of this category would not change. 88 Fed. Reg. 61966.

[7] Additionally, the Amended 2023 Rule's exclusions for ditches do not apply to these non-navigable "interstate waters" "even if the water would otherwise meet the criteria for an exclusion." 88 Fed. Reg. at 3067.

47.    Texas's borders feature many minor, non-navigable water features that just happen to cross state lines as depicted by these highlighted minor water features in the Texas panhandle.



48.    The Amended 2023 Rule also authorizes the cascading expansion of federal authority from these non-navigable "interstate waters" by lumping these minor water features in with Traditional Waters, expanding the Federal Agencies' authority to all tributaries, impoundments, or other waters connected to these minor water features.

### ii.  *Jurisdictional Impoundments.*

49.     Although the Amended 2023 Rule purports to include "impoundments," it does not actually define the term.[8] Jurisdictional Impoundments, referred to as "(a)(2) impoundments," include all impoundments of Traditional Waters (including interstate waters), Jurisdictional Tributaries, or Jurisdictional Wetlands.

50.     In an example of the Amended 2023 Rule allowing the Federal Agencies to "have it both ways," an impoundment is jurisdictional "regardless of the water's jurisdictional status at the time the impoundment was created." 88 Fed. Reg. at 3078. If the water body impounded was not a "water of the United States" at the time it was impounded but has since become a "water of the United States" (as a result of its impoundment) the impoundment is now jurisdictional, even many years later. 88 Fed. Reg. at 3078. And in the case of an impoundment for which the water body impounded was jurisdictional at the time of impoundment but that water body is no longer jurisdictional, the impoundment remains jurisdictional, even if the contributing water body is not. 88 Fed. Reg. at 3078. This catch-all approach requires landowners to both monitor hydrological developments related to tanks and ponds after their creation, and also know the historical classifications of water features located on their properties. Rather than add clarity, the Amended 2023 Rule creates complication and confusion. And, moreover, the practice of ignoring the navigability of the impounded water directly contradicts the *Sackett* opinion, which recognizes that unless

---

[8] The Federal Agencies provide that "impoundments are distinguishable from natural lakes and ponds because they are created by discrete structures (often human-built) like dams or levees that typically have the effect of raising the water surface elevation, creating or expanding the area of open water, or both." 88 Fed. Reg. at 3075.

constructed illegally, "a barrier separating a wetland from a water of the United States would ordinarily remove that wetland from federal jurisdiction." *Sackett*, 598 U.S. at 678, n. 16.

51.     Furthermore, the Federal Agencies qualify impoundments as jurisdictional whether or not the impoundment is hydrologically connected to the Traditional Water, Jurisdictional Tributary, or Jurisdictional Wetland it impounded. The Final Rule would include off-channel impoundments ("an impoundment with no outlet or hydrologic connection to the tributary network"), 88 Fed. Reg. at 3077-3078, and waters wholly separated by dams because "dams generally do not prevent all water flow, but rather allow seepage under the foundation of the dam and through the dam itself," 88 Fed. Reg. at 3076. By including impoundments that under normal operation may, at most, allow seepage, the Federal Agencies show no regard for whether the impoundment bears a relatively permanent connection to a jurisdictional water. The same principle that restricts jurisdiction over wetlands lacking "a continuous surface connection" to proper waters of the United States should equally apply to impoundments. *Sackett*, 598 U.S. at 678.

### iii.     *Jurisdictional Tributaries.*

52.     Jurisdictional Tributaries, or "(a)(3) waters," includes "rivers, streams, lakes, ponds, and impoundments, regardless of their flow regime, that flow directly or indirectly through another water or waters to" Traditional Waters and satisfies the undefined Relatively Permanent Standard. 88 Fed. Reg. at 3083. When the Federal Agencies note that a tributary can flow "indirectly" to a Traditional Water, they acknowledge that "indirect" flow could be through "a number" of downstream waters including non-jurisdictional tributaries, ephemeral

streams, impoundments, ditches, or waste treatment systems, "so long as part of a tributary system that **eventually** flows to" a Traditional Water.[9] 88 Fed. Reg. at 3080. (emphasis added).

53.     Manmade features like ditches[10] or canals may be tributaries—notwithstanding that those features are supposedly excluded from jurisdiction—"so long as they contribute flow to" a Traditional Water. 88 Fed. Reg. at 3080. This would include roadside ditches that carry water only in response to rain events. The Federal Agencies explain "a tributary may flow through another stream that flows infrequently, and only in direct response to precipitation, and the presence of that stream is sufficient to demonstrate that the tributary flows to a [Traditional Water]. Tributaries are not required to have a surface flowpath all the way down to the [Traditional Waters]") 88 Fed. Reg. at 3084.

54.     Those tributaries are Jurisdictional Tributaries when they meet the Relatively Permanent Standard. As implemented by the Federal Agencies, the standard "encompasses surface waters that have flowing or standing water year-round or continuously during certain times of the year." 88 Fed. Reg. 3084. To understand its application, one must analyze a variety of murky phrases to know if the Federal Agencies can claim jurisdiction, e.g., "flowing water," which includes "still water," or "certain times of the year" which may take into account artificial water management regimes. 88 Fed. Reg. 3084-85. As was endemic in

---

[9] To guess at whether a stream is part of a tributary system, the Federal Agencies suggested the public engage in direct observation or try their hand at "various remote sensing resources" like stream gauge data, elevation maps, flood zone maps, and satellite imagery. 88 Fed. Reg. at 3084, fn. 99. This insistence of the use of computer software encourages the Federal Agencies to assign their own jurisdiction without ever viewing the supposed "water" in real world, present-day conditions.

[10] The Federal Agencies purported to make a concession to the many commenters opposed to federal jurisdiction over ditches by excluding ditches, but the exclusion extends only to ditches "excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water." 88 Fed. Reg. at 3144.

the 2023 Rule, and remains in the Amended 2023 Rule, these additional layers of indeterminate analysis create another cascading effect—causing impoundments of these ditches and canals, and wetlands adjacent to these ditches and canals—to become jurisdictional.

### iv.    Jurisdictional Wetlands.

55.    Jurisdictional Wetlands, or "(a)(4) waters," include any wetland "adjacent" to Traditional Waters, and any wetland "adjacent" to a Jurisdictional Impoundment or Jurisdictional Tributary if it meets the Relatively Permanent Standard. 88 Fed. Reg. at 3143.

56.    The Amended 2023 Rule abandons the 2023 Rule's definition of "adjacent," defining the term as "having a continuous surface connection." 88 Fed. Reg. at 61969. But inexplicably, the Federal Agencies conclude that "a continuous surface connection," "does not require surface water to be continuously present between the wetland and the tributary." 88 Fed. Reg. at 3096. But this practice of saying one thing and defining it differently contradicts *Sackett*, which only permits "temporary interruptions in surface connection may sometimes occur because of phenomena like low tides or dry spells." *Sackett* at 678. The Federal Agencies approach flies in the face of the admonition in *Sackett* that wetlands "must be indistinguishable from waters of the United States." *Sackett*, 598 U.S. at 678-679.

### v.    Other Jurisdictional Intrastate Waters.

57.    The Amended 2023 Rule continues to assert jurisdiction over the troublingly broad catch-all unnamed category that can be described as "Other Jurisdictional Intrastate Waters" or "(a)(5) waters." This category includes "intrastate lakes and ponds" not already identified in the other four categories but satisfy the Relatively Permanent Standard. 88 Fed. Reg. 3143, 88 Fed. Reg. 61968-69.

58.     By definition, these Other Jurisdictional Intrastate Waters are not traditional navigable waters, interstate waters, and the territorial seas, nor are they impoundments, adjacent wetlands, or even tributaries to traditional navigable waters, interstate waters, and the territorial seas, impoundments, or wetlands. Instead, the Other Jurisdictional Intrastate Waters are any lakes or ponds that do not fall into another broad category that meets the Relatively Permanent Standard (to Traditional Waters or Jurisdictional Tributaries). 88 Fed. Reg. 61968-69. Of course, the Supreme Court already determined that the CWA does not extend to "ponds that are not adjacent to open water." *SWANCC*, 531 U.S. at 168.

59.     Due to the overly broad definitions and application of the other four categories to determine jurisdictional waters and standards, this category for Other Jurisdictional Intrastate Waters swallows up any potential remaining waters not already under the Federal Agencies' authority.

### vi.      The Relatively Permanent Standard.

60.     The "Relatively Permanent Standard" is undefined but purports to identify relatively permanent, standing or continuously flowing waters connected to Traditional Waters, and waters with a continuous surface connection to such relatively permanent waters. 88 Fed. Reg. 3006. The 2023 Rule gave the Federal Agencies their pick of the Relatively Permanent Standard or the Significant Nexus Standard for purposes of asserting jurisdiction over tributaries, wetlands, and other intrastate waters. The Amended 2023 Rule removed the Significant Nexus Standard, but the Federal Agencies did not provide any additional definition, information, or guidance on the implementation of the Relatively Permanent Standard.

61.     The "Relatively Permanent Standard" includes flows that occur "year-round or

continuously during certain times of the year," but also encompasses "tributaries in which extended periods of standing or continuously flowing water are not linked to naturally recurring annual or seasonal cycles," as well as flows driven by water management practices and effluent-dependent streams. 88 Fed. Reg. 3085. "Certain times of year" apparently includes "extended periods of standing or continuously flowing water occurring in the same geographic feature year after year, except in times of drought." Of course, the Federal Agencies will not say whether that "extended period" is 3 months (as in the pre-2015 implementation),[11] 3 weeks, or 3 days.

62.     Theoretically, the Relatively Permanent Standard does "not include surface waters with flowing or standing water for only a short duration in direct response to precipitation," but the Federal Agencies do not describe how they will implement the contours of that phrase. Tautologically, saying only that the phrase "is intended to distinguish between episodic periods of flow associated with discrete precipitation events versus continuous flow for extended periods of time." 88 Fed. Reg. 3085.

63.     Further complicating application of this standard, under the Amended 2023 Rule a continuous surface connection "does not require surface water to be continuously present between the wetland and the tributary." 88 Fed. Reg. at 3096. Thus, "relatively permanent" tributaries could include stream beds that remain dry for substantial portions of the year.

---

[11] The Federal Agencies have decided not to use the term "seasonal" from the *Rapanos* Guidance because the meaning of "seasonal" may vary and be misunderstood to establish a specific required flow duration. 88 Fed. Reg. 3085.

**F.      The Amended 2023 Rule still harms Texas, Idaho, and their agencies.**

64.     The Amended 2023 Rule still harms Plaintiffs by: (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding the States' authorities over their own land and waters; (3) increasing the States' burdens and diminishing the States' abilities to administer their own programs; (4) undermining the States' sovereignty to regulate their internal affairs as guaranteed by the Constitution; (5) depriving the States of knowledge as to what areas are under federal versus state regulation; and (6) preventing the States from commenting on the scope of regulation.

65.     The Amended 2023 Rule still intrudes upon Texas's and Idaho's sovereignty. The Tenth Amendment provides States with traditional authority over their own lands and waters. *See, e.g.*, *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) (holding that "regulation of land use [is] a function traditionally performed by local governments"). The Amended 2023 Rule shifts primary responsibility over traditional state lands and waters from the States to the federal government.

66.     The Amended 2023 Rule usurps the role of coregulating agencies, which the CWA recognizes as having primary responsibility over environmental management. 33 U.S.C. § 1251(b). This is directly inconsistent with the Supreme Court's precedent. *Sackett*, 598 U.S. at 680. What's more, because the Amended 2023 Rule is vaguely constructed, coregulating agencies—and regulated entities—are unable to determine where the federal government's intrusion onto state regulation ends for Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters.

Despite their effort, the Federal Agencies' interpretation remains "hopelessly indeterminate" *Sackett*, 598 U.S. at 681.

67.     The Amended 2023 Rule subjects Texas, Idaho, and their agencies like the GLO, TXDOT, IDL, and IDT to permitting obligations to obtain CWA section 402 and 404 permits to manage their own land, mineral, and water resources, develop state land for the interests of the Texas Permanent School Fund, or to construct roads and highways in Texas and Idaho. And to determine whether they must obtain section 402 and 404 permits, due to the inconsistency and uncertainty of the Amended 2023 Rule, the States and their agencies must devote staff time and expert resources to deducing where the Federal Agencies may choose to allege jurisdiction over Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters. With four USACE districts in Texas and three districts in Idaho, state agencies and citizens will be forced seek USACE guidance regarding jurisdiction on a case-by-case basis.

68.     The Amended 2023 Rule increases both the costs of energy projects by requiring federal permits where they were previously unnecessary, and uncertainty in agricultural and energy planning because it is difficult, costly, and ultimately uncertain to determine what the Federal Agencies may choose to interpret as Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters.

69.     Development of the agricultural interests of Texas and Idaho, the lifeblood of many rural economies, is regulated and statutorily guarded by TDA and IDA, respectively. The Amended 2023 Rule threatens federal regulation of ditches and canals that carry a

relatively permanent flow of water, as arbitrarily determined by the Federal Agencies on a case-by-case basis. Farmers and ranchers across Texas and Idaho will be saddled with increased costs and uncertainty in determining whether the undefined standards cover their agricultural land and water supplies and subjects their activities to the CWA's water quality standards and permitting requirements.

70.     Likewise, RRC is tasked with supporting the development of the state's energy resources to prevent the waste of Texas's oil and gas resources. Similarly, IDL is tasked with issuing oil and gas leases in Idaho. Oil and gas development activities like exploration and production, refining, and transportation within Texas and Idaho will be stifled by the Amended 2023 Rule, which arbitrarily subjects isolated water features (or dry land) to the CWA's extensive regulatory requirements.

71.     Texas, Idaho, and their agencies were deprived of the ability to comment on the Amended 2023 Rule, which they would have done had they been given the opportunity. Although the Amended 2023 Rule purports to address changes required under *Sackett*, had the Federal Agencies allowed comment, they could have been informed of the ways that the Amended 2023 Rule does not accomplish that objective. And now that the Federal Agencies acknowledge that the Significant Nexus Standard is unlawful and waters must be Relatively Permanent, Plaintiffs should have been afforded the opportunity to comment on the operative standard. In the Proposed Rule, the Federal Agencies instructed commenters multiple times that the Significant Nexus Standard swallowed the Relatively Permanent Standard, describing it only as an "administratively useful" example of Significant Nexus waters. 86 Fed. Reg. at

69395, 69397-98.[12] And this sentiment was reiterated throughout the 2023 Rule. 88 Fed. Reg. at 3007, 3034, 3038, 3042, 3090. Given that the Federal Agencies disclaimed the Relatively Permanent Standard right off the bat by characterizing it as insufficient, most of the comments focused on the broad, complex, and new Significant Nexus Standard.

## CLAIMS FOR RELIEF

72.     The Final Rule with the Conforming Amendment violates the Constitution, the CWA, and the APA for the following reasons, among others:

**A.     Claim One: The Federal Agencies failed to comply with the APA by issuing the 2023 Rule and Amended 2023 Rule without providing the public an opportunity to comment.**

73.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

74.     An agency must follow the requirements in the APA when promulgating a rule, which often requires a "[g]eneral notice of proposed rulemaking" and provide "interested persons an opportunity to participate in the rulemaking through submission" of information. 5 U.S.C. §§ 553(b)-(c). The proposed rule must contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3). The objective is for the agency to provide fair notice in the proposed rulemaking. *Tex. Ass'n of Mfrs. v. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381-82 (5th Cir. 2021) (citing *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007)). An agency's final rule may only differ from the proposed rule to the extent it is a "logical outgrowth" of the proposed rule. *Id.* A proposed

---

[12] "The relatively permanent standard is administratively useful as an example of a subset of waters that will virtually always have the requisite nexus, but, on its own, is insufficiently protective to meet the objective of the Clean Water Act.") 86 Fed. Reg. at 69395.

rule must adequately frame the subjects for discussion so an interested party should have anticipated an agency's final decision. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). Under the APA, a final agency action may be held unlawful and set aside if it is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

75.     When an agency amends a prior rule, it must generally use the same procedures it used to issue the first rule. *Clean Water Action v. EPA*, 936 F.3d 308, 316 (5th Cir. 2019) (citing *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). However, an agency may invoke an exception to the notice and comment requirement when an agency finds a good cause that the process is impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. § 553(b)(B). The agency invoking the exception must provide a brief statement of reasons supporting the finding that good cause exists. *Id.* The good cause exception must be "narrowly construed" and reluctantly accepted "to avoid providing agencies with an 'escape clause'" from the requirements established by Congress. *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (quoting *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)). For a finding of good cause based on the unnecessary prong, the rule must be "insignificant in nature," "inconsequential to the industry and public," or "a minor rule in which the public is not particularly interested." *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754-55 (D.C. Cir. 2001) (quoting *South Carolina v. Block*, 558 F. Supp. 1004, 1016 (D. S.C. 1983) and *U.S. Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act* 30-31, (1947)). The unnecessary prong to the good cause exception cannot be relied on for a rule that is "without a doubt, something about which . . . the public [is] greatly interested." *Util. Solid Waste Activities Grp.*, 236 F.3d at 755.

76.    Between the Proposed Rule and the 2023 Rule, the Federal Agencies added a section regarding the 2023 Rule's severability. 88 Fed. Reg. 3135. The Federal Agencies claim to clarify their intent for the 2023 Rule to be severable with each category and subcategory operating independently if one provision is held invalid by judicial review or operation of law. 88 Fed. Reg. 3135. But the Proposed Rule never presented this subject of severability for the public to comment on before including it in the 2023 Rule. Severability of a rule predicated on cascading undefined definitions defies logic.

77.    When the Federal Agencies modified the 2023 Rule with the Amended 2023 Rule, they did not provide any opportunity for interested parties to comment on a proposed amendment. Instead, the Federal Agencies rely on the severability section from the 2023 Rule to sculpt a new rule and invoke the good cause exception by claiming notice and comment is unnecessary. 88 Fed. Reg. 61964-65. The Federal Agencies explain the sole purpose of the amendment is to be consistent with *Sackett* and this process did not involve the agencies' discretion for the public to opine. *Id.* While changing the unlawful 2023 Rule was mandatory, the determination of *how* to change the 2023 Rule was subject to decision-making and should have been open to the public for comment.

78.    Instead, the Federal Agencies decided that they had enough of the public's participation. They claim that notice and comment would be unnecessary given the nationwide attention every rule attempting to define "waters of the United States" and the CWA's jurisdiction has received. The Federal Agencies recognized the 2023 Rule sparked great public interest and "the agencies reviewed and considered approximately 114,000 comments received on the proposed rulemaking from a broad spectrum of interested parties." 88 Fed. Reg. 3019.

Contrary to the Federal Agencies conclusion that they already received enough comments, and no further opportunity was necessary before finalizing the Amended 2023 Rule, the APA's "good cause exception" does not apply to a rule of such great import and interest. *Util. Solid Waste Activities Grp.*, 236 F.3d at 755.

79.     Moreover, even if the Federal Agencies did not ultimately change the Amended 2023 Rule as a result of notice and comment, the process still holds value to the regulated community. Agencies are required to respond to comments, and through those responses, the Federal Agencies may shed light on how they will implement their consciously vague standards. 5 U.S.C. § 553; *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments received during the period for public comment.").

**B.    Claim Two: The Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of the APA.**

80.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

81.     Under the APA, a final agency action may be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

82.     Even though the CWA only authorizes the Federal Agencies to regulate "navigable waters," defined as "waters of the United States." 33 U.S.C. §§ 1344, 1362(7), the 2023 Rule gives jurisdiction to the Federal Agencies over lands and waters that fall outside of the law established by the CWA, as interpreted by *Riverside Bayview*, *SWANCC*, *Rapanos*, and *Sackett*. In particular, the Amended 2023 Rule's assertion of jurisdiction over Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, and Other Jurisdictional

Intrastate Waters as described is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* 5 U.S.C. § 706(2).

83.     Continuing the "notoriously unclear" regulatory regime that ensnared the Sackett family, the Amended 2023 Rule promises to "put the property rights of ordinary Americans entirely at the mercy" of the Federal Agencies. *Sackett v. E.P.A.*, 566 U.S. 120, 132 (2012) (Alito, J., concurring). Because the controlling law only authorizes the Federal Agencies to regulate "navigable waters" and the Amended 2023 Rule effectively removes any requirement of "navigability," the Federal Agencies have acted arbitrarily and not in accordance with the law in promulgating the Final Rule. *See Sackett*, 598 U.S. at 672.

## C.     Claim Three: The Final Rule is in excess of the Federal Agencies' statutory authority, in violation of the APA.

84.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

85.     Under the APA, a final agency action may be held unlawful and set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

86.     In promulgating the Amended 2023 Rule, the Federal Agencies purport to give themselves jurisdiction over Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters in excess of the grant of jurisdiction made to the Federal Agencies by the plain language of the CWA and interpretative precedent. Accordingly, in adopting the Amended 2023 Rule, the Federal Agencies exceeded their statutory jurisdiction, authority, and limitations under the CWA. 5 U.S.C. § 706(2)(C).

87.     Additionally, under the major questions doctrine, the Federal Agencies are not authorized to determine their own jurisdiction. As the Supreme Court has explained, an agency's claim of authority through the rulemaking process must be clearly supported by statute before providing an agency "'unheralded' regulatory power over a 'significant portion of the American economy.'" *W. Va. v. EPA*, 142 S. Ct. 2587, 2608 (2022). Therefore, an agency's claim of authority must be rejected when: (1) the rule concerns an issue of economic and political significance; and (2) Congress has not clearly empowered the agency with the statutory authority. As discussed in *Sackett*, the Supreme Court acknowledged the States retaining primary regulatory authority over their land and water and any "overly broad interpretation of the CWA's reach would impinge on this authority." *Sackett*, 598 U.S. at 679-80. The Supreme Court thus requires "exceedingly clear language" before the Federal Agencies "significantly alter" the balance of power they grant themselves in the Amended 2023 Rule. *Sackett*, 598 U.S. at 679-80; *see also West Virginia*, 142 S. Ct. at 2608 (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)).

88.     Because the Amended 2023 Rule seeks to subject Texas, Idaho, their agencies, and their citizens to a costly and confusing regulatory framework affecting large, crucial portions of the economy—agricultural development, construction and maintenance of infrastructure, energy development, and management of State-owned lands to name a few— with the risk of potentially incurring daily civil and/or criminal penalties of non-compliance. Moreover, the Federal Agencies seek to expand their own authority without clear statutory support when the CWA itself specifically recognizes, preserves, and protects the primary responsibilities of the states to plan the development and use of their land and water resources.

*See Sackett*, 598 U.S. at 674, 680. Thus, because Congress has not clearly empowered the Federal Agencies to interpret their own jurisdiction and exert unheralded power over the American economy, the Federal Agencies exceeded their statutory jurisdiction, authority, and limitations under the CWA. 5 U.S.C. § 706(2)(C).

**D.     Claim Four: The Final Rule intrudes on Plaintiffs' sovereignty, in violation of the APA, the Tenth Amendment, and the Commerce Clause to the U.S. Constitution.**

89.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

90.     Under the APA, a final agency action may be held unlawful and set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

91.     Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people." U.S. Const., amend. X. The federal government lacks a general police power and may only exercise powers expressly granted to it by the Constitution. *See* U.S. Const., amend. X.; *United States v. Lopez*, 514 U.S. 549, 566 (1995). Land-use planning, regulation, and zoning are not enumerated powers granted to the federal government. *See SWANCC*, 531 U.S. at 174 (recognizing the "States' traditional and primary power over land and water use"); *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("Among the rights and powers reserved to the States under the Tenth Amendment is the authority to its land and water resources."); *F.E.R.C. v. Mississippi*, 456 U.S. 742, 768, n.30 (1982) ("regulation of land use is perhaps the quintessential state activity"). The courts traditionally expect "a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority." *Rapanos*, 547 U.S. at

738 (citing *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994)). The phrase "the waters of the United States" does not constitute such a clear and manifest statement. *Id.*

92.     The CWA was enacted pursuant to Congress's authority to regulate interstate commerce under Article I, Section 8 of the Constitution. As a result, the Federal Agencies violate the Constitution when their enforcement of the CWA extends beyond the regulation of interstate commerce. *See SWANCC*, 531 U.S. at 173. In enacting the CWA, instead of authorizing the intrusion onto state sovereignty, the CWA instructs the Federal Agencies to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources . . . ." 33 U.S.C. § 1251(b); *Sackett*, 598 U.S. at 674, 680.

93.     The Amended 2023 Rule regulates intrastate and interstate waters without regard to whether those waters may have a substantial relation to interstate commerce. *Cf. Lopez*, 514 U.S. at 558–59. In particular, the Final Rule's assertion of jurisdiction over Traditional Waters, Jurisdictional Impoundments, Jurisdictional Tributaries, Jurisdictional Wetlands, and Other Jurisdictional Intrastate Waters greatly exceeds those waters that may impact interstate commerce. Accordingly, the Amended 2023 Rule is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Amended 2023 Rule also intrudes on the environmental regulatory powers vested to the states. U.S. Const., amend. X. The Amended 2023 Rule also exceeds Congress's authority to regulate interstate commerce. U.S. Const., art. I, § 8 8. And the Amended 2023 Rule is contrary to the CWA's protection of state sovereignty, and therefore, violates the CWA. 33 U.S.C. § 1251(b)

E.       **Claim Five: The Final Rule intrudes on Plaintiffs' due process rights, in violation of the APA and the Fifth Amendment.**

94.      Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

95.      Under the APA, a final agency action may be held unlawful and set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

96.      The CWA contains criminal and civil penalties for failure to obtain permits before discharging or dredging in "waters of the United States." The Due Process Clause of the Fifth Amendment requires adequate notice of what conduct is forbidden before criminal or civil penalties may attach and may not be so incomplete, vague, indefinite, or uncertain that persons of common intelligence must necessarily guess at its meaning and as to its application. *See e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964). The Federal Agencies interpretation of "waters of the United States" can give "rise to serious vagueness concerns in light of the CWA's criminal penalties." *Sackett*, 598 U.S. at 680.

97.      The Amended 2023 Rule fails to give adequate notice of what is, and what is not, "waters of the United States." By employing vague, undefined terms, and unweighted arbitrary factors that may or may not be employed by the Federal Agencies, the Amended 2023 Rule does not give adequate notice of what the terms "relatively permanent," "certain times of year," "continuous surface connection," "interstate waters," "impoundments," "tributaries," are defined and interpreted as meaning. Accordingly, the Final Rule fails to give fair notice of what conduct is forbidden under the CWA and grants impermissible ad hoc discretion to the Federal Agencies, guaranteeing arbitrary enforcement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(1) Adjudge and declare the rulemaking titled "Revised Definition of 'Waters of the United States:'"

    a. was not a logical outgrowth from the proposed rule,

    b. was issued without proper APA procedure,

    c. is unlawful because it is inconsistent with, and in excess of, the EPA's and USACE's authority under the CWA,

    d. is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and otherwise contrary to constitutional rights and powers, and

    e. violates the Constitution of the United States;

(2) remand the Amended 2023 Rule;

(3) vacate the Amended 2023 Rule;

(4) award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

(5) grant Plaintiffs such additional and further relief as the Court may deem just, proper, and necessary.

Dated: November 13, 2023

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

*/s/ J. Amber Ahmed*
J. AMBER AHMED
Attorney-in-Charge
Assistant Attorney General
State Bar No. 24080756
Southern District No. 3135176

GRANT DORFMAN
Deputy First Assistant Attorney
General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

amber.ahmed@oag.texas.gov

LOGAN HARRELL
Assistant Attorney General
State Bar No. 24106054
Southern District No. 3835750
logan.harrell@oag.texas.gov

H. CARL MYERS
Assistant Attorney General
State Bar No. 24046502
Southern District No. 852368
carl.myers@oag.texas.gov

OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel:    (512) 463-2012
Fax:    (512) 320-0911

**COUNSEL FOR STATE OF TEXAS
PLAINTIFFS**

RAÚL R. LABRADOR
Attorney General of Idaho

JOSHUA N. TURNER
Acting Solicitor General

SCOTT L. CAMPBELL
Deputy Attorney General
Chief, Energy and Natural Resources
Division
scott.campbell@ag.idaho.gov

*/s/ Joshua N. Turner*
JOSHUA N. TURNER
Acting Solicitor General
Idaho Bar No. 12193
PRO HAC VICE
Office of the Attorney General of Idaho
P.O. Box 83720
Boise, Idaho 83720-0010
Tel:    (208) 334-2400
Fax:    (208) 854-8071
josh.turner@ag.idaho.gov

**COUNSEL FOR STATE OF IDAHO**

## CERTIFICATE OF SERVICE

I certify that on November 13, 2023, a copy of the foregoing document was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on all attorneys in this case.

/s/ J. Amber Ahmed
J. AMBER AHMED
Assistant Attorney General