**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:23-cv-17 |
| | § | (consolidated with No. 3:23-cv-20) |
| U.S. ENVIRONMENTAL | § | |
| PROTECTION AGENCY, et al., | § | |
| | § | |
| Defendants, | § | |
| | § | |
| BAYOU CITY WATERKEEPER, | § | |
| | § | |
| Intervenor-Defendant. | § | |

**INTERVENOR-DEFENDANT'S COMBINED MOTION FOR SUMMARY**
**JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY**
**JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Summary of Argument ........................................................................................... 1

Nature and Stage of the Proceedings .................................................................... 2

Standard of Review ................................................................................................ 2

Background ............................................................................................................. 3

Argument ................................................................................................................ 6

I.      *Sackett v. EPA* Has Put Plaintiffs' Claims to Rest ............................... 6

II.     Plaintiffs Fail to Show that the Amended Regulations Cannot be Lawfully Applied ................................................................................................... 9

III.    Even if the Court is Inclined to Entertain Plaintiffs' Claims Regarding the Amended Regulations, Each Fails on the Merits ............................... 13

        A.      The Amended Regulations Are Squarely within EPA's Authority Under the Clean Water Act ............................................................ 13

        B.      The Amended Regulations Are a Valid Exercise of Authority Under the Commerce Clause ........................................................... 30

        C.      The Amended Regulations Do Not Violate the Tenth Amendment ...... 31

        D.      The Amended Regulations Do Not Violate the Due Process Clause .... 32

        E.      The Amended Regulations Do Not Implicate the Major Questions Doctrine, nor Do They Constitute an Improper Delegation of Legislative Powers ........................................................................................... 35

Conclusion ............................................................................................................. 37

Certificate of Service ............................................................................................. 39

i

# TABLE OF AUTHORITIES

**CASES**

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
715 F.2d 897 (5th Cir. 1983)...................................................................... 6, 15

*City of Milwaukee v. Illinois,*
451 U.S. 304 (1981) ............................................................................... 27

*Cnty. of Maui v. Hawaii Wildlife Fund,*
140 S. Ct. 1462 (2020)........................................ 11, 12, 15, 16, 18, 24, 34

*Garcia v. San Antonio Metro. Transit Auth.,*
469 U.S. 528 (1985) ............................................................................... 31

*Grinin v. Johnson,*
224 F. Supp. 3d 525 (S.D. Tex. 2016) ..................................................... 2

*Illinois v. City of Milwaukee,*
406 U.S. 91 (1972) ................................................................................. 30

*Int'l Paper Co. v. Ouellette,*
479 U.S. 481 (1987) ............................................................................... 31

*Kolender v. Lawson,*
461 U.S. 352 (1983) ............................................................................... 32

*Lewis v. United States,*
88 F.4th 1073 (5th Cir. 2023) .......................................................... 17, 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ............................................................................... 30

*PPL Montana, LLC v. Montana,*
565 U.S. 576 (2012) ............................................................................... 30

*Rapanos v. United States,*
547 U.S. 715 (2006) ......................... 4, 5, 14, 19, 25, 26, 29, 34, 35, 37

*Reno v. Flores,*
507 U.S. 292 (1993) ................................................................................. 9

*Roark & Hardee LP v. City of Austin,*
522 F.3d 533 (5th Cir. 2008) ................................................................. 32

*S.D. Warren Co. v. Maine Bd. of Envtl. Prot.,*
547 U.S. 370 (2006) ............................................................................... 21

*Sabre, Inc. v. Dep't of Transp.,*
429 F.3d 1113 (D.C. Cir. 2005) ............................................................. 11

*Sackett v. Env't Prot. Agency,*
598 U.S. 651 (2023). ....................................................................... *passim*

*United States v. Abbate*,
  970 F.3d 601 (5th Cir. 2020) ..................................................................... 32

*United States v. Brink*,
  795 F. Supp. 2d 565 (S.D. Tex. 2011) .............................................. 14, 18

*United States v. Chem. Found.*,
  272 U.S. 1 (1926) ........................................................................................ 11

*United States v. Lipar*,
  665 F. App'x 322 (5th Cir. 2016) .............................................................. 15

*United States v. Lucas*,
  516 F.3d 316 (5th Cir. 2008) ...................................................... 14, 19, 32

*United States v. Riverside Bayview Homes, Inc.*,
  474 U.S. 121 (1985) ...................................................................... 26, 35, 36

*United States v. Williams*,
  553 U.S. 285 (2008) ................................................................................... 32

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) ................................................................................... 33

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ....................................................................... 35, 36

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ................................................................................... 36

**STATUTES**

33 U.S.C. § 1251(a) ................................................................................ 1, 3, 27

33 U.S.C. § 1251(b) ................................................................................... 26, 27

33 U.S.C. § 1344(f) ............................................................................................ 6

33 U.S.C. § 1362(12) ........................................................................................ 3

33 U.S.C. § 1362(14) ........................................................................................ 3

33 U.S.C. § 1362(7) .................................................................................... 3, 36

33 U.S.C. § 1370 ............................................................................................. 31

5 U.S.C. § 706(2) ............................................................................................... 3

Idaho Code Ann.§ 39-3601 ............................................................................ 28

Texas Water Code Ann. § 26.017(5) ............................................................ 28

**FEDERAL REGULATIONS**

42 Fed. Reg. 37121 (July 19, 1977) ...................................................... 16, 22

88 Fed. Reg. 3004 (Jan. 18, 2023) ....................................................... *passim*

88 Fed. Reg. 61964 (Sept. 8, 2023) ....................................................................... *passim*

## LEGISLATIVE HISTORY

S. Rep. No. 92–414 (1971) ........................................................................ 3

## CONSTITUTIONAL PROVISIONS

U.S. Const., art. I, § 8......................................................................... 30

## SUMMARY OF ARGUMENT

The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In carrying out that objective, the U.S. Army Corps of Engineers ("Corps") and Environmental Protection Agency ("EPA") (collectively, "Agencies") must interpret the term "waters of the United States," which governs the Act's reach.

In May 2023, the Supreme Court decided *Sackett v. EPA*, which narrowed the scope of federal jurisdiction under the Clean Water Act as it pertains to wetlands adjacent to covered waters. 598 U.S. 651 (2023). Four months after the *Sackett* decision, the Agencies amended the regulations put in place in their January 2023 rulemaking to conform with *Sackett*. *See* 88 Fed. Reg. 61964 (Sept. 8, 2023) ("Conforming Rule"); 88 Fed. Reg. 3004 (Jan. 18, 2023) ("2023 Rule"). Specifically, the resulting "Amended Regulations" removed the significant nexus standard from the definition of "waters of the United States" and amended the definition of "adjacent." 88 Fed. Reg. at 61966. The Agencies confirmed that they would interpret the remainder of the definition of "waters of the United States" in the 2023 Rule consistent with *Sackett*'s holdings. 88 Fed. Reg. at 61966.

Plaintiffs are not entitled to summary judgment because *Sackett* has settled their questions about the scope of the Clean Water Act. Unsatisfied, they ask this Court to go beyond the bounds of that decision and place additional limits on federal clean water

1

jurisdiction. The Court should decline that invitation because Plaintiffs fail to demonstrate that the Conforming Rule cannot be lawfully applied as written.

In addition, the Conforming Rule is well within EPA's statutory authority under the Clean Water Act and presents no constitutional problems. Each of Plaintiffs' myriad critiques of each section of the Agencies' definition of "waters of the United States" is meritless and should be rejected.

Defendant-Intervenor Bayou City Waterkeeper has reviewed the Federal Defendants' Combined Motion for Summary Judgment and Opposition to Plaintiffs' Motions for Summary Judgment, Dkt. No. 108, and has endeavored to avoid unnecessary repetition of those arguments.

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs filed amended complaints on November 13, 2023, challenging the Amended Regulations, Dkt. Nos. 90 & 91, which the Agencies and the Waterkeeper answered on December 13, Dkt. Nos. 99-102. Pursuant to the Parties' Proposal for Further Proceedings, Dkt. No. 104, Plaintiffs then moved for summary judgment on February 2, 2024. Dkt. Nos. 106 ("State MSJ") & 107 ("Association MSJ").

## STANDARD OF REVIEW

When reviewing final agency action under the Administrative Procedure Act, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Grinin v. Johnson*, 224 F. Supp. 3d 525, 530 (S.D. Tex. 2016). In this context, the Court's

role is to determine whether the Amended Regulations must be held unlawful and set aside under the standards set out in 5 U.S.C. § 706(2).

## BACKGROUND

In 1972, Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The "major purpose" of the Act was "to establish a *comprehensive* long-range policy for the elimination of water pollution." S. Rep. No. 92–414, at 95 (1971), 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–1, p. 1511 (1971) (emphasis added). To that end, the Clean Water Act prohibits "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The Act broadly defines the term "navigable waters" as "the waters of the United States, including the territorial seas." *Id*. at 1362(7).

The Agencies developed the 2023 Rule to "establish limits that appropriately draw the boundary of waters subject to Federal protection[,]" and provide additional clarifications to improve the efficiency and consistency of jurisdictional determinations. 88 Fed. Reg. at 3005-07. The Rule was founded on the "familiar 1986 regulations, with amendments to reflect the agencies' construction of limitations on the scope of 'waters of the United States' based on the law, the science, and agency expertise." *Id.* at 3024-29. Under the Rule, the Agencies could establish jurisdiction under either the relatively permanent standard of the *Rapanos* plurality opinion or Justice Kennedy's significant

nexus standard. *Id.* at 3006 (describing both standards); *Rapanos v. United States*, 547 U.S. 715, 757 (2006) (Scalia, J., plurality); *id.* at 786-87 (Kennedy, J., concurring).

After promulgation of the 2023 Rule, the Supreme Court decided *Sackett v. EPA*, a case in which property owners challenged the Agencies' assertion of Clean Water Act jurisdiction over wetlands located on their property. 598 U.S. 651 (2023). In its opinion, the Supreme Court (i) rejected Justice Kennedy's significant nexus standard in the *Rapanos* case; (ii) adopted Justice Scalia's relatively permanent standard, which commanded a plurality of votes in *Rapanos*; and (iii) clarified that only those wetlands with a continuous surface connection to a covered water of the United States are subject to federal jurisdiction. *Id.*

Following the *Sackett* decision, the Agencies promulgated the Conforming Rule, which removed the significant nexus standard from the 2023 Rule's definition of "waters of the United States" and amended the 2023 Rule's definition of "adjacent." 88 Fed. Reg. at 61966. The Agencies concluded that "under the decision in *Sackett*, waters are not jurisdictional under the Clean Water Act based on the significant nexus standard," and that "wetlands are not defined as 'adjacent' or jurisdictional . . . solely because they are 'bordering, contiguous, or neighboring . . . [or] separated from other 'waters of the United States' by man-made dikes or barriers, natural river berms, beach dunes and the like." *Id.* (alterations in the original). The Agencies explained that they "will continue to interpret the remainder of the definition of 'waters of the United States' in the 2023 Rule consistent with the *Sackett* decision." 88 Fed. Reg. at 61966.

4

The Amended Regulations are consistent with the text, purpose, and structure of the Clean Water Act. 88 Fed. Reg. 3004, 3019-24. They are also grounded in an extensive scientific record, including hundreds of peer-reviewed scientific articles. *Id.* at 3029-33. Over the course of the rulemaking process leading up to promulgation of the 2023 Rule, the Agencies engaged state, tribal, and local governments, sought advice from the Science Advisory Board, and reviewed 114,000 public comments. *Id.* at 3018-19.

The Amended Regulations establish express limits on the scope of waters protected by the Clean Water Act, as informed by the Supreme Court's decision in *Sackett* and the *Rapanos* plurality opinion. 88 Fed. Reg. at 61966; 88 Fed. Reg. at 3038-42 (discussing the relatively permanent standard from *Rapanos*). In particular, the Amended Regulations reaffirm the "Relatively Permanent Standard," a key limiting principle from the 2023 Rule for assessing whether tributaries, adjacent wetlands, or other waters qualify as waters of the United States. 88 Fed. Reg. at 61966; 88 Fed. Reg. at 3038-42. When upstream waters have a relatively permanent connection to the traditional navigable waters, the territorial seas, and interstate waters, the Amended Regulations ensure that those upstream waters fall within the scope of the Clean Water Act. 88 Fed. Reg. at 61966; 88 Fed. Reg. at 3006. By contrast, where waters do not have a relatively permanent connection to downstream jurisdictional waters, the Regulations leave regulatory authority to the tribes and states. 88 Fed. Reg. at 61966; 88 Fed. Reg. at 3005. The Agencies' use of this limitation is "supported by the relevant provisions of the Clean Water Act and the statute as a whole, the scientific record, and the agencies' experience

5

and technical expertise after more than 45 years of implementing the longstanding pre-2015 regulations defining 'waters of the United States.'" 88 Fed. Reg. at 61966; 88 Fed. Reg. at 3033. Though the relatively permanent standard generally requires less information gathering and assessment, *see* 88 Fed. Reg. at 3038, the Corps provides the public with jurisdictional determinations free of charge. 88 Fed. Reg. at 3033-34; *see Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 917 (5th Cir. 1983) (endorsing jurisdictional determinations as a means to "obtain[] a precise delineation" of jurisdictional waters).

The Amended Regulations continue to include eight exclusions to "waters of the U.S." Among these are the longstanding exclusions for prior converted cropland and waste treatment systems, with minor modifications. 88 Fed. Reg. at 3103. The Amended Regulations also include exclusions for certain ditches, artificially irrigated areas, artificial lakes or ponds, artificial reflecting pools or swimming pools, waterfilled depressions, and swales and erosional features. *Id*. In addition, the Clean Water Act exempts activities such as the normal farming activities, construction and maintenance of irrigation ditches and the maintenance of drainage ditches. *See* 33 U.S.C. § 1344(f).

## ARGUMENT

### I.   *Sackett v. EPA* Has Put Plaintiffs' Claims to Rest.

At the outset of this case, both sets of Plaintiffs asked this Court to stay the 2023 Rule pending the Supreme Court's decision in *Sackett*, which would, Plaintiffs explained, "provide further direction on 'waters of the United States' and likely significantly impact

the Rule's implementation." State PI at 25; *see also* Association PI at 27. On May 25, 2023, the Supreme Court issued its opinion in *Sackett v. EPA*, which (i) rejected Justice Kennedy's significant nexus standard in the *Rapanos* case, (ii) affirmed the *Rapanos* plurality's relatively permanent standard; and (iii) clarified that only those wetlands with a continuous surface connection to a covered water of the United States are subject to federal jurisdiction. The Agencies responded by amending the definition of "waters of the United States" to conform with the *Sackett* decision.

Yet Plaintiffs still remain unsatisfied. The Supreme Court's answers to questions about the scope of federal jurisdiction do not go far enough in Plaintiffs' view, and so they have come back before this Court seeking to further curtail the Clean Water Act. In so doing, Plaintiffs ask this Court to do what the Supreme Court declined to do in *Sackett*, which is to unravel multiple longstanding definitions that are scientifically supported and judicially ratified and which the Agencies have successfully implemented for almost fifty years.

Plaintiffs ask too much. Although *Sackett* was not a case about the validity of the 2023 Rule, the Supreme Court considered the Sacketts' claims in the context of the 2023 Rule and evinced familiarity with its contents. *See* 598 U.S. at 668-69. The Court's opinion explicitly references the promulgation of the 2023 Rule and acknowledges the Rule's coverage of "traditional navigable waters, interstate waters, and the territorial seas, as well as their tributaries and adjacent wetlands," as well as "any '[i]ntrastate lakes and ponds, streams or wetlands' that either have a continuous surface connection to

categorically included waters or have a significant nexus to interstate or traditional navigable waters." *Id*. In deciding *Sackett*, the Supreme Court indicated which aspects of the Agencies' definition of "waters of the United States" it found unlawful—the significant nexus test and the definition of adjacent wetlands, leaving in place other elements that one may reasonably assume are lawful. In particular, the Court endorsed the *Rapanos* plurality opinion's "relatively permanent test," which is set forth in the Amended Regulations. *Id*. at 671.

*Sackett* therefore represents the Supreme Court's latest pronouncement on the scope of "waters of the United States" and is now the law of the land. All future jurisdictional determinations would have followed *Sackett* regardless of whether the Agencies decided to memorialize that reality through rulemaking. Although not required to do so, the Agencies have chosen to proceed with incorporating the *Sackett* decision into the Conforming Rule, which they promulgated without soliciting public comment, citing the need for expediency. While the Waterkeeper believes that the Conforming Rule correctly implements *Sackett*'s directives without the exercise of agency discretion, it does not necessarily follow that the agency can forego notice and comment. If the Court finds errors with the Agencies' procedural approach, the Waterkeeper respectfully suggests that the appropriate remedy would be to remand to the agency for repromulgation with proper notice and comment.

**II.    Plaintiffs Fail to Show that the Amended Regulations Cannot be Lawfully Applied.**

Rather than await application of the Amended Regulations, Plaintiffs bring a facial challenge, asking the Court to speculate as to how the Regulations will be applied and implemented. To prevail, Plaintiffs must establish "no set of circumstances" under which the Regulations would be valid. *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quotation omitted). Yet Plaintiffs fall short of demonstrating that the Amended Regulations as written will inherently sweep up waters that are non-jurisdictional under the Supreme Court's guidance. The Amended Regulations implement *Sackett*'s directives, including its endorsement of the reasoning in Justice Scalia's *Rapanos* plurality opinion. At bottom, Plaintiffs' complaints about the Amended Regulations boil down to (i) disagreement with the extent to which the Amended Regulations import language verbatim from the *Sackett* decision; (ii) speculation as to how the Amended Regulations may or may not be applied; and (iii) discontent with the inherently case-specific nature of jurisdictional determinations. These arguments are unpersuasive.

What Plaintiffs identify as contradictions between the Amended Regulations and *Sackett* are very often differences in word usage. For example, the Amended Regulations define the term "adjacent" as "having a continuous surface connection," consistent with and using direct terminology from *Sackett*. *Compare* 88 Fed. Reg. at 61969, *with Sackett,* 598 U.S. at 678 (wetlands must have a "continuous surface connection" to a covered water); 684 (same). Yet Plaintiffs make much of the Regulations' omission of additional language from *Sackett* regarding a wetland being "as a practical matter indistinguishable"

from a covered water. State MSJ at 18; Association MSJ at 22-23. Rulemaking is, however, ultimately not a recitation exercise. Agencies are required to regulate consistent with Supreme Court precedent, but they need not repeat every word from a Supreme Court opinion in the regulatory text. Here, the Agencies summarized the Supreme Court's conclusions in *Sackett*, identified those portions of the 2023 Rule that were no longer valid under the Court's interpretation of "waters of the United States," and removed or altered those parts of the 2023 Rule that are incompatible with that interpretation. *See* 88 Fed. Reg. at 61965-66.

Because Plaintiffs cannot show any inherent tension between the Amended Regulations and Supreme Court precedent, they instead rely on hypotheticals regarding how the Regulations might be applied. For example, Association Plaintiffs' declarant Mr. Robert Reed contends that certain ditches "may" or "may not" be jurisdictional under the Rule. Declaration of Robert E. Reed ("Reed Dec." or "DKT 107-5 Ex. D") at 83. This is pure speculation, especially because the Conforming Rule did not alter the 2023 Rule's approach for ditches, which is consistent with the Agencies' longstanding practice. 88 Fed. Reg. at 3082. Plaintiffs' arguments also by and large assume that the Agencies will apply the Amended Regulations in contravention to *Sackett*'s guidance. For example, Association Plaintiffs claim that the Conforming Rule "requires them to obtain CWA permits to work around features that are simply not WOTUS" and "will require them to obtain costly permits when none should be needed." Association MSJ at 12-13. These would only be "impossible—and unpredictable" burdens, *id.* at 13, if one assumes that

10

the Agencies will apply the Amended Regulations in ways that exceed the limits articulated in *Sackett* and the plain language of the Conforming Rule. *See* 88 Fed. Reg. at 61966 ("The agencies will continue to interpret the remainder of the definition of 'waters of United States' in the 2023 Rule consistent with the *Sackett* decision."). Agencies are entitled to a presumption of regularity in the discharge of their duties and Plaintiffs offer nothing to rebut that presumption. *See United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926). Rather than engage in speculation about how the Agencies might implement the Amended Regulations, this Court is better served by deferring review until it can be conducted in the context of a jurisdictional determination. *See Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005) (explaining that "a later as-applied challenge will present the court with a richer and more informative factual record").

　　Plaintiffs repeatedly label the Agencies' definition of "waters of the United States" as "vague," "uncertain," or "open-ended" simply because definitional terms and phrases must be applied in context to determine jurisdiction. But the use of "case-specific determinations" is inherent in assessing jurisdiction, and the Supreme Court has never held otherwise. 88 Fed. Reg. at 3042. On the contrary, the Supreme Court recently endorsed the use of fact-specific analysis under a different section of the Clean Water Act. In *County of Maui, Hawaii v. Hawaii Wildlife Fund,* the Supreme Court held that the Act requires a permit for the discharge of a pollutant from a point source that travels through groundwater into navigable waters if that discharge is the "*functional equivalent of a direct discharge*." 140 S. Ct. 1462, 1476 (2020). The majority opinion rejected

11

alternative bright-line tests that would have excused all indirect discharges—no matter how short the conveyance from point source to navigable waters—from federal permitting requirements. *See id*. at 1473-76. Acknowledging that its chosen phrase, "functional equivalent," "does not, on its own, clearly explain how to deal with middle instances," the Court nonetheless observed that "context imposes natural limits" on the definitional terms in the statute. *Id.* at 1476. Using "more specific language" would not account for the multitude of "factors that may prove relevant depending upon the circumstances of a particular case." *Id.* at 1476 (parentheticals omitted). Nonetheless, the Court expressed confidence that courts can, over time, "provide guidance through decisions in individual cases," guided by the "underlying statutory objectives" of the Clean Water Act. *Id.* at 1477. In addition, the Court explained, EPA "can provide administrative guidance" in the form of, for example, "grants of individual permits, promulgation of general permits, or the development of general rules." *Id.* at 1477. In sum, the Supreme Court has said, in no uncertain terms, that "broad" statutory phrases that capture a range of applied circumstances are both perfectly acceptable and often necessary to the advancement of the statutory purposes Congress seeks to achieve.

III.   **Even if the Court is Inclined to Entertain Plaintiffs' Claims Regarding the Amended Regulations, Each Fails on the Merits.**

    A.  **The Amended Regulations Are Squarely within EPA's Authority Under the Clean Water Act.**

        *1.  The Amended Regulations Retain the Longstanding Definition of Relatively Permanent, Which the Supreme Court Endorsed in Sackett.*

In *Sackett*, the Supreme Court rejected Justice Kennedy's significant nexus standard and endorsed the relatively permanent standard as set forth in Justice Scalia's *Rapanos* plurality opinion. *See* 88 Fed. Reg. at 61966. Accordingly, the Agencies revised the 2023 Rule to eliminate the significant nexus standard, thereby resolving the vast majority of issues that Plaintiffs raised at the outset of this case. *Id.* Yet Plaintiffs now take issue with the relatively permanent standard, even though *Sackett* endorsed that approach. Their arguments lack support in the record and the law.

*First*, Plaintiffs contend that the Agencies fail to provide any "definition, information, or guidance on the implementation of the Relatively Permanent Standard." State MSJ at 19; Association MSJ at 18. But *Sackett* "adopted the *Rapanos* plurality standard," and those sections of the 2023 Rule preamble that discuss the *Rapanos* plurality standard "remain relevant to implementing" the Amended Regulations.[1] Indeed, the 2023 Rule preamble defines the term "relatively permanent standard" *multiple times*: the standard "refers to the test to identify relatively permanent, standing or continuously flowing waters connected to paragraph (a)(1) waters, and waters with a continuous

---

[1] *See* Joint Coordination Memorandum to the Field Between the U.S. Department of the Army, U.S. Army Corps of Engineers (Corps) and the U.S. Environmental Protection Agency (EPA) (Sept. 27, 2023).

surface connection to such relatively permanent waters or to traditional navigable waters, the territorial seas, or interstate waters." *See, e.g.*, 88 Fed. Reg. at 3006, 3066. The 2023 Rule preamble also includes extensive sections that provide guidance on how to determine whether certain categories of waters meet the relatively permanent standard. 88 Fed. Reg. at 3084-85 (tributaries); 3095-96 (adjacent wetlands); 3102-03 ("other waters"). In addition, the Agencies explain that their interpretation is consistent with the *Rapanos* plurality's interpretation of "waters of the United States" and quote extensively from Justice Scalia's opinion. 88 Fed. Reg. at 3084. These definitions provide fair notice as to the meaning and implementation of the relatively permanent standard, which courts in the Fifth Circuit have successfully applied since it was first articulated. *See, e.g., United States v. Lucas*, 516 F.3d 316, 326-27 (5th Cir. 2008)*; United States v. Brink*, 795 F. Supp. 2d 565, 576-80 (S.D. Tex. 2011).

*Second*, Plaintiffs argue that the relatively permanent standard, as articulated in the Amended Regulations, contravenes *Sackett* because it does not establish a minimum flow duration. *See* State MSJ at 19-20; Association MSJ at 20-21. Neither *Sackett* nor the *Rapanos* plurality opinion require any such minimum flow duration. Indeed, both recognize that temporary and irregular interruptions in water flow do not sever jurisdiction under the relatively permanent standard. *See Sackett*, 598 U.S. at 678; *Rapanos*, 547 U.S. at 732 n.5 (Scalia, J., plurality). The Agencies also reasonably explain why they rejected a minimum flow requirement. The 2023 Rule preamble notes that "flow duration varies extensively by region" and that "a more flexible approach . . .

14

accounts for specific conditions in each region." 88 Fed. Reg. at 3085. As the Agencies point out, a "bright line cutoff would not reflect hydrological diversity among different regions and alterations in flow characteristics." 88 Fed. Reg. at 3085-86. Neither the 2020 Navigable Waters Protection Act, which Plaintiffs seem to prefer over the Conforming Rule, nor the pre-2015 regulatory regime, to which Plaintiffs are seeking to revert, establish a minimum flow duration. 88 Fed. Reg. at 3086. In sum, both science and past agency practice support the Agencies' decision not to include a minimum flow requirement as part of the relatively permanent standard, and Supreme Court precedent does not require otherwise.

Finally, Plaintiffs argue that the relatively permanent standard is too broad, too vague, "leaves too much uncertainty and gives too much discretion to the Agencies." State MSJ at 19; Association MSJ at 19. As explained above, the 2023 Rule preamble provides extensive guidance on how the relatively permanent standard is applied. While Plaintiffs are correct that the standard involves case-specific factors, that is not a legal defect. *See Cnty. of Maui*, 140 S. Ct. at 1476–77 & discussion *supra* at II; *see also United States v. Lipar*, 665 F. App'x 322, 325 (5th Cir. 2016) (remanding to the district court to conduct a fact-specific analysis of whether certain tracts contain waters of the United States); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 917–18 (5th Cir. 1983) (reviewing EPA's application of case-specific factors to determine the extent of federal jurisdiction over wetlands). Throughout their briefs, Plaintiffs focus almost entirely on edge cases: situations where the "flowing or standing water" is closer to the

15

"short duration in direct response to precipitation" end of the spectrum rather than the "year-round" side. 88 Fed. Reg. at 3084 (describing examples of waters covered or not covered under the relatively permanent standard). However, as *County of Maui* affirmed, standards that do not, in isolation, explain how to deal with edge cases may nonetheless be valid when applied on a case-by-case basis, with sufficient guidance from the courts, administrative agencies, and the statutory objectives. *See* 140 S. Ct. at 1476–77.

### 2.  *The Amended Regulations Limit the Scope of Jurisdiction Over Tributaries, Consistent with the Law.*

For more than 45 years, the Agencies have recognized the need to protect "the many tributary streams that feed into the tidal and commercially navigable waters . . . since the destruction and/or degradation of the physical, chemical, and biological integrity of each of these waters is threatened by the unregulated discharge of dredged or fill material." 42 Fed. Reg. 37121, 37123 (July 19, 1977). The Amended Regulations cover tributaries, but only so long as the tributary (1) flows directly or indirectly to a water identified in paragraphs (a)(1) or (a)(2) *and* (2) meets the relatively permanent test. *See* 88 Fed. Reg. at 61966. Plaintiffs have two issues with the Amended Regulations' definition of a tributary, both of which lack merit.

*First*, Plaintiffs contend that *Sackett* invalidates federal jurisdiction over tributaries that flow indirectly to a traditional water. State MSJ at 15-17. This is incorrect because while *Sackett* does require adjacent wetlands to have a continuous surface connection to a traditional water or a covered tributary or impoundment, it says nothing whatsoever about

16

the connection between a tributary and a traditional water. The Amended Regulations already address the only piece of *Sackett*'s holding that is relevant to tributaries: tributaries are covered by the Clean Water Act only if they meet the relatively permanent test as laid out in the *Rapanos* plurality—no longer will tributaries qualify for federal protection through a significant nexus analysis. Plaintiff's reliance on the Fifth Circuit's decision in *Lewis v. United States* is similarly unavailing. 88 F.4th 1073 (5th Cir. 2023). *Lewis* invalidated a pre-*Sackett* approved jurisdictional determination, which the Corps offered to withdraw following the grant of certiorari in *Sackett*, that found jurisdiction over wetlands on a property under the pre-*Sackett* adjacency and significant nexus tests. Because the definition of an adjacent wetland is not relevant to the definition of a tributary, and because the significant nexus test is no longer in place, the *Lewis* case has no bearing on Plaintiffs' claims here.

*Second*, Plaintiffs express dissatisfaction with the "vagueness" of the Agencies' definition of a tributary. Yet what State Plaintiffs call "murky phrases" are subject to substantial explication in the 2023 Rule preamble, at the exact pages State Plaintiffs cite in their brief. *See* State MSJ at 17 (citing 88 Fed. Reg. at 3084-85). Just because Plaintiffs dislike these definitions does not mean they are not reasonably comprehensible. Association Plaintiffs also assert that the Agencies erred by employing "subjective determinations," such as whether a potential tributary has indications of an "ordinary high water mark." Association MSJ at 24. While a concept like "beauty" might be a subjective determination as applied to water, indications of an "ordinary high water

mark" are decidedly not, particularly where a detailed description of the concept appears in regulatory text itself. 88 Fed. Reg. at 3144.[2] Finally, as with the relatively permanent standard, there is nothing unlawful about the multi-factor and case-specific nature of the Amended Regulations' definition of tributaries. *See Cnty. of Maui*, 140 S. Ct. at 1476–77 & discussion *supra* at II; *see also Brink*, 795 F. Supp. 2d at 576-80 (analyzing expert reports, maps, geological surveys, photographs, and measurements confirming that La Para Creek is a tributary of the Nueces River that satisfies the relatively permanent standard).

In sum, the Amended Regulations' definition of a tributary is comprehensive, reasonable, and consistent with the relevant law.

### 3. The Amended Regulations Impose Limitations on Jurisdictional Wetlands, Consistent with Sackett.

There is no dispute about the importance of protecting wetlands, which perform critical functions such as flood control and filtering pollutants. 88 Fed. Reg. at 3031-32. The Amended Regulations provide that wetlands are jurisdictional if they have a continuous surface connection to a traditionally navigable water, territorial sea, or interstate water, or a continuous surface connection to a covered impoundment or tributary. *See* 88 Fed. Reg. at 61966, 61969. Following *Sackett*'s guidance, the

---

[2] An "[o]rdinary high water mark means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas." 88 Fed. Reg. at 3144.

Conforming Rule modifies the 2023 Rule such that a wetland will not be deemed jurisdictional under the significant nexus standard.

Plaintiffs object to the Amended Regulations' usage of the term "continuous surface connection" because it "does not require surface water to be continuously present between the wetland and the tributary." State MSJ at 18; Association MSJ at 21-22. According to Plaintiffs, this definition contradicts *Sackett*'s allowance of "temporary interruptions in surface connection [that] may sometimes occur because of phenomena like low tides or dry spells." State MSJ at 18 (emphasis removed). But *Sackett* simply confirms what the Amended Regulations specify: a continuous surface connection can be interrupted at times.

Again, Plaintiffs' reliance on the Fifth Circuit's decision in *Lewis* does not help their case. For one thing, *Lewis* simply repeats language on the definition of adjacent wetlands from *Sackett* and from the *Rapanos* plurality, the same language that the Conforming Rule cites as the basis of its amendments to the 2023 Rule. *Compare* 88 F.4th at 1078 *with* 88 Fed. Reg. at 61966. For example, *Lewis* found that the wetlands on the property in question did not have a continuous surface connection to any relevant covered waters and so were not jurisdictional. 88 F.4th at 1078. Furthermore, *Lewis* demonstrates that the determination of whether wetlands are jurisdictional remains a fact-specific inquiry, even under the *Rapanos* plurality's adjacency test, which *Sackett* adopted and affirmed. *See United States v. Lucas*, 516 F.3d 316, 326-27 (5th Cir. 2008) (concluding that evidence presented at trial supported a finding of jurisdictional wetlands

under the *Rapanos* plurality's reasoning). Thus, in *Lewis*, the court struck down a jurisdictional determination where the factual context showed that the agency exceeded the bounds of the Clean Water Act. Here, by contrast, Plaintiffs have not shown that the Amended Regulations' definition of adjacent wetlands is incompatible with *Sackett* on its face, nor have they identified any particular wetland that the Regulations would erroneously cover.

### 4.  *The Amended Regulations Retain Protections for Jurisdictional Impoundments, Consistent with the Law.*

The Conforming Rule makes no alterations to the 2023 Rule's definition of jurisdictional impoundments, which retains the provision from the 1986 regulations covering impoundments of "waters of the United States." 88 Fed. Reg. at 3075.[3] In the preamble to the 2023 Rule, the Agencies provided two principal reasons for this well-established approach. First, damming or impounding "waters of the United States" does not make those waters non-jurisdictional. 88 Fed. Reg. at 3075. Second, impoundments are jurisdictional where they satisfy the criteria for other covered waters (*i.e.*, traditionally navigable waters, tributaries, etc.). 88 Fed. Reg. at 3075.

Plaintiffs fail to identify any legal or scientific flaw in the Amended Regulations' approach to impoundments. Instead, they selectively quote the 2023 Rule preamble in arguing that the Regulations can never include "off-channel" impoundments of federal waters because such features have "no outlet or hydrological connection." State MSJ at

---

[3] Impoundments are created by discrete structures (often human-built) like dams or levees that typically have the effect of raising the water surface elevation, creating or expanding the area of open water, or both. 88 Fed. Reg. at 3075.

15; Association MSJ at 23. But that is a mischaracterization of the 2023 Rule preamble, which requires a "traceable" flowpath at the time of impoundment. 88 Fed. Reg. at 3078.[4] The 2023 Rule preamble refutes Plaintiffs' other misstatements regarding the Amended Regulations' coverage of impoundments, *see* 88 Fed. Reg. at 3076-77 (responding to public comments).

Plaintiffs also appear to argue that an impoundment should never be considered jurisdictional where it severs a jurisdictional connection. State MSJ at 15; Association MSJ at 23-24. But the Agencies considered and rightly rejected that outcome, explaining that "impoundments do not de-federalize a water, and therefore impoundments of 'waters of the United States' remain 'waters of the United States.'" 88 Fed. Reg. at 3076. Otherwise, there would be a perverse incentive to impound jurisdictional waters and escape the Clean Water Act. *Cf. S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 379 n.5 (2006) ("[N]or can we agree that one can denationalize national waters by exerting private control over them.").

Finally, *Sackett* lends no support to Plaintiffs' arguments, as the decision did not address federal jurisdiction over impoundments at all. In addition, *Sackett* itself observed that "a landowner cannot carve out wetlands from federal jurisdiction by illegally constructing a barrier on wetlands otherwise covered by the CWA." *Sackett*, 598 U.S. at 678 n. 16. That reasoning is consistent with the longstanding principles supporting

---

[4] For example, impoundments like "dams do not prevent all water flow," a point that Plaintiffs do not dispute because it is so thoroughly documented in the 2023 Rule preamble and scientific record. State MSJ at 15 (quoting 88 Fed. Reg. at 3076); Technical Support Document for the Final Rule: Definition of "Waters of the United States," Docket ID No. EPA-HQ-OW-2021-0602-2500 ("TSD") at 196-202.

federal jurisdiction over impoundments: a water that otherwise qualifies for federal protection (*e.g.*, a tributary that flows directly or indirectly to a paragraph (a)(1) or (a)(2) water and meets the relatively permanent test) does not fall out of the scope of the Clean Water Act by virtue of being impounded.

In short, nothing in *Sackett* changed the core legal and scientific underpinnings of jurisdictional impoundments and Plaintiffs have not demonstrated otherwise.

### 5. *The Amended Regulations Impose Additional Limitations on Other Waters, Consistent with the Law.*

For more than 45 years, the Agencies' regulations have included a provision to address waters that did not fall within the categories it established because such waters could have effects on water quality and on interstate commerce. 42 Fed. Reg. at 37128. Under the 1986 regulations, "other waters" could be determined to be jurisdictional if the use, degradation, or destruction of the water could affect interstate or foreign commerce. 88 Fed. Reg. at 3099. The 2023 Rule was "substantially narrower," covering only those waters that satisfy the relatively permanent or significant nexus standard. 88 Fed. Reg. at 3097. Taking direction from *Sackett*, the Conforming Rule narrows the definition of "other waters" still further, eliminating the reference to the significant nexus standard but retaining the requirement that these waters must satisfy the relatively permanent standard to be jurisdictional. *See* 88 Fed. Reg. at 61966.

State Plaintiffs once again ignore this limitation, falsely claiming that the Amended Regulations create a "broad catch all." State MSJ at 18. But the Regulations do

the opposite, as evidenced by the 2023 Rule preamble's detailed description of the

numerous ways it *narrows* the pre-2015 regulatory regime that Plaintiffs seek to reinstate.

*See* 88 Fed. Reg. at 3097 (explaining that "[t]he 1986 regulations, for example,

authorized the assertion of jurisdiction over waters from which fish or shellfish are or

could be taken and sold in interstate or foreign commerce"). Other than invalidating

significant nexus as a test for finding jurisdiction over "other waters," the Supreme Court

did not otherwise disturb the Agencies' definition of this category. Plaintiffs have no basis

to seek that remedy here.

### 6.   The Amended Regulations' Exclusions to "waters of the United States" Are Consistent with the Law.

The Conforming Rule affirms the 2023 Rule's codification of eight exclusions to

"waters of the U.S." Among these are the longstanding exclusions for prior converted

cropland and waste treatment systems, with minor modifications. 88 Fed. Reg. at 3103.

The Amended Regulations also include exclusions for certain ditches, artificially irrigated

areas, artificial lakes or ponds, artificial reflecting pools or swimming pools, waterfilled

depressions, and swales and erosional features. *Id*.

Association Plaintiffs claim that the Amended Regulations' ditch exclusion is

"vague" because it requires analysis of the specific circumstances surrounding a given

ditch. Association MSJ at 25. As a result, Association Plaintiffs say, the Amended

Regulations "clearly consider[] many ditches to be tributaries." Association MSJ at 24.

Once again, the fact that certain ditches may require a fact-intensive inquiry to determine

whether they are excluded is not a problem. *See Cnty. of Maui*, 140 S. Ct. at 1476–77 & discussion *supra* at II. In any event, despite expending many briefing and declaration pages on the subject of ditches, Association Plaintiffs fail to point to any particular ditch that would be improperly covered by the Amended Regulations on their face.

### 7. *The Amended Regulations Eliminate Protections for Interstate Wetlands, but Retain Protections for Interstate Waters that Are Not Wetlands, Consistent with the Law.*

The Amended Regulations eliminate categorical protections for interstate wetlands. Specifically, the Conforming Rule removed the phrase "including interstate wetlands" from the interstate waters jurisdiction category. 88 Fed. Reg. at 61966 (noting that the Agencies are "removing 'interstate wetlands' from the 2023 Rule to conform with the decision in *Sackett*."). To explain this regulatory change, the Agencies point to the discussion in *Sackett* regarding the term "waters" in the Clean Water Act excluding wetlands, meaning that wetlands must now meet the *Sackett* test for adjacent wetlands in order to be jurisdictional under the Act. *See id*. In light of *Sackett*, the new elimination of protections for interstate wetlands is an appropriate limiting principle this Court has previously sought for the category of interstate waters. Dkt. No. 60 at 24-25.

Plaintiffs' arguments that this Court should go further and entirely eliminate protections for all interstate waters that are not traditional navigable waters is unsupported by *Sackett*. The question presented and holding in *Sackett* unambiguously apply only to wetlands. *See Sackett*, 598 U.S. at 663, 678. The Agencies' elimination of categorical protections for interstate wetlands is a logical outgrowth of the *Sackett*

Court's new test for wetland jurisdiction. But this holding simply has no bearing on the protection of other interstate waters. Moreover, *Sackett*'s endorsement of the relatively permanent test from *Rapanos* is a limitation on *intrastate* waters, not interstate waters. To the extent the majority opinion references interstate waters in *dicta*, it only does so to 1) note the scope of predecessor statutes to the Clean Water Act, and 2) support the contention that wetlands are not "waters" under the Clean Water Act. *Id*. at 659-661, 673. Nowhere in the opinion does the Supreme Court state or imply that it believes interstate waters should lose protections.

In *Sackett*, the Court provided a detailed history of predecessor statutes to the Clean Water Act like the Rivers and Harbors Act of 1899, which protected "traditional navigable waters," meaning interstate waters that were navigable in fact or susceptible to being used in commerce, and the subsequent Federal Water Pollution Control Act of 1948, which protected all "interstate waters" and which the Court called "tepid." *Id*. at 659-660. *Sackett* acknowledged that when the Clean Water Act was passed in 1972, these earlier references to navigable waters and interstate waters were replaced with the term "waters of the United States, including the territorial seas." *Id*. at 661. The Supreme Court has previously recognized that based on the Act's text and legislative history, this change in terminology was intended to broaden, not narrow, the scope of the Act, and that "in adopting this definition of 'navigable waters,' Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least

some waters that would not be deemed "navigable" under the classical understanding of that term." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985). The Supreme Court in *Sackett* reaffirmed this understanding, noting that they "have acknowledged that the CWA extends to more than traditional navigable waters." *Sackett*, 598 U.S. at 672. In other words, the *Sackett* Court again recognized, and did not repudiate, their long-time understanding that the Act extends to more than traditional navigable waters — interstate waters that are navigable-in-fact or capable of use in commerce.

Moreover, while the 2023 Rule was not formally before the Supreme Court, the *Sackett* Court nonetheless had the text of that rule in its record and specifically recognized that the 2023 Rule protected interstate waters as "waters of the United States." *Id*. at 668. The Court never even suggested it was concerned about this category of protections.

Finally, rather than raising federalism questions as State Plaintiffs aver, State MSJ at 22-23, the protection of interstate waters under the Act actually protects state sovereignty. *See, e.g.*, *Rapanos*, 547 U.S. at 777 ("As for States' 'responsibilities and rights,' § 1251(b), it is noteworthy that 33 States plus the District of Columbia have filed an *amici* brief in this litigation asserting that the Clean Water Act is important to their own water policies . . . [noting] that the Act protects downstream States from out-of-state pollution that they cannot themselves regulate."). Indeed, without protection for interstate waters, downstream states would be forced to resort to uncertain, and potentially

unavailable,[5] common law claims to challenge unfettered pollution streaming across state lines into their waters. Such circumstances are far from unrealistic, as State Plaintiffs' brief illustrates. State Plaintiffs cite and depict many purportedly non-navigable interstate waters that cross into Texas that could be polluted, filled, or impounded by Oklahoma or New Mexico without available recourse for Texas under the Clean Water Act, if non-navigable interstate waters lose the protection State Plaintiffs seek to strip away. State MSJ at 13. Such a loss would undermine Texas' ability to protect its own waters from upstream states' actions.

### 8. *The Amended Regulations Respect the Rights and Responsibilities of States, Consistent with Section 101(b).*

Congress made its purpose crystal clear by stating its objective in the first section of the Clean Water Act: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It also set forth a policy of cooperative federalism to preserve the "primary responsibilities" of states "to prevent, reduce, and eliminate pollution" within state boundaries. *Id.* § 1251(b). The 2023 Rule preamble thus explains how the Agencies "carefully considered" both Section 101(a) and Section 101(b) to strike a balance consistent with the Clean Water Act. 88 Fed. Reg. at 3043-46. The 2023 Rule preamble details how it "respects the role of Tribes and States in section 101(b)" by limiting federal jurisdiction to "those waters that significantly affect

---

[5] *See City of Milwaukee v. Illinois*, 451 U.S. 304, 317-19 (1981) (noting that the Clean Water Act supplanted common law claims regarding water pollution crossing state lines); *Illinois v. City of Milwaukee*, 406 U.S. 91, 102, 104-05 (1972) (noting that "federal, not state, law . . . controls the pollution of interstate or navigable waters" and that "[r]ights in interstate streams, like questions of boundaries, 'have been recognized as presenting federal questions.'" (citation omitted)).

the indisputable federal interest in . . . traditional navigable waters, the territorial seas, and interstate waters." 88 Fed. Reg. at 3043. By contrast, "where protection (or degradation) of waters does not implicate this Federal interest, such waters fall exclusively within Tribal or State regulatory authority should they choose to exercise it." *Id.* at 3043-44. That balanced approach avoids federalism concerns and respects Section 101(b). *Id.* at 3045.

Association Plaintiffs nonetheless contend that the Agencies got it wrong, apparently by failing to elevate Section 101(b) to the exclusion of federal jurisdiction. Association MSJ at 26. But there is no basis for giving Section 101(b) such "prominence." 88 Fed. Reg. at 3044. By its terms, Section 101(b) does not reflect a general policy of deference to state regulation to the exclusion of Federal regulation—an outcome that would "be inconsistent with Congress's enactment of the Clean Water Act because of the failures of a statutory scheme that relied primarily on State enforcement of State water quality standards." *Id.* (citing S. Rep. No. 92–414, 92d Cong., 1st Sess. 7 (1971). To this day, Texas and Idaho have no state-level wetlands regulation program, leaving these important features vulnerable without federal Clean Water Act protections. *See* Economic Analysis for the Final "Revised Definition of Waters of the United States" Rule, Docket ID No. EPA-HQ-OW-2021-0602-2489 ("EA") at 49-51 (Table II-1). Both states also generally disallow regulatory action stricter than that set forth in the Act for the discharge of pollutants. *See* Idaho Code Ann.§ 39-3601; Texas Water Code Ann. § 26.017(5). The Agencies did not therefore improperly "subordinate" Section 101(b) as

Association Plaintiffs claim, Association MSJ at 26; Congress never granted Section 101(b) such "prominence" to begin. 88 Fed. Reg. at 3044. Instead, the Agencies carefully and appropriately considered both Section 101(a) and Section 101(b), striking a balance well within their discretion.

To the extent Association Plaintiffs believe *Sackett* supports their position, they are mistaken. On page 25 of their brief, Association Plaintiffs claim, without citation, that *Sackett* declared the "Agencies' broad interpretation of WOTUS . . . not supported by the clear congressional statement needed to so fundamentally alter the State's traditional authority over land and water use within their boundaries." The "interpretation" to which the Supreme Court refers in that section of the majority opinion, is the *significant nexus standard*, which the Court rejected, and which is no longer part of the definition of "waters of the United States" under the Conforming Rule. *See Sackett*, 598 U.S. at 679-680; 88 Fed. Reg. at 61966. Likewise, Association Plaintiffs say that under *Sackett*, "the States' role in regulating water resources would" be undermined "if the EPA had jurisdiction over anything defined by the presence of water." Association MSJ at 25-26. But as explained in detail above, the Amended Regulations do not assert federal jurisdiction over all geographic features that have water. Rather, the Agencies have established express limits on the scope of waters protected by the Clean Water Act, as informed by the Supreme Court's *Sackett* decision and the *Rapanos* plurality opinion. 88 Fed. Reg. at 3034-42; 88 Fed. Reg. at 61965-66.

29

## B. The Amended Regulations Are a Valid Exercise of Authority Under the Commerce Clause.

Congress's constitutional authority to regulate interstate commerce, U.S. Const., art. I, § 8, extends to navigable waters, interstate waters, and waters that significantly affect those waters. Waters that are themselves navigable are, by definition, channels of commerce. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (Congress may regulate "the channels of interstate commerce"); *PPL Montana, LLC v. Montana*, 565 U.S. 576, 592 (2012) (waters are "navigable in fact" when they are or may be used "as highways for commerce"). Federal authority over interstate waters, without regard to navigability, is equally well-established. *See, e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 (1972) ("Rights in interstate streams, like questions of boundaries, 'have been recognized as presenting federal questions.'").

Plaintiffs appear to argue erroneously that the Amended Regulations in their entirety exceed the Commerce Clause authority under the Clean Water Act because *Sackett* limited federal jurisdiction to traditionally navigable waters. State MSJ at 22. This Court considered and rejected that overly narrow reading of the Clean Water Act in the preliminary injunction order, and the Supreme Court did not reach a different conclusion. Dkt. No. 60 at 24. On the contrary, *Sackett* explicitly "acknowledged that the CWA extends to more than traditional navigable waters." *Sackett*, 598 U.S. at 672. Plaintiffs' preferred reading of the Clean Water Act—limiting federal jurisdiction to only those waters that are traditionally navigable or could be so made—only commanded the votes of two justices, far from a majority position. Thus, Plaintiffs' assertion that the

Agencies have stretched the limits of their Commerce Clause authority lacks grounding in *Sackett* or any other judicial precedent.

### C. The Amended Regulations Do Not Violate the Tenth Amendment.

To the extent State Plaintiffs argue that the Amended Regulations violate the Tenth Amendment because they regulate an area traditionally subject to state regulation, the Supreme Court has resoundingly rejected that theory as "unsound in principle and unworkable in practice." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985). As explained above, the Amended Regulations are within the scope and purpose of the Clean Water Act and the Constitution, as interpreted and directed by the Supreme Court, and are fully supported by the record. The Regulations do not infringe on the purview of the states.

Moreover, the Tenth Amendment reserves only those rights not granted to the federal government, so it has no bearing on valid Commerce Clause legislation. Here, a water protected by the Act can also be regulated by the states and subject to even more stringent protections. That is, the Act's protections are a floor, a minimum standard of protection for a shared resource. *See* 33 U.S.C. § 1370; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 499 (1987) (the Act "specifically allows" states "to impose stricter standards" on pollution sources). It preserves state authority; it does not displace state authority.

31

### D.  The Amended Regulations Do Not Violate the Due Process Clause.

Plaintiffs mistakenly claim that the Amended Regulations are unconstitutionally vague and therefore violate the Due Process Clause of the Constitution by creating uncertainty about whether water bodies will be deemed waters of the United States. State MSJ at 24; Association MSJ at 27.

Due process requires that "a statute may not be 'so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'" *United States v. Abbate*, 970 F.3d 601, 603–04 (5th Cir. 2020). The Constitution, however, does not demand "perfect clarity" or "precise guidance." *United States v. Williams*, 553 U.S. 285, 304 (2008). It requires "[o]nly a reasonable degree of certainty," and even statutes imposing criminal penalties need not "delineate the exact actions" that one "would have to take to avoid liability." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552–53 (5th Cir. 2008). Ultimately, the test for constitutionality in a void-for-vagueness challenge is whether a person of common intelligence has a reasonable opportunity to know what is prohibited and need not guess. *Kolender v. Lawson,* 461 U.S. 352, 357 (1983); *see also United States v. Lucas*, 516 F.3d 316, 328 (5th Cir. 2008) (rejecting vagueness challenge to an application of the Act because "the prevalence of wet property . . . and an area network of creeks and their tributaries leading to the Gulf, some of which connected to wetlands on the property,

32

should have alerted 'men of common intelligence' to the *possibility* that the wetlands were waters of the United States" (emphasis added)).[6]

Characterizing words or phrases as "vague" or "dynamic" does not establish a lack of "fair notice" as to the jurisdictional reach of the Clean Water Act. For one thing, Plaintiffs falsely claim that the Amended Regulations do not define these terms when the Regulations provide substantial guidance on what these terms mean, how they are applied, and their scientific underpinnings.

The 2023 Rule preamble defines "relatively permanent standard" at 88 Fed. Reg. at 3006, which State Plaintiffs ought to know, having cited this definition in their brief in support of their motion for a preliminary injunction. *See* State PI at 18; *see also* 88 Fed. Reg. at 3066. The 2023 Rule preamble also includes extensive sections that provide guidance on how to determine whether certain categories of waters meet the relatively permanent standard. 88 Fed. Reg. at 3084-85 (tributaries), 3095-96 (adjacent wetlands), 3102-03 ("other waters"). The phrase "certain times of year" is defined at 88 Fed. Reg. at 3085. Unsurprisingly, given that it is a key component of the jurisdictional impoundment category, the 2023 Rule preamble defines the term "impoundments" at 88 Fed. Reg. at 3066. The preamble also explains that "[i]mpoundments are distinguishable from natural lakes and ponds because they are created by discrete structures (often human-built) like dams or levees that typically have the effect of raising the water surface elevation, creating or expanding the area of open water, or both." 88 Fed. Reg. at 3075. The

---

[6] Vagueness challenges should also only be entertained if the rule is *vague in all of its applications. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982).

definition of impoundments encompasses both the "natural (like beaver ponds)" and the "artificial (like reservoirs)" *Id.* Again, State Plaintiffs should be well aware of these definitions, having cited the aforementioned pages in their brief. *See* State MSJ at 14 n.9. Further guidance as to how to identify an impoundment, including additional examples of impoundments, appears at 88 Fed. Reg. at 3077-78. The Amended Regulations cover the phrase "continuous surface connection" multiple times, explaining how the term applies to adjacent wetlands in line with the *Rapanos* plurality opinion, *see* 88 Fed. Reg. at 3096, and how it applies to "other waters," *id.* at 3102. Finally, the term "wetlands" is defined in the regulatory text itself. *See* 88 Fed. Reg. at 3143, 3144.[7] This term should be familiar as it remains unchanged from the 1986 regulations. *See* 88 Fed. Reg. at 3067.

While the 2023 Rule preamble does not provide specific definitions for "extended period" and "short duration," these terms have fairly straightforward meanings and are used throughout the 2023 Rule preamble with considerable contextual support. In addition, these words and phrases do not exist in a vacuum. They are objective, science-based terms that are grounded in familiar concepts that long predate the Conforming Rule and the 2023 Rule. Plaintiffs' real complaint thus seems to be that the meaning of these terms is further clarified by case-specific application. Once again, this is not problematic under Supreme Court precedent. *See Cnty. of Maui*, 140 S. Ct. at 1476–77 & discussion *supra* at II. The Amended Regulations thus satisfy due process because they put the

---

[7] "(1) *Wetlands* means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas."

regulated public on reasonable notice that certain types of water bodies—based on scientifically supported, objective, and knowable measures present on the landscape—may be covered by the Act.

### E.  The Amended Regulations Do Not Implicate the Major Questions Doctrine, nor Do They Constitute an Improper Delegation of Legislative Powers.

Association Plaintiffs invoke *West Virginia v. EPA*, 142 S. Ct. 2587 (2022). Association MSJ at 28-29. They claim, as best as can be gleaned from the short paragraph of discussion their brief provides, that Congress did not authorize the Agencies to issue a rule that interprets the statutory term "waters of the United States." But the Supreme Court recognizes, and has endorsed, the Agencies' responsibility to clarify that term through regulation. *See Riverside Bayview*, 474 U.S. at 134 (noting "the breadth of federal regulatory authority contemplated by the Act itself and the inherent difficulties of defining precise bounds to regulable waters"); *see also Rapanos*, 547 U.S. at 758 (Roberts, J., concurring) (noting that the need for the Court's review could have been avoided if the Agencies had issued regulations and that they "enjoyed plenty of room to operate in developing some notion of an outer bound to the reach of their authority").

As the Waterkeeper has explained in detail in its briefing on Plaintiffs' motions for preliminary injunction, *see* Waterkeeper's Br. in Opp. to Motions for PI at 28-30, the Amended Regulations lack any of the indicators suggesting a "transformative" or paradigm-shifting expansion of the Agencies' authority. *West Virginia*, 142 S. Ct. at 2612 (calling EPA's enactment of the Clean Power Plan a fundamental shift from source-based

pollution regulation to generation-shifting). Under the Amended Regulations, the Agencies will continue to exercise jurisdiction over waters that were covered under the existing baseline pre-2015 regulations, authorized by the same portions of the same statute (33 U.S.C. § 1362(7)), using the same tools. Nothing in *Sackett*, which represents the Supreme Court's most recent pronouncement on the Agencies' authority to define the scope of federal Clean Water Act jurisdiction, suggests that "major questions" analysis is applicable. In sum, for some "extraordinary" cases to warrant major questions scrutiny, there must be other, "ordinary" cases subject to the normal course of judicial evaluation. The Amended Regulations represent the ordinary case, and Association Plaintiffs fail to demonstrate otherwise.

For parallel reasons, Association Plaintiffs' brief nondelegation argument fails too. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 473-76 (2001) (noting that the Court has invalidated only two statutes on nondelegation grounds, while endorsing many that contain minimal guidance). The Clean Water Act's text and purpose provide intelligible principles to guide the Agencies (and courts) when interpreting the term "waters of the United States." The Supreme Court has never suggested that the Agencies have limitless authority when doing so; instead, it has consistently said that the phrase contains discernable limits. *See, e.g.*, *Riverside Bayview*, 474 U.S. at 139 (evaluating regulation against "the language, policies, and history of the Clean Water Act"); *see also Rapanos*, 547 U.S. at 753 (Scalia, J., plurality) (describing its analysis as resting only on "the phrase 'waters of the United States'").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for summary judgment, grant the Waterkeeper's motion, and enter final judgment in the Waterkeeper's favor. In the alternative, like Federal Defendants, the Waterkeeper respectfully requests the opportunity to submit supplemental briefing on remedy issues should the Court rule in Plaintiffs' favor on any merits issue.

Respectfully submitted,

EARTHJUSTICE

By: */s/ Jennifer Anne Powis*
Jennifer Anne Powis
Texas State Bar No. 24041716
Southern District No. 605931
845 Texas Ave., Suite 200
Houston, TX 77002
jpowis@earthjustice.org
Tel: 281-694-5157
Fax: 415-217-2040
*Attorney-in-charge*

Stu Gillespie (*pro hac vice*)
633 17th Street, Suite 1600
Denver, CO 80202
sgillespie@earthjustice.org
Tel: 303-996-9616
Fax: 720-550-5757

Adrienne Y. Lee (*pro hac vice*)
1001 G St. NW, Suite 1000
Washington, DC 20001
alee@earthjustice.org
Tel: 202-667-4500
Fax: 202-667-2356

*Counsel for Intervenor-Defendant Bayou City Waterkeeper*

Kristen Schlemmer
Texas State Bar No. 24075029
Southern District No. 2078411
Bayou City Waterkeeper
2010 N. Loop West, Suite 103
Houston, TX 77018
Tel: 512-619-1583
kristen@bayoucitywaterkeeper.org

*Of counsel, Bayou City Waterkeeper*

38

*Privileged & Confidential*
*Attorney Work Product*

## CERTIFICATE OF SERVICE

I certify that on April 16, 2024, I filed the foregoing document using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

*/s/ Danielle Broyles*